**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACL1 INVESTMENTS LTD., ACL2 INVESTMENTS LTD., and LDO (CAYMAN) XVIII LTD., <br><br>         Plaintiffs, <br><br>    v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br>         Defendant. | C.A. No. 21-mc-46 |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR AN ORDER CONDITIONALLY AUTHORIZING
THE ISSUANCE AND SERVICE OF A WRIT OF ATTACHMENT *FIERI FACIAS***

*Of counsel*:

Joshua S. Bolian (*pro hac vice*)
Keane A. Barger (*pro hac vice*)
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, Tennessee 37203
(615) 320-3700
jbolian@rwjplc.com
kbarger@rwjplc.com

Dated: November 22, 2021

ASHBY & GEDDES
Marie M. Degnan (#5602)
500 Delaware Ave., 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
mdegnan@ashbygeddes.com

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

NATURE AND STAGE OF PROCEEDINGS ............................................................... 1

SUMMARY OF ARGUMENT ......................................................................................... 2

BACKGROUND .............................................................................................................. 3

      A.    *Crystallex* Decisions on Relationship of PDVSA to Venezuela Before
            2019 ................................................................................................................. 3

      B.    Relationship of PDVSA to Venezuela in Venezuelan Territory from 2019
            to the Present ................................................................................................. 5

      C.    Relationship of PDVSA to Venezuela Outside Venezuelan Territory from
            2019 to the Present ........................................................................................ 7

      D.    Plaintiffs' Bonds and Judgment .................................................................. 10

JURISDICTION ............................................................................................................. 10

ARGUMENT .................................................................................................................. 10

I.       PDVSA IS VENEZUELA'S ALTER EGO .................................................... 10

      A.    PDVSA Has Been Venezuela's Alter Ego Since 2019 ........................... 11

      B.    Even Identifying Venezuela Solely with the Guaidó Government, PDVSA
            Has Been Venezuela's Alter Ego Since 2019 ......................................... 13

      C.    PDVSA Was Venezuela's Alter Ego at the Pertinent Time—2018 ...................... 14

II.     NO SOVEREIGN IMMUNITY APPLIES ..................................................... 15

III.    ATTACHMENT IS PROPER UNDER CIVIL RULE 69 AND DELAWARE
      LAW ..................................................................................................................... 16

IV.    OFAC REGULATIONS DO NOT BAR RELIEF ........................................... 17

V.     A REASONABLE PERIOD OF TIME HAS ELAPSED SINCE JUDGMENT ............. 18

CONCLUSION ............................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Consumer's Co-op. of Walworth Cty. v. Olsen*,
    419 N.W.2d 211 (Wis. 1988) ........................................................................ 15

*Cont'l Bankers Life Ins. Co. of the S. v. Bank of Alamo*,
    578 S.W.2d 625 (Tenn. 1979) ....................................................................... 15

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    2021 WL 129803 (D. Del. Jan. 14, 2021) ................................................. 4, 14

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    333 F. Supp. 3d 380 (D. Del. 2018) .................................................... 1, 3, 4, 5

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    932 F.3d 126 (3d Cir. 2019) ................................................................. *passim*

*Crystallex Int'l Corp. v. PDV Holding Inc.*,
    2019 WL 6785504 (D. Del. Dec. 12, 2019) .................................................... 3

*Estate of Heiser v. Islamic Republic of Iran*,
    885 F. Supp. 2d 429 (D.D.C. 2012) ............................................................. 17

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) ............................................................................... 10, 17

*Flatow v. Islamic Republic of Iran*,
    308 F.3d 1065 (9th Cir. 2002) ...................................................................... 12

*Groden v. N&D Transp. Co.*,
    866 F.3d 22 (1st Cir. 2017) ..................................................................... 14, 15

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    948 F.3d 457 (1st Cir. 2020) ........................................................................ 18

*In re Krafft-Murphy Co.*,
    82 A.3d 696 (Del. 2013) .............................................................................. 18

*In re Majestic Star Casino, LLC*,
    716 F.3d 736 (3d Cir. 2013) ........................................................................ 18

*In re Stephan*,
    588 F. App'x 143 (3d Cir. 2014) .................................................................. 18

*Jiménez v. Palacios*,
    250 A.3d 814 (Del. Ch. 2019) ......................................................... 5, 7, 9, 13

*LNC Invs., Inc. v. Republic of Nicaragua,*
    115 F. Supp. 2d 358 (S.D.N.Y. 2000) ........................................................ 12

*M. Salimoff & Co. v. Standard Oil Co. of N.Y.,*
    186 N.E. 679 (N.Y. 1933) ........................................................................... 12

*N.J. Retail Merchants Ass'n v. Sidamon-Eristoff,*
    669 F.3d 374 (3d Cir. 2012) ....................................................................... 17

*Naples v. Keystone Bldg. & Dev. Corp.,*
    990 A.2d 326 (Conn. 2010) ........................................................................ 15

*OI European Grp. B.V. v. Bolivarian Republic of Venezuela,*
    419 F. Supp. 3d 51 (D.D.C. 2019) ............................................................. 19

*Oneok, Inc. v. Learjet, Inc.,*
    575 U.S. 373 (2015) .................................................................................... 17

*Pharo Gaia Fund Ltd. v. Bolivarian Republic of Venezuela,*
    No. 18 Civ. 11940, 2021 WL 2168916 (S.D.N.Y. May 27, 2021) ............ 19

*Republic of Argentina v. NML Capital, Ltd.,*
    573 U.S. 134 (2014) .................................................................................... 15

*Rubin v. Islamic Republic of Iran,*
    138 S. Ct. 816 (2018) .................................................................................. 15

*Sikkelee v. Precision Airmotive Corp.,*
    822 F.3d 680 (3d Cir. 2016) ....................................................................... 17

*The Denny,*
    127 F.2d 404 (3d Cir. 1942) ....................................................................... 12

*The Maret,*
    145 F.2d 431 (3d Cir. 1944) ....................................................................... 12

*Transamerica Leasing, Inc. v. La Republica de Venezuela,*
    200 F.3d 843 (D.C. Cir. 2000) ................................................................... 12

*Wilmington Trust Co. v. Barron,*
    470 A.2d 257 (Del. 1983) ........................................................................... 16

**Statutes and Rules**

8 Del. C. § 324(a) ............................................................................................... 16

10 Del. C. § 5031 ................................................................................................ 16

28 U.S.C. § 1604 ................................................................................................. 15

28 U.S.C. § 1605(a)(1)...................................................................................... 15

28 U.S.C. § 1609................................................................................................ 16

28 U.S.C. § 1610(a)........................................................................................... 16

28 U.S.C. § 1610(a)(1)....................................................................................... 16

28 U.S.C. § 1610(c).................................................................................... 3, 18

50 U.S.C. § 1702(a)(1)(B)................................................................................. 18

Fed. R. Civ. P. 69(a)(1) ...................................................................................... 16

**Regulations**

31 C.F.R. § 591.309........................................................................................... 18

31 C.F.R. § 591.310........................................................................................... 18

31 C.F.R. § 591.407..................................................................................... 17, 18

Exec. Order No. 13,850, 83 Fed. Reg. 55,243 (Nov. 1, 2018)......................... 17

**Other Authorities**

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 205............. 12

## NATURE AND STAGE OF PROCEEDINGS

Pending in this Court are multiple post-judgment attachment proceedings involving the Bolivarian Republic of Venezuela ("Venezuela") and its instrumentalities. This is another such proceeding. It is broadly comparable to certain of the others.

Venezuela wholly owns an oil company, Petróleos de Venezuela, S.A. ("PDVSA"). PDVSA owns properties inside and outside Venezuelan territory. Its principal holding in the United States is the large refiner CITGO Petroleum Corp. ("CITGO"). PDVSA wholly owns the Delaware corporation PDV Holding, Inc. ("PDVH"), which wholly owns CITGO Holding, Inc. ("CITGO Holding"), which wholly owns CITGO.

Under President Nicolás Maduro, Venezuela stopped paying many of its debts. Among them was a judgment debt to Crystallex International Corp. Crystallex moved this Court to attach the PDVH shares held by PDVSA, on the ground that PDVSA was Venezuela's alter ego. This Court so held and granted Crystallex's motion. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380 (D. Del. 2018) ("*Crystallex 2018*"). The Third Circuit affirmed. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019) ("*Crystallex CA3*"). Other judgment creditors of Venezuela thereafter filed motions similar to Crystallex's.[1]

In January 2019, two governments—one led by Maduro, the other led by legislator Juan Guaidó—claimed to be the legitimate government of Venezuela. The United States promptly recognized the Guaidó government. Thereafter, the United States changed its Venezuela sanctions in a way that aided the Guaidó government. It provided the Guaidó government with (and excluded the Maduro government from) practical control over Venezuelan property located here, including

---

[1] *E.g.*, *Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*, C.A. No. 19-mc-79 (D. Del.), D.I. 5; *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, C.A. No. 19-mc-290 (D. Del.), D.I. 2; *Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venezuela*, C.A. No. 20-mc-257 (D. Del.), D.I. 3.

the PDVH shares and CITGO. It further prevented attachment of that property absent a license from the Office of Foreign Assets Control of the U.S. Department of Treasury ("OFAC").

Plaintiffs are judgment creditors of Venezuela. They own bonds on which Venezuela defaulted in 2018. They sued Venezuela and ultimately stipulated to a judgment against it. The stipulation prohibited Plaintiffs from seeking to enforce their judgment before October 23, 2021.

That date having passed, Plaintiffs submit the instant motion. Like analogous motions pending in this Court, and limited by OFAC regulations, this motion does not seek immediate attachment of the PDVH shares, as Crystallex obtained. It instead seeks issuance and service of a writ of attachment conditioned on OFAC's authorization. This motion is also like other pending motions in its central assertion that PDVSA is Venezuela's alter ego notwithstanding the United States' recognition of the Guaidó government.

As set forth more fully herein, Plaintiffs respectfully submit that the Court should grant the motion and authorize issuance and service of a writ of attachment conditioned on receipt of evidence that OFAC has either authorized such issuance and service or removed the prohibition and sanctions currently in place that prevent them.

## SUMMARY OF ARGUMENT

1.    PDVSA is Venezuela's alter ego for three independent reasons. First, the Venezuelan state extensively controls PDVSA. Second, even if the Venezuelan state must be identified solely with the Guaidó government, that government extensively controls PDVSA. Third, the time pertinent to the alter-ego determination is not now but 2018, when Venezuela injured Plaintiffs—and, as this Court held in *Crystallex*, PDVSA then was Venezuela's alter ego.

2.    No sovereign immunity applies. In the contract governing Plaintiffs' bonds, Venezuela waived its immunity from this Court's jurisdiction and, separately, from attachment. And the property sought to be attached is used for commercial activity in the United States.

2

3.      Delaware law governs the procedure for attachment. It provides for the issuance of a writ of attachment fieri facias to attach the PDVH shares. Delaware law does not govern the alter-ego analysis, which is not procedural and as to which federal law preempts contrary state law.

4.      OFAC sanctions do not bar the relief Plaintiffs seek, namely, issuance and service of a writ of attachment conditioned on OFAC's authorization. Such relief would not create a property interest for Plaintiffs, as it must for the OFAC regulations to bar relief.

5.      Nearly a year has passed since Plaintiffs obtained their judgment, which courts have held is "a reasonable period of time" within the meaning of 28 U.S.C. § 1610(c).

## BACKGROUND

### A.      *Crystallex* Decisions on Relationship of PDVSA to Venezuela Before 2019

In 2017, a judgment creditor of Venezuela, Crystallex International Corp., moved this Court to attach the shares of PDVH legally held by PDVSA. *Crystallex 2018*, 333 F. Supp. 3d at 385. Although the judgment debtor was Venezuela, not PDVSA, Crystallex argued that Venezuela controlled PDVSA so extensively that PDVSA was Venezuela's alter ego. This Court agreed with Crystallex, making numerous findings of fact. *Id.* at 399-414. The Third Circuit affirmed. *Crystallex CA3*, 932 F.3d 126.

Like Crystallex, Plaintiffs are judgment creditors of Venezuela seeking attachment of the PDVH shares. This Court has advised that parties thus situated "may be able to find support (perhaps strong support) in the record created in [*Crystallex*] and the finding reached (and affirmed) there." *Crystallex Int'l Corp. v. PDV Holding Inc.*, 2019 WL 6785504, at *8 (D. Del. Dec. 12, 2019) (footnote omitted). Even if the facts directly relevant to Plaintiffs' motion differ from those relevant in *Crystallex*, "[h]istorical facts could have an impact, even a substantial or perhaps dispositive impact, on assessing (for example) whether an alter ego relationship exists in

3

the pertinent period." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2021 WL 129803, at \*6 n.4 (D. Del. Jan. 14, 2021) ("*Crystallex 2021*").

Pursuant to this guidance, Plaintiffs here summarize the facts central to *Crystallex*.[2] Additional facts may be gleaned from the record and the courts' decisions in that proceeding.

Venezuela wielded extensive economic control over PDVSA. *Crystallex CA3*, 932 F.3d at 146. For example, Venezuela's bondholder disclosures stated: "[G]iven that we are controlled by the Venezuelan government, we cannot assure you that [it] will not, in the future, impose further material commitments upon us or intervene in our commercial affairs in a manner that will adversely affect our operations, cash flow and financial results." *Id.* at 146. Consistent with these bondholder disclosures, between 2011 and 2016, PDVSA contributed in excess of $119 billion to state-run agriculture, infrastructure, and housing programs, which are matters tending to concern governments but not oil companies. *Id.* at 146-47. Under Venezuela's "Petrocaribe" agreements with its allies, PDVSA sold billions of dollars of oil at discounted prices to enable Venezuela to reap political benefits. *Crystallex 2018*, 333 F. Supp. 3d at 413.

As the Third Circuit held, PDVSA's alter-ego status stemmed in part from "the Venezuela constitution, which endows the State with significant control over PDVSA and the oil industry in the country." *Crystallex CA3*, 932 F.3d at 147. Among other things, Article 303 of the constitution mandates that the "State shall retain all shares in [PDVSA]." *Id.* Article 5 of the Organic Hydrocarbons Law "required" PDVSA to use its revenues "to finance health and education, to create funds for macroeconomic stabilization and to make productive investments, all in favor of the Venezuelan people." *Id.*

---

[2] Documents from the *Crystallex* record that support these facts are attached to the Declaration of Keane A. Barger, filed herewith, as exhibits 41 through 60.

In addition to these economic controls, PDVSA's profits ultimately ran to Venezuela because Venezuela is the lone shareholder of PDVSA. *Id.* at 148. PDVSA also paid extraordinary taxes and royalties to Venezuela for its oil production. *Id.*

Venezuela combined its economic control with management of PDVSA's daily affairs. Venezuela's president appointed PDVSA's president, directors, vice-presidents, and members of its shareholder council. *Id.* PDVSA's president commonly also served as Venezuela's oil minister. *Id.* Venezuela routinely appointed military personnel to serve as officers of PDVSA. *Id.* Venezuela treated PDVSA employees as functionaries of the state by threatening to terminate employees opposed to the governing regime and pressuring them to attend Socialist Party rallies. *Id.*

Venezuela was the real beneficiary of PDVSA's conduct. Venezuela compelled PDVSA to sell oil to China, Russia, and seventeen Caribbean countries at discounted prices to support Venezuela's foreign policy goals. *Crystallex 2018*, 333 F. Supp. 3d at 409. PDVSA paid the administrative fees that Venezuela incurred in arbitrations in which Venezuela—and not PDVSA—was the named defendant. *Crystallex CA3*, 932 F.3d at 149.

## B.    Relationship of PDVSA to Venezuela in Venezuelan Territory from 2019 to the Present

In 2018, when this Court held in *Crystallex* that PDVSA was Venezuela's alter ego, the United States recognized the government of Nicolás Maduro as the government of Venezuela. On January 10, 2019, after a disputed election, Maduro was sworn in for a second term as president. *Jiménez v. Palacios*, 250 A.3d 814, 821 (Del. Ch. 2019). The Venezuelan legislature did not accept Maduro as president and, on January 23, proclaimed its leader Juan Guaidó as interim president. *Id.* The same day, the United States recognized Guaidó's government as the government of Venezuela. Ex. 1.[3] The Maduro government retained de facto power within Venezuelan territory.

---

[3] "Ex. __" refers to exhibits to the Declaration of Keane A. Barger, filed herewith.

The disputed election and its aftermath did not meaningfully change the relationship of the Maduro government to PDVSA. That relationship remains largely as it was when this Court rendered the *Crystallex 2018* decision.

*Venezuela still exercises extensive economic control over PDVSA.* In December 2020, PDVSA struck a deal to sell $260 million of crude oil to a company called Supraquimic C.A., in exchange for food to be distributed to Venezuelan citizens as part of a Food Ministry program. Ex. 2. When Supraquimic failed to deliver as much food as the government expected, Venezuela arrested the company's supplier at PDVSA's headquarters. *Id.*

In a state television broadcast by Maduro on May 31, 2020, Venezuela set the prices at which PDVSA sells gasoline to domestic consumers and announced new limits on who would be allowed to purchase PDVSA's gasoline. Ex. 3. To sustain its political alliance with Cuba, in 2020, Venezuela directed PDVSA to donate diesel to Cuba without consideration. Ex. 5.

*Venezuela still uses PDVSA property as its own.* Venezuelan officials routinely use PDVSA aircraft to conduct government business. Ex. 7 (minister of foreign affairs traveling abroad using PDVSA plane); Ex. 9 (government officials traveling to Trinidad and Tobago on PDVSA plane); Ex. 10 (oil minister using PDVSA plane to attend OPEC meeting in the United Arab Emirates).

*Venezuela continues to meddle in and control the day-to-day affairs of PDVSA.* Maduro continues to appoint PDVSA's officers and directors from the ranks of government officials. Ex. 11 (Maduro appointed Asdrúbal Chávez, former minister of petroleum and mining, as president of PDVSA); *see also* Ex. 12 (appointing former economy vice president as chairman of presidential commission charged with restructuring the oil industry, including PDVSA).

*Venezuela still exerts direct control over PDVSA employees.* In February 2020, Maduro urged PDVSA employees to criticize Guaidó and to provide to the Maduro government the names

and photographs of any Guaidó supporters in PDVSA's ranks. Ex. 13. On the other side of the coin, in May 2020, Venezuela arrested a PDVSA employee for criticizing Maduro. Ex. 15.

*Venezuela controls where PDVSA maintains its offices.* In March 2019, Venezuela's vice president announced that PDVSA's Lisbon office was ordered to relocate to Moscow in an attempt to avoid U.S. sanctions. Ex. 16. The vice president made the announcement to move PDVSA's office during a joint news conference with Russia's foreign minister. *Id.*

*Venezuela remains the true beneficiary of PDVSA's conduct.* Venezuela uses the social media and marketing platforms of PDVSA to drive support for state initiatives, political actors, and policies. Ex. 17 (tweeting support for government's Anti-Blockade Law); Ex. 19 (tweeting support for expansion of Petrocaribe agreements); Ex. 21 (retweeting Ministry of Petroleum's fuel distribution schedule as applied to PDVSA). Venezuela's policy of forcing PDVSA to sell oil for food serves political welfare objectives, at the expense of business objectives. *See* Ex. 2. Likewise, Venezuela's policy of compelling PDVSA to donate oil to foreign allies serves the foreign policy objectives of Venezuela rather than business objectives. *See* Ex. 6.

### C.    Relationship of PDVSA to Venezuela Outside Venezuelan Territory from 2019 to the Present

As noted above, in January 2019, the United States recognized the Guaidó government as the government of Venezuela. To support the Guaidó government, the United States crafted and implemented sanctions in a way that provided the Guaidó government with (and excluding the Maduro government from) practical control over Venezuelan property located here. *Jiménez*, 250 A.3d at 823-24. That property includes PDVH, CITGO Holding, and CITGO.

In February 2019, Guaidó appointed an ad hoc managing board of PDVSA. *Id.* at 825. That board, in turn, appointed new directors for PDVH, CITGO Holding, and CITGO. *Id.*

The Guaidó government wields the power of the Venezuelan state within the United States and other nations that recognize the Guaidó government. The Guaidó government has used this power to maintain extensive control over PDVSA outside Venezuelan territory.

*Venezuela still exercises extensive economic control over PDVSA*. The Venezuelan constitution remains unchanged with respect to the state's control over PDVSA and the oil industry. *See Crystallex CA3*, 932 F.3d at 147 (discussing legal obligations imposed by Venezuela constitution). In April 2019, the Guaidó-led legislature of Venezuela passed an "accord" authorizing Guaidó to expand by special decree the powers of his hand-picked ad hoc board of PDVSA and to suspend the rights otherwise vested in the shareholders' meeting, board of directors, and PDVSA president. Ex. 23. The legislature must approve any PDVSA contract with a foreign national, including even ordinary transactions such as payment of legal fees. Ex. 25 art. 36; *see also* Ex. 26 (legislature declaring null unauthorized contracts); Ex. 27 at 29-30 (PDVSA arguing in U.S. court that debts to bondholders were invalid as they were not approved by legislature). Indeed, the Guaidó government has refused calls from within its own ranks to have PDVSA's assets managed by an independent trust. Ex. 28.

*Venezuela still uses PDVSA property as its own*. Because the Guaidó government lacks control over resources and persons inside Venezuelan territory, it has looked to PDVSA to fund its government activities. In February 2019, the Guaidó government gained direct access to PDVSA's bank accounts inside the United States. Ex. 29.

With respect to debt negotiations, the Guaidó government has made no meaningful distinction between the assets and liabilities of Venezuela and those of PDVSA. In its "Guidelines for the Renegotiation of the Chávez/Maduro Era Legacy Public External Debt," the Guaidó

government's policy is to give "[e]qual [t]reatment" to all claims, no matter "the identity of the public sector obligor (the Republic, PDVSA or another public sector entity)." Ex. 30.

*Venezuela continues to control the day-to-day affairs of PDVSA*. The chairman of the PDVSA ad hoc board appointed by Guaidó reports directly to the Guaidó-led legislature of Venezuela. Ex. 31; *see also* Exs. 32, 33, & 34 (Guaidó government website taking credit for protection of PDVSA assets in the United States). Like the Maduro government, the Guaidó government appoints the directors of PDVSA. *Jiménez*, 250 A.3d at 825. Those directors (indirectly) appoint the directors of CITGO—leading to CITGO's board being "largely composed of members of Venezuela's opposition parties" (aligned with Guaidó) and "the politically connected sons of former PDVSA executives." Ex. 35.

*Venezuela remains the true beneficiary of PDVSA's conduct*. When Guaidó lobbied the U.S. Department of the Treasury to prevent holders of PDVSA's bonds from seizing control of Citgo Holding, his government "warned that losing Citgo would be a political catastrophe" for him. Ex. 36. Venezuela's U.S. ambassador, Special Prosecutor's office, and legislature, and PDVSA's ad hoc managing board, have sought U.S. legal protection from creditors "under the guidelines of President Guaidó." Ex. 33. The primary aim of the Guaidó government appears to be using PDVSA to prop up its own political power and legitimacy.

The Guaidó government uses PDVSA assets to directly benefit the people of Venezuela. PDVSA's ad hoc managing board has announced that, "since the arrival of the [Guaidó] administration," the Simón Bolívar Foundation (a charitable foundation of CITGO) has supported social welfare projects for the benefit of "Venezuelans inside and outside Venezuela." Ex. 31.

D.      **Plaintiffs' Bonds and Judgment**

Plaintiffs are (and at all relevant times have been) beneficial owners of bonds issued by Venezuela. In January 2018, Venezuela ceased paying principal and interest on the bonds. In December 2018, the bonds were accelerated, making their full principal payable immediately.

In September 2019, Plaintiffs ACL1 and ACL2 (among others) sued Venezuela for breach of contract. The action was styled *ACL1 Investments Ltd. v. Bolivarian Republic of Venezuela*, No. 19-cv-9014 (S.D.N.Y.). In October 2020, the complaint was amended to include Plaintiff LDO.

In December 2020, Venezuela stipulated to entry of judgment against it in the amount of $118,186,251.24. In return, Plaintiffs stipulated that they would not seek to enforce their judgment before October 23, 2021 (with an exception not applicable here). The court thereupon entered the judgment in the form to which Plaintiffs and Venezuela had agreed. Ex. 37. In February 2021, Plaintiffs registered their judgment in this District pursuant to 28 U.S.C. § 1963. D.I. 1. Venezuela has neither paid Plaintiffs anything nor sought to satisfy their judgment in some other way.

## JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1330(a).

## ARGUMENT

I.      **PDVSA IS VENEZUELA'S ALTER EGO**

Instrumentalities owned by foreign states are presumed to be legally independent of their owners. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 628 (1983) ("*Bancec*"). That presumption is overcome—that is, the instrumentality is found to be the state's alter ego—where the instrumentality is "extensively controlled by its owner." *Id.* at 629. Although the extensive-control inquiry has no "mechanical formula," *id.* at 633, courts in this Circuit use five factors as guideposts: "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials

manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." *Crystallex CA3*, 932 F.3d at 141.

Under this standard, PDVSA is Venezuela's alter ego for three independent reasons. First, the Venezuelan state extensively controls PDVSA. Second, even if the Venezuelan state must be identified solely with the Guaidó government, that government extensively controls PDVSA. Third, the time pertinent to the alter-ego determination is not now but 2018, when Venezuela injured Plaintiffs—and, as this Court held in *Crystallex*, PDVSA then was Venezuela's alter ego.

### A.     PDVSA Has Been Venezuela's Alter Ego Since 2019

Venezuela is one foreign state with two governments claiming legitimacy. Each government has appointed its own board of PDVSA. But that does mean that there are two Venezuelas, or two PDVSAs. There is only one Venezuela entity and one PDVSA entity. And the question is "whether to treat PDVSA as Venezuela's alter ego." *Crystallex CA3*, 932 F.3d at 136.

The answer to the alter-ego question depends largely on events in Venezuelan territory. Most of the foreign state of Venezuela, and most of the corporation PDVSA, are located there.

In Venezuelan territory, PDVSA is Venezuela's alter ego. Venezuela tells PDVSA to whom it can (or must) provide oil, and at what price, for political ends. *Supra* p. 6. Venezuela uses PDVSA oil to procure citizens' food. *Id.* Venezuela appoints military officials and political partisans to run PDVSA. *Supra* pp. 6-7. Venezuela uses PDVSA's media platforms to advance political ends. *Supra* p. 7. *See generally supra* pp. 6-7.

In related litigation, Venezuela and PDVSA hardly dispute that PDVSA is Venezuela's alter ego in Venezuelan territory. Instead, they argue that, because the United States has recognized the Guaidó government, the Court may not consider actions of the Maduro government that retains

11

power in Venezuelan territory. *See OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, C.A. No. 19-mc-290 (D. Del.), D.I. 65, 69.

Venezuela and PDVSA are incorrect because "acts of unrecognized governments" should be considered insofar as they "deal[] solely with private, local and domestic matters." RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 205 note 3. Even if a foreign government "ha[s] not been recognized by our government," courts "must treat [that government's] acts within its own territory as valid and binding upon its nationals domiciled therein." *The Denny*, 127 F.2d 404, 410 (3d Cir. 1942); *accord, e.g.*, *M. Salimoff & Co. v. Standard Oil Co. of N.Y.*, 186 N.E. 679, 682 (N.Y. 1933) (unrecognized "government cannot be ignored by the courts of this state, so far as the validity of its acts in [its territory] is concerned"). Accordingly, this Court should consider the Maduro government's control over PDVSA in Venezuelan territory.

Venezuela and PDVSA rest their contrary argument on inapposite cases about unrecognized governments' *extraterritorial* affairs. For example, in *The Maret*, an unrecognized government "purport[ed] to change the ownership of a chattel many hundreds of miles away from its borders." 145 F.2d 431, 445 (3d Cir. 1944) (Goodrich, J., concurring). That situation, the court recognized, was "different in essential respects from" *The Denny*. *Id.* at 439 (panel op.).

Nor does it aid Venezuela and PDVSA that the property Plaintiffs seek to attach (the PDVH shares) is located here, outside Venezuelan territory. Many, perhaps most, cases applying *Bancec* concern assets located here. Yet their alter-ego analyses consider facts arising in the foreign state's territory. *E.g.*, *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1071-73 (9th Cir. 2002); *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 850-53 (D.C. Cir. 2000); *LNC Invs., Inc. v. Republic of Nicaragua*, 115 F. Supp. 2d 358, 363-66 (S.D.N.Y. 2000).

**B.     Even Identifying Venezuela Solely with the Guaidó Government, PDVSA Has Been Venezuela's Alter Ego Since 2019**

Even if this Court does not consider the actions of the Maduro government and looks solely to the actions of the Guaidó government, PDVSA is still Venezuela's alter ego.

The Guaidó government exercises extensive economic control over PDVSA. *See Crystallex CA3*, 932 F.3d at 146-47 (first *Bancec* factor); Ex. 23 (accord authorizing Guaidó to expand and suspend powers vested in shareholders' meeting, board of directors, and PDVSA president); Exs. 25, 26, & 31 (legislature asserting authority to require preapproval of any PDVSA contract with a foreign national); Ex. 30 (treating debts of PDVSA and Venezuela as functionally equivalent in official debt renegotiation guidelines). Rather than heeding calls to allow PDVSA to run its business free from government interference, Ex. 28, the Guaidó government has asserted significant control.

PDVSA's profits outside the United States go to the Guaidó government. *See Crystallex CA3*, 932 F.3d at 148 (second *Bancec* factor). "As PDVSA's lone shareholder, all profit ultimately runs to the Venezuelan government." *Id.*; *see also* Ex. 29 (Guaidó government directly accessing PDVSA's United States bank accounts).

The Guaidó government exercises direct and extensive control over the day-to-day affairs of PDVSA. *Crystallex CA3*, 932 F.3d at 148 (third *Bancec* factor); *see* Ex. 31 (PDVSA chairman reporting directly to Guaidó-led legislature); Exs. 32, 33, & 34 (Guaidó government taking credit for protecting PDVSA's United States assets); *Jiménez*, 250 A.3d at 825 (Guaidó appointing directors of PDVSA). Like Maduro, the Guaidó government has installed politically connected allies to run PDVSA and its subsidiaries. Ex. 35.

The Guaidó government, not PDVSA, is the real beneficiary of PDVSA's conduct. *Crystallex CA3*, 932 F.3d at 148-49 (fourth *Bancec* factor); *see* Ex. 31 (Guaidó government using

13

PDVSA-connected charitable foundation to fund social welfare programs for Venezuelans); Exs. 36 & 33 (Guaidó government publicly lobbying United States for PDVSA legal protections to avoid "political catastrophe" for Guaidó).

Finally, adherence to separate identities would allow Venezuela to obtain the benefits of U.S. courts while avoiding its obligations. *See Crystallex CA3*, 932 F.3d at 149 (fifth *Bancec* factor). Plaintiffs' bonds are subject to U.S. law and the jurisdiction of U.S. courts, Ex. 38 § 14(a), and that legal framework is the "backstop that gives substantial assurance to investors," *Crystallex CA3*, 932 F.3d at 149. Any outcome where Plaintiffs are not paid means that Venezuela has avoided its obligations. *See id.*

### C.      PDVSA Was Venezuela's Alter Ego at the Pertinent Time—2018

PDVSA is Venezuela's alter ego for present purposes *even if* recognition of the Guaidó government bars consideration of the Maduro government's actions and *even if* the Guaidó government lacks extensive control. That is because Venezuela injured Plaintiffs in 2018, before the Guaidó government's recognition. And the time of injury governs the alter-ego analysis. (Plaintiffs recognize that this Court has held otherwise. *Crystallex 2021*, 2021 WL 129803, at *6. Plaintiffs respectfully submit this alternative argument if only to preserve it for further review.)

Courts make the alter-ego determination as of the time of the plaintiff's injury. The First Circuit, for example, recently so held under federal law. *Groden v. N&D Transp. Co.*, 866 F.3d 22, 30 (1st Cir. 2017). The plaintiff won a judgment against an entity that did not pay. *Id.* at 24. Post-judgment, the plaintiff urged that a different entity was the judgment debtor's alter ego. *Id.* The court allowed the plaintiff to proceed against the second entity, because it was the judgment

debtor's "alter ego when [its] liability arose" and thus "the same company" bearing "the same obligation." *Id.* at 30. This holding accords with the alter-ego standard in numerous jurisdictions.[4]

Applied here, the alter-ego determination should be made as of 2018. That year, Venezuela ceased making payments on Plaintiffs' bonds, and Venezuela's obligation to pay the full principal was accelerated. Those events comprised the injury that Plaintiffs' judgment serves to redress.

As a result, the alter-ego analysis in this case should hardly differ from that in *Crystallex*, decided by this Court in 2018. The Court's determination that PDVSA was Venezuela's alter ego at that time was supported so well that Venezuela "d[id] not substantially contest" it on appeal. *Crystallex CA3*, 932 F.3d at 133. The Court should therefore make the same determination here.

## II.    NO SOVEREIGN IMMUNITY APPLIES

Foreign sovereign immunity is governed exclusively by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-11. *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 141-42 (2014). That Act provides for two kinds of immunity: immunity from jurisdiction and immunity of property. *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822 (2018). Neither is present here.

<u>No immunity from jurisdiction</u>. "[A] foreign state," such as Venezuela, is "immune from the jurisdiction of" federal courts "except as provided in [28 U.S.C.] sections 1605 to 1607." 28 U.S.C. § 1604. One of those exceptions applies when "the foreign state has waived its immunity." *Id.* § 1605(a)(1). That exception covers this case. Plaintiffs' bonds are governed by a Fiscal Agency Agreement. In that Agreement, Venezuela "irrevocably waive[d]" "any immunity from suit [and] from the jurisdiction of" this Court, whether this post-judgment proceeding is viewed as a

---

[4] *E.g.*, *Naples v. Keystone Bldg. & Dev. Corp.*, 990 A.2d 326, 339 (Conn. 2010) (requiring "complete domination . . . in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind" (quotation marks omitted)); *Consumer's Co-op. of Walworth Cty. v. Olsen*, 419 N.W.2d 211, 217-18 (Wis. 1988) (identical); *Cont'l Bankers Life Ins. Co. of the S. v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979) (nearly identical).

continuation of the judgment action or as a distinct enforcement action. Ex. 38 § 14(d). Because PDVSA is Venezuela's alter ego, *supra* § I, PDVSA's immunity vel non follows from Venezuela's. *Crystallex CA3*, 932 F.3d at 138-39.

No immunity of property. Independent of jurisdiction, "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in [28 U.S.C.] sections 1610 and 1611." 28 U.S.C. § 1609. One of those exceptions applies when the property (i) is "used for a commercial activity in the United States" and (ii) "the foreign state has waived its immunity from attachment in aid of execution or from execution." *Id.* § 1610(a), (a)(1). That exception covers this case. First, PDVSA uses the property at issue (the PDVH shares) for commercial activities such as appointing PDVH's directors. *See Crystallex CA3*, 932 F.3d at 151. And second, Venezuela waived its immunity from property. Specifically, in the Fiscal Agency Agreement, it "irrevocably waive[d]" "any immunity . . . from attachment in aid of execution of judgment" of "any of its revenues, assets or properties." Ex. 38 § 14(d).

## III.   ATTACHMENT IS PROPER UNDER CIVIL RULE 69 AND DELAWARE LAW

A federal money judgment "is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(1). Under Delaware law, "[t]he plaintiff in any judgment . . . may cause an attachment . . . to be issued thereon, containing an order for the summoning of garnishees, to be proceeded upon and returned as in cases of foreign attachment." 10 Del. C. § 5031. Among the property that may be attached are shares of a Delaware corporation. 8 Del. C. § 324(a). A writ of attachment fieri facias serves "to execute upon the defendant's property which is not in his legal possession, but in that of another." *Wilmington Trust Co. v. Barron*, 470 A.2d 257, 262 (Del. 1983).

Rule 69's incorporation of state law does not make Delaware alter-ego law applicable here. The rule incorporates only state law on "procedure"; the alter-ego determination is not procedural. In any event, *Bancec* governs not only for jurisdictional purposes but also for attachment purposes because it preempts contrary state law. "[M]atters bearing on the nation's foreign relations should not be left to divergent and perhaps parochial state interpretations. When it enacted the FSIA, Congress expressly acknowledged the importance of developing a uniform body of law." *Bancec*, 462 U.S. at 622 n.11 (quotation marks omitted). Thus, *Bancec* "leaves no room for state regulation" of foreign-sovereign alter-ego determinations. *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016) (quotation marks omitted); *see Estate of Heiser v. Islamic Republic of Iran*, 885 F. Supp. 2d 429, 444-45 (D.D.C. 2012) (holding that statute analogous to *Bancec* field-preempts state law otherwise applicable under Rule 69). At the least, state law different from *Bancec* would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law and so is preempted. *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quotation marks omitted). That *Bancec* is a case, not a statute, is irrelevant. *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 392 (3d Cir. 2012).

## IV. OFAC REGULATIONS DO NOT BAR RELIEF

OFAC regulations presently bar the issuance and service of a writ of attachment. The PDVH shares that Plaintiffs seek to attach are "blocked." *See* Exec. Order No. 13,850, 83 Fed. Reg. 55,243 (Nov. 1, 2018). And attachment of blocked property is prohibited (absent an OFAC license, which Plaintiffs have sought but not yet obtained). 31 C.F.R. § 591.407.

Plaintiffs therefore seek an order authorizing issuance and service of the writ *conditioned on* "this Court's receipt of evidence that [OFAC] has either authorized such issuance and service or removed the prohibition and sanctions currently in place that prevent" them.

PDVSA has argued that even this conditional relief is barred by OFAC regulations. "[J]udicial process purporting to transfer" blocked property is barred, 31 C.F.R. § 591.407; "transfer" includes any act "to create . . . any . . . interest with respect to any property," *id.* § 591.310; and property includes any interest "present, future, or contingent," *id.* § 591.309. And, says PDVSA, Plaintiffs seek creation of a contingent property interest. Therefore, the argument goes, the relief Plaintiffs seek is barred.

PDVSA is wrong because the relief Plaintiffs seek is not the creation of a contingent property interest. The regulation covers not all contingent rights but only contingent "property . . . interest[s]." 31 C.F.R. § 591.309. (It could hardly be otherwise. The statute allows OFAC to prohibit only transfer of "property." 50 U.S.C. § 1702(a)(1)(B).) And what Plaintiffs seek— authorization to issue and serve a writ *when OFAC itself so allows*—is in no sense a property interest. That is because a right whose existence depends entirely on the exercise of governmental discretion is "merely an expectancy and not a property right." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d 457, 468 (1st Cir. 2020) (quotation marks omitted); *accord, e.g.*, *In re Majestic Star Casino, LLC*, 716 F.3d 736, 757 (3d Cir. 2013) ("[A] tax classification over which the debtor has no control is not a 'legal or equitable interest[] of the debtor in property.'"). By contrast, a right contingent on an event over which the possessor has some control can be property. *E.g.*, *In re Stephan*, 588 F. App'x 143, 143 (3d Cir. 2014) (pre-foreclosure mortgage interest is property); *In re Krafft-Murphy Co.*, 82 A.3d 696, 704 (Del. 2013) (unexhausted insurance policies are property).

## V.    A REASONABLE PERIOD OF TIME HAS ELAPSED SINCE JUDGMENT

"No attachment or execution" under the Foreign Sovereign Immunities Act "shall be permitted until the court has . . . determined that a reasonable period of time has elapsed following the entry of judgment." 28 U.S.C. § 1610(c). The Court should so determine here.

18

Venezuela has defaulted on substantially all its U.S.-law debts and declared its intent not to pay until some unknown time. In this context, courts have determined that periods well short of a year are "reasonable" under section 1610(c). *E.g.*, *Pharo Gaia Fund Ltd. v. Bolivarian Republic of Venezuela*, No. 18 Civ. 11940, 2021 WL 2168916, at *1 (S.D.N.Y. May 27, 2021) (seven months, noting that Venezuela "has not provided a timeline for" satisfying the judgment); *OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, 419 F. Supp. 3d 51, 54-55 (D.D.C. 2019) (five months, noting that Venezuela "has not pointed the Court to any mechanism . . . through which it will satisfy the judgment"). Nearly a year has elapsed since entry of Plaintiffs' judgment.

The period of time is particularly reasonable here because it was agreed upon by Venezuela itself. Venezuela stipulated to entry of Plaintiffs' judgment so long as Plaintiffs did not seek to enforce the judgment before October 23, 2021. That Venezuela-negotiated period is over. It is time for execution.

## **CONCLUSION**

For the foregoing reasons, the motion should be granted.

Dated: November 22, 2021                    Respectfully submitted,

*Of counsel*:                                ASHBY & GEDDES

Joshua S. Bolian (*pro hac vice*)            */s/ Marie M. Degnan*
Keane A. Barger (*pro hac vice*)             _____
Riley Warnock & Jacobson, PLC                Marie M. Degnan (#5602)
1906 West End Avenue                         500 Delaware Ave., 8th Floor
Nashville, Tennessee 37203                   P.O. Box 1150
(615) 320-3700                               Wilmington, DE  19899
jbolian@rwjplc.com                           (302) 654-1888
kbarger@rwjplc.com                           mdegnan@ashbygeddes.com

                                             *Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 22nd day of November, 2021, the attached **Memorandum of Law in Support of Plaintiffs' Motion for an Order Conditionally Authorizing the Issuance and Service of a Writ of Attachment** *Fieri Facias* was served upon the below-named counsel at the address and in the manner indicated:

A. Thompson Bayliss, Esq.                                        BY ELECTRONIC MAIL
Stephen C. Childs, Esq.
Abrams & Bayliss
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
Telephone: 302-778-1000
Facsimile: 302-261-0292
bayliss@abramsbayliss.com
childs@abramsbayliss.com

Donald B. Verrilli, Jr., Esq.                                    BY ELECTRONIC MAIL
Elaine J. Goldenberg, Esq.
Ginger D. Anders, Esq.
Brendan B. Gants, Esq.
Jacobus P. van der Ven, Esq.
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com
Brendan.Gants@mto.com
Jacobus.VanderVen@mto.com

George M. Garvey, Esq.                                           BY ELECTRONIC MAIL
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com

*[continued on next page]*

Sergio J. Galvis, Esq.                                    <u>BY ELECTRONIC MAIL</u>
Joseph E. Neuhaus, Esq.
James L. Bromley, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Telephone: 212-558-4000
Facsimile: 212-558-3588
galviss@sullcrom.com
neuhausj@sullcrom.com
bromleyj@sullcrom.com

Samuel T. Hirzel, II, Esq.                                <u>BY ELECTRONIC MAIL</u>
Jamie L. Brown, Esq.
Heyman Enerio Gattuso & Hirzel LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
SHirzel@hegh.law
JBrown@hegh.law

Joseph D. Pizzurro, Esq.                                  <u>BY ELECTRONIC MAIL</u>
Julia B. Mosse, Esq.
Kevin A. Meehan, Esq.
Juan O. Perla, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

*[continued on next page]*

Nathan P. Eimer, Esq.                                 BY ELECTRONIC MAIL
Lisa S. Meyer, Esq.
Daniel D. Birk, Esq.
Gregory M. Schweizer, Esq.
Eimer Stahl LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com
LMeyer@eimerstahl.com
DBirk@eimerstahl.com
GSchweizer@eimerstahl.com


Kenneth J. Nachbar, Esq.                              BY ELECTRONIC MAIL
Alexandra M. Cumings, Esq.
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
KNachbar@mnat.com
ACumings@mnat.com


Michael J. Gottlieb, Esq.                             BY ELECTRONIC MAIL
David J. L. Mortlock, Esq.
Samuel G. Hall, Esq.
Willkie Farr & Gallagher LLP
1875 K Street, NW
Washington, DC 20006
Tel.: (202) 303-1000
mgottlieb@willkie.com
dmortlock@willkie.com
shall@willkie.com


                                    /s/ Marie M. Degnan
                                    Marie M. Degnan (#5602)