**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACL1 INVESTMENTS LTD., ACL2 INVESTMENTS LTD., and LDO (CAYMAN) XVIII LTD., <br><br> Plaintiffs, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | C.A. No. 21-mc-46 |

**EXHIBITS 1-44 TO DECLARATION OF KEANE A. BARGER IN SUPPORT OF
PLAINTIFFS' MOTION FOR AN ORDER CONDITIONALLY AUTHORIZING
THE ISSUANCE AND SERVICE OF A WRIT OF ATTACHMENT *FIERI FACIAS***
(Volume I of IV)

*Of counsel*:

Joshua S. Bolian (*pro hac vice*)
Keane A. Barger (*pro hac vice*)
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, Tennessee 37203
(615) 320-3700
jbolian@rwjplc.com
kbarger@rwjplc.com

ASHBY & GEDDES
Marie M. Degnan (#5602)
500 Delaware Ave., 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
mdegnan@ashbygeddes.com

*Attorneys for Plaintiffs*

Dated: November 22, 2021

# EXHIBIT 1

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.



**STATEMENTS & RELEASES**

# Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela

— **FOREIGN POLICY**

Issued on: **January 23, 2019**

★ ★ ★

Today, I am officially recognizing the President of the Venezuelan National Assembly, Juan Guaido, as the Interim President of Venezuela.  In its role as the only legitimate branch of government duly elected by the Venezuelan people, the National Assembly invoked the country's constitution to declare Nicolas Maduro illegitimate, and the office of the presidency therefore vacant.  The people of Venezuela have courageously spoken out against Maduro and his regime and demanded freedom and the rule of law.

I will continue to use the full weight of United States economic and diplomatic power to press for the restoration of Venezuelan democracy.  We encourage other Western Hemisphere governments to recognize National Assembly President Guaido as the Interim President of Venezuela, and we will work constructively with them in support of his efforts to restore constitutional legitimacy.  We continue to hold the illegitimate Maduro regime directly responsible for any threats it may pose to the safety of the Venezuelan people.  As Interim President Guaido noted yesterday: "Violence is the usurper's weapon; we only have one clear action: to remain united and firm for a democratic and free Venezuela."

 The White House

  

President Donald J. Trump

Vice President Mike Pence

First Lady Melania Trump

Mrs. Karen Pence

The Cabinet

Administration Accomplishments

News

Remarks

Articles

Presidential Actions

Briefings & Statements

About The White House

Economy & Jobs

Budget & Spending

Education

Immigration

National Security & Defense

Healthcare

Council of Economic Advisers

Council of Environmental Quality

National Security Council

Office of Management and Budget

Office of National Drug Control Policy

Office of Science and Technology Policy

# EXHIBIT 2



 

August 24, 2021 8:56 AM CDT Last Updated 3 months ago

**Americas**

# EXCLUSIVE Venezuela swapped PDVSA oil for food, then punished the dealmakers

**By Luc Cohen and Marianna Parraga**

7 minute read

    

1/3     Venezuela's President Nicolas Maduro along with Venezuela's Defense
Minister Vladimir Padrino Lopez, delivers a speech during his visit to a
packing center of the CLAP (Local Committees of Supply and Production)...

Read More

CARACAS, Aug 24 (Reuters) - With U.S. sanctions spooking key oil buyers and depriving its government of cash, Venezuela last year inked a deal with a little-known local company to swap crude for food, Reuters has learned.

That agreement saw state oil company PDVSA, beginning in December 2020, deliver more than 6 million barrels of crude worth nearly $260 million to a company named Supraquimic C.A., which was to supply food for a government program. But the arrangement collapsed when PDVSA accused two executives linked to Supraquimic with embezzling the proceeds, according to criminal charges filed by Venezuelan prosecutors in late March.

This account of the deal and its demise is based on dozens of pages of internal PDVSA documents viewed by Reuters, court filings by prosecutors, and interviews with three people familiar with the situation. It offers a rare glimpse inside one of the maneuvers that Venezuela's socialist government devised to continue exporting crude - the lifeblood of its beleaguered economy - despite U.S. sanctions.

Neither PDVSA nor Venezuela's oil or information ministries or chief prosecutor's office responded to requests for comment. President Nicolas Maduro has called U.S. sanctions illegal and blames Washington and his domestic political opponents for the country's woes.

The Supraquimic deal is also the latest example of how Venezuela, cut off from the global financial system and short of hard currency after years of economic decline, has turned to bartering its crude. It has previously used oil to **pay down debts**, buy **gasoline and diesel**, and purchase **water trucks**. Maduro has even proposed using oil to **buy coronavirus vaccines**.

Just as important, the Supraquimic deal provided PDVSA with a new customer. Since the United States blacklisted PDVSA in early 2019, many major clients have stopped buying. In their place, **a series of mysterious, recently-formed companies** with no previous oil experience have materialized to buy PDVSA's oil, including previously-unknown Mexican and Russian firms.

Purchases by these new players have allowed Venezuela's crude exports **to climb sharply this year**, internal PDVSA shipping documents and Refinitiv Eikon vessel tracking data show.

"It is amazing how Venezuela has mutated to overcome difficulties coming from sanctions, which is making Venezuela's oil trade increasingly opaque," said Francisco Monaldi, a fellow in Latin American Energy Policy at Rice University's Baker Institute.

It's all part of a cat-and-mouse game that Caracas is playing with U.S. authorities to keep selling its most important commodity. Washington has barred American companies from purchasing Venezuelan oil and has threatened to punish firms based anywhere in the world that do business with PDVSA.

"Maduro and his supporters have attempted to exploit U.S. policy in support of humanitarian related transactions by disguising their attempts to squeeze profit from Venezuelan resources as oil-for-food schemes," a State Department spokesperson said in a statement.

"We do not preview our sanctions, but of course evasion schemes may prove vulnerable to sanctions," the statement read.

The Supraquimic deal also demonstrates potential perils for companies doing business with Venezuela's government, which has sparred repeatedly with the private sector even as the Socialist Party has **courted their investment** to boost the economy.

In 2015, for example, with Venezuela rocked by shortages of consumer goods, authorities detained executives of a **pharmacy chain** and workers at a **leading food company** on accusations of hoarding supply to destabilize the economy, which they denied.

Venezuela's industrialists have blamed Maduro's socialist economic policies for the nation's woes.

"The main risk to doing business with the government is not that you're going to lose money or that your assets are going to be expropriated. It's that you're going to end up in jail," said Jose Ignacio Hernandez, a specialist in Venezuelan administrative law and economic regulation at the Harvard Kennedy School and the former legal representative for Venezuela's opposition.

Venezuela's Information Ministry did not reply to a request for a response to Hernandez's assertions.

Such tensions were on display again on March 30, when Venezuelan authorities issued arrest warrants for Supraquimic President Oscar Garcia as well as Jose Llamozas, who owns firms that sold food to Supraquimic. Both were charged with embezzlement, collusion between a public official and a contractor, and illicit association, according to the prosecutor's request to a judge for the warrant.

Garcia, whose whereabouts are unknown, did not respond to phone calls, emails and messages to social media profiles seeking comment. Reuters could not determine whether Garcia was ever arrested or if he has legal representation.

Llamozas, who was jailed for three months before being released on July 2 pending a possible trial, did not respond to messages sent to phone numbers and email addresses listed for his companies. Llamozas' defense counsel did not respond to requests for comment.

In Venezuela, prosecutors first charge a suspect and then investigate further before deciding whether or not to recommend to a judge that the case go forward, according to Jose Vicente Haro, a law professor at the Central University of Venezuela.

'STRATEGIC ALLIANCE'

The arrangement between PDVSA and Supraquimic began with a request from Venezuela's Food Ministry to ensure supply for its CLAP boxes, a food handout program that many families depend on to survive, according to a copy of a contract between the two companies and the ministry which was viewed by Reuters.

That contract, dated April 2020 and described as a "strategic alliance," stipulated that Supraquimic would receive up to 5 million barrels of crude per month from PDVSA in exchange for supplying food products of equal value to the Food Ministry. Supraquimic, in turn, would be responsible for selling the oil.

Supraquimic was founded by Garcia in Caracas in 2015, according to government commercial registry records. In total, the company received from PDVSA six cargoes between Dec. 28, 2020 and Feb. 10, 2021, totaling 6.2 million barrels valued at $257.8 million, according to internal oil company invoices viewed by Reuters. That was in line with market prices at the time. All the shipments set sail in tankers bound for Asia, according to the PDVSA invoices and shipping documents, and Refinitiv Eikon data.

Reuters could not determine how much food, if any, Supraquimic delivered to the CLAP program. But according to a March 4 letter written to company officials by Antonio Perez Suarez, PDVSA's vice president for supply and trading, it was not enough to satisfy the agreement.

"You have not honored your payment commitments according to the contractual terms established and accepted by your company," Perez Suarez wrote in that letter, viewed by Reuters.

Supraquimic does not appear to be a food manufacturer. It purchased products from Venezuelan companies including Alimentos Santa Lucia and Agroinsumos El Granero, both owned by Llamozas, according to a person familiar with the deal.

Llamozas' companies agreed to sell food items totaling $80 million to Supraquimic in installments, the person said. But after receiving payment for delivery of an initial $8 million worth of products, Llamozas' firms stopped shipping because they received no

further funds, leaving Supraquimic unable to meet its obligations to the government, the person said.

On March 30, Llamozas was summoned to PDVSA's offices, according to the person. He was arrested in the oil company's parking lot, according to the police arrest report.

While Llamozas was in jail, Maduro found another source of help to feed some of the estimated 7 million Venezuelans experiencing food insecurity in what was once one of Latin America's wealthiest nations. The U.N. World Food Programme in April **reached a deal** with his administration to deliver monthly rations to school children.

Reporting by Luc Cohen in Caracas and Marianna Parraga in Mexico City Additional reporting by Mayela Armas in Caracas and Tibisay Romero in Valencia, Venezuela Editing by Marla Dickerson

Our Standards: **The Thomson Reuters Trust Principles.**

## More from Reuters

### Read Next

COP26                                                                  1:40 PM CST
**Vulnerable states call climate loss and damage deal 'bare minimum'**

Americas                                                              1:27 PM CST
**U.S. vacations in Cuba still come with hangovers from Trump's sanctions**

Americas

1:12 PM CST

**EXCLUSIVE Mexico considers tighter entry rules for Venezuelans after U.S. requests - sources**

---

Americas

12:50 PM CST

**Ahead of Three Amigos summit, Canada foreign minister presses U.S. on EVs, pipeline**

---



## Sign up for our newsletter

Subscribe for our daily curated newsletter to receive the latest exclusive Reuters coverage delivered to your inbox.

**Sign up**

## Americas

# EXHIBIT 3

p. 1

**ABC** INTERNATIONAL

**Maduro increases price of gas and opens the door to sales in dollars**

*The country has been facing a severe fuel shortage for weeks that has led thousands of citizens to form long lines at gas stations.*

(IMAGE)

Ludmila Vinogradoff        FOLLOW

**VENEZUELA** Updated 05/31/2020 3:46 a.m.                                    SAVE

After two decades without changes, **Nicolás Maduro** finally decided to increase the price of gasoline to 5,000 bolívares (0.019 Euros) per liter. The leader explained that the fuel will be sold at this new price in 1,500 service stations throughout the country starting next Monday.

The leader of the Chavista regime made the announcement today on Venezuelan State TV (VTV), clarifying that the new fuel price, which will remain in effect for the next 90 days, will carry a **99% subsidy for those carrying a Homeland card.**

The approximately 10 million people who have the Homeland card will have the right to receive 120 liters of gasoline per month for cars. Motorcycle drivers can access 60 liters per month.

Venezuelan citizens who exceed this amount will have to pay **US $0.50 per liter** at all 200 refueling stations. This is the first time that Maduro has been open to accepting US currency, which is gaining ground for daily transactions in Venezuela.

Maduro said that the 200 gas stations that will sell gas will be run by private business owners who have received licenses to sell the product. "I hope Trump doesn't stop private business owners from bringing what you need," the Chavista leader noted.

Maduro made the difficult decision to raise fuel prices. Over the past 21 years, the Chavista party has never wanted to change the prices of its main export product, oil, because it is afraid of another "Caracazo," the 1998 uprising that followed former President **Carlos Andrés Pérez's** decision to raise gas prices by US $0.12.

Maduro also thanked **Iran for the five ships** that it sent with 1.5 million barrels of oil and criticized the Trump administration for applying sanctions against the regime.

Meanwhile, after 76 days of lockdown, which began on March 13, **he announced that measures will be relaxed**. Various economic and financial sectors will have a time slot during which they can resume activities starting Monday.

"**The lockdown will continue**, but it will be flexible and gradual," he said. Nine sectors including the banks, finance, wholesale, textile, body shops, industries, pharmacies and retail stores will alternate, opening from 9 a.m. to 1 p.m. Public transportation will be available from 7 a.m. to 5 p.m."

Maduro announced that there were **1,459 cases of coronavirus and 12 deaths** in Venezuela. The Las Pulgas market in Maracaibo (Zulia state) was identified as a "danger zone" for contagion. "We hope to produce 10 million tests for all Venezuelans," he concluded.

# EXHIBIT 4



**ES NOTICIA**  Interinos   Cristal de olivino   Fondos Europeos   Manel Monteagudo   Clientes Bankia   Secret Story   Exámenes recuperación   Black Friday   Horóscopo hoy

Síguenos en **f** **twitter** **instagram**     NACIONAL   SEVILLA   MADRID       SUSCRÍBETE   **Inicio sesión** 👤

# ABC INTERNACIONAL                                                      Buscar  🔍

Opinión ▾   España ▾   Economía ▾   **Internacional ▾**   Sociedad   Deportes ▾   Cultura ▾   Historia   Ciencia   Gente   Play ▾       EXCLUSIVO PREMIUM      Estilo ▾      Más ☰

ABC   INTERNACIONAL   Europa Hoy

---

# Maduro sube el precio de la gasolina y abre la puerta a la venta en dólares

**El país atraviesa desde hace semanas por una severa escasez de combustible que mantiene a miles de ciudadanos formando largas colas en las gasolineras**



18        👤 **Ludmila Vinogradoff**   SEGUIR

**f**

**twitter**     VENEZUELA - Actualizado:31/05/2020 03:46h                    🔖 GUARDAR

**+**

Tras dos décadas sin ajustes, **Nicolás Maduro** se decidió finalmente a aumentar el precio de la gasolina, que pasará a costar 5.000 bolívares (0,019 euros) por litro. El mandatario explicó que el combustible se expenderá con este nuevo precio en 1.500 estaciones de servicio a lo largo del país a partir del próximo lunes.

El jefe del régimen chavista hizo hoy sus anuncios en una transmisión de la cadena estatal Venezolana de Televisión (VTV) donde aclaró que el nuevo precio del combustible, que regirá durante los próximos 90 días, tendrá una compensación del **99% de subvención para los portadores del carnet de la patria**.

Los que tengan carnet de la patria, que son unos 10 millones de personas, tendrán derecho a 120 litros de gasolina por mes para los coches, mientras que los motoristas podrán acceder a 60 litros por mes.

**LO MÁS LEÍDO EN ABC**

**Internacional**    ABC

**1**  Rusia y Bielorrusia realizan maniobras militares conjuntas en la frontera con Polonia   

**2**  Londres y Bruselas se reúnen bajo la amenaza del colapso de las negociaciones sobre Irlanda del Norte   

**3**  La ONU y los representantes de la UE en Cuba seguirán de cerca la marcha del 15-N   

**4**  Bielorrusia amenaza con cortar el tránsito de gas a la UE en caso de nuevas sanciones   

**5**  «Los bielorrusos nos pegaron y nos dijeron que siguiéramos caminando»   

---

# ABC INTERNACIONAL           Buscar 🔍     SUSCRÍBETE    Inicio sesión 👤 ›   Menú

Una vez se supere esta cantidad, los ciudadanos venezolanos tendrán que pagar el combustible a **0,50 dólares el litro**, un precio que regirá en 200 estaciones de repostaje. Es la primera vez que Maduro se abre a aceptar la divisa estadounidense, pues gana cada vez más terreno para las transacciones diarias en el país.

Maduro dijo que estas 200 gasolineras que venderán la gasolina serán manejadas por empresarios privados que han recibido las licencias para comercializar el producto. «Espero que Trump no vaya a impedir a los empresarios privados traer lo que necesiten», subrayo el dirigente chavista.

Maduro ha tomado una difícil decisión de subir el precio del combustible. En los últimos 21 años el chavismo nunca quiso ajustar los precios de su principal producto de exportación, que es el petróleo, por temor a un nuevo «Caracazo», que en 1998 provocó una revuelta debido a que el expresidente **Carlos Andrés Pérez** subió la gasolina en 12 centavos de dólar.

Además, Maduro agradeció el envío de los **cinco buques iraníes** que trajeron unos 1,5 millones de barriles y cargó contra la administración Trump por aplicar las sanciones contra el régimen.

Por otra parte, al cumplirse hoy 76 días de cuarentena desde que se decretó el 13 de marzo pasado, **anunció que se flexibilizará el confinamiento** con una franja horaria para distintos sectores económicos y financieros que reactivan su actividad este lunes.

«**La cuarentena continúa** pero de manera flexible y gradual», dijo. 9 sectores como los bancarios, económicos, comerciales, textil, talleres mecánicos, industrias, farmacias y comercios se alternarán en las franjas de 9 de la mañana a 13 horas del mediodía. Mientras que el transporte funcionará desde las 7 de la mañana hasta las 5 de la tarde.

Maduro anunció que en Venezuela la cifra de contagios por coronavirus es de **1.459 y de 12 fallecidos**, siendo el mercado de Las Pulgas en Maracaibo (en el estado de Zulia) un «foco peligroso» para el contagio del virus. «Esperamos hacer unos 10 millones de test de prueba a todos los venezolanos», concluyó.

**VER LOS 18 COMENTARIOS**

**TEMAS**

Venezuela     Nicolás Maduro     Gasolina

**+**   18 comentarios

**LO ÚLTIMO EN ABC**

**1** Alemania alcanza el mayor número de contagios diarios de toda la pandemia 

**2** Dos paracaidistas rusos mueren durante las maniobras en Bielorrusia 

**3** Londres y Bruselas se dan una semana para evitar la ruptura 

**4** Una familia afgana entrega en matrimonio a una bebé de 20 días para poder subsistir 

**5** El otoño transforma la Toscana 

mujerhoy



**Así le amargaron la vida (y el matrimonio) a Grace Kelly su suegra y su cuñada**



**-42%** | **24€** | **14€**

**Entradas The Primitals Madrid**

Teatro Infanta Isabel

VER OFERTA 



**Código descuento Wiggle**

Hasta 50% Rebaja este Black Friday en Wiggle ¡Para MultiSport!

VER DESCUENTOS ABC

# ABC                                                                                ⌃

Vocento   Sobre nosotros   Contacto   Política de privacidad   Política de cookies   Condiciones de uso   Aviso legal   Condiciones de contratación

Horóscopo   Horóscopo chino   Ultimas noticias   Programación TV   Calendario laboral 2021   Buscar número Lotería Navidad 2021   Bienestar

Lotería de Navidad 2021   Escuchar noticias del día   Blogs   Sorteo Lotería del Niño 2022   Buscar Lotería del Niño 2022   La Colmena   Descuentos

Abecedario del Bienestar   Directos ABC   Declaración Renta 2020-2021   Traductor

Copyright © DIARIO ABC, S.L.

**ENLACES VOCENTO**

| | | | | |
|---|---|---|---|---|
| ABC | ABC Sevilla | Hoy | El Correo | La Rioja |
| El Norte de Castilla | Diario Vasco | El Comercio | Ideal | Sur |
| Las Provincias | El Diario Montañés | La Voz Digital | La Verdad | Leonoticias.com |
| Burgosconecta | Unoauto.com | Infoempleo | WomenNow | Autocasión |
| Oferplan | Pisos.com | Mujerhoy | XL Semanal | Welife |

# EXHIBIT 5

# Maduro sends four oil freighters to Cuba amid a national gasoline shortage

According to the document issued by the public oil company, there are 380,000 barrels destined for four ports on the island.

In the midst of Venezuela's terrible humanitarian crisis, the regime of Nicolás Maduro yesterday **sent four oil tankers to Cuba** while fuel is rationed and restricted for Venezuelans who must wait endlessly in  line to refuel their vehicles. The former president of the National Assembly, **Julio Borges,** Commissioner for the Lima Group, appointed by the interim President Juan Guaidó, denounced on his Twitter account that the 4 ships add up to a supply of 380,000 barrels that were transported to the ports of Cuba.

"This is how the dictatorship acts, while in our country thousands of Venezuelans suffer daily, and patients even die due to lack of fuel, Maduro prefers today to send a shipment of diesel to Cuba. They are traitors to Venezuela and servants of Cubans," Borges wrote.

The diplomatic representative of the interim Presidency showed the **customs document of the cargo manifest**, issued from the Venezuelan plant of Amuay in Paraguaná, in the northern part of the country, as proof of his complaint, in addition to the images of the oil tankers. "These are the 4 ships that left the docks of Amuay loaded with diesel heading for Cuba. The regime does not care about the Venezuelan people, its only objective is to hand over the country's resources to Castro," he stressed.

According to this PDVSA report, the fuel shipments given by Maduro to Cuba amid the Venezuelan mega-crisis **arrived at the following ports: Cienfuegos, Havana, and Santiago de Cuba.** "It's never happened before! Unbelievable but true!," the high commissioner emphasized. The gifts to Cuba already amount to more than 40,000 million dollars (the equivalent of $40 billion dollars) in 20 years. And this is just for oil; it doesn't even count the humanitarian aid that has been sent or the power plants that have been financed. Meanwhile, Venezuelans continue to suffer from the serious humanitarian crisis, Borges added.

The Amuay refinery barely produces 12% of its capacity because it is damaged, along with the closed Palito plant in Paraguaná. That is the reason for the lack of gasoline in Venezuela, oil expert José Toro Hardy tells ABC, noting that the

regime has no money to repair or maintain it, now "it is importing gasoline when it has the largest plant in the region with a potential to process more than 900,000 barrels a day."

# EXHIBIT 6

ES NOTICIA    Interinos    Cristal de olivino    Fondos Europeos    Manel Monteagudo    Clientes Bankia    Secret Story    Exámenes recuperación    Black Friday    Horóscopo hoy

Síguenos en  f  🐦  📷                                NACIONAL    SEVILLA    MADRID                    SUSCRÍBETE    Inicio sesión 👤 ›

# ABC INTERNACIONAL                                                          Buscar  🔍

Opinión ▾  España ▾  Economía ▾  **Internacional** ▾  Sociedad  Deportes ▾  Cultura ▾  Historia  Ciencia  Gente  Play ▾          EXCLUSIVO PREMIUM          Estilo ▾        Más ☰

ABC    INTERNACIONAL    Europa Hoy

# Maduro envía a Cuba cuatro cargueros de petróleo en plena escasez nacional de gasolina

**Según el documento expedido por la petrolera pública, son 380.000 barriles con destino a cuatro puertos de la isla**



Logo de Pdvsa en una gasolinera que hoy no tiene combustible en Caracas - REUTERS

10        **Ludmila Vinogradoff**

f         Actualizado: **30/03/2020 18:46h**                              🔖 GUARDAR

🐦

➕         En medio de la terrible crisis humanitaria de Venezuela el régimen de Nicolás Maduro **envió ayer cuatro buques petroleros a Cuba** mientras el combustible está racionado y restringido para los venezolanos que deben hacer interminables colas para repostar sus vehículos. El ex presidente de la Asamblea Nacional, **Julio Borges,** Comisionado para el Grupo de Lima, designado por el presidente interino Juan Guaidó, denunció en su cuenta de Twitter que los 4 buques suman un suministro de 380.000 barriles que fueron transportados a los puertos de Cuba.

«Así actúa la dictadura, mientras en nuestro país diariamente miles de venezolanos padecen y hasta pacientes mueren por falta de combustible, Maduro prefiere hoy enviar un cargamento de gasoil a Cuba. Son unos traidores a Venezuela y unos sirvientes de los cubanos», escribió Borges.

LO MÁS LEÍDO EN ABC

**Internacional**          ABC

1  Rusia y Bielorrusia realizan maniobras militares conjuntas en la frontera con Polonia  

2  Londres y Bruselas se reúnen bajo la amenaza del colapso de las negociaciones sobre Irlanda del Norte  

3  La ONU y los representantes de la UE en Cuba seguirán de cerca la marcha del 15-N  

4  Bielorrusia amenaza con cortar el tránsito de gas a la UE en caso de nuevas sanciones  

5  Una familia afgana entrega en matrimonio a una bebé de 20 días para poder subsistir  

BLOGS DE CORRESPONSALES

Los migrantes tienen donde escribir

  **El bochinche venezolano** por Ludmila Vinogradoff

En vídeo: Crónica de una cuarentena en China

  **Tras un biombo chino** por Pablo M. Díez

Lo que el fuego se llevó en la finca de la familia de la Reina Sofía

  **A la sombra de la Acrópolis** por Begoña Castiella

# ABC INTERNACIONAL          Buscar 🔍        SUSCRÍBETE      Inicio sesión 👤  ›      Menú

El representante diplomático de la Presidencia interina mostró el **documento aduanero del manifiesto de carga**, emitida desde la planta venezolana de Amuay en Paraguaná, norte del país, como prueba de su denuncia, además de las imágenes de los buques petroleros. «Estos son los 4 barcos que partieron del muelle de Amuay cargados de gasoil vía a Cuba. Al régimen no le importa el pueblo venezolano, su único objetivo es entregarle los recursos del país a Castro», subrayó.

Según este informe de PDVSA, los envíos de combustible obsequiados por Maduro a Cuba en plena megacrisis venezolana, **llegaron a los siguientes puertos: Cienfuegos, La Habana y Santiago de Cuba**. "¡Nunca antes había ocurrido! ¡Increíble pero cierto!·, enfatizó el alto comisionado. Los regalos a Cuba ya ascienden a más de 40.000 millones de dólares en 20 años, esto sólo por concepto de petróleo, sin contar la ayuda humanitaria que se ha enviado ni las plantas eléctricas que se han financiado. Mientras, los venezolanos siguen padeciendo la grave crisis humanitaria, añadió Borges.

La refinería de Amuay apenas produce el 12% de su capacidad porque se encuentra averiada junto a la planta cerrada del Palito en Paraguaná. Esa es la razón de la falta de gasolina en Venezuela, dice a ABC el experto petrolero José Toro Hardy al señalar que el régimen no tiene dinero para reparar ni darle mantenimiento, ahora «está importando gasolina cuando tiene la planta más grande de la región con un potencial para procesar más 900.000 barriles diarios».

VER LOS **10 COMENTARIOS**

**TEMAS**

Venezuela      La Habana      Nicolás Maduro      Petróleo

+ **10 comentarios**



ABC PLAY

**El caótico rodaje español de 'El Cid': la guerra sucia entre Charlton Heston y Sofía Loren**



-10% | 42€ | 38€

**Entradas Film Symphony Orchestra - Gira Fénix**
Film Symphony Orchestra

VER OFERTA



**Cupón Descuento Padel Nuestro**
5% Cupón Descuento Padel Nuestro en TODO

VER DESCUENTOS ABC

     

# ABC

Vocento   Sobre nosotros   Contacto   Política de privacidad   Política de cookies   Condiciones de uso   Aviso legal   Condiciones de contratación

Horóscopo   Horóscopo chino   Ultimas noticias   Programación TV   Calendario laboral 2021   Buscar número Lotería Navidad 2021   Bienestar

Lotería de Navidad 2021   Escuchar noticias del día   Blogs   Sorteo Lotería del Niño 2022   Buscar Lotería del Niño 2022   La Colmena   Descuentos

Abecedario del Bienestar   Directos ABC   Declaración Renta 2020-2021   Traductor

Copyright © DIARIO ABC, S.L.

**ENLACES VOCENTO**

| | | | | |
|---|---|---|---|---|
| ABC | ABC Sevilla | Hoy | El Correo | La Rioja |
| El Norte de Castilla | Diario Vasco | El Comercio | Ideal | Sur |
| Las Provincias | El Diario Montañés | La Voz Digital | La Verdad | Leonoticias.com |
| Burgosconecta | Unoauto.com | Infoempleo | WomenNow | Autocasión |
| Oferplan | Pisos.com | Mujerhoy | XL Semanal | Welife |

# EXHIBIT 7

# What's behind the Venezuelan plane that landed in Athens?

The landing of a PDVSA plane in Greece arouses suspicion. Its main passenger, according to reports, is Maduro's chancellor.

The regime's foreign minister, Jorge Arreaza, was on board the PDVSA-owned plane that landed at Athens International Airport on Saturday, March 2, the Hellenic Civil Aviation Authority (CAA) reported on Tuesday.

The statement came after Skai TV network reported that a Venezuelan plane had landed at the airport in secret and remained in Athens, Greece, for four hours before taking off. They also noted that other EU countries had refused to let the plane land.

CAA said it was an "ordinary flight" traveling through Greek airspace according to the flight plan submitted.

The flight plan showed that it left Abu Dhabi in the United Arab Emirates at 7:30 a.m. (Greek time) and landed in Athens at 1:59 p.m. (Greek time), after flying over Bahrain, Saudi Arabia, and Egypt.

While waiting for the plane to refuel, Arreaza waited in the lounge, following a relevant request from the Venezuelan embassy, CAA said. He didn't meet anyone while he was there.

**#Venezuela Foreign Minister Jorge #Arreaza was on board the #PDVSA plane that landed in #Grecia on March 2. It is unknown who else was inside the plane. Arreaza had a meeting at the VIP lounge of the Athens airport. pic.twitter.com/P3QoOgXeBP**

— Iásonas Pipinis (@iasonaspipinis) March 5, 2019
The Venezuelan plane took off at 5:47pm local time, heading to Cape Verde, according to the official flight plan.

Diplomatic sources from Greece's Foreign Ministry confirmed that the plane landed in Athens to refuel and that no state official met with Arreaza.

(Image)

Earlier in the day, New Democracy spokeswoman Maria Spyraki demanded that the government explain why the flight received permission to land in Athens when other European Union countries had refused.

She also asked whether the government was aware that Venezuela's main opposition party has accused Nicolas Maduro's regime of using the plane for private purposes to illegally transport money, gold, and relatives of senior officials out of the country.

(Image)

# EXHIBIT 8



VENEZUELA     INTERNACIONALES     TECNOLOGÍA     VARIEDADES     VIDA     #TBT

*INTERNACIONAL*     05/03/2019 11:41 pm ET

# ¿Qué hay detrás del avión venezolano que aterrizó en Atenas?

El aterrizaje de un avión de Pdvsa en Grecia despierta suspicacias. Su principal pasajero, según reportes, es el canc







El ministro de Relaciones Exteriores del régimen, Jorge Arreaza, estaba a bordo del avión propiedad de Pdvsa que aterrizó en el Aeropuerto Internacional de Atenas el sábado 2 de marzo, informaron este martes las Autoridad Helénica de Aviación Civil (CAA).

La declaración se produjo después de que la emisora Skai TV informó que un avión venezolano había aterrizado en el aeropuerto en secreto y permaneció en Atenas, Grecia, durante cuatro horas antes de despegar. También señalaron que otros países de la UE se habían negado a dejar aterrizar el avión.

**Lee también: La confesión de "Pau Pau", la espía arrepentida del régimen que ahora trabajará por la democrácia de su país**

CAA dijo que era un "vuelo ordinario" que viajaba a través del espacio aéreo griego de acuerdo con el plan de vuelo presentado.

El plan de vuelo mostró que salió de Abu Dhabi en los Emiratos Árabes Unidos a las 7.30 a.m. (hora griega) y aterrizó en Atenas a las 13.59 p.m. (Hora griega), después de volar sobre Bahrein, Arabia Saudita y Egipto.

Mientras esperaba que el avión se reabasteciera, Arreaza esperó en la sala VIP, luego de una solicitud relevante de la embajada venezolana, dijo CAA. No se reunió con nadie mientras estuvo allí.

**El ministro de Relaciones Exteriores de #Venezuela Jorge #Arreaza estuvo a bordo en el avion de #PDVSA que aterrizo en #Grecia el 2 de marzo. Se desconoce quienes mas estaban dentro del avion. Arreaza tuvo una reunion en el VIP del aeropuerto de Atenas. pic.twitter.com/P3Qo0gXeBP**

— Iásonas Pipinis (@iasonaspipinis) March 5, 2019

El avión venezolano despegó a las 17.47 p.m. Local, rumbo a cabo verde, según el plan de vuelo oficial.

Fuentes diplomáticas del Ministerio de Relaciones Exteriores de Grecia confirmaron que el avión aterrizó en Atenas para repostar combustible y que ningún funcionario estatal se reunió con Arreaza.



YO Er 🔥 HDP ®
@ThePinguinHDP

12:00 pm.  En el aire el Falcon900 #YV2486  con rumbo desconocido.

#TeamHDP



10:03 AM · Mar 2, 2019

♡ 99    💬 21    ⬆ Share this Tweet

Tweet your reply

Más temprano en el día, la portavoz de New Democracy, Maria Spyraki, exigió que el gobierno explicara por qué el vuelo recibió permiso para aterrizar en Atenas cuando otros países de la Unión Europea se habían negado.

También preguntó si el gobierno estaba consciente de que el principal partido de oposición de Venezuela ha acusado al régimen de Nicolás Maduro de usar el avión en particular para transportar ilegalmente dinero, oro y familiares de altos funcionarios fuera del país.





10:06 AM · Mar 2, 2019   (i)

♡ 1   💬   ↑ Share this Tweet

**Tweet your reply**

Redacción Contexto Diario

Fuente: Skai TV

**RELATED TOPICS:**   #AVIÓN DE PDVSA   #CRISIS EN VENEZUELA   #INFORMACIÓN INTERNACIONAL



INICIO    TÉRMINOS DE USO    POLÍTICAS DE PRIVACIDAD    RSS    CONTACTO

Todos los derechos reservados © Contexto Diario 2017

# EXHIBIT 9



Friday Nov 12        🌤 28°C

**News**        **Videos**        ☰

BREAKING NEWS   Woman, three men aiding police in investigations into gun find                    Diego Martin

 T&T News   3 min read

## Kamla to PM: Did PDVSA officials visit T&T in March?

Loop News    |    May 8, 2020 04:18 PM ET



*Photo: Opposition Leader Kamla Persad-Bissessar shows what she said appears to be plane manifest documents showing that officials from PDVSA arrived in Trinidad on March 27, 2020. She has asked Prime Minister Dr Keith Rowley to provide clarity on the matter.*

Opposition Leader Kamla Persad-Bissessar has asked Prime Minister Dr Keith Rowley to provide clarity after she shared what appeared to be documents showing officials from Venezuelan energy company PDVSA arriving in Trinidad.

In a media briefing on Thursday evening, Persad-Bissessar said she was sent documents by a concerned citizen that appear to be plane manifest documents showing the arrival of people from the company on March 27, the day after the US indicted Venezuelan president Nicolás Maduro.



Opposition Leader: Did PDVSA officials vi...

### Recent Articles

 Lifestyle

**Therapist and life coach discusses men's mental health for...**

2 hrs ago

 World News

**Biden-Xi set virtual summit for Monday to discuss tensions**

2 hrs ago

Environment

**Championing eco-friendly with Zero Plastic Marketplace**

2 hrs ago

We use cookies on this site to enhance your user experience

By clicking the Accept button, you agree to us doing so. More info

Ok

(Video via the UNC/Facebook)

"On March 26, 2020, the US Department of Justice indicted Maduro on charges of drug trafficking, narco-terrorism and money laundering."

"On March 27 after these charges were made, Trinidad and Tobago opened its borders...to allow the Vice President of Venezuela, Delcy Rodriguez and a contingent of persons into the country."

She said that the reason for the visit was to discuss strategies for COVID-19, but is asking for clarity after receiving the documents.

"I have in my possession what purports to be...a customs general declaration, which I presume to be a passenger manifest for a private Venezuelan flight on March 27, 2020."

She said she could not prove the veracity of the documents but has asked Dr Rowley to explain.

She said if true, these continued relations with the company, which has been sanctioned by the US government, raises questions.

"I want to ask the Prime Minister and National Security Minister, did Ms Rodriguez have in her company, apart from the flight crew, five other persons on that flight, one of whom was the president of PDVSA?"

"If this is true, I don't see what they would want to talk about COVID-19."

She also asked whether Dr Rowley met those people and what the conversation entailed.

According to media reports National Security Minister Stuart Young acknowledged that Venezuelan Vice President Delcy Rodriguez was given special permission to enter the country in March to discuss matters related to COVID-19.

Prime Minister Dr Keith Rowley responded during a public address on Friday evening, slamming Persad-Bissessar's accusations and saying they had no knowledge of any connection between Rodriguez' visit and PDVSA.

"We are now discovering today that the aircraft they came on is a PDVSA aircraft which was sanctioned by the US."

He said however that government has not committed any act which would constitute a breach of sanction.

He said the Trinidad and Tobago government has provided no support to PDVSA.

He added that Persad-Bissessar's comments are reprehensible and dangerous.

"What the UNC is trying to do is stir that pot to upset the US hoping that they take action against Trinidad and Tobago. That's an underminer that is dangerous to Trinidad and Tobago."

We use cookies on this site to enhance your user experience
By clicking the Accept button, you agree to us doing so. More info

Ok

*Editor's note: This story has been updated to include Prime Minister Dr Keith Rowley's response following a public address on Friday at 5.00 pm.*

**Loop is better in the app. Customize your news feed, save articles for later, view your reading history and more. Click the links below to download the app for Android and IOS.**

 

---

## *Related Articles*



*loop* **Politics**

**'Delusional rant': PM responds to Kamla on possible US sanctions**

*May 2, 2020 07:48 AM ET*



*loop* **Energy**

**PM blames US sanctions as Dragon deal put on hold**

*February 3, 2020 03:50 PM ET*





*loop* **Energy**

**Oil tankers 'go dark' off Venezuela to evade US sanctions**

*November 14, 2019 08:38 AM ET*

---

Comments (0)

*Write a comment*

3000

Be the first to comment

**TALK OF THE TOWN**



T
1 Comment

CWI thanks Bravo for outstanding international career | Loop Trinidad & Tobago
1 Comment




**We use cookies on this site to enhance your user experience**

By clicking the Accept button, you agree to us doing so. More info

Ok

# EXHIBIT 10

# U.S. DEPARTMENT OF THE TREASURY

## United States Government Continues Pressure on Former Maduro Regime

January 21, 2020

**Washington** – Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) identified fifteen aircraft as blocked property of Petroleos de Venezuela, S.A. (PdVSA) pursuant to Executive Order (E.O.) 13884, which blocks the property and interests in property of the Government of Venezuela.

Several PdVSA aircraft have been used to transport senior members of the former Maduro regime.  In late summer 2019, Venezuelan Oil Minister Manuel Salvador Quevedo Fernandez, who is also a Specially Designated National, attended an OPEC meeting in the United Arab Emirates and utilized the PdVSA aircraft Falcon 200EX (**YV3360**).  Falcon 200EX (**YV3360**) also was used throughout 2019 to transport senior members of the former Maduro regime in a continuation of the former Maduro regime's misappropriation of PdVSA assets.  In 2018, individuals tied to the senior levels of the former Maduro regime traveled aboard PdVSA Dassault Falcon 900EX (**YV2486**).

Additionally, several of these aircraft have been operated in an unsafe and unprofessional manner in proximity to U.S. military aircraft, while in international air space.  In the winter of 2019, PdVSA Learjet 45 (**YV2734**) flew in close proximity to a U.S. military aircraft over the Caribbean Sea.  In the spring of 2019, during a joint operation conducted by PdVSA and the Venezuelan Integrated Air Command, PdVSA's Learjet 45XR (**YV2567**) attempted to interfere with a U.S. military aircraft in the northern Caribbean Sea.



The following aircraft are property in which PdVSA has an interest.

- **YV3360**, Make & Model: Dassault Falcon 200EX
- **YV2040**, Make & Model: Dassault Falcon 900B
- **YV2726**, Make & Model: Dassault Falcon 900
- **YV2485**, Make & Model: Dassault Falcon 900EX
- **YV2486**, Make & Model: Dassault Falcon 900EX
- **YV2565**, Make & Model: Bombardier Learjet 45
- **YV2567**, Make & Model: Bombardier Learjet 45
- **YV1118**, Make & Model: Bombardier Learjet 45
- **YV2734**, Make & Model: Bombardier Learjet 45
- **YV2716**, Make & Model: Bombardier Learjet 45
- **YV2738**, Make & Model: Bombardier Learjet 45
- **YV2739**, Make & Model: Bombardier Learjet 45
- **YV2763**, Make & Model: Beech 1900D
- **YV2762**, Make & Model: Beech 1900D
- **YV2869**, Make & Model: Beech 1900D

OFAC's regulations generally prohibit all transactions by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked persons.

Identifying information on the individual and entities identified today.

####

# EXHIBIT 11

 **NEWS**    VIDEO    LIVE    SHOWS    CORONAVIRUS    

# Maduro taps US fugitive to revamp Venezuela oil industry

*Nicolás Maduro has named a powerful ally sanctioned by the U.S. as a drug kingpin along with a cousin of the late Hugo Chávez to revamp Venezuela's oil industry amid massive gasoline shortages*

By  JOSHUA GOODMAN and SCOTT SMITH Associated Press Writer
April 27, 2020, 4:50 PM • 4 min read

  



The Associated Press

*FILE - In this May 19, 2018 file photo, Venezuela's President Nicolas Maduro, right, and...* **Read More**

CARACAS, Venezuela -- President Nicolás Maduro on Monday named a powerful ally sanctioned by the U.S. as a drug kingpin, along with a cousin of the late socialist leader Hugo Chávez, to revamp Venezuela's oil industry amid massive gasoline shortages.

Tareck El Aissami was appointed oil minister and Asdrúbal Chávez tapped to head of state-run oil giant PDVSA. The appointments were published in the official gazette and announced on state television. The government has yet to comment.

Both positions were occupied until now by Gen. Manuel Quevedo, who during his 28-month tenure watched as oil production in the country sitting atop the world's largest petroleum reserves collapsed by 65%.

"The country's only source of revenue, oil, has collapsed under Quevedo and the U.S. sanctions put the final nails in his coffin," said Russ Dallen, head of the Miami-based investment firm Caracas Capital Markets.

The shakeup comes amid crashing global oil prices and it follows a two-decade collapse of crude production at Venezuela's state-ruin oil firm, which today pumps an amount equal to 19% of levels seen when the late President Chávez took power in 1999. Critics blame rampant corruption and mismanagement.

## Top Stories

**What's driving a COVID-19 surge in the country's most vaccinated state**
Nov 12, 4:04 AM 

**Justice Department charges Steve Bannon with criminal contempt of Congress**
1 hour ago 

**Pilot who flew with William Shatner to space killed in plane crash**
2 hours ago 

**Toddler found safe after desperate 36-hour search**
Nov 12, 8:47 AM 

**Officer: Ahmaud Arbery would have received trespass warning**
18 minutes ago

 ABC News Live



*24/7 coverage of breaking news and live events*

Venezuelans in recent weeks have experienced critical gasoline shortages and mile-long gas lines lasting days even in the capital of Caracas, the seat of the country's politics and wealth normally spared the shortages seen across the nation.

In a bid to meet domestic gasoline demand, Venezuela has turned to Iran, receiving the first of several shipments of a key chemical catalyst needed to convert the South American nation's crude to fuel.

Asdrúbal Chávez had served for a few months as head of Houston-based CITGO, a PDVSA subsidiary, but had to abandon the position after he was denied a U.S. visa.

U.S. Immigration and Customs Enforcement recently added El Aissami to its list of 10 most-wanted fugitives. He was sanctioned in 2017 as allegedly being a major drug trafficker and then was indicted two years later on allegations of violating those sanctions.

A key adviser to Maduro, El Aissami, 45, has served previously as vice president and most recently minister of industry. El Aissami is among dozens of Maduro allies sanctioned by Washington, while Chávez has not been targeted by the Trump administration with financial measures.

El Aissami was indicted for the second time by a U.S. federal court last month for being part of the alleged narcoterrorist conspiracy alongside Maduro. Authorities offered a $10 million bounty for information leading to El Aissami's arrest and $15 million for Maduro's arrest.

Risa Grais-Targow, the director for Latin America at Eurasia Group, said El Aissami's appointment underscores Maduro's efforts to inject more professional management of the country's oil industry.

"Within Chavismo, El Aissami is a relative pragmatist," said Grais-Targow. "But it's an extremely difficult situation on any front."

Despite having the world's largest oil reserves, Venezuela's political and social crisis continues to deepen, as the U.S. and a coalition of nearly 60 nations press Maduro to stand down. Those nations recognize opposition politician Juan Guaidó as Venezuela's legitimate president, arguing that Maduro's election in 2018 was a sham because the most popular opposition candidates were banned from running.

The crisis had driven more than 4.5 million Venezuelans from their home, most crossing into neighboring Colombia, Peru and Ecuador, while escaping failing public services like power, running water and adequate medical care.

In attempt to relieve the pain of soaring inflation, Maduro's government on Monday raised the minimum wage most workers earn, bringing their monthly take-home pay up to the equivalent of $4.66 including both the base pay and food vouchers. Venezuela's Central Bank charted inflation at 124% for the first three months of the year.

While PDVSA faces multiple challenges, from low crude prices to falling production, the new oil team's first priority will be finding gasoline supplies that are on the verge of running out as U.S. sanctions have made fuel imports harder to come by, she said.

Grais-Targow said U.S. sanctions on El Aissami are also likely to complicate his efforts.

"This tells you they're throwing in the towel about a sanctioned individual being an impediment to future oil deals and engaging with foreign partners," she said. "Or maybe it's just an implicit recognition of their reality."

———

Goodman contributed from Miami, Florida.

💬 Comments (0)

abc NEWS

ABC News Network | Privacy Policy | Your CA Privacy Rights | Children's Online Privacy Policy | Interest-Based Ads | About Nielsen Measurement | Terms of Use | Do Not Sell My Personal Information | Contact Us

Copyright © 2021 ABC News Internet Ventures. All rights reserved.

# EXHIBIT 12






| PDVSA | HOME    WE ARE PDVSA    WHAT WE DO    SUBSIDIARIES    MEDIA    INVESTORS    › ESPAÑOL |

COMUNICACIONES / NOTICIAS





# THE PRESIDENTIAL COMMISSION "ALÍ RODRÍGUEZ ARAQUE" FOR THE DEFENSE, RESTRUCTURING AND REORGANIZATION OF THE OIL INDUSTRY

PDVSA.COM /
Thursday, 20 February 2020

**Caracas.-** Mr. Nicolás Maduro, president of the Bolivarian Republic of Venezuela, signed a decree for the creation of a Presidential Commission for the Defense, Restructuring and Reorganization of the Oil Industry under the name of "Alí Rodríguez Araque".

From Simón Bolívar Hall, located in MinPetróleo-PDVSA Complex, La Campiña, Mr. Maduro said that the commission will be headed by Mr. Tareck El Aissami; Mr. Asdrúbal Chávez as Executive vice-president. The Commission will also be composed by Admiral Remigio Ceballos, Chief of the Strategic Operational Command of the Bolivarian National Army Force (CEOFANB in Spanish); General –in-Chief Vladimir Padrino López; and Mr. Néstor Luis Reverol, People's Power Minister of Justice and Internal Affairs.

Other members of the Commission are Mr. Manuel Quevedo, People's Power Minister of Petroleum; Mr. Hipólito Abreu, People's Power Minister of Transport; Mrs. Gabriela Jiménez, People's Power Minister of Science and Technology, and Mr. Eduardo Piñate, People's Power Minister for Work Social Process.
Apart from them, Mr. Wills Rangel, Mr. José Guerrero, Mrs. Elia García, Mrs. Yurbis Gómez, Mrs. Sandra Nieves, Mr. Antonio Lugo and Mrs. María Grimán also are members of the Commission, as well as Mr. Jesús Martínez, a member of the Bolivarian Militia and Mr. Luis Rodríguez, dean of the Bolivarian University for Workers "Jesús Rivero".

The head of the state especially made reference to Mr. Alí Rodríguez Araque, honorary chairman of PDVSA, for his bravery and defense of the industry. "He was an extraordinary , a giant of this time, always true to Commander Chávez and myself; he was the one who recovered PDVSA and started the real PDVSA Roja Rojita" (The Red PDVSA), said Maduro.

**Revolutionary Changes**

In this context, Mr. El Aissami pointed out that the Presidential Commission "Alí Rodríguez Araque" will foster a new beginning for PDVSA and will place the industry at the productive forefront to defend national development and economy.

Mr. El Aissami assured that Venezuelan people's victories cannot be understood in the near future without taking into account the contribution of PDVSA's working class. "It has been a vanguard and a light to political and revolutionary changes of the whole national public sector. We have to be self-critical. Imperialist threats, sanctions and blockade have been very harmful for the whole national, public and private sector. We are compelled not to fail to history", said he.

Mr. El Aissami emphasized that "the enemy put PDVSA as a point in the agenda, and it is for the oil working class to respond with dignity as it has been during these 20 years of Revolution to show that Venezuela is a sovereign and independent country".

On the other hand, worker president Nicolás Maduro stressed

that "the sanctions that Guaidó is asking for are not for me, are for you oil workers and their families. They want to oppress us, to destroy, but we have a maximum formula to warranty Victory in year 2020: National union, production and productivity".

In this sense, President Maduro announced the Presidential and Constitutional Decree of Energy Emergency for Hydrocarbon Industry, with the view to take the necessary steps to protect the company from imperialist attacks.

On his side, Mr. Wills Rangel, president of the FUTPV delivered a work plan to President Nicolás Maduro to recover production, which was made by Productive Workers Councils.

**COMPARTIR:**









## ACCESOS RÁPIDOS

Subsidiaries

PDVSA Radio

Revista Orinoco Magna Reserva

## CONTÁCTANOS

Petróleos de Venezuela, S.A.

Avenida. Libertador con calle El Empalme

Complejo MinPetróleo - PDVSA,

La Campiña, Caracas - Venezuela,

Phone: +58(212)7084021

Fax: +58(212)7084460

Copyright © 2016 PDVSA. Todos los derechos reservados.

# EXHIBIT 13

p. 1

**Maduro ordered Pdvsa workers to attack Guaidó over Rosneft sanctions**

*The President of the PSUV called on the working class to identify all opposition traitors using their full names and photographs so that they can be attacked, as occurred with Conviasa employees.*

By EL NACIONAL February 19, 2020

VENEZUELA

WORLD

ECONOMICS

(IMAGE)

archive photo

**Nicolás Maduro** came out against Venezuelan Interim President **Juan Guaidó** and called on Pdvsa workers to attack him and call him a traitor for the recent United States sanctions against Rosneft Trading.

"That gutter rat Juan Guaidó is selling out our country. Pdvsa workers have to call him out as a traitor and a sell-out," Maduro said in an appearance on national television.

The President of the PSUV called on employees of the state-run oil company to lead the charge against Guaidó and all of the traitors who form part of what he called the creeping opposition.

"You should identify them the way they identified Conviasa workers (...). With their full names and photographs," he urged.

**Lima Group to meet this Thursday in Canada to increase pressure on the regime**

Maduro blamed Guaidó for the sanctions and said that their only purpose is to destroy Pdvsa. "He (Guaidó) asked for those sanctions against you (the workers). Yesterday's sanctions are against you, and they are meant to break Pdvsa," he said.

The ruling party leader said that there is practically a national consensus against the sanctions that is equivalent to over 80% of the population. "How are they hurting me? They are doing it

p. 2

to the people," he claimed.

Maduro reiterated that the United States' intention is to destroy the country and dominate Venezuela in order to colonize it. "No one destroys Venezuela! No one colonizes Venezuela!," he said.

The Treasury Department issued sanctions against Russian oil company Rosneft Trading on Tuesday for helping the regime to avoid penalties issued by the United States on the sale of Venezuelan oil.

# EXHIBIT 14

# Maduro ordenó a trabajadores de Pdvsa atacar a Guaidó por sanciones a Rosneft

*El presidente del PSUV llamó a la clase obrera a identificar a todos los opositores traidores, con nombre, apellido y foto, para agredirlos tal como lo hicieron algunos empleados de Conviasa*

Por **El Nacional** febrero 19, 2020

VENEZUELA

MUNDO

ECONOMÍA



*Foto archivo*

**Nicolás Maduro** arremetió contra **Juan Guaidó**, presidente interino de Venezuela, y llamó a los trabajadores de Pdvsa a atacarlo y llamarlo traidor de la patria por las recientes sanciones de Estados Unidos a Rosneft Trading.

«Juan Guaidó, esa rata de cañería, vendepatria. Los trabajadores de Pdvsa tienen que identificarlo y gritarle: ¡traidor, vendepatria!», dijo Maduro en cadena nacional.

En este sentido, el presidente del PSUV pidió a los trabajadores de la estatal petrolera ir a la carga contra Guaidó y todos los traidores de lo que llamó oposición rastrera.

«Deben identificarlos como lo hicieron los trabajadores de Conviasa (…). Con nombre, apellido y foto», exhortó.

- Grupo de Lima se reunirá este jueves en Canadá para fortalecer presión contra el régimen

Maduro señaló a Guaidó como el culpable de las sanciones y dijo que el único fin es destruir a Pdvsa. «Él (Guaidó) pidió estas sanciones contra ustedes (trabajadores). Esas sanciones de ayer son contra ustedes, para quebrar a Pdvsa», apuntó.

Además, el dirigente oficialista afirmó que hay prácticamente un consenso nacional en rechazo a las sanciones y que equivale a más del 80% de la población. «¿Qué daño me hacen a mí? Le hacen

daño al pueblo», aseguró.

Reiteró que la intención de Estados Unidos es destruir al país y dominar a Venezuela para colonizarla. «¡A Venezuela no la destruye nadie, no la coloniza nadie!», manifestó.

El Departamento del Tesoro sancionó este martes a la petrolera rusa Rosneft Trading por ayudar al régimen a evadir las penalizaciones de Estados Unidos para vender el crudo venezolano.

*El periodismo independiente necesita del apoyo de sus lectores para continuar y garantizar que las noticias incómodas que no quieren que leas, sigan estando a tu alcance. ¡Hoy, con tu apoyo, seguiremos trabajando arduamente por un periodismo libre de censuras!*

**Apoya a El Nacional ->**

# EXHIBIT 15

 **REUTERS**   World    Business    Markets    Breakingviews    Video    More  

**ENERGY**

MAY 11, 2020 / 2:39 PM / UPDATED 2 YEARS AGO

# PDVSA worker arrested after criticism of Venezuela's Maduro, says union leader

By Reuters Staff



CARACAS, May 11 (Reuters) - A worker at Venezuelan state-oil company Petroleos de Venezuela's maritime unit was arrested after criticizing President Nicolas Maduro in a meeting with company leadership, according to a union leader and a person present at the meeting.

Eudis Girot, the executive director of Venezuela's FUTPV oil workers' union, said in a statement on Monday that Bartolo Guerra - a tugboat captain with 24 years of experience at PDV Marina, the unit - was arrested on Friday by military counterintelligence officials following the Wednesday exchange.

"We demand his immediate release," Girot said. "All he did was tell the truth about the inhumane conditions in which they work, and the corruption that engulfs not just PDV Marina, but all of PDVSA."

Prosecutors have accused Guerra of treason, Girot said.

Neither PDVSA nor Venezuela's oil or information ministries immediately responded to requests for comment.

Reuters has not been able to verify if Guerra was arrested or his current whereabouts.

At the meeting with PDV Marina's new chief, Cesar Romero, workers voiced concerns about low salaries, poor working conditions, and worries that PDVSA would sell its stake in the

company, in line with a proposed restructuring, said the person present, who spoke on the condition of anonymity.

During the meeting, Guerra said he had been working for 40 consecutive days without a day off, and that the company had not provided food or water for employees in a week, said Girot and the person present. He ended by blaming the situation at the company on Maduro and the socialist national government, they said.

Romero assumed the leadership of PDV Marina after its prior president, Oswaldo Vargas, was arrested in March on accusations by the government of fuel smuggling, part of a broader purge at PDVSA.

Opposition politicians have denounced widespread corruption at PDVSA, once the engine of the OPEC nation's economy. The state-run firm has suffered from acute cash flow issues and an exodus of qualified personnel in recent years as its crude output has plummeted.

Maduro insists his government is committed to combating corruption, and argues that U.S. sanctions on the company - part of Washington's strategy to oust him from power - are the cause of its more recent struggles. (Reporting by Mircely Guanipa in Maracay, Venezuela Writing by Luc Cohen Editing by Rosalba O'Brien)

*Our Standards: The Thomson Reuters Trust Principles.*

Apps    Newsletters    Advertise with Us    Advertising Guidelines    Cookies    Terms of Use    Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2021 Reuters. All Rights Reserved.

# EXHIBIT 16

 World    Business    Markets    Breakingviews    Video    More

COMMODITIES

MARCH 1, 2019 / 4:38 AM / UPDATED 3 YEARS AGO

# Venezuela to move state oil firm PDVSA office from Lisbon to Moscow

By Polina Ivanova, Maria Tsvetkova

MOSCOW (Reuters) - Venezuelan President Nicolas Maduro has ordered state oil company PDVSA's office in Lisbon to be relocated to Moscow, Vice President Delcy Rodriguez said on Friday, a move she said was designed to help safeguard her country's assets.



FILE PHOTO: The corporate logo of Venezuelan state-owned oil company PDVSA is seen at a gas station in Cupira, Venezuela December 16, 2018. REUTERS/Marco Bello/File Photo

Moscow has backed Maduro in the face of a political challenge from opposition leader Juan Guaido, who declared himself interim president in January -- a move backed by most Western nations.

Rodriguez, explaining the decision to move PDVSA's office at a joint news conference in Moscow with Russian Foreign Minister Sergei Lavrov, said Europe had shown it was no longer able to guarantee the safety of Venezuela's assets.

She cited the Bank of England's reluctance to hand over her country's gold supplies as an example, and said Caracas was now determined to expand cooperation with Russia.

The PDVSA office move corresponded with plans to expand technical cooperation in extracting oil with Russian oil companies Rosneft and Gazprom, she added.

"We are going to make industrial investments to produce everything we need in our country with the Russian Federation's help," said Rodriguez. "We (Venezuela and Russia) are strategic partners."

The decision to move the office to Moscow came after a source at Gazprombank told Reuters last month it would freeze PDVSA's accounts and halt transactions with the firm to reduce the risk of the Russian lender falling under U.S. sanctions.

Lavrov told the same news conference that Russia had sent a first shipment of medical aid to Venezuela and that Moscow was also helping Venezuela with supplies of wheat.

Russia has supplied 64,100 tonnes of wheat to Venezuela so far in the 2018/19 marketing season, data from Russia's SovEcon agriculture consultancy showed on Feb. 18.

Russia has accused the United States of trying to engineer an illegal coup to topple Maduro and the prospect of his being ousted is a geopolitical and economic headache for Moscow.

Russia, like China, has become a creditor of last resort for Caracas, lending it billions of dollars as its economy implodes. Moscow has also helped its military and oil industry.

Kremlin spokesman Dmitry Peskov said earlier on Friday that there were no talks at the moment between Maduro and President Vladimir Putin about Moscow lending Caracas more money, but that Russia was watching the situation closely.

"We're interested in continuing cooperation with Venezuela, especially since many of our companies are working on quite big projects there," said Peskov.

"We hope that these projects have good prospects, that there are prospects to expand them, and of course we hope our Venezuelan partners can overcome the internal political and economic difficulties they are facing as soon as possible."

*Additional reporting by Polina Devitt and Oksana Kobzeva; Writing by Andrew Osborn; Editing by Catherine Evans*

*Our Standards: The Thomson Reuters Trust Principles.*

Apps     Newsletters     Advertise with Us     Advertising Guidelines     Cookies     Terms of Use     Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2021 Reuters. All Rights Reserved.

# EXHIBIT 17

**Tweet**

**Petróleos de Venezuela, S.A.**

@PDVSA

This Constitutional Law will go into effect when it is published in the Official Gazette of the Bolivarian Republic of Venezuela, and it will remain in place until the effects of unilateral coercive measures, restrictions and other threats that affect the country cease.

# EXHIBIT 18



← **Tweet**

**Petróleos de Venezuela, S.A.**
@PDVSA                                        ···

    Esta Ley Constitucional tendrá vigencia desde su publicación en Gaceta Oficial de la República Bolivariana de Venezuela, hasta que cesen los efectos de las medidas coercitivas unilaterales, restricciones y otras amenazas que afectan al país.

5:58 PM · Feb 10, 2021 · TweetDeck

**11** Retweets  **12** Likes

Show more replies

---

Q Search Twitter

**New to Twitter?**
Sign up now to get your own personalized timeline!

Sign up

**Relevant people**

**Petróleos de Venezuel...**          Follow
@PDVSA
Exploración, Producción, Refinación, Comercio y Suministro de hidrocarburos. Comprometida con el dueño del petróleo: el Pueblo Venezolano. ¡Patria y Soberanía!

**What's happening**

US politics · LIVE
**Impeachment trial: House managers conclude opening arguments against Trump**

News · 2 hours ago
**Tessica Brown's Gorilla Glue saga has a happy ending**
Trending with Dr. Obeng, Tessica

MLB · Trending
**Braves in 4th**                    ···

Trending in United States
**Shelley Duvall**                   ···
1,539 Tweets

Entertainment · This morning
**Lucasfilm drops The Mandalorian star Gina Carano following 'abhorrent' social media posts**
Trending with Carano, Holocaust

Show more

Terms of Service   Privacy Policy   Cookie Policy
Ads info   More ···   © 2021 Twitter, Inc.

🐦

# Explore

⚙ Settings

**Don't miss what's happenin**
People on Twitter are the first to know.                    Log in    **Sign up**

# EXHIBIT 19

Tweet

Petróleos de Venezuela, S.A.

@PDVSA

"The goal that we set last year was to reactivate Petrocaribe in its highest expression. Expanding production is the goal we are setting for 2021."

President Maduro: We will promote the full recovery and expansion of Petrocaribe. bit.ly/3h16FY5

(IMAGE)

9:56 AM Dec. 15, 2020 Twitter Web App

**57** Retweets **34** Likes

Nancy @NancyOlivar8 December 15, 2020

Replying to @PDVSA

Cursed masses... They destroyed what they left behind. Get out of here, you bastards.

Dannys Vasquez @dannysvas December 17, 2020

Replying to @PDVSA

With all due respect... You cannot continue to use our petroleum to help countries that don't support us when we need them. Those resources should be allocated to the people. That is who really needs them.

# EXHIBIT 20



**Tweet**

# Explore

## Settings



**Petróleos de Venezuela, S.A.**
@PDVSA

🇻🇪 📱 "El objetivo que nos planteamos el año pasado fue reactivar Petrocaribe en su máxima expresión, es el reto que nos planteamos para 2021, su expansión productiva".

Pdte. Maduro: Vamos a impulsar la recuperación y expansión plena de Petrocaribe ↖️ bit.ly/3h16FY5



9:56 AM · Dec 15, 2020 · Twitter Web App

**57** Retweets   **34** Likes

○            ↇ            ♡            ↥

**nancy** @NancyOlivar8 · Dec 15, 2020                    ···
Replying to @PDVSA
Cuerdas de malditos destruyeron los que nos dejaron salgan y vayasan hijos del demonio

○            ↇ            ♡            ↥

**Dannys Vasquez** @dannysvas · Dec 17, 2020              ···
Replying to @PDVSA
Con todo respeto... no se puede seguir ayudando con nuestro petróleo a países que no nos apoyan cuando los necesitamos. Esos recursos se deben destinar al pueblo que realmente es quien los necesita.

○            ↇ            ♡            ↥

**Don't miss what's happening**

# EXHIBIT 21

Tweet

Petróleos de Venezuela S.A. Retweeted

Min PP Petróleo

@MinPetroleoVE

The schedule for fuel distribution by license plate for the week of February 15-21, 2021 is presented below.

Image:

PDVSA

SCHEDULE FOR FUEL DISTRIBUTION BY LICENSE PLATE

MONDAY, FEBRUARY 15 THROUGH SUNDAY, FEBRUARY 21, 2021

| DAY | TERMINAL |
|---|---|
| Monday 15 | 7 and 8 |
| Tuesday 16 | 9 and 0 |
| Wednesday 17 | 1 and 2 |
| Thursday 18 | 3 and 4 |
| Friday 19 | 5 and 6 |
| Saturday 20 | 7 and 8 |
| Sunday 21 | 9 and 0 |

12:44 PM Feb. 15, 2021 Twitter for Android

**37** Retweets     **4** Quote Tweets     **24** Likes

Ybrahim Yabour @ybrahim43 - 21 h

Replying to @MinPetroleoVE and @globovision

THIS IS NOT BEING FOLLOWED IN BOLIVAR STATE. OUR GOVERNOR AND THE ZODI STOCK THE GUAYANESE HOWEVER THEY WANT. WE ARE NOT GETTING OUT OF THIS NIGHTMARE.

Edwin @edwinderepuesto 20 h

Replying to @MinPetroleoVE

This is not being followed in Bolívar state.

Alfon1949 @Alfon1949  - 20 h

This is supposed to be happening throughout the National territory, but according to Justo Noguera and Zodi Bolívar 62, the orders of the President and his ministers are not being followed and they are tight-lipped!

# EXHIBIT 22

⟲ Tweet



⟲ Petróleos de Venezuela, S.A. Retweeted

**Min. PP Petróleo**
@MinPetroleoVE

🇻🇪 🛢️ Aquí te presentamos el cronograma de suministro de combustible por placa para la semana del 15 al 21 de febrero de 2021.

**PDVSA**

**CRONOGRAMA DE SUMINISTRO DE COMBUSTIBLE POR PLACA LUNES 15 AL DOMINGO 21 DE FEBRERO DE 2021**

| DÍA | TERMINAL |
|---|---|
| LUNES 15 | 7 Y 8 |
| MARTES 16 | 9 Y 0 |
| MIÉRCOLES 17 | 1 Y 2 |
| JUEVES 18 | 3 Y 4 |
| VIERNES 19 | 5 Y 6 |
| SÁBADO 20 | 7 Y 8 |
| DOMINGO 21 | 9 Y 0 |

Gobierno **Bolivariano** de Venezuela | Petróleo

12:44 PM · Feb 15, 2021 · Twitter for Android

**37** Retweets   **4** Quote Tweets   **24** Likes

**Ybrahim Yabour** @ybrahim43 · 21h
Replying to @MinPetroleoVE and @globovision
ESO NO SE CUMPLE EN EL ESTADO BOLIVAR ACA EL.GOBERNADOR Y LA ZODI SURTEN COMO LES DA LA GANA LOS GUAYANESES NO SALIMOS DE ESTA PESADILLA

**Edwin** @edwinderepuesto · 20h
Replying to @MinPetroleoVE
En el estado Bolívar no se cumple esto

**Alfon1949** @Alfon1949 · 20h
Replying to @MinPetroleoVE
Se supone que es en todo el territorio Nacional, pero el Estado Bolivar , según Justo Noguera y la Zodi Bolivar 62, no cumplen órdenes del Presidente y sus ministros y tan campantes!

# EXHIBIT 23

República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

## THE NATIONAL ASSEMBLY
## OF THE BOLIVARIAN REPUBLIC OF VENEZUELA

As spokesperson for the Free, Sovereign and Democratic People

**AGREEMENT TO REJECT THE JUDGMENT OF THE FULL CHAMBER OF THE ILLEGITIMATE SUPREME COURT, WHICH SEEKS TO INCRIMINATE THE FIRST VICE PRESIDENT OF THE NATIONAL ASSEMBLY, DEPUTY EDGAR JOSÉ ZAMBRANO RAMÍREZ, AND TO REJECT ANY ATTACKS ON THE PARLIAMENTARY IMMUNITY OF NATIONAL ASSEMBLY DEPUTIES**

**WHEREAS**

On May 2 of this year, the illegitimate Full Chamber of the Supreme Court decided by judgment of file AA10-L-2019-000026, to hold the First Vice President of the National Assembly, Deputy Edgar José Zambrano Ramírez, liable for the flagrant commission of alleged offenses of "Treason against the Homeland, Conspiracy, Instigation of Insurrection, Civil Rebellion, Conspiracy to Commit a Crime, Usurpation of Functions, Public Instigation to Disobey Laws and Continued Hatred";

**WHEREAS**

There is an attempt to incriminate Deputy Edgar José Zambrano Ramírez for attending an event organized by the President (E) of the Republic and Commander-in-Chief of the Armed Forces, Juan Gerardo Guaidó Márquez, which does not, under any circumstances, constitute a crime. He has acted in accordance with Articles 233, 333 and 350 of the National Constitution;

**WHEREAS**

Such an illegitimate decision of the Supreme Court constitutes yet another attack on the National Assembly, its leadership and the people of Venezuela who elected it in parliamentary elections on December 6, 2015, which is an attack on the Constitution of the Bolivarian Republic of Venezuela;

**WHEREAS**

The Supreme Court that issues the judgment against Deputy Edgar José Zambrano Ramírez is illegitimate and seeks to annul the power and authority that the Constitution and the people of Venezuela grant to Parliament;

República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

**WHEREAS**

Those who signed the judgment are usurping functions, for they were not chosen in accordance with the Constitution, such that the above decision is rejected as absolutely null and void;

**WHEREAS**

With its unfounded decision, the illegitimate Supreme Court is once again attacking the Constitutional Order by violating the institution of parliamentary immunity enjoyed by deputies since its proclamation as such under Article 200 of the Constitution of the Bolivarian Republic of Venezuela. Likewise, the spurious national constituent assembly has no capacity to make a decision on the breach of the immunity of National Assembly deputies, since such power is unique and exclusive to the body of which the deputies form a part;

**WHEREAS**

The aforementioned decision of the Full Chamber of the illegitimate Supreme Court is issued in violation or impairment of the rights guaranteed by the Constitution. In addition to devaluing and degrading the prerogative of parliamentary immunity by eliminating the need for merit, it entrusted the trial of Deputy Edgar José Zambrano Ramírez to the common courts, disregarding "the reserved, sole, unique and exclusive jurisdiction conferred on it by the Constitution in its Article 200", "as well as its Article 266, Paragraph 3";

**WHEREAS**

The judgment of the illegitimate Supreme Court is also a violation of the rights to due process, to defense, to presumption of innocence and to be tried by its natural judge, under Article 49, Paragraphs 1, 2 and 4, which, as fundamental rights and due to the abuse of power by which they were disregarded, constitutes a serious violation of human rights under Articles 29 and 30 of the Constitution;

República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

**WHEREAS**

The serious violation of the human rights of Deputy Edgar José Zambrano Ramírez has no statutory limit. As such, the officials who violate the prerogative of parliamentary immunity and the aforementioned rights incur criminal liability under the last paragraph of Article 200 of the Constitution; Article 139, for abuse of power; and Article 25, also of the Constitution;

**WHEREAS**

The classification of flagrancy in the commission of an offense is a probative status, which can only be made upon presentation of the apprehended party by guaranteeing his right to defense. In this case, such a factual assumption was not made and, as such, there is no judicial qualification; therefore, the injunction is based on a false assumption and, therefore, its consequence is null;

**WHEREAS**

On December 18, 2018, Deputy Edgar José Zambrano Ramírez, in his capacity as President of the Defense Commission of this National Assembly, denounced the presence of ships hired by Exxon Mobil in the Exclusive Economic Zone formed by the Orinoco Delta. As a member of the Commission for the Defense of the Essequibo and the Atlantic Seaboard, he has defended and promoted Venezuela's claim to its territory, having established its rejection of the Declaration of the Lima Group in the Agreement on Ratification of National Sovereignty over the Essequibo Territory, its Atlantic Seaboard and the Exclusive Economic Zone of the Orinoco Delta approved by the National Assembly on January 8 of this year, on which he serves as First Vice President;

**WHEREAS**

Deputy Edgar José Zambrano Ramírez is not involved in any plan to overthrow the government. He is a faithful believer in using dialogue and democratic avenues to resolve the disputes inherent to political activity. Notable examples of his capacity for dialogue and negotiation include the cases of detained deputies who were elected for the 2010-2015 term. Thanks to his humanistic capacity and ability to engage in dialogue, they were freed, and some were re-elected for the 2015-2020 term;

República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

**WHEREAS**

Deputy Edgar José Zambrano Ramírez has advocated for the guarantee, promotion and respect of human rights. Proof of this is the submission of two bills focused on Amnesty and Political Reconciliation that speak to his strong belief in the spiritual and political dimension of human beings;

**WHEREAS**

The spurious judicial attack against the First Vice President of the National Assembly is a further escalation in the process of falsifying the Constitution by illegitimate judges who are engaged in subversion vis-à-vis the Constitutional Order;

**WHEREAS**

This National Assembly, the sole legitimate authority of the Venezuelan State, is committed to the defense of the interests of the people of Venezuela and will not endorse any dark practice on the part of the illegitimate powers that sustain the usurpation that seeks to nullify this body and its representatives, who were chosen by the people.

**RESOLVES**

**FIRST**. To reject categorically and in all its terms the alleged ruling that seeks to hold Deputy Edgar José Zambrano Ramírez, First Vice President of the National Assembly, responsible for the alleged crimes because in accordance with the Statute that Governs the Transition to Democracy in order to Restore the Validity of the Constitution, the members of the Supreme Court are illegitimate, except for the justices appointed by this National Assembly during the session held on July 21, 2017. This body further resolves to reject any acts of the government entities that seek to violate the parliamentary immunity of National Assembly deputies.

**SECOND**. To ratify this National Assembly's rejection of the decisions of a Supreme Court which has no legitimacy or jurisdiction.

**THIRD**. To express this body's solidarity with and support for Deputy Edgar José Zambrano Ramírez in view of this new violation of his rights and of this Legislative Body. The National Assembly further resolves to grant all of its support to the Inter-American Commission on Human Rights (IACHR) so that it may issue a statement on this matter.

5



República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

**FOURTH**. To submit this Agreement to the Diplomatic Corps accredited in the Bolivarian Republic of Venezuela, to the various diplomatic bodies representing the President (E) Juan Gerardo Guaidó accredited abroad, to the Inter-parliamentary Union, the Organization of American States (OAS), the Secretary General of the United Nations and the High Commissioner for Human Rights of that Organization, the Socialist International, the Permanent Conference of Political Parties of Latin America (OPPPAL), the Christian Democratic Organization of America (ODCA) and other organizations of democratic parties in the world, the Latin American Parliament, the Mercosur Parliament (Parlasur) and the Episcopal Conference of Venezuela.

**FIFTH**. To publish this Agreement.

Completed, signed and sealed at the Federal Legislative Palace, seat of the National Assembly of the Bolivarian Republic of Venezuela, in Caracas on the seventh day of May 2019, years 209 of Independence and 160 of the Federation.


**JUAN GERARDO GUAIDÓ MÁRQUEZ**
President


**EDGAR JOSÉ ZAMBRANO RAMÍREZ**          **IVÁN STALIN GONZÁLEZ MONTAÑO**
First Vice President                                  Second Vice President


**EDINSON DANIEL FERRER ARTEAGA**          **JOSÉ LUIS CARTAYA PIÑANGO**
Secretary                                              Deputy Secretary

# EXHIBIT 24

República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

**LA ASAMBLEA NACIONAL**
**DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA**

Como Vocera del Pueblo libre, Soberano y Democrático

**ACUERDO EN DESCONOCIMIENTO DE LA SENTENCIA**
**DE LA SALA PLENA DEL ILEGÍTIMO TRIBUNAL SUPREMO**
**DE JUSTICIA QUE PRETENDE INCRIMINAR AL PRIMER**
**VICEPRESIDENTE DE LA ASAMBLEA NACIONAL, DIPUTADO EDGAR**
**JOSÉ ZAMBRANO RAMÍREZ Y EN DESCONOCIMIENTO DE**
**CUALESQUIERA ATENTADOS EN CONTRA DE LA INMUNIDAD**
**PARLAMENTARIA DE LOS DIPUTADOS DE LA ASAMBLEA NACIONAL**

**CONSIDERANDO**

Que en fecha 02 de mayo del presente año, el ilegítimo Tribunal Supremo de Justicia, en Sala Plena, decidió mediante sentencia del expediente AA10-L-2019-000026, comprometer la responsabilidad del Primer Vicepresidente de la Asamblea Nacional, Diputado Edgar José Zambrano Ramírez**,** en la comisión flagrante de supuestos delitos de "Traición a la Patria, Conspiración, Instigación a la Insurrección, Rebelión Civil, Concierto para Delinquir, Usurpación de Funciones, Instigación Pública a la desobediencia de las leyes y el odio continuada";

**CONSIDERANDO**

Que se pretende incriminar al Diputado Edgar José Zambrano Ramírez por hacerse presente en un acto convocado por el Presidente (E) de la República y Comandante en Jefe de las Fuerzas Armadas, Juan Gerardo Guaidó Márquez, lo cual no configura bajo ninguna circunstancia, delito alguno. Ha actuado apegado a los artículos 233, 333 y 350 de la Constitución Nacional;

**CONSIDERANDO**

Que tal decisión del Tribunal Supremo de Justicia ilegítimo, constituye una agresión más a la Asamblea Nacional, su directiva y al pueblo de Venezuela que la escogió en elecciones parlamentarias del 06 de diciembre de 2015, lo cual es un atentado contra la Constitución de la República Bolivariana de Venezuela;

**CONSIDERANDO**

Que el Tribunal Supremo de Justicia que emite la sentencia contra el Diputado Edgar José Zambrano Ramírez es ilegítimo y prosigue en su

República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

pretensión de anular el poder y las facultades que la Constitución y el pueblo de Venezuela otorgan al Parlamento;

**CONSIDERANDO**

Que quienes suscriben el fallo usurpan funciones, pues no fueron escogidos en apego a la Constitución, por lo que se reputa la mencionada decisión como nula de nulidad absoluta;

**CONSIDERANDO**

Que con su decisión infundada, el ilegítimo Tribunal Supremo de Justicia vuelve a agredir el Orden Constitucional al vulnerar la institución de la inmunidad parlamentaria, propia de los diputados desde el momento de su proclamación como tales, de conformidad con el artículo 200 de la Constitución de la República Bolivariana de Venezuela. Asimismo, no tiene cualidad la espuria asamblea nacional constituyente, para conocer sobre el allanamiento de la inmunidad de los diputados a la Asamblea Nacional, toda vez que tal facultad es exclusiva y excluyente del cuerpo al cual forman parte los diputados;

**CONSIDERANDO**

Que la decisión incontinente de la Sala Plena del ilegítimo Tribunal Supremo de Justicia es un acto dictado en violación o menoscabo de los derechos garantizados por la Constitución, que además de devaluar y degradar la prerrogativa de la inmunidad parlamentaria al prescindir del antejuicio de merito, encomendó el juicio del Diputado Edgar José Zambrano Ramírez a los tribunales comunes, declinando "la competencia privativa, única, exclusiva y excluyente que le atribuye la Constitución en su artículo 200", "al igual que su artículo 266, numeral 3";

**CONSIDERANDO**

Que la sentencia del ilegítimo Tribunal Supremo de Justicia es también una violación de los derechos al debido proceso, de defensa, de presunción de inocencia y de ser juzgado por su juez natural, a que se contrae el artículo 49, numerales 1, 2 y 4, que por su carácter de derechos fundamentales y el abuso de poder por el que se les desconoció, constituye un delito de violación grave a los Derechos Humanos, concordantes con lo dispuesto en los artículos 29 y 30 de la misma Constitución;

República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

**CONSIDERANDO**

Que el delito de grave violación a los Derechos Humanos del Diputado Edgar José Zambrano Ramírez, es imprescriptible, por lo que los funcionarios que violen la prerrogativa de la inmunidad parlamentaria y los mencionados derechos, incurren en responsabilidad penal, según el último párrafo del artículo 200 constitucional, en concordancia con el artículo 139, por abuso de poder; y con el artículo 25, también de la Constitución;

**CONSIDERANDO**

Que la calificación de flagrancia en la comisión de un delito, es un estado probatorio, que solo puede hacerse previa presentación del aprehendido asegurándole su derecho a la defensa. En el presente caso tal supuesto de hecho no se configuró y, en consecuencia, no existe calificación judicial alguna; por lo que, la solicitud parte de un falso supuesto y, por tanto, su consecuencia es nula;

**CONSIDERANDO**

Que el Diputado Edgar José Zambrano Ramírez, desde la Presidencia de la Comisión de Defensa de esta Asamblea Nacional, el 18 de diciembre del 2018, denunció la presencia de buques contratados por la Exxon Móbil en la Zona Económica Exclusiva que genera el Delta del Orinoco y desde la Comisión para la defensa del Esequibo y la Fachada Atlántica, de la cual es integrante, ha sido defensor y promotor de la reclamación venezolana de su territorio, quedando establecido su rechazo a la Declaración del Grupo de Lima en el Acuerdo en Ratificación de la Soberanía Nacional sobre el Territorio Esequibo, su Fachada Atlántica y la Zona Económica Exclusiva del Delta del Orinoco, aprobado por la Asamblea Nacional el 8 de enero del año en curso, de cuyo cuerpo es el Primer Vicepresidente;

**CONSIDERANDO**

Que el Diputado Edgar José Zambrano Ramírez no se encuentra involucrado en ningún plan golpista, siendo fiel creyente del diálogo y las vías democráticas para la resolución de las controversias propias de la actividad política. Ejemplos notorios de su capacidad de diálogo y negociación, se han hecho evidentes en casos de diputados detenidos que fueron electos para el período 2010-2015, y gracias a su capacidad humanista y de diálogo se logró su liberación, siendo algunos reelectos para el período 2015-2020;

República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

## CONSIDERANDO

Que el Diputado Edgar José Zambrano Ramírez ha sido un activista por la garantía, promoción y respeto de los Derechos Humanos, y prueba de ello es la presentación de dos proyectos de Amnistía y Reconciliación Política, proyectos que denotan su fuerte convicción en la dimensión espiritual y política del Ser Humano;

## CONSIDERANDO

Que la arremetida judicial espuria contra el Primer Vicepresidente de la Asamblea Nacional es una escalada más en el proceso de falseamiento a la Constitución, por parte de los ilegítimos magistrados que se encuentran en subversión frente al Orden Constitucional;

## CONSIDERANDO

Que esta Asamblea Nacional, único poder legítimo del Estado venezolano, está comprometida en la defensa de los intereses del pueblo de Venezuela y no avalará ninguna práctica oscura por parte de los poderes ilegítimos que sostienen la usurpación que persiga anular a este cuerpo y sus representantes escogidos por el pueblo.

## ACUERDA

**PRIMERO**. Rechazar categóricamente y en todos sus términos el pretendido fallo que busca comprometer la responsabilidad del Diputado Edgar José Zambrano Ramírez, Primer Vicepresidente de la Asamblea Nacional, por cuanto de conformidad con el Estatuto que Rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución, los integrantes del Tribunal Supremo de Justicia son ilegítimos, salvo los Magistrados designados por esta Asamblea Nacional en la sesión de fecha 21 de julio de 2017. Asimismo, desconocer cualesquiera actos de los órganos del Poder Público que pretendan violar la inmunidad parlamentaria de los diputados de la Asamblea Nacional.

**SEGUNDO**. Ratificar el desconocimiento de esta Asamblea Nacional a las decisiones de un Tribunal Supremo de Justicia que no posee legitimidad ni jurisdicción alguna.

**TERCERO**. Expresar la solidaridad y apoyo de la Asamblea Nacional al Diputado Edgar José Zambrano Ramírez, ante este nuevo atropello a sus derechos y a este Cuerpo Legislativo. Al mismo tiempo, tenderle todo el



República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

apoyo para que la Comisión Interamericana de los Derechos Humanos (CIDH) se pronuncie.

**CUARTO**. Hacer entrega del presente Acuerdo al Cuerpo Diplomático acreditado en la República Bolivariana de Venezuela; a las diversas representaciones diplomáticas que representan al Presidente (E) Juan Gerardo Guaidó acreditadas en el exterior; a la Unión Interparlamentaria, a la Organización de Estados Americanos (OEA), al Secretario General de las Naciones Unidas y a la Alta Comisionada de los Derechos Humanos de dicho Organismo; a la Internacional Socialista, a la Conferencia Permanente de Partidos Políticos de América Latina (OPPPAL), a la Organización Demócrata Cristiana de América (ODCA) y demás organizaciones que congregan partidos democráticos en el mundo, al Parlamento Latinoamericano, al Parlamento del Mercosur (Parlasur) y a la Conferencia Episcopal de Venezuela.

**QUINTO**. Dar publicidad al presente Acuerdo.

Dado, firmado y sellado en el Palacio Federal Legislativo, sede de la Asamblea Nacional de la República Bolivariana de Venezuela, en Caracas a los siete días del mes de mayo de 2019, años 209° de la Independencia y 160° de la Federación.


**JUAN GERARDO GUAIDÓ MÁRQUEZ**
Presidente


**EDGAR JOSÉ ZAMBRANO RAMÍREZ**          **IVÁN STALIN GONZÁLEZ MONTAÑO**
Primer Vicepresidente                                   Segundo Vicepresidente


**EDINSON DANIEL FERRER ARTEAGA**          **JOSÉ LUIS CARTAYA PIÑANGO**
Secretario                                              Subsecretario

# EXHIBIT 25

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

## THE NATIONAL ASSEMBLY OF THE
## BOLIVARIAN REPUBLIC OF VENEZUELA
Decrees

The following:

## STATUTE TO GOVERN A TRANSITION TO DEMOCRACY
## TO REESTABLISH THE FULL FORCE AND EFFECT OF THE
## CONSTITUTION OF THE BOLIVARIAN REPUBLIC OF VENEZUELA

### PRELIMINARY RECITALS

The *Statute that governs a Transition to democracy to restore the full force and effect of the Constitution of the Bolivarian Republic of Venezuela* is an act to directly and immediately execute article 333 of our Magna Carta. The purpose of the Statute is to return to the Constitution, based on the Constitution itself, to provide for an orderly and rational path for the unprecedented and imminent process of political change that has begun in the country. The Statute is a legislative initiative by the National Assembly, which aspires to preserve the 1999 Constitution as a covenant of coexistence for the civic life of Venezuelans and the foundation of a transition to democracy.

### I

For twenty years during the Bolivarian Revolution, a political system has been imposed which is divorced from Venezuela's constitutional principles and republican tradition. Venezuelans suffer serious material shortages, and a radical curtailment of all their rights, including political rights. Real socialism has subjected them to persecution, chaos and misery. Faced with this situation an urgent need arises to return to constitutional democracy. In this sense, the superior values that inspire the present Statute "are life, liberty, justice, equality, solidarity, democracy, social responsibility, constitutional supremacy and, in general, the pre-eminence of Human Rights, ethics, and political pluralism"(article 5).

### II

A narrative of the democratic struggle that has been fought in recent years is required to explain the relevance of the rules that are submitted below. The conditions currently in favor of political change are not a random event. They are not about the spontaneous collapse of a dictatorship. They are a heroic deed by all of the people of Venezuela, with the support of the international community, in view of the severity of the autocratic expansion of the Bolivarian Revolution.

National Assembly
Caracas - Venezuela

[*Translation*]

The moment of liberation which began on January 10, 2019 had its origin in the opposition's refusal to participate in the fraudulent process of May 20, 2018, following its refusal to sign the Electoral Agreement proposed by the emissaries of Nicolás Maduro Moros in the Dominican Republic. On May 20, 2018, the *de facto* regime tried to simulate an electoral process in which the Venezuelan people were unable to exercise their right to vote in freedom and the foundation was laid for the current usurpation scenario. The silence of the citizenry at the polls became a deafening cry for freedom that stripped the regime of its legitimacy and has expanded to this day. Thus, when the time came for a new President-elect to be sworn in under the Constitution, that did not take place, and Nicolás Maduro Moros clung to the Executive power, as a matter of fact, deepening the usurpation.

### III

Since January 10, 2019, Nicolás Maduro Moros continues to usurp the Presidency of the Bolivarian Republic of Venezuela, and a *de facto* government has been set up in the country. However, article 333 of the National Constitution in force reads: *this Constitution shall not lose its effectiveness if it ceases to be observed by an act of force, or because it is repealed by any other means than the means contained in the Constitution. In such a case, any citizen, whether invested with such authority or not, shall have the duty to cooperate in restoring the Constitution's full force and effect.* In this sense, by being faithful to our Magna Carta and by responding to their civic conscience, the Venezuelan people are obliged to promote actions to allow the restoration of constitutional order.

It should be noted that the Statute deals with a reality, present both in the country and the world. While the Legislative Branch is enacts this Statute, the Venezuelan people are rebelling peacefully against the usurpation and the group of free nations has acknowledged that constitutional order has been broken. The whole world is witness to massive demonstrations of a peaceful and constitutional nature, which evidence the irreversible demand for change and freedom within the heart of every Venezuelan.

Thus, we find ourselves in a political, legal, and constitutional situation that favors the restoration of constitutional order. The National Assembly is aware of the urgency of this moment, and offers this Statute as an efficient way to return to democracy along the paths established by the Constitution and, in that manner, guarantee an orderly transition which will permit the establishment of a system of liberties that offers lasting and stable peace, from generation to generation.

### IV

*The Statute that governs the transition to democracy, and restore the full force and effect of the Constitution of the Bolivarian Republic of Venezuela* consists of seven (7) chapters

2

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

and thirty-nine (39) articles. It is at the same time specific and flexible in its design. It is intended to efficiently address the challenges of institutional reconstruction, while remaining open to the dynamics of political change. These design guidelines -specificity and flexibility - respond to the challenges that will bring about democratic openness, pluralism and the need to find paths of consensus among the different political forces that will be involved in the process of restoring constitutional order. In short, the Statute attempts to rationalize, morally, legally, and technically, the democratizing energies of political organizations and civil society in order to frame them in the best Venezuelan republican tradition.

The first chapter - *General Provisions* - includes the definition of democratic transition, the legal nature of the Statute, the superior values that guided the legislators and their objectives. Regarding the definition of democratic transition (article 3), it is worth mentioning that three progressive phases are identified. First, ceasing the usurpation. Next, establishing a provisional government and, finally, holding free, clear, and fair elections. In each of these phases, the National Assembly shall exercise certain powers, in a progressive manner, until the democratic transition is achieved and constitutional order is restored.

The second chapter deals with *usurpation of the National Executive Branch.* It confirms the absence of an elected president in Venezuela; qualifies the situation as a usurpation; specifies the ineffectiveness of the usurped authority; establishes the cessation of any duty of obedience to Nicolás Maduro Moros; and identifies the end of usurpation as a milestone marking the liberation from the autocratic regime.

The third chapter deals with *the role of the National Assembly* and its President for as long as usurpation of the Presidency of the Republic continues. First, it reaffirms the validity of the constitutional period of the Legislative Branch. Next, it establishes that, "the President of the National Assembly is, in accordance with article 233 of the Constitution, the legitimate President in charge of the Bolivarian Republic of Venezuela" (article 14). The following articles discuss the role of the National Assembly, the path to reintegrate the Venezuelan State into the group of free nations, and the rules that will guide the political and economic transition.

The fourth chapter discusses the *re-institutionalization of bodies of the Citizen Branch, the National Electoral Council, and the Supreme Court of Justice.* The Statute specifies the National Assembly competence to renew public powers and a path is established to legitimize the Citizen Branch, the Supreme Court of Justice, and the rectors of the National Electoral Council, establishing a transitional period for the Public Powers designated during the provisional Government.

The fifth chapter establishes the guidelines *to create a provisional Government for national unity.* Once the usurpation is ended, the National Assembly shall guarantee full

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

compliance with article 233 of the National Constitution, once liberation from the autocracy is completed. The President of the Legislative Branch "shall act for thirty (30) consecutive days as President in Charge for the purpose of conducting the process which will bring about the establishment of a provisional Government for national unity and adopting the necessary measures to hold free and fair presidential elections" (article 25). This section provides for the mechanisms that will govern the political process following the end of usurpation.

Following the transition path established in article 3, the sixth chapter refers to *free elections*. It establishes mechanisms to guarantee free, just and fair elections. It also establishes a clear and unequivocal commitment to "strengthening political organizations, in accordance with the provisions of article 67 of the Constitution" (article 32). This commitment is specifically made in recognition of the importance of guaranteeing political participation and a stable democratic system.

And in conclusion, in the *Final Provisions,* the publication of the Statute is authorized and extraordinary measures are ordered for its promulgation, given the impossibility publishing it in the Official Gazette.

**V**

The Statute that governs *the Transition to democracy to re-establish the full force and effect of the Constitution of the Bolivarian Republic of Venezuela* is an expression of the democratic vocation and desire for freedom of the Venezuelan people. It is proof of the people's political maturity and, through it, the country will be guided toward the reestablishment of the constitutional order, in a peaceful and orderly manner, and to set the foundation for a stable and lasting democracy.

4

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

**THE NATIONAL ASSEMBLY OF THE
BOLIVARIAN REPUBLIC OF VENEZUELA**
Based on Article 7, and Article 333, of the Constitution,

**DECREES**

The following

**STATUTE TO GOVERN A TRANSITION TO DEMOCRACY,
TO REESTABLISH THE FULL FORCE AND EFFECT OF THE
CONSTITUTION OF THE REPUBLIC OF VENEZUELA**

**CHAPTER I
GENERAL PROVISIONS**

*Purpose*

**Article 1.**  The purpose of this Statute is to establish a legal framework to govern a democratic transition in the Bolivarian Republic of Venezuela.

*Democratic Transition*

**Article 2.**  For the purposes of this Statute, transition is understood as the process of democratization and re-institutionalization involving the following phases: liberation from the autocratic regime that oppresses Venezuela, creation of a provisional Government for national unity, and holding free elections.

*Purpose of the Democratic Transition*

**Article 3.**  The objectives of the democratic transition are to fully restore the constitutional order, rescue the popular sovereignty through free elections, and reverse the complex humanitarian emergency, for the purpose of rescuing the system of liberties, constitutional guarantees and human rights.

*Legal Nature*

**Article 4.**  The present Statute is a legal act in direct and immediate execution of article 333 of the Constitution of the Bolivarian Republic of Venezuela.  Any action decreed by entities of the Public Branch to carry out the guidelines established in this Statute are also based on article 333 of the Constitution, and are mandatory for all authorities and public officials, as well as all individuals.

5

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

*Principles*

**Article 5.**  The superior values which govern this Statute are  life, liberty, justice, equality, solidarity, democracy, social responsibility, constitutional supremacy and, in general, preeminence of human rights, ethics, and political pluralism.

*Objectives*

**Article 6.**  In accordance with article 333 of the Constitution, the objectives of this Statute are to:

1. Regulate actions by the different branches of the Public Power during the process of democratic transition, in accordance with article 187, paragraph 1 of the Constitution, allowing the National Assembly to begin the process of re-establishing constitutional and democratic order.

2. Establish guidelines for the National Assembly to protect the rights of the Venezuelan State and people before the international community, until a provisional Government for national unity is set up.

3. Lay the foundation to initiate a process of national reconciliation among citizens.

4. Establish political guidelines to guide the National Assembly to set up a Government for national unity, which shall act during the absence of a President-elect until free and transparent elections are completed in the shortest time possible.

5. Define criteria and timing to appoint or ratify public officials within the Citizen Branch, the Electoral Branch and the Supreme Court of Justice, in accordance with the Constitution and the laws.

6. Establish guidelines to guarantee a constitutional integration of the National Armed Forces in the democratic transition process, in accordance with the directives of article 328 of the Constitution.

7. Define the bases for economic transition under the terms of article 299 of the Constitution and reverse the complex humanitarian emergency.

8. Establish a general framework to implement reforms aimed at rescuing popular sovereignty through free, fair and transparent elections.

9. Fully reinsert the Venezuelan State into the international organizations for the protection of human rights, rendering the renunciation of the OAS Charter null and void, ratify the American Convention on Human Rights and the compulsory contentious

6

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

jurisdiction of the Inter-American Court of Human Rights; as well as ratify the other treaties on human rights in the inter-American system and in the United Nations system.

*Progressive Application of this Statute*

**Article 7.**  To progressively achieve the objectives defined in the previous article, the three phases of the democratic transition enshrined in article 2 of this Statute shall be taken into account:

1.  Liberation from the dictatorial regime, which shall occur with the cessation of the *de facto* powers exercised by Nicolás Maduro Moros.

2.  Establishment of a provisional Government for national unity, which shall ensure that the democratic system is restored and free elections are held.

3.  Restoration of a democratic State by holding free, clear and fair elections in the shortest time possible.

### CHAPTER II
### On the Usurpation of the Executive Branch

*Absence of President-elect*

**Article 8.**  The political event held on May 20, 2018 was not a legitimate presidential election.  Therefore, there is no legitimate President-elect to assume the Presidency of the Bolivarian Republic of Venezuela for the 2019-2025 period.

*Usurpation of the Presidency of the Republic*

**Article 9.**  By virtue of the provisions of the preceding article, the assumption of the Presidency of the Bolivarian Republic of Venezuela by Nicolás Maduro Moros, or by any other official or representative of the *de facto* regime, is a usurpation of authority under the terms of article 138 of the Constitution.

*Ineffectiveness of usurped presidential authority*

**Article 10.**  The usurpation of the Presidency of the Bolivarian Republic of Venezuela is derived from the assumption of that position by a person who is not the President-elect and does not have a constitutional right to so assume it.  All acts by the usurping authority as of January 10, 2019 shall be considered null and void, in accordance with article 138 of the Constitution of the Bolivarian Republic of Venezuela.

7

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

*Cessation of the duty of obedience to usurped authority*

**Article 11.** No citizen, whether invested with authority or not, shall obey any mandate by the usurping authority. Public officials who contribute to the usurpation shall be liable, as established in articles 25 and 139 of the Constitution. All public officials have the duty to abide by article 7 and article 333 of the Constitution in order to obey the mandates of Venezuela's legitimate Public Branches, especially with regard to the execution of this Statute.

*Cessation of usurpation and liberation from the autocratic regime*

**Article 12.** The cessation of the usurped authority of Nicolás Maduro Moros, and the creation of a provisional Government for national unity are concurrent elements that will free the country from the autocratic regime as established in article 2 herein.

### CHAPTER III
### On Actions by the National Assembly and its President

*Validity of the National Assembly term*

**Article 13.** The National Assembly, elected by popular vote on December 6, 2015, shall exercise its constitutional functions within the framework of the current Legislature until January 4, 2021. On January 5, 2021, a new legislature of the National Assembly shall be installed, in accordance with article 219 of the Constitution of the Bolivarian Republic of Venezuela. To that end, parliamentary elections shall be held during the last quarter of the 2020, as established in the constitutional rules and electoral laws.

*The NA President as Interim President*
*of the Bolivarian Republic of Venezuela*

**Article 14.** The President of the National Assembly is, in accordance with article 233 of the Constitution, the legitimate Interim President of the Bolivarian Republic of Venezuela. The acts of the Interim President shall be submitted to the parliamentary control of the National Assembly under article 187, numeral 3, of the Constitution.

*Defense of the rights of the Venezuelan people and State*

**Article 15.** The National Assembly may adopt any decisions necessary to defend the rights of the Venezuelan State before the international community, to safeguard assets, property and interests of the State abroad, and promote the protection and defense of human rights of the Venezuelan people, all in accordance with Treaties, Conventions, and International Agreements in force.

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

In exercising the powers derived from article 14 of this Statute, and within the framework of article 333 of the Constitution, the Interim President of the Bolivarian Republic of Venezuela shall exercise the following powers, subject to authorization and control by the National Assembly under the principles of transparency and accountability.

a.      Appoint *ad hoc* Administrative Boards to assume the direction and administration of public institutes, autonomous institutes, State foundations, State associations and organizations, State companies, including companies established abroad, and any other decentralized entity, for the purpose of appointing administrators and, in general, adopting the measures necessary to control and protect State company assets.  The decisions adopted by the Interim President of the Republic shall be executed immediately, with full legal effect.

b.      While an Attorney General is validly appointed in accordance with article 249 of the Constitution, and within the framework of articles 15 and 50 of the Organic Law of the Attorney General of the Republic, the Interim President of the Republic may appoint a special attorney general to defend and represent the rights and interests of the Republic, State companies and other decentralized entities of the Public Administration abroad. The special attorney general shall have the power to appoint judicial representatives, including before international arbitration proceedings, and shall exercise the powers set forth in article 48, paragraphs 7, 8, 9 and 13, of the Organic Law of the Attorney General of the Republic, subject to the limitations derived from article 84 of that Law and this Statute.  Such representation shall be especially oriented toward ensuring the protection, control, and recovery of State assets abroad, as well as executing any action required to safeguard the rights and interests of the State.  The attorney general thus appointed shall have the power to execute any action and exercise all of the rights that the Attorney General would have, with regard to the assets described herein.  For such purposes, such special attorney general shall meet the same conditions that the Law requires to occupy the position of Attorney General of the Republic.

*Actions by the National Assembly*

**Article 16.**  By virtue of the provisions of the previous article, the National Assembly shall:

1.  Authorize the appointment of the heads of permanent diplomatic missions by the Interim President, in accordance with article 236, numeral 15, of the Constitution.

2.  Within the framework of the control powers established in the Constitution, defend the assets of the Bolivarian Republic of Venezuela and its entities abroad.

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

3. Participate in the investigation of any serious human rights violation, and the investigation of any illicit activity related to corruption and money laundering in order to ensure the recovery of capital derived from such illicit activities;

4. Promote the implementation of international cooperation mechanisms to address the humanitarian emergency and the refugee and migrant crisis, in accordance with International Humanitarian Law and article 23 of the Constitution of the Bolivarian Republic of Venezuela.

5. Adopt measures that will permit the recovery of state sovereignty throughout the territory of the Bolivarian Republic of Venezuela.

6. Articulate actions with civil society to promote mechanisms for public participation that will legitimize the democratic transition process and assist in bringing about the cessation of the usurpation of presidential powers by Nicolás Maduro Moros.

7. Exercise any other power that may be assumed by the National Assembly under article 333 of the Constitution, the laws of the Republic, and this Statute, within the limits established by Treaties and other international human rights instruments in force.

*Re-insert the Venezuelan State into the group of free nations*

**Article 17.** In exercise of the powers set forth in this Chapter, the National Assembly shall take actions designed to re-insert as soon as possible the Venezuelan State into the group of free nations, in accordance with the provisions of the Charter of the Organization of American States, the Inter-American Democratic Charter, the Charter of the United Nations, and other international instruments, in particular those relating to human rights in the inter-American and universal systems.

*Guidelines for political transition*

**Article 18.** The National Assembly shall enact Laws to promote the political transition in accordance with article 333 of the Constitution. The objectives of such Laws will be the following:

1. Create legal incentives and guarantees for civilian and military officials to act in accordance with the Constitution and disregard any order from the usurpers of the Presidency of the Republic since January 10, 2019, as well as other bodies tht have been established unconstitutionally, such as the current Supreme Court of Justice, the National Electoral Council, the Public Ministry, the Ombudsman's Office, and the Comptroller General of the Republic. The purpose of such incentives to for such civilian and military officials to cooperate and participate in the transition process and restoration of constitutional order.

10

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

2.  Develop a transitional justice system, aimed at recovering human dignity, justice, protection and integral reparations for victims of human rights violations.  The system shall include measures to establish the truth, and promote national reconciliation, in accordance with current human rights treaties and article 30 of the Constitution.  Once the usurpation ceases, the National Assembly shall create by law an independent Truth Commission, which shall be charged with investigating human rights violations, proposing political and legislative guidelines for reparations to victims, and promoting democratic education, a culture of peace and national reconciliation.

3.  Decree amnesty for citizens, both civilian and military, who are still deprived of their liberty for political reasons, and guarantee a democratic reintegration of citizens who cooperate in restoring constitutional order, all in accordance with articles 23, 29 and 187, numeral 5, of the Constitution and the standards of International Law on Human Rights.

4.  Define policies aimed at effective compliance with article 328 of the Constitution and constitutional integration of the Armed Forces into the democratic transition process.

*Guidelines for an economic transition*

**Article 19.**   The National Assembly shall issue laws to address the humanitarian emergency and promote the recovery of the Venezuelan economy, in accordance with article 299 of the Constitution.

## CHAPTER IV

### On the Re-institutionalization of the Citizen Branch, Supreme Court of Justice and National Electoral Council

*National Assembly jurisdiction to renew public branches*

**Article 20.**   It shall the National Assembly's responsibility to determine when to implement, in full or in part, the necessary procedures under article 333 of the Constitution to enable modifications to timing and legal requirements in order to recover the legitimacy of the Public Branch.  It is the duty of every citizen and public official to cooperate in such process.

The National Assembly shall proceed to appoint or ratify public officials within Public Branches: Citizen Branch, Rectors of the National Electoral Council, and Judges of the Supreme Court of Justice.

[*Translation*]

*Legitimizing the Citizen Branch*

**Article 21.**  The National Assembly shall determine when the process of appointing or ratifying public officials of the Citizen Branch.

Given that the Republican Moral Council cannot function constitutionally and democratically, and the factual impossibility of convening the Nominations Committee of the Citizen Branch while the usurpation by Nicolás Maduro Moros persists, the National Assembly, under article 333 of the Constitution, shall establish mechanisms pursuant to which citizens, organized through academies, universities and nongovernmental organizations, may publicly post lists of candidates for public office within the Citizen Branch.  The foregoing shall be in compliance with article 279 of the Constitution.

*Legitimizing the Supreme Court of Justice*

**Article 22.**  For the purposes of this Statute, any individual appointed by the National Assembly in accordance with the Constitution and the Organic Law of the Supreme Court of Justice, in the July 21, 2017 session, shall be considered a legitimate judge.

The National Assembly shall appoint or ratify judges to the Supreme Court of Justice who were appointed during legislatures prior to the 2016-2021 Legislature.

Once all Judges have been appointed, and vacancies have been filled, such Judges shall be incorporated into the highest jurisdictional body of the Bolivarian Republic of Venezuela in accordance with the provisions of the Organic Law of the Supreme Court of Justice.

*Legitimizing the Rectors of the National Electoral Council*

**Article 23.**  The National Assembly shall exercise its powers, under article 295 of the Constitution and the Organic Law of the Electoral Branch, to appoint or ratify the Rectors of the National Electoral Council.

The appointment of the Rectors of the National Electoral Council shall be a priority for the National Assembly.  The Electoral Nominations Committee shall exercise its powers as soon as possible so that a new National Electoral Council may proceed to hold free and fair elections without undue delay such that, once usurpation has come to an end and a provisional Government for national unity has been formed, such elections shall enable the consolidation of democracy.

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

*Transitory period for re-legitimized Public Branches*

**Article 24.** All Public Branches legitimized by the National Assembly in accordance with this Statute shall exercise their functions until the end of the first six months of 2021. The National Assembly that is elected in the last quarter of the year 2020, pursuant to article 13 of this Statute, shall appoint or ratify public officials within the Citizen Branch, judges of the Supreme Court of Justice, and Rectors of the National Electoral Council. Such appointed or ratified officials shall hold office for complete constitutional periods as set forth in the Constitution of the Bolivarian Republic of Venezuela.

## CHAPTER V

### On the creation of a Provisional Government for National Unity

*Continuity in the application of article 233 of the Constitution*

**Article 25.** Once usurpation of the Presidency of the Bolivarian Republic of Venezuela by Nicolás Maduro Moros and other representatives of the *de facto* regime ends, the National Assembly shall ensure that article 233 of the Constitution will continue to apply. The President of the National Assembly shall be Interim President of the Republic for thirty (30) consecutive days for the purpose of leading the process to create a provisional Government of national unity and adopt measures required to hold free and fair presidential elections.

*Appointment of a temporary President to form a provisional Government*

**Article 26.** Once the two assumptions set forth in the previous article are met, and in case of a technical impossibility to call and hold free and fair elections within thirty (30) continuous days as established in article 233 of the Constitution, the National Assembly shall ratify the Interim President as provisional President of the Bolivarian Republic of Venezuela for the purpose of forming a Government of national unity, which will initiate a second phase of the transition to democracy, as established in article 2 of this Statute, and within the framework of article 333 of the Constitution.

article 333 of the Constitution establishes that the mandate of the provisional Government will end when a new President-elect is sworn in before the National Assembly. The President-elect will be have been elected in free and fair elections convened and organized by the Electoral Branch and benefitting from all guarantees established by national and international electoral transparency standards. Such elections shall result in a Presidential period from 2019 to 2025, as established in article 233 of the Constitution. In any event, presidential elections must be held as soon as possible, as soon as all technical conditions are met and within a maximum period of twelve (12) months.

13

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

*Governance rules and minimum government program*

**Article 27.** The National Assembly, after consulting civil society and political organizations, shall approve by parliamentary agreement the rules of governance and guidelines of the minimum program to be implemented by the provisional Government within the principles of social market economy. To this end, guidelines for a political transition and guidelines for an economic transition derived from the provisions of articles 17 and 18 of this Statute shall be taken into consideration. That minimum program will respect the principles of the socioeconomic regime and role of the State in the economy as established in article 299 of the Constitution.

*International cooperation*

**Article 28.** The provisional Government for national unity shall procure international financial cooperation from multilateral organizations and other nations in the free world in order to initiate a process of economic transition and pursue the reversal of the humanitarian emergency. The provisional Government shall also request the permanent presence of international organizations specialized in guaranteeing and defending human rights to accompany the democratic transition process and inform the international community on the status of such rights in Venezuela.

*Rescuing state sovereignty throughout the erritory of the Republic*

**Article 29.** The provisional Government may request the assistance of the international community for the purpose of restoring State sovereignty in the territory of the Republic, with prior authorization by the National Assembly, in accordance with the powers granted in article 187 of the Constitution.

## CHAPTER VI

## On Elections

*Holding free elections*

**Article 30.** The National Assembly shall adopt, by application of articles 233 and 333 of the Constitution, measures to restore the conditions for electoral integrity and permit a presidential election to be held for the 2019-2025 presidential term.

*Restoring political rights*

**Article 31.** Once the other Public Branches have been renewed, the National Assembly shall adopt measures to ensure the right to seek nomination for elected office and the

14

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

right of suffrage may be freely exercised, in accordance with the Constitution and international electoral integrity standards.

*Strengthening political organizations*

**Article 32.** The National Assembly and the other legitimized Public Branches shall adopt measures to strengthen political organizations in accordance with article 67 of the Constitution.

## VII

## Transitory and Final Provisions

*Parliamentary acts for the execution of this Statute*

**Article 33.** The National Assembly shall adopt any decision, Agreements and Laws necessary to implement this Statute, in order to allow the effective restoration of the Constitution and to put an end to the usurpation of the Presidency of the Republic. Until such objectives are achieved, the provisions in this Statute and other decisions adopted within the framework of articles 233 and 333 of the Constitution shall apply preferentially.

*Transitional rules regarding PDVSA and PDVSA subsidiaries*

**Article 34.** Given the risks faced by PDVSA and its subsidiaries as a result of the usurpation referred to in Chapter II of the present Statute, and while such a situation persists, under the authoritative control of the National Assembly and within the framework of the application of article 333 of the Constitution, the Interim President shall appoint an *ad hoc* Administrative Board for Petróleos de Venezuela S.A. (PDVSA), in accordance with article 15, letter a, of the present Statute, to exercise PDVSA's rights as shareholder of PDV Holding, Inc. The powers shall be exercised in accordance with the following principles:

1. The *ad hoc* Administrative Board may be composed of persons domiciled abroad and shall have powers to act as shareholders' assembly and board of directors of PDVSA, with the objective of taking all actions that may be necessary to designate the board of directors of PDV Holding, Inc., in representation of PDVSA as sole shareholder of that company. The new directors of PDV Holding, Inc. shall proceed to appoint new boards of directors for the PDV Holding, Inc.'s subsidiaries, including Citgo Petroleum Corporation.

2. This transitory provision shall prevail over any other applicable rule, and shall govern the interpretation of any other formality required by the Venezuelan legal

15

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

system and corporate documents, in order to exercise the representation of PDVSA as sole shareholder of PDV Holding, Inc.

3. The new directors of PDV Holding, Inc. and its subsidiaries shall guarantee the functional autonomy of said companies, particularly with respect to PDVSA. Based on the foregoing:

   a) The autonomous management of the business of PDV Holding, Inc. and its subsidiaries shall follow commercial efficiency criteria, subject only to the control and accountability mechanisms exercised by the National Assembly, and other applicable control mechanisms.

   b) PDV Holding, Inc. and its subsidiaries shall have no relationship whatsoever with the people currently usurping the Presidency of the Republic. For as long as such usurpation persists, PDV Holding, Inc. and its subsidiaries shall make no payments or distributions to PDVSA.

*Publicity concerning present Statute*

**Article 35.** The National Assembly shall communicate as soon as possible the contents of this Statute to the Venezuelan Nation, as well as the international community, including foreign Governments, the Secretary General of the United Nations (UN), the Secretary General of the OAS, the UN High Commissioner for Human Rights, the Inter-American Commission on Human Rights, the European Union, the African Union, the Organization of Petroleum Exporting Countries, the World Bank, the International Monetary Fund, the Inter-American Development Bank, and the Andean Development Corporation-Latin American Development Bank, among others.

*Disposition and management of State assets*

**Article 36.** State assets that are recovered through the mechanisms established in this Statute may not be disposed of or realized until the usurpation ends and a provisional Government of national unity is formed. To this end, and by virtue of the continuous budgetary renewal process that the Republic has experienced since 2016, the National Assembly may issue a special law on financial and budgetary matters, in accordance with article 187, paragraphs 6, 7 and 8 of the Constitution.

*Entry into Force*

**Article 37.** This Statute shall enter into force after being approved by the members of the National Assembly, pursuant to Constitutional rules for legislative procedures and in accordance with the National Assembly's Internal and Debate Rules

Bolivarian Republic of Venezuela
National Assembly
Caracas - Venezuela

[*Translation*]

*Extraordinary means to promulgate the present Statute*

**Article 38.** By virtue of the fact that access to the Official Gazette is an impossibility because of the *de facto* regime and the usurpation that prevails in Venezuela, the Statute and the decisions that are to be implemented shall be published in such manner as may be determined by the National Assembly for such purpose.

For such purposes, and while the situation indicated in this article persists, the Laws and Agreements issued by the National Assembly, as well as the decisions issued by the Interim President of the Republic, shall be published in the Legislative Gazette, in accordance with the provisions of the Internal and Debate Regulations. Laws, Agreements, and other decisions shall become effective upon publication in the Legislative Gazette, including in digital format. The Official Publications Act shall apply supplementally.

*Residual Clause*

**Article 39.** In order to ensure a democratic transition, anything not covered by this Statute shall be resolved by the National Assembly by application of article 333 of the Constitution.

Issued, signed and sealed at the Federal Legislative Palace, seat of the National Assembly of the Bolivarian Republic of Venezuela, in Caracas, on February 5, 2019. 209th Year of Independence and 150th Year of the Federation.

[*Signed*]

**JUAN GERARDO GUAIDO MARTINEZ**
President

[*Signed*]

**EDGAR JOSE ZAMBRANO RAMIREZ**
First Vice-President

[*Signed*]

**EDINSON DANIEL FERRER ARTEAGA**
Secretary

[*Signed*]

**IVAN STALIN GONZALEZ MONTAÑO**
Second Vice-President

[*Signed*]

**JOSE LUIS CARTAYA PIÑANGO**
Undersecretary

17

**LA ASAMBLEA NACIONAL**
**DE LA REPUBLICA BOLIVARIANA DE VENEZUELA**
Decreta

el siguiente,

**ESTATUTO QUE RIGE LA TRANSICIÓN A LA DEMOCRACIA**
**PARA RESTABLECER LA VIGENCIA DE LA CONSTITUCIÓN**
**DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA**

**EXPOSICIÓN DE MOTIVOS**

El *Estatuto que rige la Transición a la democracia para restablecer la vigencia de la Constitución de la República Bolivariana de Venezuela* es un acto en ejecución directa e inmediata del artículo 333 de la Carta Magna. Su propósito es volver a la Constitución desde la propia Constitución para ofrecer un cauce ordenado y racional al inédito e inminente proceso de cambio político que ha comenzado en el país. Se trata de una iniciativa normativa de la Asamblea Nacional que aspira a preservar la Constitución de 1999 como pacto de convivencia para la vida cívica de los venezolanos y como fundamento de la transición democrática.

I

Durante veinte años de Revolución Bolivariana se ha impuesto un sistema político alejado de los principios constitucionales y de la tradición republicana del país. Los venezolanos sufren graves carencias materiales y el cercenamiento radical de todos sus derechos, incluidos los políticos. El socialismo real los ha sometido a la persecución, al caos y a la miseria. Frente a esta situación emerge la necesidad urgente de regresar a la democracia constitucional. En este sentido, los valores superiores que inspiran al presente Estatuto "son la vida, la libertad, la justicia, la igualdad, la solidaridad, la democracia, la responsabilidad social, la supremacía constitucional y, en general, la preeminencia de los Derechos Humanos, la ética y el pluralismo político" (artículo 5).

II

Explicar la pertinencia de las normas que a continuación se presentan supone hacer un recuento de la lucha democrática que se ha librado en los últimos años. Las condiciones que actualmente favorecen al cambio político

no son un hecho azaroso. No se trata del colapso espontáneo de la dictadura. Es una gesta heroica de todo el pueblo de Venezuela con el apoyo de la comunidad internacional ante la gravedad de la expansión autocrática de la Revolución Bolivariana.

La coyuntura liberadora que comenzó el 10 de enero de 2019 tuvo sus orígenes cuando las fuerzas opositoras se negaron a participar en el proceso fraudulento del 20 de mayo de 2018, después de negarse a suscribir el Acuerdo Electoral propuesto por los emisarios de Nicolás Maduro Moros en República Dominicana. El 20 de mayo de 2018 el régimen de facto pretendió simular un proceso comicial en el que los venezolanos no pudieron ejercer su derecho al voto en libertad y se sentaron las bases para el escenario de usurpación que ocurre actualmente. El silencio ciudadano en las urnas se convirtió en un grito ensordecedor de libertad que despojó de legitimidad al régimen y se expandió hasta el día de hoy. De esta manera, llegado el plazo constitucional en el que un nuevo Presidente electo debía juramentarse, no ocurrió lo debido y Nicolás Maduro Moros se aferró al Poder Ejecutivo de manera fáctica para profundizar la usurpación.

III

A partir del 10 de enero de 2019 Nicolás Maduro Moros continúa usurpando la Presidencia de la República Bolivariana de Venezuela y se ha instalado un gobierno de facto en el país. Pero el artículo 333 de la Constitución Nacional vigente reza: *esta Constitución no perderá su vigencia si dejare de observarse por acto de fuerza o porque fuere derogada por cualquier otro medio distinto al previsto en ella. En tal eventualidad, todo ciudadano investido o ciudadana investida o no de autoridad, tendrá el deber de colaborar en el restablecimiento de su efectiva vigencia.* En tal sentido, siendo fieles a la Carta Magna y respondiendo a su conciencia ciudadana, los venezolanos están obligados a impulsar acciones que permitan el restablecimiento del orden constitucional.

Conviene destacar que el Estatuto recoge lo que es una realidad en el país y en el mundo. Mientras el Poder Legislativo decreta este Estatuto, los venezolanos se rebelan pacíficamente en contra de la usurpación y el concierto de las nacionales libres reconoce que se ha quebrado el orden constitucional. El mundo entero es testigo de las movilizaciones masivas de carácter pacífico y constitucional que evidencian la irreversible voluntad de cambio y libertad que yace en el corazón de cada venezolano.

Asamblea Nacional
Caracas - Venezuela

Se ha configurado, así, una situación política, jurídica y constitucional que favorece la restitución del orden constitucional. La Asamblea Nacional es consciente de la urgencia del momento y ofrece el presente Estatuto como un camino eficiente para regresar a la democracia por los caminos establecidos en la Constitución y así garantizar una transición ordenada que permita la inauguración de un sistema de libertades que ofrezca una paz duradera y estable, de generación en generación.

IV

El *Estatuto que rige la Transición a la democracia para restablecer la vigencia de la Constitución de la República Bolivariana de Venezuela* consta de siete (7) capítulos y treinta y nueve (39) artículos. Su diseño es específico y flexible a la vez. Se propone atender con eficiencia los desafíos de la reconstrucción institucional al tiempo que permanece abierto a la dinámica del cambio político. Estas pautas de diseño –especificidad y flexibilidad– responden a los retos que traerán apertura democrática, pluralismo y la necesidad de encontrar caminos de consenso entre las diferentes fuerzas políticas que participarán en el proceso de restablecimiento del orden constitucional. Se trata, en suma, de racionalizar moral, jurídica y técnicamente las energías democratizadoras de las organizaciones con fines políticos y de la sociedad civil para enmarcarlas en lo mejor de la tradición republicana de Venezuela.

El primer capítulo -*Disposiciones Generales*- incluye la definición de transición democrática, la naturaleza jurídica del Estatuto, los valores superiores que guiaron a los legisladores y sus objetivos. Sobre la definición de transición democrática (artículo 3) conviene destacar que se identifican tres fases progresivas. Primero, el cese de la usurpación. Luego, la instalación de un Gobierno provisional y, finalmente, la realización de elecciones libres, transparentes y competitivas. En cada una de estas fases progresivas la Asamblea Nacional ejercerá competencias, también de manera progresiva, hasta lograr consumar la transición democrática y restablecer el orden constitucional.

El segundo capítulo trata sobre *la usurpación del Poder Ejecutivo Nacional*. Su articulado especifica la inexistencia de un presidente electo en el país, califica la situación de usurpación, precisa la ineficacia de la autoridad usurpada, establece el cese del deber de obediencia a Nicolás Maduro Moros

e identifica en el fin de la usurpación como el hito que marca la liberación del régimen autocrático.

El tercer capítulo especifica *la actuación de la Asamblea Nacional y su presidente* mientras permanezca la usurpación de la Presidencia de la República. Para comenzar se reafirma la vigencia del periodo constitucional del Poder Legislativo. Acto seguido se establece que, "el Presidente de la Asamblea Nacional es, de conformidad con el artículo 233 de la Constitución, el legítimo Presidente encargado de la República Bolivariana de Venezuela" (Artículo 14). Y en los artículos siguientes se especifica la actuación de la Asamblea Nacional, el camino de reinserción del Estado venezolano en el concierto de las nacionales libres y los lineamientos que guiarán la transición política y económica.

El cuarto capítulo desarrolla *la reinstitucionalización de los órganos del Poder Ciudadano, del Consejo Nacional Electoral y del Tribunal Supremo de Justicia*. Se precisan las competencias de la Asamblea Nacional para renovar los poderes públicos y se establece el camino para legitimar al Poder Ciudadano, al Tribunal Supremo de Justicia y a los rectores del Consejo Nacional Electoral, estableciendo un periodo transitorio de los Poderes Públicos designados durante el Gobierno provisional.

El quinto capítulo establece los lineamientos para *la conformación de un Gobierno provisional de unidad nacional*. Una vez cesada la usurpación la Asamblea Nacional garantizará el cumplimiento pleno del artículo 233 de la Constitución Nacional una vez que se concrete la liberación de la autocracia. El Presidente del órgano legislativo "ejercerá durante treinta (30) días continuos como Presidente encargado de la República a efectos de conducir el proceso que conlleve a la conformación de un Gobierno provisional de unidad nacional y a la adopción de medidas que sean necesarias para la realización de elecciones presidenciales libres y competitivas" (artículo 25). En este apartado se ofrecen los mecanismos que ordenarán el proceso político que seguirá al cese de la usurpación.

Siguiendo el itinerario de transición establecido en el artículo 3, el capítulo sexto del Estatuto se refiere a la realización de *elecciones libres*. Se establecen mecanismos para garantizar comicios libres, justos y competitivos. También se determina un compromiso claro e inequívoco con "el fortalecimiento de las organizaciones con fines políticos, de conformidad con los términos establecidos en el artículo 67 de la Constitución" (artículo

4

32). Esta precisión responde al reconocimiento de importancia de estas instancias para garantizar la participación política y la estabilidad del sistema democrático.

Y para finalizar, en las *Disposiciones finales* se autoriza la publicación de la Ley y se ordenan medios extraordinarios para su promulgación dada la imposibilidad de su publicación en Gaceta Oficial.

V

El *Estatuto que rige la Transición a la democracia para restablecer la vigencia de la Constitución de la República Bolivariana de Venezuela* expresa la vocación democrática y los deseos de libertad del pueblo de Venezuela. Es evidencia de su madurez política y con él se propone guiar al país hasta la reinauguración del orden constitucional en paz y orden, sentando las bases para una democracia estable y duradera.

República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

**LA ASAMBLEA NACIONAL
DE LA REPUBLICA BOLIVARIANA DE VENEZUELA,
con base en los artículos 7 y 333 de la Constitución,
DECRETA**

el siguiente

**ESTATUTO QUE RIGE LA TRANSICIÓN A LA DEMOCRACIA PARA
RESTABLECER LA VIGENCIA DE LA CONSTITUCIÓN DE LA
REPÚBLICA BOLIVARIANA DE VENEZUELA**

**CAPÍTULO I
DISPOSICIONES GENERALES**

*Objeto*

**Artículo 1.** El objeto del presente Estatuto es establecer el marco normativo que rige la transición democrática en la República Bolivariana de Venezuela.

*Transición democrática*

**Artículo 2.** A efectos del presente Estatuto se entiende por transición el itinerario de democratización y reinstitucionalización que incluye las siguientes etapas: liberación del régimen autocrático que oprime a Venezuela, conformación de un Gobierno provisional de unidad nacional y celebración de elecciones libres.

*Fines de la transición democrática*

**Artículo 3.** Los fines de la transición democrática son el pleno restablecimiento del orden constitucional, el rescate de la soberanía popular a través de elecciones libres y la reversión de la emergencia humanitaria compleja, con el propósito de rescatar el sistema de libertades, garantías constitucionales y los derechos humanos.

*Naturaleza jurídica*

**Artículo 4.** El presente Estatuto es un acto normativo en ejecución directa e inmediata del artículo 333 de la Constitución de la República Bolivariana de Venezuela. Los actos dictados por los órganos del Poder Público para ejecutar los lineamientos establecidos en este Estatuto también están fundamentados en el artículo 333 de la Constitución y son de obligatorio acatamiento para todas las autoridades y funcionarios públicos, así como para los particulares.

*Principios*

**Artículo 5.** Los valores superiores que rigen el presente Estatuto son la vida, la libertad, la justicia, la igualdad, la solidaridad, la democracia, la responsabilidad social, la supremacía constitucional y, en general, la

6

preeminencia de los derechos humanos, la ética y el pluralismo político.

*Objetivos*

**Artículo 6.** De conformidad con el artículo 333 de la Constitución, los objetivos del presente Estatuto son:

1. Regular la actuación de las diferentes ramas del Poder Público durante el proceso de transición democrática de conformidad con el artículo 187, numeral 1 de la Constitución, permitiendo a la Asamblea Nacional iniciar el proceso de restablecimiento del orden constitucional y democrático.

2. Establecer los lineamientos conforme a los cuales la Asamblea Nacional tutelará ante la comunidad internacional los derechos del Estado y pueblo venezolanos, hasta tanto sea conformado un Gobierno provisional de unidad nacional.

3. Sentar las bases para iniciar el proceso ciudadano de reconciliación nacional.

4. Establecer los lineamientos políticos que guiarán las acciones de la Asamblea Nacional para la conformación de un Gobierno de unidad nacional que supla la ausencia de Presidente electo hasta tanto se celebren elecciones libres y transparentes en el menor tiempo posible.

5. Definir los criterios de oportunidad y celeridad para designar o ratificar a los titulares del Poder Ciudadano, el Poder Electoral y el Tribunal Supremo de Justicia, de conformidad con la Constitución y las leyes.

6. Fijar los lineamientos para garantizar la integración constitucional de la Fuerza Armada Nacional en el proceso de transición democrática, de conformidad con las directrices del artículo 328 de la Constitución.

7. Definir las bases para la transición económica en los términos del artículo 299 de la Constitución y para revertir la emergencia humanitaria compleja.

8. Establecer el marco general para implementar las reformas orientadas a rescatar la soberanía popular a través de elecciones libres, competitivas y transparentes

9. Reinsertar plenamente al Estado venezolano en los organismos internacionales de protección de derechos humanos dejando sin efecto la denuncia de la Carta de la OEA, ratificando de nuevo la Convención Americana sobre Derechos Humanos y la jurisdicción contenciosa obligatoria de la Corte Interamericana de Derechos Humanos; así como ratificar los demás tratados sobre derechos humanos en el sistema interamericano y en el sistema de Naciones Unidas.

República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

*Aplicación progresiva del presente Estatuto*

**Artículo 7.** Para el cumplimiento progresivo de los objetivos establecidos en el artículo anterior se tomarán en cuenta las tres etapas de la transición democrática consagradas en el artículo 2 del presente Estatuto:

1. La liberación del régimen dictatorial, que ocurrirá con el cese de los poderes de facto que ejerce Nicolás Maduro Moros.

2. La conformación de un Gobierno provisional de unidad nacional que asegure restablecer el sistema democrático y convocar elecciones libres.

3. El restablecimiento del Estado democrático con la celebración de elecciones libres, transparentes y competitivas en el menor tiempo posible.

## CAPÍTULO II
### De la Usurpación del Poder Ejecutivo Nacional

*Inexistencia de Presidente electo*

**Artículo 8.** El evento político celebrado el 20 de mayo de 2018 no fue una legítima elección presidencial. En consecuencia, no existe Presidente electo legitimado para asumir la Presidencia de la República Bolivariana de Venezuela para el período 2019-2025.

*Usurpación de la Presidencia de la República*

**Artículo 9.** En virtud de lo establecido en el artículo anterior, el ejercicio de la Presidencia de la República Bolivariana de Venezuela por parte de Nicolás Maduro Moros o por cualesquiera otros funcionarios o personeros del régimen de *facto* constituye usurpación de autoridad en los términos del artículo 138 de la Constitución.

*Ineficacia de la autoridad presidencial usurpada*

**Artículo 10.** La usurpación de la Presidencia de la República Bolivariana de Venezuela deriva del ejercicio de ese cargo por quien no es Presidente electo ni tiene la cualidad constitucional para ejercerlo. Todos los actos del poder usurpado a partir del 10 de enero de 2019 se consideran nulos e ineficaces, de conformidad con el artículo 138 de la Constitución de la República Bolivariana de Venezuela.

*Cese del deber de obediencia a la autoridad usurpada*

**Artículo 11.** Ningún ciudadano, investido o no de autoridad, obedecerá los mandatos de la autoridad usurpada. Los funcionarios públicos que contribuyan con la usurpación comprometerán su responsabilidad, tal como

lo establecen los artículos 25 y 139 de la Constitución. Todo funcionario público tiene el deber de observar los artículos 7 y 333 de la Constitución para obedecer los mandatos de los Poderes Públicos legítimos en Venezuela, especialmente en lo referido a los actos en ejecución del presente Estatuto.

*Cese de la usurpación y liberación del régimen autocrático*

**Artículo 12.** El cese de la autoridad usurpada por parte de Nicolás Maduro Moros y la conformación de un Gobierno provisional de unidad nacional constituyen los elementos concurrentes que configuran la liberación del régimen autocrático establecida en el artículo 2 del presente Estatuto.

## CAPÍTULO III
## De la Actuación de la Asamblea Nacional y su Presidente

*Vigencia del período de la Asamblea Nacional*

**Artículo 13.** La Asamblea Nacional, electa mediante voto popular el 6 de diciembre de 2015, ejercerá sus funciones constitucionales en el marco de la presente Legislatura hasta el 4 de enero de 2021. El 5 de enero de 2021 se instalará la nueva Legislatura de la Asamblea Nacional de conformidad con el artículo 219 de la Constitución de la República Bolivariana de Venezuela, a cuyo efecto se celebrarán elecciones parlamentarias durante el último trimestre del año 2020, según lo establecido en las normas constitucionales y en las leyes electorales.

*Presidente de la AN como Presidente Encargado*
*de la República Bolivariana de Venezuela*

**Artículo 14.** El Presidente de la Asamblea Nacional es, de conformidad con el artículo 233 de la Constitución, el legítimo Presidente encargado de la República Bolivariana de Venezuela. Los actos del Presidente encargado serán sometidos al control parlamentario de la Asamblea Nacional de conformidad con el artículo 187, numeral 3, de la Constitución.

*Defensa de los derechos del pueblo y Estado venezolanos*

**Artículo 15.** La Asamblea Nacional podrá adoptar las decisiones necesarias para la defensa de los derechos del Estado venezolano ante la comunidad internacional, a los fines de asegurar el resguardo de los activos, bienes e intereses del Estado en el extranjero y promover la protección y defensa de los derechos humanos del pueblo venezolano, todo ello de conformidad con los Tratados, Convenios y Acuerdos Internacionales en vigor.

En ejercicio de las atribuciones derivadas del artículo 14 de presente Estatuto y en el marco del artículo 333 de la Constitución, el Presidente encargado de la República Bolivariana de Venezuela ejercerá las siguientes competencias sometidas al control autorizatorio de la Asamblea Nacional

bajo los principios de transparencia y rendición de cuentas:

a. Designar Juntas Administradoras ad-hoc para asumir la dirección y administración de institutos públicos, institutos autónomos, fundaciones del Estado, asociaciones o sociedades civiles del Estado, empresas del Estado, incluyendo aquellas constituidas en el extranjero, y cualesquiera otros entes descentralizados, a los fines de designar a sus administradores y en general, adoptar las medidas necesarias para el control y protección de sus activos. La decisiones adoptadas por el Presidente encargado de la República serán de inmediato cumplimiento y tendrán plenos efectos jurídicos.

b. Mientras se nombra válidamente un Procurador General de la República de conformidad con el artículo 249 la Constitución, y en el marco de los artículos 15 y 50 de la Ley Orgánica de la Procuraduría General de la República, el Presidente encargado de la República podrá designar a quien se desempeñe como procurador especial para la defensa y representación de los derechos e intereses de la República, de las empresas del Estado y de los demás entes descentralizados de la Administración Pública en el exterior. Dicho procurador especial tendrá capacidad de designar apoderados judiciales, incluso en procesos de arbitraje internacional, y ejercerá las atribuciones  mencionadas en los numerales 7, 8, 9 y 13 del artículo 48 de la Ley Orgánica de la Procuraduría General de la República, con las limitaciones derivadas del artículo 84 de esa Ley y del presente Estatuto. Tal representación se orientará especialmente a asegurar la protección, control y recuperación de activos del Estado en el extranjero, así como ejecutar cualquier actuación que sea necesaria para salvaguardar los derechos e intereses del Estado.  El procurador así designado tendrá el poder de ejecutar cualquier actuación y ejercer todos los derechos que el Procurador General tendría, con respecto a los activos aquí mencionados. A tales efectos, deberá cumplir con las mismas condiciones que la Ley exige para ocupar el cargo de Procurador General de la República.

*Actuación de la Asamblea Nacional*

**Artículo 16.** En virtud de lo establecido en el artículo anterior, corresponderá a la Asamblea Nacional:

1. Autorizar las designaciones de los jefes de misiones diplomáticas permanentes realizadas por el Presidente encargado, de conformidad con el artículo 236, numeral 15, de la Constitución.

2. Defender, en el marco de las competencias de control establecidas en la Constitución nacional, los activos de la República Bolivariana de Venezuela y de sus entes en el extranjero.



3. Participar en la investigación de las graves violaciones a derechos humanos, la investigación de las actividades ilícitas relacionadas con corrupción y lavado de dinero a los fines de asegurar la recuperación de los capitales derivados de tales actividades ilícitas.

4. Promover la implementación de los mecanismos de cooperación internacional para atender la emergencia humanitaria y la crisis de refugiados y migrantes, de conformidad con el Derecho Internacional Humanitario y el artículo 23 de la Constitución de la República Bolivariana de Venezuela.

5. Adoptar medidas que permitan el rescate de la soberanía estatal en todo el territorio de la República Bolivariana de Venezuela.

6. Articular acciones con la sociedad civil para promover mecanismos de participación ciudadana que legitimen el proceso de transición democrática y favorezcan la cesación de la usurpación de los poderes presidenciales por parte de Nicolás Maduro Moros.

7. Las demás atribuciones que la Asamblea Nacional asuma de conformidad con el artículo 333 de la Constitución, las leyes de la República y el presente Estatuto, con los límites derivados de los Tratados y demás instrumentos internacionales de derechos humanos en vigor.

*Reinserción del Estado venezolano*
*en el concierto de las naciones libres*

**Artículo 17.** En ejercicio de las atribuciones previstas en este Capítulo, la actuación de la Asamblea Nacional se orientarán a reinsertar a la mayor brevedad al Estado venezolano en el concierto de las Naciones libres, de conformidad con lo dispuesto en la Carta de la Organización de Estados Americanos, la Carta Democrática Interamericana, la Carta de las Naciones Unidas y los demás instrumentos internacionales, en especial, los relativos a derechos humanos en el sistema interamericano y el sistema universal.

*Lineamientos para la transición política*

**Artículo 18.** La Asamblea Nacional dictará Leyes que promuevan la transición política de conformidad con el artículo 333 de la Constitución. Tales Leyes atenderán a los siguientes objetivos:

1. Crear los incentivos jurídicos y garantías para que los funcionarios civiles y militares actúen apegados a la Constitución y no obedezcan las órdenes de quien usurpa la Presidencia de la República desde el 10 de enero de 2019, así como de los demás órganos integrados inconstitucionalmente como el Tribunal Supremo de Justicia, el Consejo Nacional Electoral, el Ministerio Público, la Defensoría del Pueblo y la Contraloría General de la República, de manera que colaboren y participen en el proceso de transición y de restablecimiento del orden

constitucional.

2. Desarrollar el sistema de justicia transicional, orientado a rescatar la dignidad humana, la justicia, la protección y reparación integral de las víctimas de violaciones de derechos humanos, incluyendo las medidas para establecer la verdad y promover la reconciliación nacional   , de acuerdo con lo dispuesto en los tratados vigentes de derechos humanos y en el artículo  30 de la Constitución . Una vez cesada la usurpación la Asamblea Nacional creará mediante ley    una Comisión de la Verdad independiente, encargada de investigar las violaciones a los derechos humanos, proponer los lineamientos políticos y legislativos para la reparación de las víctimas y promover la educación democrática, la cultura de la paz y la reconciliación nacional.

3. Decretar las amnistías para aquellos ciudadanos, civiles y militares, que se mantienen privados de libertad por razones políticas, así como otorgar garantías de reinserción democrática a las personas que coadyuven al restablecimiento del orden constitucional, todo de conformidad con los artículos 23, 29 y 187, numeral 5, de la Constitución y los estándares del Derecho Internacional de los Derechos Humanos.

4. Definir las políticas orientadas al efectivo cumplimiento del artículo 328 de la Constitución y a la integración constitucional de la Fuerza Armada Nacional en el proceso de transición democrática.

*Lineamientos para la transición económica*

**Artículo 19.** La Asamblea Nacional dictará Leyes para atender la emergencia humanitaria  y promover el rescate de la economía venezolana, de conformidad con el artículo 299 de la Constitución.

**CAPÍTULO IV**
**De la reinstitucionalización de los órganos del Poder Ciudadano, del Tribunal Supremo de Justicia y del Consejo Nacional Electoral**

*Competencias de la Asamblea Nacional*
*para renovar los Poderes Públicos*

**Artículo 20.** Corresponde a la Asamblea Nacional determinar la oportunidad para efectuar total o parcialmente los trámites necesarios que, en el marco del artículo 333 de la Constitución, permitan modificar lapsos y requisitos legales con el objeto de recuperar la legitimidad de los Poderes Públicos. Todos los ciudadanos y funcionarios públicos tienen el deber de colaborar con dichos trámites.

La Asamblea Nacional procederá a designar o ratificar a los titulares de los Poderes Públicos: Poder Ciudadano, Rectores del Consejo Nacional Electoral y Magistrados del Tribunal Supremo de Justicia.

*Legitimación del Poder Ciudadano*

**Artículo 21.** La Asamblea Nacional establecerá la oportunidad para iniciar el procedimiento de designación o ratificación de los titulares de los órganos del Poder Ciudadano.

Ante la imposibilidad de funcionamiento constitucional y democrático del Consejo Moral Republicano, y ante la imposibilidad fáctica de convocatoria del Comité de Evaluación de Postulaciones del Poder Ciudadano mientras persista la usurpación de Nicolás Maduro Moros, la Asamblea Nacional, el aplicación del artículo 333 de la Constitución, establecerá los mecanismos para que la ciudadanía organizada a través de academias, universidades y organizaciones no gubernamentales postule de manera pública las ternas de candidatos para ser designados como titulares de los órganos del Poder Ciudadano, de modo que se cumplan los extremos establecidos por el artículo 279 de la Constitución.

*Legitimación del Tribunal Supremo de Justicia*

**Artículo 22.** A los fines del presente Estatuto se reputan como Magistrados legítimos los designados por esta Asamblea Nacional de conformidad con la Constitución y con la Ley Orgánica del Tribunal Supremo de Justicia, en sesión de fecha 21 de julio de 2017.

La Asamblea Nacional efectuará el trámite de designación o ratificación del resto de los Magistrados del Tribunal Supremo de Justicia que hayan sido designados en legislaturas anteriores a la Legislatura 2016-2021.

Una vez designados todos los Magistrados y provistas todas las magistraturas vacantes, los mismos deberán incorporarse al máximo órgano jurisdiccional de la República Bolivariana de Venezuela de acuerdo con lo establecido en la Ley Orgánica del Tribunal Supremo de Justicia.

*Legitimación de los Rectores del Consejo Nacional Electoral*

**Artículo 23.** La Asamblea Nacional ejercerá sus competencias establecidas en el artículo 295 de la Constitución y en la Ley Orgánica del Poder Electoral para la designación o ratificación de los Rectores del Consejo Nacional Electoral.

La designación de los Rectores del Consejo Nacional Electoral será materia prioritaria para la Asamblea Nacional. El Comité de Postulaciones Electorales ejercerá sus competencias con la mayor celeridad posible, de modo que la renovación del Consejo Nacional Electoral favorezca la realización de elecciones libres y competitivas sin dilaciones indebidas que, una vez cesada la usurpación y conformado el Gobierno provisional de unidad nacional, permitan la consolidación de la democracia.

*Período transitorio de los Poderes Públicos relegitimados*

**Artículo 24.** Los Poderes Públicos legitimados por la Asamblea Nacional de conformidad con este Estatuto ejercerán sus funciones hasta el primer semestre del año 2021. La Asamblea Nacional electa el último trimestre del año 2020 en los términos del artículo 13 del presente Estatuto designará o ratificará titulares de los órganos del Poder Ciudadano, Magistrados del Tribunal Supremo de Justicia y Rectores del Consejo Nacional Electoral, los cuales ejercerán períodos constitucionales completos en los términos establecidos en la Constitución de la República Bolivariana de Venezuela.

## CAPÍTULO V
### De la conformación de un Gobierno Provisional de Unidad Nacional

*Continuación de la aplicación del artículo 233 de la Constitución*

**Artículo 25.** Una vez cesada la usurpación de la Presidencia de la República Bolivariana de Venezuela por parte de Nicolás Maduro Moros y demás personeros del régimen de facto, la Asamblea Nacional velará por la continuación de la aplicación del artículo 233 de la Constitución. El Presidente de la Asamblea Nacional ejercerá durante treinta (30) días continuos como Presidente encargado de la República a efectos de conducir el proceso que conlleve a la conformación de un Gobierno provisional de unidad nacional y a la adopción de medidas que sean necesarias para la realización de elecciones presidenciales libres y competitivas.

*Designación de un Presidente temporal para conformar de un Gobierno provisional*

**Artículo 26.** Verificados los dos supuestos del artículo anterior, y en caso de imposibilidad técnica para convocar y realizar elecciones libres y competitivas dentro de los treinta (30) días continuos establecidos en el artículo 233 de la Constitución, la Asamblea Nacional podrá ratificar al Presidente encargado como Presidente provisional de la República Bolivariana de Venezuela a los fines de conformar un Gobierno de unidad nacional que dará inicio a la segunda etapa de la transición democrática, según lo establecido en el artículo 2 del presente Estatuto, en el marco del artículo 333 constitucional.

Al amparo del artículo 333 de la Constitución, el mandato de dicho Gobierno provisional culminará con la juramentación ante la Asamblea Nacional del nuevo Presidente electo en las elecciones libres y competitivas que a tal efecto sean convocadas y organizadas por el Poder Electoral bajo todas las garantías establecidas por los estándares nacionales e internacionales de transparencia comicial, dándose lugar a la culminación del período presidencial 2019-2025, tal como lo establece el artículo 233 de la



Constitución. A todo evento, las elecciones presidenciales deberán realizarse en el menor tiempo posible, tan pronto como las condiciones técnicas lo permitan dentro de un plazo máximo de doce (12) meses.

*Reglas de gobernabilidad y programa mínimo de Gobierno*

**Artículo 27.** La Asamblea Nacional, previa consulta con la sociedad civil y con las organizaciones con fines políticos,  aprobará mediante acuerdo parlamentario las reglas de gobernabilidad y las directrices del programa mínimo que, dentro de los principios de la economía social de mercado, ejecutará el Gobierno provisional. A tal efecto se tendrán en consideración los lineamientos para la transición política y los lineamientos para la transición económica derivados de lo establecidos en los artículos 17 y 18 del presente Estatuto. El mencionado programa mínimo respetará los principios del régimen socioeconómico y de la función del Estado en la economía que están establecidos en el artículo 299 de la Constitución.

*Cooperación internacional*

**Artículo 28.** El Gobierno provisional de unidad nacional tramitará la cooperación financiera internacional de organismos multilaterales y países del mundo libre a los fines de iniciar el proceso de transición económica y de proseguir la reversión de la emergencia humanitaria. También solicitará la presencia permanente de organismos internacionales especializados en la garantía y defensa de los derechos humanos a los fines de acompañar el proceso de transición democrática e informar a la comunidad internacional de la situación de dichos derechos en Venezuela.

*Rescate de la soberanía estatal en el territorio de la República*

**Artículo 29.** El Gobierno provisional podrá solicitar la ayuda de la comunidad internacional a los fines de restablecer la soberanía estatal en el territorio de la República, previa autorización de la Asamblea Nacional de conformidad con las competencias establecidas en el artículo 187 de la Constitución.

## CAPÍTULO VI
### De las Elecciones

*Celebración de elecciones libres*

**Artículo 30.** La Asamblea Nacional adoptará, en el marco de la aplicación de los artículo 233 y 333 de la Constitución, las medidas que rescaten las condiciones de integridad electoral y permitan la realización de una elección presidencial correspondiente al término del período presidencial 2019-2025.

*Restablecimiento de los derechos políticos*

**Artículo 31.** La Asamblea Nacional, una vez renovados los demás Poderes

Asamblea Nacional
Caracas - Venezuela

Públicos, adoptará medidas que aseguren el ejercicio efectivo de los derechos a la libre postulación a cargos de elección popular y al sufragio, de conformidad con lo dispuesto en la Constitución y en los estándares internacionales de integridad electoral.

*Fortalecimiento de las organizaciones con fines políticos*

**Artículo 32.** La Asamblea Nacional y los demás Poderes Públicos legitimados adoptarán medidas para el fortalecimiento de las organizaciones con fines políticos, de conformidad con los términos establecidos en el artículo 67 de la Constitución.

## VII
## Disposiciones Transitorias y Finales

*Actos parlamentarios para la ejecución del presente Estatuto*

**Artículo 33.** La Asamblea Nacional adoptará todas las decisiones, Acuerdos y Leyes necesarios para la implementación del presente Estatuto, a los fines de permitir el restablecimiento efectivo de la Constitución y el cese de la usurpación de la Presidencia de la República. Hasta tanto se cumplan estos objetivos, aplicarán de manera preferente las disposiciones del presente Estatuto y las demás decisiones adoptadas en el marco de los artículos 233 y 333 de la Constitución.

*Régimen transitorio de PDVSA y sus filiales*

**Artículo 34.** Ante los riesgos en que se hallan PDVSA y sus filiales como resultado de la usurpación referida en el Capítulo II del presente Estatuto, y mientras persiste tal situación, el Presidente encargado de la República, bajo el control autorizatorio de la Asamblea Nacional y en el marco de la aplicación del artículo 333 de la Constitución, designará la Junta de Administración ad-hoc de Petróleos de Venezuela S.A. (PDVSA) de conformidad con el artículo 15, literal a, de este Estatuto, para que ejerza los derechos que corresponden a PDVSA como accionista de PDV Holding, Inc. Esta atribución se ejercerá de conformidad con los siguientes principios:

1. La Junta de Administración ad-hoc podrá estar compuesta por personas domiciliadas en el exterior y tendrá las atribuciones correspondientes a la asamblea de accionista y a la junta directiva de PDVSA, a los fines de realizar todas las actuaciones necesarias para designar la junta directiva de PDV Holding, Inc., en representación de PDVSA como accionista de esa sociedad. Los nuevos directores de PDV Holding, Inc., procederán a realizar todas las actuaciones necesarias a los fines de designar a las nuevas juntas directivas de las filiales de esa empresa, incluyendo a Citgo Petroleum Corporation.

2. La presente disposición transitoria prevalecerá sobre cualesquiera otras normas aplicables y orientará la interpretación de cualesquiera otras

formalidades requeridas en el ordenamiento jurídico venezolano y en documentos corporativos, a los fines de ejercer la representación de PDVSA como accionista de PDV Holding, Inc.

3. Los nuevos directores de PDV Holding, Inc. y sus filiales garantizarán la autonomía funcional de esas empresas y en particular de PDVSA. En consecuencia de lo anterior:

   a) La gestión autónoma del giro comercial de PDV Holding, Inc. y sus filiales responderá a criterios de eficiencia comercial, dejando a salvo los mecanismos de control y rendición de cuenta que ejerza la Asamblea Nacional en el marco de sus atribuciones, y los demás mecanismos de control aplicables.

   b) PDV Holding, Inc. y sus filiales no tendrán relación alguna con quienes hoy usurpan la Presidencia de la República. Mientras persiste tal situación de usurpación, PDV Holding, Inc. y sus filiales no realizarán ningún pago o aporte patrimonial a PDVSA.

*Publicidad del presente Estatuto*

**Artículo 35.** La Asamblea Nacional comunicará a la mayor brevedad el contenido del presente Estatuto a la Nación venezolana, así como a la comunidad internacional, incluidos los Gobiernos extranjeros, el Secretario General de la Organización de Naciones Unidas (ONU), el Secretario General de la OEA, la Alta Comisionada para los Derechos Humanos de la ONU, la Comisión Interamericana de Derechos Humanos, la Unión Europea, la Unión Africana, la Organización de Países Exportadores de Petróleo, el Banco Mundial, el Fondo Monetario Internacional, el Banco Interamericano de Desarrollo y  la Corporación Andina de Fomento-Banco de Desarrollo de América Latina, entre otros.

*Disposición y administración de los activos del Estado*

**Artículo 36.** Los activos del Estado que hayan sido recuperados a través de los mecanismos establecidos en el presente Estatuto no podrán ser dispuestos o ejecutados hasta tanto cese la usurpación y se haya conformado un Gobierno provisional de unidad nacional. A estos efectos, y en virtud de la situación de reconducción presupuestaria continuada en la que se encuentra la República desde el año 2016, laAsamblea Nacional podrá dictar una ley especial en materia financiera y presupuestaria, de conformidad con el artículo 187, numerales 6, 7 y 8 de la Constitución.

*Entrada en vigencia*

**Artículo 37.** Este Estatuto entrará en vigencia luego de ser aprobado por los diputados de la Asamblea Nacional, de conformidad con las normas constitucionales para el procedimiento legislativo y de acuerdo con el

Reglamento Interior y de Debates de la Asamblea Nacional.

*Medios extraordinarios*
*de promulgación del presente Estatuto*

**Artículo 38.** En virtud de la imposibilidad de acceder a la Gaceta Oficial debido al régimen de facto y a la usurpación que imperan en Venezuela, el presente Estatuto y las decisiones que se implementen serán publicados en los medios de divulgación que a tales efectos determine la Asamblea Nacional.

A estos efectos, y mientras persiste la situación señalada en este artículo, las Leyes y Acuerdos dictados por la Asamblea Nacional, así como las decisiones dictadas por el Presidente encargado de la República, serán publicadas en la Gaceta Legislativa, de conformidad a lo dispuesto en el Reglamento Interior y de Debates. Las Leyes, Acuerdos y demás decisiones entrarán en vigencia a su publicación en la Gaceta Legislativa, incluso en formato digital. La Ley de Publicaciones Oficiales aplicará de manera supletoria.

*Cláusula residual*

**Artículo 39.** A los fines de asegurar la transición democrática, todo lo no previsto en el presente Estatuto será resuelto por la Asamblea Nacional en aplicación del artículo 333 de la Constitución.

Dado, firmado y sellado en el Palacio Federal Legislativo, sede de la Asamblea Nacional de la República Bolivariana de Venezuela, en Caracas, a los cinco días del mes de febrero de dos mil diecinueve. Años 209° de la Independencia y 159° de la Federación.

JUAN GERARDO GUAIDÓ MÁRQUEZ
Presidente

EDGAR JOSÉ ZAMBRANO RAMÍREZ          IVÁN STALIN GONZÁLEZ MONTAÑO
Primer Vicepresidente                              Segundo Vicepresidente

EDINSON DANIEL FERRER ARTEAGA          JOSE LUIS CARTAYA PIÑANGO
Secretario                                          Subsecretario

# EXHIBIT 26

 **REUTERS**   World   Business   Markets   Breakingviews   Video   More 

ENERGY

MAY 13, 2020 / 6:32 PM / UPDATED 2 YEARS AGO

# Venezuela's congress to voice concern to U.S. over Nynas sanctions removal

By Luc Cohen



May 13 (Reuters) - Venezuela's opposition-held congress plans to voice concern to the U.S. government over its removal of sanctions on Swedish refiner Nynas AB after Venezuela's state-run oil company, Petroleos de Venezuela, sold most of its stake in the firm, three people with knowledge of the matter said.

Nynas said on Tuesday that PDVSA was no longer its majority owner after selling a 35% stake in the company to a Swedish foundation. Nynas did not disclose the terms of the sale.

The transaction paved the way for the U.S. Treasury Department, which sanctioned PDVSA in 2019 as part of its plan to oust Venezuelan President Nicolas Maduro, to unblock Nynas, which is now 49.99%-owned by Finnish biofuel producer and oil refiner Neste, 15%-owned by PDVSA and 35%-owned by the foundation.

The National Assembly's energy committee agreed on Wednesday to prepare a resolution declaring the deal null, as it was not approved by congress and was negotiated by representatives of Maduro, who is considered a usurper by the opposition and dozens of countries, said committee Chairman Elias Matta.

"We want to alert all nations and make clear in the agreement that we present that no deal struck with the current regime will be approved by us," Matta said in a telephone interview.

The resolution will be presented to the full National Assembly at its next meeting, and Matta said that once it is approved, the lawmakers would send it to the governments involved in the deal, including Sweden, the Netherlands - where Nynas' parent company is located - and the United States.

Washington has been the Venezuelan opposition's most robust ally in its efforts to oust Maduro, a socialist who has overseen an economic collapse in the once-prosperous OPEC nation.

The United States and dozens of other countries recognize Juan Guaido, the National Assembly's leader, as the rightful president.

That helped Guaido, who is seeking to protect Venezuela's assets abroad from seizure by creditors or possible sale by cash-strapped Maduro, attain control of PDVSA assets such as U.S.-based refiner Citgo Petroleum.

But his representatives never managed to take control of Nynas.

"If they do not recognize Maduro's government, how are they going to recognize an administrative act by Maduro's government? It makes no sense," said Luis Stefanelli, another opposition lawmaker on the committee.

The U.S. Treasury Department, which enforces sanctions, declined to comment.

A third person with knowledge of the matter, who spoke on condition of anonymity, said it was unlikely the resolution would prompt a reversal allowing PDVSA to keep its stake in Nynas, but it could sway Washington to reverse its decision to lift sanctions. (Reporting by Luc Cohen in New York; Additional reporting by Daphne Psaledakis in Washington; Editing by Peter Cooney)

*Our Standards: [The Thomson Reuters Trust Principles.](#)*

Apps   Newsletters   Advertise with Us   Advertising Guidelines   Cookies   Terms of Use   Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2021 Reuters. All Rights Reserved.

# EXHIBIT 27

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

                Plaintiffs,

        - against -

MUFG UNION BANK, N.A. and GLAS AMERICAS
LLC,

                Defendants.

---

Case No: 19-cv-10023-KPF

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................. 1

MATERIAL FACTS NOT SUBJECT TO GENUINE DISPUTE ................................................ 4

I.      Plaintiffs and Their RECONSTITUTED Boards of Directors .......................................... 4

II.     Defendants and the Beneficial Holders of the 2020 Notes ................................................ 6

III.    The Exchange Offer and the 2020 Notes Transaction ........................................................ 6

IV.     The Economic Outcome of the Exchange Offer for PDVSA and Exchanging
        Noteholders .......................................................................................................................... 8

V.      Venezuela's Constitutional Requirement of Prior National Assembly
        Authorization for National Public Interest Contracts with Foreign/Non-Domiciled
        Counterparties ...................................................................................................................... 9

VI.     The National Assembly's Public Opposition to the Exchange Offer and Explicit
        Rejection of the Pledge ...................................................................................................... 10

VII.    Media Reporting and Analyst Commentary Regarding the National Assembly's
        Opposition to the Exchange Offer and Associated Invalidity Risk .................................. 13

VIII.   The Subjugation of the National Assembly and the Supreme Tribunal by the
        Chávez and Maduro Regimes ............................................................................................ 14

IX.     The U.S. Government's Recognition of the National Assembly and Interim
        President Guaidó ................................................................................................................ 17

ARGUMENT .............................................................................................................................. 18

I.      The National Assembly's Official Actions Withholding Authorization of the
        Transaction Documents and Declaring the 2020 Notes Transaction Invalid are
        Acts of State that cannot be "Overruled" by a U.S. Court ................................................ 18

II.     The Transaction Documents are Invalid, Illegal, Null and Void *Ab Initio*, and
        Unenforceable Under Applicable Venezuelan Law .......................................................... 23

        A.     Venezuelan Law Governs the Validity of the 2020 Notes Transaction .............. 23

        B.     Comity Favors Deferring to the  Legitimate Venezuelan Government's
               Interpretation of its Own Laws ........................................................................... 28

        C.     The Transaction Documents Are National Public Interest Contracts That
               Required Prior National Assembly Authorization Under the Venezuelan
               Constitution ......................................................................................................... 29

        D.     The Lack of Required National Assembly Authorization Precluded
               Contract Formation and Valid Legal Existence of the Transaction
               Documents ........................................................................................................... 31

        E.     National Public Interest Contracts Need Not Include the Republic as a
               Party ..................................................................................................................... 32

**TABLE OF CONTENTS**

(continued)

**Page**

III.    Defendants' Defenses Fail as a Matter of Law ................................................................. 39

IV.    Defendants' Counterclaims Fail as a Matter of Law ....................................................... 42

CONCLUSION ........................................................................................................................ 45

APPENDIX A ........................................................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred Dunhill of London, Inc. v. Republic of Cuba,*
    425 U.S. 682 (1976)...................................................................................................21

*Allied Bank International v. Banco Credito Agricola de Cartago,*
    757 F.2d 516 (2d Cir. 1985)..................................................................................22,23

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.,*
    138 S. Ct. 1865 (2018)..............................................................................................29

*Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.),*
    528 F.3d 162 (2d Cir. 2008)......................................................................................29

*Banco de Espana v. Fed. Reserve Bank of New York,*
    114 F.2d 438 (2d Cir. 1940)......................................................................................21

*Banco Nacional de Cuba v. Sabbatino,*
    376 U.S. 398 (1964)..................................................................................................19

*Estate of Leventhal ex rel. Bernstein v. Wells Fargo Bank, N.A.,*
    No. 14 Civ. 8751 (ER), 2015 WL 5660945 (S.D.N.Y. Sept. 25, 2015) .................43

*Braka v. Bancomer, S.N.C.,*
    762 F.2d 222 (2d Cir. 1985)......................................................................................23

*Briarpatch Ltd., L.P. v. Phoenix. Pictures, Inc.,*
    373 F.3d 296 (2d Cir. 2004)......................................................................................43

*Carmine v. Murphy,*
    285 N.Y. 413 (1941) .................................................................................................43

*City of Zanesville, Ohio v. Mohawk Data Scis. Corp.,*
    97 A.D.2d 64 (4th Dep't 1983)................................................................................41

*Cohen v. Krantz,*
    227 A.D.2d 581 (2d Dep't 1996) .............................................................................41

*Cornea v. U.S. Attorney Gen.,*
    771 F. App'x 944 (11th Cir. 2019) ..........................................................................30

*Defendants' Answers and Counterclaims,*
    Case No. 1:19-cv-10023-KPF, Dkt. No. 40 (S.D.N.Y. Dec. 18, 2019)....................6

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp.3d 393 (S.D.N.Y. 2018) .......................................................................................41

*Draper v. Georgia Prop*s.,
    Inc., 230 A.D.2d 455, 460 (1st Dep't 1997), *aff'd*, 94 N.Y.2d 809 (1999) ............................40

*Fabrizio & Martin, Inc. v. Bd. of Educ.*,
    290 F. Supp. 945 (S.D.N.Y. 1968) ........................................................................................43

*Faison v. Lewis*,
    25 N.Y.3d 220 (2015) ............................................................................................................42

*Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*,
    809 F.3d 737 (2d Cir. 2016) .............................................................................................19,29

*First Nat. City Bank v. Banco Nacional de Cuba*,
    406 U.S. 759 (1972) ...............................................................................................................34

*Hall & Co. v. Continental Cas. Co.*,
    34 A.D.2d 1028 (3d Dep't 1970), *aff'd*, 30 N.Y. 517 (1972) ................................................28

*Hausler v. JP Morgan Chase Bank, N.A.*,
    127 F. Supp. 3d 17 (S.D.N.Y. 2015) ....................................................................................23

*Highland Capital Mgmt. LP v. Schneider*,
    607 F.3d 322 (2d Cir. 2010) ..................................................................................................40

*Impact Fluid Solutions et al v. Bariven S.A. et al*,
    Civ No. 4:19-cv-00654, Dkt. No. 55 (S.D. Tex. May 20, 2020) ...................................6, 35,46

*Jimenez v. Palacios*,
    No. 2019-0490-KSJM, 2019 WL 3526479 (Del. Ch. Aug. 2, 2019)............................. *passim*

*Kashef v. BNP Paribas S.A.*,
    925 F.3d 53 (2d Cir. 2019) ....................................................................................................21

*Konowaloff v. Metro. Museum of Art*,
    702 F.3d 140 (2d Cir. 2012) ..............................................................................................19,20

*Levison v. Illinois Surety Co.*,
    222 N.Y. 280 (1918) ..............................................................................................................28

*M+J Savitt, Inc. v. Savitt*,
    No. 08 CIV. 8535 (DLC), 2009 WL 691278 (S.D.N.Y. Mar. 17, 2009)................................44

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Michael R. Gianatasio, PE, P.C. v. City of New York*,
    53 Misc. 3d 757 (N.Y. Sup. Ct. 2016), *aff'd sub nom.* 159 A.D.3d 659 (1st
    Dep't 2018) ...................................................................................................43

*NML Capital, Ltd. v. Republic of Arg.*,
    699 F.3d 246 (2d Cir. 2012)............................................................................42

*Oetjen v. Central Leather Co.*,
    246 U.S. 297 (1918)...................................................................................23,42

*PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*,
    372 F. Supp. 3d 1353 (S.D. Fla. 2019) .............................................................4

*PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*,
    Case No. 1:18-cv-20818-DPG, Dkt. No. 517 (S.D. Fla. July 23, 2018)......................... *passim*

*PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*,
    Case No. 19-10950 (11th Cir. May 29, 2020) ..........................................22

*In re Republic Airways Holdings Inc.*,
    598 B.R. 118 (Bankr. S.D.N.Y. 2019)...........................................................28

*Republic of Benin v. Mezei*,
    No. 06 CIV 870 JGK, 2010 WL 3564270 (S.D.N.Y. Sept. 9, 2010) ......................27

*Republic of Panama v. Air Panama Int'l, S.A.*,
    745 F. Supp. 669 (S.D. Fla. 1988) ..................................................................23

*Roberts v. Criss*,
    266 F. 296 (2d Cir. 1920) ...............................................................................40

*Robertshaw v. Pudles*,
    No. CIV.A 11-7353, 2014 WL 1789307 (E.D. Pa. May 6, 2014).....................40

*Saratoga Cty Chamber of Commerce v. Pataki*,
    100 N.Y.2d 801 (2003) ...................................................................................42

*Sardanis v. Sumitomo Corp.*,
    282 A.D.2d 322 (1st Dep't 2001) ....................................................................40

*Stone v. Freeman*,
    298 N.Y. 268 (1948) .......................................................................................40

*Strauss Linotyping Co. v. Schwalbe*,
    159 A.D. 347 (1st Dep't 1913) ........................................................................40

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Tasini v. AOL, Inc.*,
   851 F. Supp. 2d 734 (S.D.N.Y.), *aff'd*, 505 F. App'x 45 (2d Cir. 2012)................................44

*Themis Capital, LLC v. Democratic Republic of Congo*,
   881 F.Supp.2d 508 (S.D.N.Y. 2012).....................................................................................27

*U.S. v. Maikel Jose Moreno Perez*,
   Case No. 1:20-mj-02407-JJO (S.D. Fla. Mar. 12, 2020).........................................................17

*Underhill v. Hernandez*,
   168 U.S. 250 (1897)...................................................................................................20, 21,42

*United States v. Belmont*,
   301 U.S. 324 (1937).............................................................................................................20

*United States v. Pink*,
   315 U.S. 203 (1942).........................................................................................................20,29

*W.S. Kirkpatrick & Co. v. Env'l Tectonics Corp*,
   493 U.S. 400 (1990)............................................................................................................19

*Worthington v. JetSmarter, Inc.*,
   Civ. No. 18-12113 (KPF), 2019 WL 4933635 (S.D.N.Y. Oct. 7, 2019) (J.
   Failla) .............................................................................................................................3,25

*In re Zarro*,
   268 B.R. 715 (Bankr. S.D.N.Y. 2001)..................................................................................41

**Statutes**

New York General Obligations Law
   § 5-1401 ...................................................................................................................26, 27
   § 5-1401(1)....................................................................................................................26

U.C.C.
   § 1-301 .............................................................................................................................26
   § 8......................................................................................................................................26, 27
   § 8-110 .............................................................................................................................26
   § 8-110:6 ..........................................................................................................................26
   § 8-110(a)(1) .....................................................................................................................26
   § 8-110(d) .........................................................................................................................26

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Other Authorities**

ALLAN RANDOLPH BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA 132–
33 (2d ed. 2015) ........................................................................................38

Allan R. Brewer-Carías, *The effects of constitutional sentences in Venezuela*, *in*
22 ANUARIO INTERNATCIONAL SOBRE JUSTICIA 19, 64 (2008) ...............37

Allan R. Brewer-Carías, *The Principle of Separation of Powers and Authoritarian
Government in Venezuela*, *in* 47 DUQ. L. REV. 837-38 (2009) ...............16

ALLAN R. BREWER-CARIAS, THE CONSTITUTIONAL JUSTICE SYSTEM IN THE 1999
CONSTITUTION 86–87 (Editorial Jurídica Venezolana 2000).....................37

Asamblea Nacional, *Statute to Govern a Transition to Democracy to Reestablish
the Validity of the Constitution of the Republic of Venezuela* (Feb. 5, 2019).....................5,17

Asemblea Nacional, Resolution Dated May 4, 2006 ...................................35

Asemblea Nacional, Resolution Dated September 24, 2009 .........................35

Asemblea Nacional, Resolution Dated May 26, 2016 ......................10, 12, 30

Asemblea Nacional, Resolution Dated September 27, 2016 ..................... 10-13, 20, 22, 33, 39, 44

Asemblea Nacional, Resolution Dated February 9, 2017 ...........................34

Asemblea Nacional, Resolution Dated April 24, 2018 ...............................21

Asemblea Nacional, Resolution Dated October 15, 2019 ......................... 11-12, 20, 33

Carolyn Cui, *Venezuela's PdVSA to Offer to Swap $7 Billion in Debt*, WALL ST. J.
(Sept. 14, 2016)........................................................................................13

*Debt Issue Under New Decree Will be Void*, EL NACIONAL (VENEZUELA) (Sept.
27, 2016) ..................................................................................................14

*Default. Few People Seem to Understand Why*, BLOOMBERG (July 4, 2016) ...............1

Doug Stanglin, *U.S. recognizes Venezuela opposition leader Juan Guaidó as
president; Russia backs Maduro*, USA TODAY (Jan. 23, 2019).............18

Lysaura Fuentes, *Freddy Guevara: Government has proven negligent and
destructive of the economy*, El Cooperante (Sept. 28, 2016)....................14

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Letter Dated June 9, 2020 to the Honorable Katherine Polk Failla, United States
District Court Judge, from Carlos Vecchio, Ambassador of the Bolivarian
Republic of Venezuela to the United States* .................................................................20, 29, 42

*PDVSA Announces Expiration and Final Results for its Offers to Exchange its
Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due
2017 for New 8.50% Senior Secured Notes due 2020*, PR NEWSWIRE (Oct. 24,
2016) ....................................................................................................................................7

Press Statement, Secretary of State Michael R. Pompeo, Recognition Of Juan
Guaidó As Venezuela's Interim President By Several European Countries
(Feb. 4, 2019)......................................................................................................................18

Press Statement, U.S. Department of State, *Defending Democracy in Venezuela*
(July 30, 2017) ....................................................................................................................18

*Third Quarter Assets Under Management Statement*, Ashmore Group, plc (Apr.
16, 2020) ..............................................................................................................................6

Thomas W. Wälde and George Ndi, STABILIZING INTERNATIONAL INVESTMENT
COMMITMENTS: INTERNATIONAL LAW VERSUS CONTRACT INTERPRETATION,
31 Tex. Int'l L.J. 215 (Spring 1996) ................................................................................25

U.S. Department of State, *U.S. Sanctions on Venezuelan Individuals and Entities*
(Press Statement, Feb. 15, 2019) .....................................................................................17

Venezuelan Constitution
    Article 150 ......................................................................................................... *passim*
    Article 187 .........................................................................................................10, 30
    Article 187.9 ....................................................................................................... *passim*
    Article 233 ................................................................................................................18
    Article 245 ................................................................................................................37
    Article 303 ......................................................................................................... *passim*
    Article 335 .......................................................................................................36, 37,38

Petróleos de Venezuela, S.A. ("PDVSA"), PDVSA Petróleo, S.A., ("PDVSA Petróleo"),
and PDV Holding, Inc. ("PDV Holding" and, together with PDVSA and PDVSA Petróleo,
"Plaintiffs") respectfully submit this memorandum of law in support of their motion for
summary judgment on all of their claims and defenses and all counterclaims and defenses of
MUFG Union Bank, N.A. ("Union Bank") and GLAS Americas LLC ("GLAS Americas" and,
together with Union Bank, "Defendants").[1]

## PRELIMINARY STATEMENT

PDVSA is Venezuela's national oil company, wholly owned by the Republic "[f]or
reasons of economic and political sovereignty and national strategy." (Venezuelan Constitution,
Art. 303). U.S.-based oil refiner CITGO Petroleum Company is an indirect, wholly-owned
PDVSA subsidiary and Venezuela's most economically and strategically important foreign asset.
This case will determine whether the legitimate, democratically elected government of
Venezuela loses CITGO—the foreign "crown jewel" of its national oil industry—to the hedge
funds that provided the illegitimate, authoritarian Maduro regime with a financial and political
lifeline by participating in an exchange of PDVSA notes carried out in total disregard of the
constitutional oversight powers of the opposition-led National Assembly. In the words of one
hedge fund manager a few months earlier, Venezuela under the Chávez and Maduro regimes had
become "one of the most miserable, mismanaged, hopeless countries on the planet. But that
doesn't mean you can't make money."[2]

---

[1] A chart of the parties' claims and defenses is attached as Appendix A to this memorandum.
[2] Sebastian Boyd, *Venezuela Refuses to Default. Few People Seem to Understand Why*, BLOOMBERG (July 5, 2016),
Ex. 49. *See also* Quote from Jan Dehn (ASH_00006371), Ex. 1; ████████████████████████████
████████████████████████████████████████████████████████████████ All citations to exhibits
(Ex. _) in this Memorandum are exhibits to the Declaration of James R. Bliss in Support of Motion Plaintiffs'
Motion for Summary Judgment.

In September 2016, the faltering Maduro regime initiated the Exchange Offer[3] in a desperate attempt to conserve cash and stave off a politically disastrous PDVSA default.  Having failed to negotiate a forbearance with the holders of PDVSA's unsecured 2017 Notes, the Maduro regime's PDVSA leadership (including Maduro's oil minister, who simultaneously served as PDVSA's president) offered to exchange the 2017 Notes for an even larger amount of new, 2020 Notes secured by a purported pledge of a controlling interest in CITGO.

 As soon as the Exchange Offer was announced, the National Assembly passed a resolution "categorically rejecting" the offered pledge, initiating an investigation into PDVSA and the Exchange Offer, and invoking Article 187.9 of the Venezuelan Constitution, which provides that one of the National Assembly's core powers is to authorize (or, as in this case, refuse to authorize) contracts in the national public interest.  This crucial oversight power is based on Article 150 of the Venezuelan Constitution, which provides that "[n]o contract in the . . . *national public interest* shall be entered into . . . with companies not domiciled in Venezuela . . . *without the approval of the National Assembly*."  In a subsequent resolution passed after the 2020 Notes had been issued in violation of these constitutional provisions, the National Assembly declared the 2020 Notes Transaction invalid and void *ab initio* because PDVSA lacked the capacity to pledge CITGO as part of the Exchange Offer without the National Assembly's prior authorization.  Under the act of state doctrine, these resolutions, as well as the National Assembly's refusal to authorize the execution of the Transaction Documents, are official acts of state to which a U.S. court must defer.

Plaintiffs are also entitled to summary judgment independent of the act of state doctrine. The Transaction Documents for the 2020 Notes Transaction are "national public interest contracts" that were entered into illegally without prior National Assembly authorization as

---

[3]Capitalized terms in the preliminary statement are defined more fully below.

required by Articles 150 and 187.9 of the Venezuelan Constitution.  They are therefore invalid, null and void *ab initio*, and entirely unenforceable, *as they never came into valid legal existence*. Plaintiffs' position is supported by the overwhelming weight of Venezuelan legal authority, including the National Assembly's own interpretation and assertion of its constitutional prerogative to authorize national public interest contracts; the legitimate Venezuelan Government's interpretation of its own laws as conveyed in its letter to this Court; decisions of the Venezuelan Supreme Tribunal recognizing that contracts entered into by state-owned enterprises such as PDSVA and PDVSA Petróleo were national public interest contracts; the opinions of Plaintiffs' Venezuelan law expert, Professor Allan R. Brewer-Carías, who proposed the inclusion of Article 150 in the Venezuelan Constitution and who is widely regarded as the world's foremost scholar of Venezuelan public law; and the views on national public interest contracts expressed by the overwhelming majority of other Venezuelan public law scholars.

From the beginning of this case, Defendants have attempted to hide behind the New York choice-of-law provisions in the Transaction Documents.  But, as Your Honor recently observed, "there is a logical flaw inherent in following a contractual choice-of-law provision before determining whether the parties have actually formed the contract in which the choice-of-law clause appears." *Worthington v. JetSmarter, Inc.*, Civ. No. 18-12113 (KPF), 2019 WL 4933635, at *4 (S.D.N.Y. Oct. 7, 2019) (J. Failla).  Defendants' primary argument regarding Venezuelan law is that the 2020 Notes Transaction did not require National Assembly approval because a "national public interest contract" must include the Venezuelan Republic itself as a party. Meanwhile, in another case involving a contract entered into by PDVSA (and not the Republic itself) with foreign/non-domiciled counterparties to establish a U.S.-based PDVSA litigation trust, Defendants' own counsel (Paul Weiss) has been correctly arguing the precise opposite—

that the "Trust Agreement" in question is "null and void" because it is a national public interest

contract entered into by PDVSA without constitutionally required National Assembly

authorization.  What is more, and also contrary to Defendants' position here, Defendants'

counsel has been correctly arguing that a National Assembly resolution declaring the Trust

Agreement to be a national public interest contract is "conclusive" as a matter of law.  Relying

on expert testimony directly contrary to the testimony of Defendants' expert in this case,

Defendants' counsel has argued that:

- "[C]ontracts with state-owned enterprises (like PDVSA) . . . may qualify as national public interest contracts."

- "The Trust Agreement is [] void because it was not approved by the National Assembly. Under Venezuelan law, public contracts that qualify as 'national interest contracts' must be approved by the National Assembly to be effective."

- "The National Assembly concluded in its resolution that the Trust Agreement is a national interest contract.  Under Venezuelan law, the National Assembly's resolution on this matter is ***conclusive*** . . . ."[4]

The District Court accepted this line of argument, which is essentially identical to *Plaintiffs'* line

of argument here.[5]

This Court should do the same and declare the entire 2020 Notes Transaction invalid and

unenforceable under the act of state doctrine and Venezuelan law.  Once the Court has decided,

as it must, that Plaintiffs are entitled to this declaration, Defendants' affirmative defenses and

counterclaims fall away.

## MATERIAL FACTS NOT SUBJECT TO GENUINE DISPUTE

## I.   PLAINTIFFS AND THEIR RECONSTITUTED BOARDS OF DIRECTORS

Formed in 1975 after the nationalization of the oil industry to coordinate, monitor, and

---

[4] *See* Defendant's Motion to Dismiss, *PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*, Case No. 1:18-cv-20818-DPG, Dkt. No. 517 (S.D. Fla. July 23, 2018), at 26, Ex. 3.
[5] *PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*, 372 F. Supp. 3d 1353, 1362 (S.D. Fla. 2019).

control all Venezuelan oil and gas operations, Plaintiff PDVSA is a Caracas-based Venezuelan

state-owned enterprise that is wholly owned by the Republic of Venezuela as mandated by

Article 303 of the Venezuelan Constitution, which provides that "[f]or reasons of economic and

political sovereignty and national strategy, the State shall retain all shares of [PDVSA] . . . ."[6]

Plaintiff PDVSA Petróleo, also a Venezuelan state-owned enterprise based in Caracas, is a

wholly-owned PDVSA subsidiary and the entity responsible for oil production and exploration.[7]

Plaintiff PDV Holding, a Houston-based Delaware corporation and wholly-owned

PDVSA subsidiary,[8] is a holding company that owns 100% of the shares of CITGO Holding, Inc.

("CITGO Holding"), which, in turn, owns 100% of the shares of CITGO Petroleum Company

("CITGO"), a major, U.S.-based oil refiner.[9]  Thus, PDVSA indirectly owns 100% of CITGO

through PDV Holding and CITGO Holding.[10]

On February 8, 2019, pursuant to the "Statute to Govern a Transition to Democracy to

Reestablish the Validity of the Constitution of the Republic of Venezuela" (the "Transition

Statute") enacted by the National Assembly,[11] Interim President Juan Guaidó appointed a new,

ad-hoc board of directors of PDVSA (the "Ad-Hoc Board") "for the purpose of carrying out all

necessary actions to appoint a Board of Directors" for PDV Holding.[12]  The Ad-Hoc Board is the

only legitimate board of directors of PDVSA.[13]  In accordance with the Transition Statute, the

PDVSA Ad-Hoc Board appointed new boards of PDV Holding, PDVSA Petróleo, and PDVSA's

---

[6]1999 VENEZUELAN CONSTITUTION art. 303, Ex.4; Offering Circular at 3, Ex. 5.
[7]Offering Circular at 85, Ex. 5.
[8]Id. at A-33.
[9]Id. at 87.
[10]Id. at 84.
[11]Asamblea Nacional,  Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela,  (Feb. 5, 2019) (translated), Ex. 6.
[12]Jimenez v. Palacios, No. 2019-0490-KSJM, 2019 WL 3526479, at *6 (Del. Ch. Aug. 2, 2019) (quoting Decree of Juan Guaidó (Feb. 5, 2019)).
[13]See Jimenez, 2019 WL 3526479, at *13 (holding that the Guaidó Government's reconstitution of PDVSA's board was an official act of state that must be accepted by U.S. courts without further inquiry); Impact Fluid Solutions et al v. Bariven S.A. et al, Civ No. 4:19-cv-00654, Dkt. No. 55 (S.D. Tex. May 20, 2020) (same), Ex. 29.

other wholly-owned subsidiaries.[14]

## II.  DEFENDANTS AND THE BENEFICIAL HOLDERS OF THE 2020 NOTES

Defendant Union Bank, a U.S. national banking association with its main office in California and an office in New York City, is the Trustee under the Indenture and the Pledge.[15] Defendant GLAS Americas is a New York limited liability company with a single English member based in London.[16]  GLAS Americas is the Collateral Agent under the Indenture and the Pledge Agreement.[17]  Defendants were never domiciled in Venezuela.[18]  As Trustee, Union Bank represents the interests of the beneficial holders of the 2020 Notes, which are mostly hedge funds managed by some of the largest and most sophisticated asset managers in the world.[19]

## III.  THE EXCHANGE OFFER AND THE 2020 NOTES TRANSACTION

In a September 2016 exchange offer (the "Exchange Offer"), PDVSA offered to exchange its outstanding unsecured notes due in April and November 2017 (respectively, the "April 2017 Notes" and the "November 2017 Notes" and, collectively, the "2017 Notes") for new notes due in 2020 (the "2020 Notes").[20]  Like the 2017 Notes, the 2020 Notes were to be issued with a purported guaranty from PDVSA Petróleo.[21]  However, unlike the 2017 Notes or

---

[14]*See* Decree of Juan Guaidó (Apr. 10, 2019), Ex. 7.

[15]*Defendants' Answers and Counterclaims*, Case No. 1:19-cv-10023-KPF, Dkt. No. 40, at ¶ 13 (S.D.N.Y. Dec. 18, 2019).

[16]*Id*. at ¶ 114.

[17]*Id*.

[18]*See id*. ¶¶ 77 & 114; *Complaint for Declaratory and Injunctive Relief*, Case No. 1:19-cv-10023-KPF, Dkt. No. 1, at ¶ 77.

[19]More than 50% of the 2020 Notes are beneficially held by hedge funds managed by Ashmore, a London-based asset manager with more than $98.4 billion under management as of December 31, 2019.  *See Third Quarter Assets Under Management Statement*, Ashmore Group, plc (Apr. 16, 2020), *available at* http://www.ashmoregroup.com/sites/default/files/reports/Ashmore%20Q3%20AuM%20statement%202019-20%20FINAL.pdf.  A substantial percentage of the remaining 2020 Notes are beneficially held by hedge funds managed by Blackrock, a New York-based asset manager with more than $7.4 trillion under management as of December 31, 2019, and hedge funds managed by Contrarian, a Greenwich, Connecticut-based asset manager with more than $6 billion under management as of December 31, 2019.  *See Form ADV*, Contrarian Capital Management, Ex. 8; *Annual Report 2019*, Blackrock, *available at*, https://s24.q4cdn.com/856567660/files/doc_financials/2019/ar/BlackRock-2019-Annual-Report.pdf.

[20]Offering Circular at cover page, Ex. 5.

[21]*Id*. at cover page & p. 14.

any other notes or debt previously issued or incurred by PDVSA, the 2020 Notes were also to be purportedly secured by a pledge of 50.1% of PDV Holding's shares of CITGO Holding (the "CITGO Shares") due to PDVSA's financial distress stemming from mismanagement and the collapse of its oil production.[22]

The Exchange Offer was accepted by the holders of approximately U.S. $2,799,000,000 of 2017 Notes, which was just 52.57% of the maximum tender amount and just 39.43% of the aggregate principal amount outstanding.[23]  For each U.S. $1,000 in outstanding principal amount of 2017 Notes tendered, PDVSA delivered between U.S. $1,120 and U.S. $1,170 of 2020 Notes depending on the due date of the tendered notes and the timing of the tender.[24] In aggregate, PDVSA issued approximately U.S. $3,367,529,000 in principal amount of 2020 Notes.[25] PDVSA received no additional funds from noteholders as part of the exchange.

The 2020 Notes were issued pursuant to an indenture dated as of October 28, 2016 (the "Indenture") and, as contemplated by the Indenture, purportedly secured by a pledge of 50.1% of PDV Holding's CITGO Holding shares pursuant to a pledge and security agreement (the "Pledge") also dated as of October 28, 2016.[26]  The 2020 Notes, the Indenture, and the Pledge comprise a set of interrelated contracts (as defined in the Indenture, the "Transaction Documents") relating to a single, integrated transaction (the "2020 Notes Transaction").[27]

The Indenture was entered into among (i) PDVSA, as Issuer, (ii) PDVSA Petróleo, as Guarantor, (iii) Union Bank, as Trustee, (iv) GLAS Americas, as Collateral Agent, (v) Law

---

[22] *Id.* at cover page & pp. 7 & 14.
[23] *PDVSA Announces Expiration and Final Results for its Offers to Exchange its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes due 2020*, PR NEWSWIRE (Oct. 24, 2016), *available at* https://www.prnewswire.com/news-releases/pdvsa-announces-expiration-and-final-results-for-its-offers-to-exchange-its-outstanding-5250-senior-notes-due-2017-and-850-senior-notes-due-2017-for-new-850-senior-secured-notes-due-2020-300349775.html.
[24] Offering Circular Supplement at 2, Ex. 9.
[25] Indenture at cover page, Ex. 10.
[26] *Id.* at 4; Pledge and Security Agreement, at 3-4, Ex. 11.
[27] Indenture at 18, Ex. 10.

Debenture Trust Company of New York, as Registrar, Transfer Agent, and Principal Paying

Agent, and (vi) Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg Paying

Agent.[28]  The Pledge was entered into among (i) PDV Holding, as Pledgor, (ii) PDVSA, as

Issuer, (iii) PDVSA Petróleo, as Guarantor, (iv) GLAS Americas, as Collateral Agent, and (v)

Union Bank, as Trustee.[29]

The stated purpose of the Exchange Offer was to refinance the 2017 Notes because

"external factors" had affected the price at which PDVSA could sell its products, making it

"prudent to rearrange [PDVSA's] debt profile."[30]  However, the Exchange Offer did not alleviate

the causes of PDVSA's cash flow crisis and overall financial distress.  Instead of pursuing a

comprehensive restructuring of PDVSA's debt, the Maduro regime chose to refinance just the

2017 Notes, increasing PDVSA's debt burden and placing CITGO at risk.  Just one year after the

Exchange Offer, PDVSA defaulted on all of its debt except the 2020 Notes.

## IV.   THE ECONOMIC OUTCOME OF THE EXCHANGE OFFER FOR PDVSA AND EXCHANGING NOTEHOLDERS

Rather than having to accept a principal reduction (a face value "haircut"), noteholders

who accepted the Exchange Offer received more in 2020 Notes than remained due on their 2017

Notes (a face value "premium").[31]  The exchanging holders of April 2017 Notes also received a

3.25% higher interest rate.  Meanwhile, PDVSA obtained a (weighted average) maturity

extension of only 1.67 years for its obligations on the 2017 Notes.  Thus, the Exchange Offer

allowed PDVSA to avoid paying U.S. $2.982 billion in interest and principal through November

2017 on 2017 Notes but committed PDVSA to paying 40% *more* (U.S. $4.163 billion) in interest

---

[28]*Id.* at cover page & 18.

[29]Pledge at cover page & 18, Ex. 11.

[30]Offering Circular, at 7, Ex. 5.

[31]All facts in this section are from paragraphs 74-95 and Exhibits 4A and 4B of the Expert Report of David C. Hinman, dated March 16, 2020 (the "Hinman Report"), attached as Exhibit A to the Declaration of David C. Hinman in Support of Plaintiffs' Motion for Summary Judgment.

and principal on the 2020 Notes through October 2020.  As one analyst report described the

economics from PDVSA's perspective: "The swap in and of itself does nothing to improve

PDVSA's creditworthiness.  If anything, it worsens it . . . The swap provides some cash flow

relief . . . But this cash flow relief is at the expense of a buildup of a new amortization hump not

that far into the future."[32]  While doing nothing to solve PDVSA's financial problems, the

Exchange Offer created a new problem by placing CITGO at risk.

 Regardless of when a noteholder purchased 2017 Notes exchanged for 2020 Notes, the

total interest and principal payments received plus the current market value of the 2020 Notes

exceeds the 2017 Notes' purchase cost.  Counting only interest and principal payments, the value

received for 2017 Notes purchased at issuance equals 153% and 192% of the purchase cost of the

April 2017 Notes and the November 2017 Notes, respectively.  For 2017 Notes purchased during

the Exchange Offer window, the value received equals no less than 96% of the purchase cost.[33]

## V. VENEZUELA'S CONSTITUTIONAL REQUIREMENT OF PRIOR NATIONAL ASSEMBLY AUTHORIZATION FOR NATIONAL PUBLIC INTEREST CONTRACTS WITH FOREIGN/NON-DOMICILED COUNTERPARTIES

 The Venezuelan Constitution is the supreme law of Venezuela.[34]  The Constitution was

drafted by an elected Constituent Assembly that included Plaintiffs' Venezuelan law expert,

Professor Allan R. Brewer-Carías.[35]  Several articles of the Constitution impose requirements for

"public interest contracts."  As discussed more fully below, Article 150, which Professor Brewer

proposed in his role as a constitutional drafter, provides that "*[n]o contract in the . . . national*

*public interest shall be entered into with . . . companies not domiciled in Venezuela . . . without*

---

[32]Email from Javier Kulesz to Jan Dehn, "Jefferies LatAm Sovns – PDVSA's swap and Argentina's Euro bond deal," dated October 5, 2016.  (ASH_00004270 – 274 at 271), Ex. 12.
[33]Hinman Report, at ¶¶ 92-96, Figure 1B.
[34]Expert Report of Allan R. Brewer-Carías dated March 16, 2020 (the "Brewer Report"), at ¶ 12, attached as Exhibit A to the Declaration of Allan R. Brewer-Carías in Support of Plaintiffs' Motion for Summary Judgment.
[35]*Id*. at ¶¶ 12-13.

*the approval of the National Assembly.*"[36]  Authorization of public interest contracts is

enumerated in Article 187.9 as one of the National Assembly's key oversight functions.[37]

## VI.   THE NATIONAL ASSEMBLY'S PUBLIC OPPOSITION TO THE EXCHANGE OFFER AND EXPLICIT REJECTION OF THE PLEDGE

On May 26, 2016 (before the announcement of the Exchange Offer), the National

Assembly passed a resolution (the "May 2016 Resolution")[38] reciting, *inter alia*, that:

> In relation to contracts of national, state or municipal public interest concluded by and between the National Executive and . . . companies not domiciled in Venezuela, the Constitution categorically mandates, without exception, the approval of the National Assembly (art 150) . . . .

Following this and other recitals, the National Assembly resolved, *inter alia*:

> To warn that any activity carried out by an organ that usurps the constitutional functions of another public authority is null and void and shall be considered non-existent . . . [and]

> To remind that the contracts of national, state or municipal public interest concluded by and between the National Executive and . . . companies not domiciled in Venezuela, without the approval of the National Assembly; as well as other contracts of national public interest that it signs without this approval outside of the cases excepted by law, shall be null and void in their entirety.

On September 27, 2016, before the Transaction Documents were executed, the National

Assembly passed a resolution specifically regarding the 2020 Notes Transaction (the "September

2016 Resolution")[39] reciting, *inter alia*:

> That Article 187 of the Constitution empowers the National Assembly to exercise control functions over the National Government and the Public Administration, with the power to obtain information about the financial statements and details of any transaction that commits PDVSA's assets as collateral.

Following this and other recitals, the National Assembly resolved, *inter alia*:

---

[36] 1999 VENEZUELAN CONSTITUTION art. 150, Ex. 4.
[37] 1999 VENEZUELAN CONSTITUTION art. 187, Ex. 4.
[38] *Resolution on the Respect of the Inherent and Nontransferable Powers of the National Assembly on Contracts of Public Interest Signed by and between the National Executive and Foreign States or Official Entities or with Companies Not Domiciled in Venezuela*, dated May 26, 2016 (translated), Ex. 13.
[39] *Resolutions on the Current Financial Situation of Petróleos de Venezuela S.A.*, dated September 27, 2016 (translated), Ex. C to Complaint (emphasis added).

To summon citizen Eulogio del Pino, President of Petróleos de Venezuela SA, to appear before this National Assembly to explain the terms of this bond swap transaction, based on offering the majority of Citgo Holding Inc. shares as collateral . . .

**_To reject categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of CITGO Holding, Inc. are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation . . . [and]_**

To urge the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with article[] 187, section 9. . . of the Constitution . . . .

During the National Assembly debate preceding the September 2016 Resolution, representative Guevara, President of the Comptroller's Commission, stated with respect to the Exchange Offer that "we will not acknowledge any national interest contract that does not come before this National Assembly; let me make this very clear to our international creditors: you know that this Party [of Maduro] is on its way out and that the people will enter Miraflores [presidential palace] very soon and you will not be able to ask us to honor the commitments of the irresponsible individuals who destroyed PDVSA."[40]  In the same National Assembly session, representative Guerra stated that "***[h]ere for the first time collateral is being put up, in the issuance of a PDVSA corporate bond, 50.1% of the shares of Citgo, that is questioned by the Venezuelan legal order***."[41]  On October 28, 2016, after the illegitimate, Maduro-controlled Supreme Tribunal quashed the National Assembly's investigation into PDVSA and the Exchange Offer, the 2020 Notes Transaction was completed despite the National Assembly's strenuous opposition and "categorical rejection" of the offered pledge.

Three years later, on October 15, 2019, after an investigation made possible by the formal recognition earlier in 2019 of the National Assembly and Interim President Guaidó as the only

---

[40]Asamblea Nacional, *Regular Session of Tuesday, September 27, 2016. Discussions on the effects of PDVSA Bond Redemption* (translated), Ex. 14, at 22.
[41]*Id.* at 5.

legitimate Venezuelan Government, the National Assembly passed a resolution (the "October 2019 Resolution")[42] reciting, *inter alia*:

> That PDVSA decided to ignore the [September 2016 Resolution] of this National Assembly, and proceeded with the bond swap transaction, despite the market not reacting favorably, due to the economic collapse of PDVSA and the public complaints presented by this Assembly in its [September 2016 Resolution] . . .
>
> That the swap increased PDVSA's obligations during 2016-2020 by US$1,102 million . . . Consequently, the total financing of the bond swap has an internal rate of return of almost 19.8% in dollars, plus the 50.1% of the Citgo Holding, Inc. shares offered as collateral . . .
>
> That the day following the announcement of the bond swap results, the Constitutional Court issued its ruling No. 893, in which it illegitimately prevented this National Assembly from investigating PDVSA . . . even though the nullity of the Resolution dated September 27, 2016 was not declared . . . [and]
>
> That following the investigations conducted in coordination with the Office of the Special Prosecutor, ***it was concluded that the 2020 Bond indenture is a national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution*** . . .

Following these and other recitals, the National Assembly resolved, *inter alia*:

> To ratify that ***the 2020 Bond indenture violated Article 150 of the Constitution of the Bolivarian Republic of Venezuela, since it concerned a national interest public contract, executed with foreign companies, which was not authorized by the National Assembly*** . . . .

The foregoing National Assembly resolutions were each made public upon their passage and remain in full force and effect.[43]

Thus, the National Assembly opposed the Exchange Offer and declared the 2020 Notes Transaction invalid because, for the first time in any PDVSA debt transaction, a controlling interest in CITGO, an asset of national public interest, was purportedly pledged as collateral.

---

[42]*Resolutions that Reiterates the Invalidity of PDVSA's 2020 Bonds* (translated), Ex. D to Complaint (emphasis added).

[43]*See* May 2016 Resolution (ordering publication), Ex. 13; September 2016 Resolution, (same), Exhibit C to the Complaint; and October 2019 Resolution (same), Exhibit D to the Complaint.

## VII.   MEDIA REPORTING AND ANALYST COMMENTARY REGARDING THE NATIONAL ASSEMBLY'S OPPOSITION TO THE EXCHANGE OFFER AND ASSOCIATED INVALIDITY RISK

The National Assembly's public opposition to the Exchange Offer and the associated

invalidity risk was the subject of contemporaneous media reporting and market analyst

commentary.  No fewer than fourteen media and market research sources called attention to the

invalidity risk during the Exchange Offer period, many pointing to the National Assembly's

September 2016 Resolution.  For example:

- On September 14, 2016, the day after the Exchange Offer was announced, a Wall Street Journal article noted that "*Venezuela's constitution requires the National Assembly to approve any new indebtedness of the republic*;"[44]

- On September 17, 2016, an article in *El Nacional*, a leading Venezuelan news outlet, quoted a Venezuelan constitutional lawyer as saying that *the decree purportedly allowing PDVSA to use CITGO as collateral was unconstitutional* and that "*any contract [PDVSA] signs is invalid*;"[45]

- On September 18, 2016, a Nomura analyst stated in an email to market participants that "[t]he make or break of the exchange is the assessment of the equity valuation and the *legal risks*" and that "opinions from local lawyers suggest[ed] that *all [such] international transactions . . . would require legislative approval or otherwise risk illegality* . . . ;"[46]

- On September 19, 2016, UBS published an analyst report ████████████████████████████████████████████████████████████████████████████████████████[47]

- On September 28, 2016, the day after the National Assembly adopted the September 2016 Resolution, a Venezuelan media outlet published a press release entitled "*Freddy*

---

[44]Carolyn Cui, *Venezuela's PdVSA to Offer to Swap $7 Billion in Debt*, WALL ST. J. (Sept. 14, 2016) (emphasis added), *available at* https://www.wsj.com/articles/venezuelas-pdvsa-to-offer-to-swap-7-billion-in-debt-1473878226.
[45]*Debt Issue Under New Decree Will be Void*, EL NACIONAL (VENEZUELA) (Sept. 27, 2016) (translated) (emphasis added), Ex. 15.
[46]Email from Siobhan Morden to Patrick Haller, Michel Aubenas, Pablo Goldberg and 27 others, "Venezuela | PdVSA exchange," *Nomura*, September 18, 2016. (ASH_00000743 – 746 at 743) (emphasis added), Ex. 16; Email from Dan Gelfand to Michel Aubenas, Pablo Goldberg and 27 others, "FW: Venezuela | PdVSA exchange," dated September 18, 2016, forwarding an email from Siobhan Morden, "Venezuela | PdVSA exchange," *Nomura*, dated September 18, 2016. (BLA_00000556 – 558 at 557) (emphasis added), Ex. 17.
[47]Alejo Czerwonko, "Venezuela bonds: Of politics and swaps," *UBS*, September 19, 2016, p. 3. (UBS-PDV000001 – 009 at 003) (emphasis added), Ex. 18.

13

*Guevara: Government has proven negligent and destructive of the economy*," which quoted representative Guevara as saying with respect to the Exchange Offer that the National Assembly "***will not recognize any public contract that is not considered or authorized by the Legislative Branch in accordance with the Constitution***;"[48]

- On October 11, 2016, a research report from Torino Capital—an analyst firm that advised Ashmore in connection with the Exchange Offer—noted that the tender deadline had been extended twice because of "concern[s] about the ***legal risks associated with the new bond***" and that noteholders "may expect that the market will not only discount the collateral on the 2020 but perhaps also force it to trade at an additional discount given ***concerns about the legality of the issuance***;"[49] and

- On October 13, 2016, Goldman Sachs and J.P. Morgan published research reports noting, respectively, that "***the National Assembly has questioned the legitimacy of offering a 50% participation of CITGO as collateral***[50] and that "***the deal could be 'illegal' and reneged upon by a future opposition government***."[51]

These and numerous other sources questioning the validity of the 2020 Notes Transaction are compiled in Plaintiffs' Rule 56.1 Statement and discussed in the accompanying initial expert report of David C. Hinman, an expert in sovereign and quasi-sovereign debt investing (as defined above, the Hinman Report).

## VIII.  THE SUBJUGATION OF THE NATIONAL ASSEMBLY AND THE SUPREME TRIBUNAL BY THE CHÁVEZ AND MADURO REGIMES

The Maduro regime's disregard of the National Assembly's public opposition to the Exchange Offer was emblematic of a longstanding disregard of the separation of powers

---

[48]Lysaura Fuentes, *Freddy Guevara: Government has proven negligent and destructive of the economy*, *El Cooperante* (Sept. 28, 2016) (emphasis added) (translated), Ex. 19. An article from the same outlet the day before quoted Mr. Guevara as saying "[w]e will not pay for the broken crockery of a small group of crooks that destroyed Venezuela. *Not only do we not recognize these transactions, we will also investigate everyone involved in the sale because it would be implying an embezzlement of the Nation. Freddy Guevara on PDVSA: We will not recognize any bond swap that has not been authorized by the NA*, LA PATILLA (Sept. 27, 2016) (translated) (emphasis added), Ex. 20.

[49]Francisco Rodríguez, "Venezuela this Week: October 11-16, 2016 Of Laws and Bonds," *Torino Capital LLC*, (ASH_00006934 – 941 at 939 – 940) (emphasis added), Ex. 21.

[50]Email from GS Macro Economics Research to Jan Dehn, Herbert Saller, Xin Xu, and Pablo Goldberg, "LATAM Today: October 13, 2016," dated October 13, 2016. (ASH_00000275 – 280, Ex. 22; ASH_00001588 – 593, Ex. 23; ASH_00002573 – 578, Ex. 24; BLA_00001162 – 167, Ex. 25) (emphasis added).

[51]Email from Dan Gelfand to Blackrock employees, "FW: PDVSA : Swap extended again and the clock is ticking," dated October 13, 2016 forwarding email from Javier Zorrilla, Ben Ramsey, and Trang Nguyen, "PDVSA Swap Extended Again and the Clock is Ticking," *J.P. Morgan*, October 13, 2016. (BLA_00001171 – 175 at 172). (emphasis added), Ex. 26.

14

embodied in the Venezuelan Constitution.[52]  Since the beginning of the Chávez regime in 1999,

the National Executive branch of the Venezuelan Government has devoted itself to neutralizing

the National Assembly and subduing the judiciary.  The primary means of neutralizing the

National Assembly has been simply to ignore its constitutional powers.  Thus, in flagrant

violation of the Venezuelan Constitution, the National Executive has entered into numerous

national public interest contracts[53] without National Assembly authorization.[54]

It was not until the opposition parties won control in the December 2015 parliamentary

elections that the National Assembly could begin asserting its constitutional powers as an

independent branch of government, overseeing the government and the Public Administration.

Since that time, the National Assembly has passed numerous resolutions declaring contracts to

be national public interest contracts or rejecting contracts entered into without legislative

authorization, including PDVSA contracts unrelated to the 2020 Notes Transaction.

---

[52]All facts in this section are from paragraphs 54-65 of the Brewer Report.

[53]The Brewer Report (pp. 21-23) cites numerous examples of high-profile national public interest contracts entered into with foreign/non-domiciled counterparties that were required to be submitted to the National Assembly for authorization under Article 150 of the Constitution but were not, including: a 2007 contract for technological services relating to the transformation and modernization of Venezuelan citizen identification and passport services entered into by the Republic and a Venezuelan state foundation with a unit of the Republic of Cuba and a Cuban corporation; the Framework Contract of the National Geological Prospection of Venezuela, entered into in 2012 by the Republic and the Venezuelan Geology and Mining Institute with a Chinese corporation; and various contracts of national public interest entered into by a number of Venezuelan state-owned entities with a Chinese engineering company.

[54]Other means have included the appropriation of the National Assembly's legislative functions through executive decrees and the direct persecution of opposition party members, many of whom have been jailed or forced into exile. In 2001, Chávez approved his first forty-eight executive decrees, proclaiming "La Ley soy yo . . . El Estado soy yo" ("The law is me . . . The state is me").  Allan R. Brewer-Carías, *The Principle of Separation of Powers and Authoritarian Government in Venezuela*, *in* 47 DUQ. L. REV. 837-38 (2009).  Chávez approved another forty decrees in 2008, threatening to persecute anyone opposing him and similarly proclaiming "Yo soy la Ley . . . Yo soy el Estado" ("I am the Law . . . I am the State").  *Id.*  As one of Venezuela's most important journalists described the situation in 2008: "[F]rom a conceptual point of view, the Venezuelan political system is autocratic.  All political power is concentrated in the hands of the President.  There is no real separation of Powers."  Brewer Report at ¶ 60 (citing Teodoro Petkoff, *Election and Political Power. Challenges for the Opposition*, *in* REVISTA: HARVARD REVIEW OF LATIN AMERICA 2 (2008), Ex. 27.  In 2009, the President of the Supreme Tribunal, which was by then completely dominated by Chávez, exclaimed in a press conference that "the separation of powers weakens the State" and that this system "has to be reformed."  Brewer Report at ¶ 59 (citing Juan Francisco Alonso, *La división de poderes debilita al estado. La presidenta del TSJ [Luisa Estela Morales] afirma que la Constitución hay que reformarla* [*The division of power weakens state,President of TSJ [Luisa Estela Morales] states that the Constitution must be reformed*], El Universal (Dec. 5, 2009), Ex. 28.

Yet, following the December 2015 parliamentary elections, the illegitimate Supreme Tribunal issued more than a hundred decisions that transformed Venezuela's government into what has been called a "judicial dictatorship" or "judicial tyranny."[55]  In one such decision, the Supreme Tribunal eliminated the parliamentary immunity of National Assembly members, arrogated to itself all of the legislative powers of the National Assembly, and delegated legislative powers to Maduro, permitting him to reform laws and codes at his discretion.[56]  In 2016, the Secretary General of the Organization of American States reported on "the co-opting of the Judicial branch by the Executive Branch" and called for "a new composition of the Supreme Tribunal of Justice . . . given that the current composition is completely flawed, both in the appointment process as well as in the political bias of virtually all its members."[57]

Thus, in the 2019 Transition Statute, the National Assembly called for legislation prohibiting public officials from "obey[ing] orders from the one who usurps the Presidency of the Republic [Maduro]" or from "the other unconstitutionally integrated organs such as the Supreme Tribunal of Justice," declaring illegitimate all justices appointed before July 21, 2017.[58]  The U.S. Government has also declared the Supreme Tribunal illegitimate, recognizing that it "usurped the authority of Venezuela's democratically-elected legislature, the National Assembly, including by allowing the Executive Branch to rule through emergency decree, thereby restricting the rights and thwarting the will of the Venezuelan people."[59]  Going even further, the

---

[55]Brewer Report at ¶ 87 (quoting Allan R. Brewer-Carías, Emeritus Professor, Central University of Venezuela, *Transition from Democracy to Tyranny through the Fraudulent Use of Democratic Institutions: The Case of Venezuela* (Sept. 25, 2018)), *available at* https://allanbrewercarias.com/wp-content/uploads/2018/09/1218.-Brewer.-conf.-Transictiion-Democracy-to-Tyranny.-B.C.-2018.pdf.
[56]*Id.*
[57]Org. of Am. States, *Luis Almagro to Mr. Juan Jose Arcuri*, at 65, 109, OSG/243-16 (May 26, 2016), at 111 & 112, *available at* http://www.oas.org/documents/eng/press/OSG-243.en.pdf.
[58]Asamblea Nacional,*Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela* (Feb. 5, 2019) (translated), Ex. 6.
[59]*See Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice*, U.S. DEP'T OF THE TREASURY (May 18, 2017), *available at* https://www.treasury.gov/press-center/pressreleases/Pages/sm0090.aspx.

U.S. Government has sanctioned the President of the Supreme Tribunal and seven principal

members of the Constitutional Chamber for preventing "the democratically-elected National

Assembly [from] perform[ing] its constitutional functions."[60]More recently, the U.S.

Government has placed visa restrictions on "members of the illegitimate Supreme Court[] for

undermining Venezuela's democracy" and indicted the Supreme Tribunal's President for alleged

crimes, including accepting bribes to fix civil and criminal cases.[61]

## IX.   THE U.S. GOVERNMENT'S RECOGNITION OF THE NATIONAL ASSEMBLY AND INTERIM PRESIDENT GUAIDÓ

Following a rigged presidential election in 2018, the National Assembly invoked Article

233 of the Venezuelan Constitution to declare Maduro's presidency illegitimate and name

National Assembly President Juan Guaidó as the Interim President of Venezuela.[62]  On January

23, 2019, the U.S. President branded the Maduro regime "illegitimate," acknowledged the

National Assembly as the "only legitimate branch of government duly elected by the Venezuelan

people," and officially recognized "the President of the Venezuelan National Assembly, Juan

Guaidó, as the Interim President of Venezuela."[63]The U.S. Government has continually affirmed

its official recognition of and support for Interim President Guaidó and the National Assembly

through executive orders, licenses, guidance, acceptance of diplomats, and public statements.[64]

---

[60]*Id.*

[61]U.S. Department of State, *U.S. Sanctions on Venezuelan Individuals and Entities* (Press Statement, Feb. 15, 2019), *available at* https://www.state.gov/u-s-sanctions-on-venezuelan-individuals-and-entities/; *U.S. v. Maikel Jose Moreno Perez*, Case No. 1:20-mj-02407-JJO (S.D. Fl. Mar. 12, 2020).

[62]Doug Stanglin, *U.S. recognizes Venezuela opposition leader Juan Guaidó as president; Russia backs Maduro*, USA TODAY (Jan. 23, 2019).

[63]Press Statement, Secretary of State Michael R. Pompeo, Recognition Of Juan Guaidó As Venezuela's Interim President By Several European Countries (Feb. 4, 2019), *available at* https://eg.usembassy.gov/secretary-pompeo-on-recognition-of-juan-Guaidó-as-venezuelas-interim-president-by-several-european-countries/.

[64]For example, the U.S. President has issued numerous executive orders imposing strict sanctions in light of Maduro's "usurpation of power" and the "illegitimate Maduro regime['s]" efforts to "prevent the Interim President and the National Assembly from exercising legitimate authority in Venezuela."  *See* Executive Orders 13857 (January 25, 2019) and 13884 (August 5, 2019).  The U.S. Treasury Department has likewise issued orders blocking transactions with the Maduro regime and permitting transactions with the National Assembly and Interim President Guaidó.  *See* OFAC General Licenses 7 & 31.  The U.S. State Department has issued statements reiterating that "the

Even before formal recognition, the U.S. had declared the National Assembly to be Venezuela's "only legitimate legislative body."[65]

## ARGUMENT

**I.      THE NATIONAL ASSEMBLY'S OFFICIAL ACTIONS WITHHOLDING AUTHORIZATION OF THE TRANSACTION DOCUMENTS AND DECLARING THE 2020 NOTES TRANSACTION INVALID ARE ACTS OF STATE THAT CANNOT BE "OVERRULED" BY A U.S. COURT**

Longstanding Supreme Court and Second Circuit precedent "precludes any review whatever of the acts of the government of one sovereign State done within its own territory by the courts of another sovereign State." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 743 (2d Cir. 2016) (quoting *First Nat. City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 763 (1972)).  The act of state doctrine was recast in its modern form in *Banco Nacional de Cuba v. Sabbatino*, where the Supreme Court elucidated the doctrine's "constitutional underpinnings," noting that it "arises out of the basic relationships between branches of government in a system of separation of powers" and "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere."  376 U.S. 398, 423 (1964).

Under the act of state doctrine, domestic acts of a legitimate foreign government "cannot be questioned but must be accepted by our courts as a rule for their decision." *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012) (quoting *Ricaud v. American Metal*

---

United States does not recognize the Maduro regime as the government of Venezuela" and considers Maduro the "former President."  Press Statement, U.S. Dep't of State, *Continuing U.S. Diplomatic Presence in Venezuela* (Jan. 23, 2019), *available at* https://www.state.gov/continuing-u-s-diplomatic-presence-in-venezuela/.

[65] Press Statement, U.S. Department of State, *Assumption of Legislative Powers in Venezuela* (Aug. 18, 2017) ("[T]he democratically-elected National Assembly is the only legitimate legislative body . . . As long as the Maduro regime continues to conduct itself as an authoritarian dictatorship, we are prepared to bring the full weight of American economic and diplomatic power to bear in support of the Venezuelan people as they seek to restore their democracy."), *available at* https://www.state.gov/assumption-of-legislative-powers-in-venezuela/.

*Co.*, 246 U.S. 304, 309 (1918)); *see also W.S. Kirkpatrick & Co. v. Env'l Tectonics Corp*, 493 U.S. 400, 409 (1990) (the act of state doctrine is a "rule of decision" and "requires that, in the process of deciding [a case or controversy], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid."). Courts in the U.S. have already recognized that acts of the National Assembly with regard to the PDVSA Ad Hoc Board merit deference under the act of state doctrine as the actions of Venezuela's only legitimate government. *See Jimenez*, 2019 WL 3526479, at *11 ("The determinations of the Executive Branch are unambiguous: Guaidó is recognized, the National Assembly is legitimate, and neither Maduro nor the Constituent Assembly are legitimate parts of the Venezuelan government."); *Impact Fluid Solutions et al v. Bariven S.A. et al*, Civ No. 4:19-cv-00654, Dkt. No. 55, at 6 (S.D. Tex. May 20, 2020) ("Appl[ying the act of state doctrine] here, the Court will not question the validity of any laws promulgated by the Venezuelan National Assembly or any acts taken by Interim President Guaidó pursuant to those laws. In accord with other courts confronted by similar issues, this recognition extends to acts regarding the management of Venezuela's state-owned corporations."), Ex. 29.

The U.S. Government's official recognition in 2019 of Interim President Guaidó and the opposition-led National Assembly as Venezuela's only legitimate government (consistent with its prior recognition of the National Assembly as Venezuela's "only legitimate legislative body") is "*retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence*"—*i.e.*, after the opposition won control of the National Assembly in the December 6, 2015 parliamentary elections. *Konowaloff*, 702 F.3d at 146 (quoting *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302–03 (1918) (retroactively recognizing the seizure of hides by the revolutionary government in Mexico)) (emphasis in

original); *see also United States v. Belmont*, 301 U.S. 324 (1937) (retroactively recognizing

actions by the Soviet Government); *United States v. Pink,* 315 U.S. 203 (1942) (same); *Underhill*

*v. Hernandez*, 168 U.S. 250 (1897) (retroactively recognizing actions taken by the Palacio

government in Venezuela before it seized power).

As conveyed in the legitimate Venezuelan Government's letter to this Court,[66] the

Republic considers the National Assembly's above-referenced resolutions regarding the 2020

Notes Transaction and refusal to authorize the Transaction Documents to be official acts of state

warranting deference from U.S. courts under the act of state doctrine.[67]  The Republic is

absolutely right.  As further conveyed in that letter and discussed more fully below, the National

Assembly's refusal to authorize the Transaction Documents and the adoption of its September

2016 Resolution condemning the Exchange Offer, "categorically rejecting" the proposed pledge

of CITGO Shares, and initiating an investigation *before* the Indenture and the Pledge were

executed prevented them from coming into valid legal existence and rendered them void *ab*

*initio*.[68]  The National Assembly's October 2019 Resolution—unmistakably entitled "Resolution

that Reiterates the Invalidity of PDVSA's 2020 Bonds"—confirmed the import of the National

Assembly's September 2016 Resolution and refusal of authorization and explicitly declared the

---

[66]Letter to the Honorable Katherine Polk Failla, United States District Court Judge, from Carlos Vecchio, Ambassador of the Bolivarian Republic of Venezuela to the United States, *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A., et. al.*, Case No: 19-cv-10023-KPF, Dkt. 80 (June 9, 2020).

[67]Courts have long recognized that a State's refusal to act can qualify as an "official act" for purposes of the act of state doctrine.  *See, e.g., Underhill*, 168 U.S. at 252 (holding that the act of state doctrine "must necessarily extend" to the retroactively recognized Venezuelan revolutionary forces' refusal to grant the plaintiff a passport).  Likewise, the passage of a "statute, decree, order, *or resolution*" qualifies as an "official act."  *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60 (2d Cir. 2019) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976)) (emphasis added).

[68]Such evidence from a foreign sovereign representative has been considered by the Supreme Court and the Second Circuit on numerous instances as proof that the "official act" in question occurred, had a specific effect, and was of a governmental character. *See, e.g., Alfred Dunhill*, 425 U.S. at 723 (statements from counsel representing Cuba were considered "authoritative representations of the position" of Cuba and thereby "serve to confirm that the continued retention of [the seized money] has been undertaken as an exercise of sovereign power."); *Banco de Espana v. Fed. Reserve Bank of New York*, 114 F.2d 438, 441 (2d Cir. 1940) (affidavit from ambassador of Spain alleging that the Spanish government had authority to acquisition a cache of silver through governmental decree and ministerial orders was accepted by court as proof of the fact that such acts had occurred).

20

invalidity of the 2020 Notes Transaction.

Likewise, in the *PDVSA U.S. Litigation Trust* case, Defendants' counsel (Paul Weiss) correctly argued that a National Assembly resolution passed prior to formal recognition and declaring invalid an unauthorized PDVSA contract of national public interest was an official act deserving deference under the act of state doctrine.[69]  As Defendants' counsel rightly pointed out: "The Judiciary's rebuke of the only Venezuelan legislative body recognized by the Executive Branch would thus undermine the long-standing principle that '[r]ecognition is a topic on which the Nation must speak . . . with one voice.'"  *Id*. (quoting *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2086 (2015)).  The court agreed, explaining that "[t]he United States' recognition of the National Assembly, as opposed to the Maduro regime, is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence."  *PDVSA U.S. Litigation. Trust*, 372 F. Supp. at 1362 (internal quotation marks omitted).  Although the case was decided on other grounds, the court acknowledged that "if the National Assembly's [2018 resolution declaring] that the [Trust Agreement entered into by PDVSA] is unconstitutional is considered an official act of the government of Venezuela, the Act of State doctrine would preclude this Court from ruling otherwise."  *Id*. (citing *Konowaloff*, 702 F.3d at 146).  Less than two weeks ago, Paul Weiss filed a supplemental appeal brief asking the Eleventh Circuit to defer to a letter from the legitimate Venezuelan Government conveying the Republic's view that "[c]onsistent with its constitutional role under Article 187.9, the National Assembly had authority to identify the Litigation Trust Agreement as a national public interest agreement [requiring National Assembly

---

[69]Defendant's Motion to Dismiss, *PDVSA U.S. Litig. Tr.*, Case No. 1:18-cv-20818-DPG, Dkt. No. 517 (S.D. Fla. July 23, 2018), at 20-23, Ex. 3; *Resolution to Denounce the Unconstitutionality of the Constitution of the Trust 'PDVSA US Litigation Trust', by Sociedad Anonima Petroleos de Venezuela,* dated  April 24, 2018 (translated), Ex. 69).

authorization].">[70]

Notably, this is not a case like *Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985), where the Second Circuit held that the act of state doctrine did not apply to actions taken by the Costa Rican Government to suspend payments on indisputably valid New York debt already in existence at the time of the suspension.[71]   In other words, this is *not* a case of a government taking actions after the fact in an effort to avoid valid, preexisting obligations sited in the U.S.   The National Assembly's September 2016 Resolution and refusal of authorization before the Transaction Documents were executed were "able to come to complete fruition within the dominion of the [sovereign]," preventing the Transaction Documents from coming into valid legal existence, and therefore are "not subject to re-examination and modification by the courts of this country."   *Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 224 (2d Cir. 1985) (deferring to Mexico's official acts modifying certificates of deposit paid in U.S. dollars to U.S. Citizens in their New York bank accounts).   Accordingly, the act of state doctrine applies to the National Assembly's actions, which were undertaken within Venezuela to stop a transaction relating to the debt of Venezuela's state-owned oil company and its national oil industry activities in Venezuela, notwithstanding any "corollary effects" outside of Venezuelan territory (i.e., effects on the purportedly pledged CITGO Shares).[72]

---

[70]Letter to Mr. David J. Smith, Clerk of Court for United States Court of Appeals for the Eleventh Circuit, from Carlos Vecchio, Ambassador of Bolivarian Republic of Venezuela to the United States of America, dated, May 7, 2020, Ex. 30; Supplemental Brief of Appellees, *PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*, Case No. 19-10950 (11th Cir. May 29, 2020), at 7-8, Ex. 31.

[71]Even if this *were* such a case, the act of state doctrine would still apply because, unlike in *Allied Bank*, any extraterritorial "taking" of property would be "consistent with the law and policy of the United States"—*i.e.*, the U.S. foreign policy vis-à-vis Venezuela.  *See Allied Bank*, 757 F.2d at 522; *see also Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 57 (S.D.N.Y. 2015) (applying the act of state doctrine to give extraterritorial effect to Cuba's taking of assets in the U.S. because doing so would further U.S. policy).

[72]The act of state doctrine applies to the National Assembly's actions notwithstanding any "corollary effects" outside of its territory (*e.g.*, effects on PDVSA's assets abroad).  *See Republic of Panama v. Air Panama Int'l, S.A.*, 745 F. Supp. 669, 673 n.4 (S.D. Fla. 1988) (holding that board and management appointments were valid under the act of state doctrine where such appointments were made for the purpose of controlling assets in the U.S.); *Jimenez*, 2019 WL 3526479, at *1 and *20 (upholding the National Assembly's act resulting in the constitution of new boards

22

The act of state doctrine is designed to prevent courts, in deciding what weight to give certain acts of foreign states, from interfering with the Executive Branch's primacy in the conduct of foreign affairs. *Oetjen*, 246 U.S. at 404. This concern looms large in the present case given the illegitimate Maduro regime's continuing hold on power in Caracas and the U.S. political branches' strong support for the Guaidó Government's continuing efforts to restore Venezuelan democracy and address the country's ongoing economic and humanitarian crises. Indeed, with CITGO hanging in the balance, a decision that the 2020 Notes Transaction was "valid, notwithstanding the National Assembly's clear pronouncement to the contrary, risks undermining the Executive Branch's recognition of that body as the 'only legitimate legislature' in Venezuela." Defendant's Motion to Dismiss, *PDVSA U.S. Litig. Tr.*, Case No. 1:18-cv-20818-DPG, Dkt. No. 517, at 21. Plaintiffs are thus entitled to summary judgment under the act of state doctrine alone.

## II.   THE TRANSACTION DOCUMENTS ARE INVALID, ILLEGAL, NULL AND VOID *AB INITIO*, AND UNENFORCEABLE UNDER APPLICABLE VENEZUELAN LAW

Plaintiffs are also entitled to summary judgment apart from the National Assembly's conclusive acts of state because, under applicable Venezuelan law, the Transaction Documents are invalid, illegal, null and void *ab initio*, and unenforceable under any standard on account of the purported pledge of CITGO Shares.

### A.   <u>Venezuelan Law Governs the Validity of the 2020 Notes Transaction</u>

The 2020 Notes, the Indenture, and the Pledge are indispensable components of a single, integrated transaction entered into by PDVSA and PDVSA Petróleo, both state-owned enterprises of the Venezuelan Republic. The pledged CITGO Shares were (and are) owned by

---

of directors for PDVSA's U.S. subsidiaries; "the knock-on effects of that act which took place outside of Venezuela do not render the original act extraterritorial").

PDV Holding, which had no independent reason to become a co-party to the Pledge alongside PDVSA and PDVSA Petróleo and did so solely because its Venezuelan parent company (and ultimately the Maduro regime, which controlled PDVSA at the time) offered up the CITGO Shares as part of the Exchange Offer.  Ultimately, the purported pledge was driven by PDVSA's financial crisis in Venezuela and had nothing to do with PDV Holding.

The Transaction Documents' New York choice-of-law provisions are irrelevant in determining whether the 2020 Notes Transaction is valid in the first place.  As Your Honor has explained, "there is a logical flaw inherent in following a contractual choice-of-law provision before determining whether the parties have actually formed the contract in which the choice-of-law clause appears." *Worthington*, 2019 WL 4933635, at *4 (J. Failla) (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)).

This logical flaw has long been recognized in the international debt context and in the context of Latin American government issuers in particular:

> It is generally recognized that the capacity or authority of a corporate, governmental or other juridical entity to contract loans and issue bonds is governed by its personal law, i.e., by the law of the borrower itself.[73]

> [T]he insulation from the borrower's law achieved basically by choosing a foreign law (mostly New York or English law) is limited: The legal status and capacity of the borrower, including his contracting and borrowing limits can only be determined only[sic] by national law.  These are matters of "non-choice."[74]

> In civil law countries [such as Venezuela], government agencies must be explicitly empowered with regard to the content, scope, and sometimes procedure of agreements.  Often (particularly in Latin America), there are constraints and rules for government contracting in the constitution, investment and sectoral laws, in general public contract regulations, and in the laws and regulations applicable to particular government agencies (e.g., central banks and other monetary authorities).  Contracts concluded by government agencies without sufficient

---

[73]G. Delaume, LEGAL ASPECTS OF INTERNATIONAL LENDING AND ECONOMIC DEVELOPMENT FINANCING, 130 (1967), Ex. 32.
[74]Thomas Wälde, THE SANCTITY OF DEBT AND INSOLVENT COUNTRIES: DEFENSES OF DEBTORS IN INTERNATIONAL LOAN AGREEMENTS, IN JUDICIAL ENFORCEMENT OF INTERNATIONAL DEBT OBLIGATIONS, David M. Sassoon and Daniel D. Bradlow, eds., 125 (International Law Institute 1987) Ex. 33.

authority . . . are ultra vires and therefore void . . . [I]t is hard to argue for the effectiveness of a contract concluded without sufficient authority or in noncompliance of material procedural rules, where such defect was known or could have been identified by the other contracting party applying due diligence.[75]

The logical proposition that the law governing the authority to issue debt is a matter of "non-choice" is also embedded in New York law, which prohibits parties from choosing the law of a jurisdiction other than the issuer's jurisdiction to govern the validity of notes or other securities.  Section 1-301 of the Uniform Commercial Code (as adopted in New York, the "UCC"), entitled "Territorial Application of the Act; Parties' Power to Choose Applicable Law," provides in subsection "(c)" that "*[i]f one of the following provisions of [this Act] specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law [including the conflict of laws rules] so specified* . . . ."  One of the "following provisions of this Act" listed in subsection "(c)" is "Section 8-110" of the UCC.

Section 8-110, which deals with investment securities such as the 2020 Notes, provides that "*[t]he local law of the <u>issuer's jurisdiction</u> . . . governs . . . the validity of a security* [and other specified issues]."  UCC § 8-110(a)(1) (emphasis added).  The "issuer's jurisdiction" is defined as "the jurisdiction under which the issuer of the security is organized or, if permitted by the law of that jurisdiction, the law of another jurisdiction specified by the issuer."  UCC § 8-110(d).  An issuer is expressly permitted to choose the law of another jurisdiction to govern issues *other than validity*.  Thus, "[t]he issuer *cannot specify* that the law of another jurisdiction should determine the validity of a security."  8 Anderson U.C.C. § 8-110:6 [Rev] (3d ed.) (emphasis added).  This is because "[t]he question whether an issuer can assert the defense of

---

[75]Thomas W. Wälde and George Ndi, Stabilizing International Investment Commitments: International Law Versus Contract Interpretation, 31 Tex. Int'l L.J. 215 (Spring 1996).

invalidity may implicate significant policies of the issuer's jurisdiction of incorporation."[76]  As

explained in Professor Brewer's initial expert report, Venezuelan law does not permit the

specification of another jurisdiction's law to govern the validity of contracts such as the

Transaction Documents because such contracts implicate significant public policies of the

Venezuelan Republic.[77]

     The requirement that Venezuelan law govern the validity of the 2020 Notes Transaction

is also reflected in the opinion letter provided to Credit Suisse, which acted as PDVSA's advisor,

covering PDVSA and PDVSA Petróleo's authorization to enter into the transaction, the need for

government approvals, and compliance with Venezuelan law.  That opinion letter, which covered

all of the Transaction Documents, was rendered exclusively under Venezuelan law by

Venezuelan counsel.[78]  By contrast, the opinion rendered by New York counsel with respect to

New York and federal law, which covered other matters, expressly "assumed" such

authorization, approvals, and legality under Venezuelan law.[79]  (As demonstrated below,

however, the opinion of Venezuelan counsel was entirely erroneous with respect to the validity

of the 2020 Notes Transaction under Venezuelan law).

     In any event, there can be no "conflict of laws" with respect to the validity of the 2020

---

[76]UCC § 8-110, Official Comment 2.

[77]Brewer Report, at pp. 53-59.  The UCC's Article 8 choice-of-law rules are expressly carved out of section 5-1401 of the New York General Obligations Law, which provides that parties can choose New York law to govern large commercial transactions, including transactions subject to the UCC, even if the transaction bears no reasonable relation to the state.  N.Y. Gen. Oblig. § 5-1401(1) (providing that "[t]his section [5-1401] shall not apply to any contract, agreement or undertaking . . . to the extent provided to the contrary in subsection (c) of section 1-301 of the uniform commercial code.").  The New York governing law provisions in the Transaction Documents expressly incorporate section 5-1401 in its entirety and thus incorporate its carve-out for the choice-of-law rules in UCC Article 8.

[78]See Form of Opinion Letter from Despacho de Abogados Miembro de Hogan Lovells to Credit Suisse Securities (USA) LLC, as Financial Advisor, re: Petróleos de Venezuela, S.A. Offering, p. 4, annexed to Financial Advisors Agreement, Ex. 34.

[79]See id. at 2 ("For purposes of this opinion letter, we have assumed that (i) each party to the Transaction Documents (except to the extent set forth in Paragraph (l) as to the [PDV Holding as Pledgor]) has all requisite power and authority under all applicable laws, rules, regulations and governing documents to execute, deliver and perform its obligations under the Transaction Documents . . . .").

Notes Transaction for the simple reason that New York law can have nothing to say regarding the authority of Venezuelan state-owned enterprises to enter into contracts of national public interest without National Assembly authorization.  This is, by nature, a question for which only Venezuelan law, which has not changed since the time of the Exchange Offer, can supply the rule of decision.  *See Themis Capital, LLC v. Democratic Republic of Congo*, 881 F.Supp.2d 508, 520-21 (S.D.N.Y. 2012) (applying DRC law to determine whether the DRC had authority to sign the credit agreement at issue); *Republic of Benin v. Mezei*, No. 06 CIV 870 JGK, 2010 WL 3564270, at *6 (S.D.N.Y. Sept. 9, 2010) ("Even if New York law applies, New York must look to the law of Benin to determine the actual authority of an agent of the Benin government.") (citing *Anglo– Iberia Under Writing Mgmt. Co. v. PT Jamsostek,* No. 97 Civ. 5116, 1998 WL 289711, at *3 (S.D.N.Y. June 4, 1998), *aff'd in relevant part,* 235 F. App'x 776, 782 (2d Cir.2007) (applying Indonesian law to determine the actual authority of an Indonesian official)). Otherwise, constitutional limitations on a state-owned entity's authority could be nullified through the selection of another jurisdiction's law in a contract the entity had no authority to enter into in the first place—an obviously nonsensical result.

Even if New York law governed the Pledge, the answer would be the same because, as discussed more fully below, the underlying Indenture and the 2020 Notes purportedly secured by the Pledge were illegally entered into and are void *ab initio*.  Under New York law (and as a matter of logic and common sense) a pledge cannot secure an obligation that never arose in the first place.  *See Hall & Co. v. Continental Cas. Co.*, 34 A.D.2d 1028 (3d Dep't 1970), *aff'd*, 30 N.Y. 517 (1972) (holding that a surety bond was a nullity where no underlying agreement ever came into existence between the principal and the obligee, as there was nothing to which the surety's obligation could attach); *Levison v. Illinois Surety Co.*, 222 N.Y. 280 (1918) (holding

that a surety's undertaking was unenforceable because it purported to guarantee payment under an assignment that was null and void).  Furthermore, under New York law, if an obligation is invalid on account of illegality or violation of public policy, any agreement purportedly securing it is also invalid notwithstanding any purported waiver of defenses, as illegality and violations of public policy cannot be waived.  *See In re Republic Airways Holdings Inc.*, 598 B.R. 118, 147 (Bankr. S.D.N.Y. 2019) ("Over the last hundred years . . . courts in New York and elsewhere have repeatedly refused to uphold contracts that violate public policy and have held that parties may not waive illegality as a defense.") (collecting cases); *see also* 63 N.Y. Jur. 2d Guaranty and Suretyship § 159 ("a guaranty agreement is not enforceable if the underlying obligation on which the guaranty is based is void.").

**B.    Comity Favors Deferring to the Legitimate Venezuelan Government's Interpretation of its Own Laws**

Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation."  *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*, 528 F.3d 162, 171 (2d Cir. 2008) (quoting *Hilton v. Guyot*, 159 U.S. 113, 143 (1895)).  Under principles of comity, federal courts deciding questions of foreign law "should carefully consider a foreign state's views about the meaning of its own laws."  *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018).  Here, the legitimate Venezuelan Government has delivered a letter to this Court setting forth the Venezuelan Republic's view that the Transaction Documents are invalid and unenforceable under Venezuelan law.[80]

This case is on all fours with *Pink,* 315 U.S. 203 (1942), in which the Supreme Court deferred to the Russian Government's declaration to the Court that its nationalization decree

---

[80]Letter from the Republic to the Honorable Katherine Polk Failla, *supra* at note 66.

applied to certain Russian assets in the U.S.  As the Supreme Court recently observed, deference was especially appropriate in *Pink* because "[t]here was no indication that the declaration was inconsistent with the Soviet Union's past statements; and the declaration was consistent with expert evidence in point." *Animal Sciences*, 138 S. Ct. at 1875; *see also Spirits Int'l*, 809 F.3d at 743 (finding that the "declaration of a United States court that the executive branch of the Russian government violated its own law by transferring its own rights to its own quasi-governmental entity (FTE) would be an affront to the government of a foreign sovereign"); *Cornea v. U.S. Attorney Gen.*, 771 F. App'x 944, 948 (11th Cir. 2019) (finding that the district court had "made a manifest error of law" in not deferring to a submission that was "offered by the agency [of the Greek Government] tasked with interpreting Greek laws, consistent with the Greek authorities' past positions expressed in this case, and well-supported by the Greek Code of Criminal Procedure").  Likewise here, the application of Venezuelan law set forth in the Venezuelan Government's letter is consistent with past statements of the same legitimate government.  And, as set forth below and in Professor Brewer's expert reports, the views expressed in the letter are consistent with the overwhelming majority of scholarly opinion.  Accordingly, in the interest of comity, this Court should defer to the Venezuelan Government's considered view that, under a proper interpretation of its own laws, the Transaction Documents are invalid, null and void *ab initio*, and unenforceable, having been entered into without prior National Assembly authorization in violation of the Venezuelan Constitution.

### C.   The Transaction Documents Are National Public Interest Contracts That Required Prior National Assembly Authorization Under the Venezuelan Constitution

Article 150 of the Venezuelan Constitution provides, in relevant part, that "*[n]o contract in the municipal, state or national public interest shall be entered into . . . with companies not domiciled in Venezuela, or transferred to any of the same, without the approval of the*

*National Assembly*."[81]  Subsection 9 of Article 187 of the Constitution provides that one of the National Assembly's functions is "*[t]o authorize contracts of municipal, state and national public interest with States or official foreign entities or with companies not domiciled in Venezuela*."[82]  There is no dispute that public interest contracts with foreign/non-domiciled counterparties must be authorized by the National Assembly *prior* to execution.[83]  It is also undisputed that the Transaction Documents were entered into with companies not domiciled in Venezuela, including Defendants as the Trustee and the Collateral Agent for the 2020 Notes.

Thus, the Transaction Documents required prior National Assembly authorization because they are "national public interest contracts" under Venezuelan law, particularly considering the purported pledge of CITGO Shares.  In its May 2016 Resolution, the National Assembly interpreted national public interest contracts as "a special category of administrative contracts, inextricably related to an object that affects the collective interest of all citizens"—a category that includes contracts that could "seriously compromise the assets of the Republic or expose them to serious losses or international claims that might be detrimental to the sovereignty or integrity of the country, as well as contacts that due to its subject matter deserve such a qualification."[84]

Venezuela's oil industry indisputably affects the collective interest of all Venezuelan citizens because it involves the management of crucial public resources and is the main driver of

---

[81] 1999 VENEZUELAN CONSTITUTION art. 150 (emphasis added), Ex. 4.
[82] 1999 VENEZUELAN CONSTITUTION art. 187 (emphasis added), Ex. 4.
[83] Expert Report of ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ ("▌▌▌ Report") at ¶ 12, Ex. 35.
[84] May 2016 Resolution (translated), Ex. 13.  In the opinion of Professor Brewer and many other Venezuelan legal scholars, any contract entered into by an organ of government or an entity within the Public Administration is, by virtue of that fact alone, a "public interest contract" within the meaning of Articles 150 and 187.9 of the Venezuelan Constitution.  Brewer Report at ¶ 39.  There is no dispute that PDVSA and PDVSA Petróleo, which are "attached" to (and thus controlled by) Venezuela's Ministry of Petroleum and Mining, are part of the National Public Administration of the Venezuelan Republic, which is comprised of the *centralized* National Public Administration (organs of the national government itself) and the *decentralized* National Public Administration (entities such as public corporations and state-owned enterprises that are closely related to the government, being "attached" to a government ministry and subject to both public and private law to varying degrees).  *Id.* at ¶ 20.

the country's crippled economy and therefore the key to any hope of recovery.  PDVSA was created as part of the nationalization of the Venezuelan oil industry and is the only state-owned enterprise whose state ownership is enshrined in the Venezuelan Constitution "[f]or reasons of economic and political sovereignty and national strategy."  (Art. 303).  In accordance with PDVSA's constitutionally prescribed role, PDVSA and PDVSA Petróleo "manage the [Venezuelan] oil industry" (Art. 303), of which CITGO is the foreign "crown jewel" and the most economically and strategically important foreign asset of national public interest. Accordingly, the Indenture and the Pledge, which were both executed by PDVSA and PDVSA Petróleo as part of a single, integrated transaction to refinance PDVSA debt relating to its oil industry activities in Venezuela, are national public interest contracts on account of the purported pledge of CITGO Shares to secure the 2020 Notes.[85]  Indeed, the purported pledge of CITGO Shares sets the 2020 Notes Transaction apart from all prior PDVSA debt transactions.[86]

### D.   The Lack of Required National Assembly Authorization Precluded Contract Formation and Valid Legal Existence of the Transaction Documents

It is undisputed that the Transaction Documents were not authorized by the National Assembly.  Indeed, the National Assembly vigorously and publicly opposed the Exchange Offer *before* the Transaction Documents were executed.[87]Under Venezuelan law, if constitutionally required National Assembly authorization is not obtained, there can be no valid consent and thus no contract can be formed.[88]  Accordingly, a public interest contract illegally executed without required National Assembly authorization is invalid and void *ab initio*.As Venezuela's Office of the Attorney General has recognized since 1959:

---

[85]*Id.* at ¶ 31, 42.

[86]Asamblea Nacional, *Regular Session of Tuesday, September 27, 2016. Discussions on the effects of PDVSA Bond Redemption* (translated), at 22, Ex. 14.

[87]As Defendants' counsel correctly argued in the *PDVSA Litigation Trust* case, "[u]nder Venezuelan law, the National Assembly's resolution [that a particular contract is a national public interest contract] is ***conclusive***."  *See* Defendant's Motion to Dismiss, *PDVSA U.S. Litig. Tr.*, Case No. 1:18-cv-20818-DPG, Dkt. No. 517, at 26, Ex. 3.

[88]Brewer Report, at § V.

> there is unanimity in the administrative doctrine regarding that the
> 'authorizations' that according to the Constitution or the statutes, public officials
> or agents of Public Administration require in order to adopt or issue certain legal
> acts, *are a constitutive element and necessary for the 'consent;' consequently, the*
> *omission of the authorization does not vitiate the consent, but prevents it,*
> *impeding its legitimate manifestation; and being that consent is an essential*
> *element of the existence of the act, once it has been omitted, also the act, legally*
> *speaking, is inexistent.*[89]

(emphasis added).  Given that the Transaction Documents were illegally executed without prior

National Assembly authorization as required under Articles 150 and 187.9 of the Venezuelan

Constitution, they are invalid, illegal, null and void *ab initio*, and entirely unenforceable, as are

the 2020 Notes issued under the Indenture.[90]

### E. National Public Interest Contracts Need Not Include the Republic as a Party

Defendants' primary argument regarding Venezuelan law is that the Transaction

Documents cannot be considered "national public interest contracts" because they were entered

into by state-owned enterprises rather than the Republic itself.  This argument is contrary to the

overwhelming weight of Venezuelan legal authority and to what Defendants' own counsel has

been arguing in the *PDVSA Litigation Trust* case, which also involves a contract entered into by

PDVSA with a foreign/non-domiciled counterparty.

Defendants' Venezuelan law expert, ███████, asserts that it is "well settled"

among Venezuelan legal scholars that "it is the *essence* of any Contract of National Interest that

the Republic be a party to it"[91] and that Venezuela's highest court has "long held" as a matter of

"binding judicial precedent" that this is "a requirement of Contracts of National Interest."[92]  But

---

[89] *Report of the Office of the Attorney General to the National Congress 1959*, 624–25 (1960) (translated), Ex. 36.
[90] Brewer Report, at §§ V & VI.
[91] ███ Report at ¶ 93, Ex. 35.
[92] *Id*. at ¶¶ 92. 94, 127.

Professor Brewer's rebuttal report exposes the falsity of these assertions in great detail.[93]  Widely recognized as the world's foremost scholar of Venezuela public law, Professor Brewer's opinions are particularly authoritative in this case because, as one of the drafters of the Venezuelan Constitution, he proposed the inclusion of Article 150.[94]  He also drafted Venezuela's Organic Law on Public Administration.[95]  While Professor Brewer's reports are comprehensive in scope, a few basic points are sufficient to dispose of Defendants' argument:

*First*, the National Assembly's September 2016 and October 2019 Resolutions remain in full force and effect, and the illegitimate Supreme Tribunal has not even purported to annul them.  The National Assembly is Venezuela's only legitimate governmental body and the first-instance interpreter of the Venezuelan Constitution.[96]  Thus, these resolutions, which were not the first resolutions declaring PDVSA contracts invalid under Article 150,[97] stand as the last word on whether the Transaction Documents are national public interest contracts that required National Assembly authorization.

*Second*, no Supreme Tribunal decision rendered after 2015 is entitled to any recognition by a U.S. court.  As set forth above, and as widely recognized in Venezuela and the international community, the Supreme Tribunal lost all judicial independence after the opposition parties won control of the National Assembly in the December 2015 parliamentary elections.[98]  From that point on, the Supreme Tribunal functioned as an arm of the Maduro regime, issuing one unconstitutional decision after another to curtail the National Assembly's powers.  These

---

[93]Expert Report of Allan R. Brewer-Carías Rebutting the Report of ███████████ ("Brewer Rebuttal Report"), at § III, attached as Exhibit B Declaration of Allan R. Brewer-Carías in Support of Plaintiffs' Motion for Summary Judgment.
[94]Brewer Report at ¶ 7.
[95]*Id.* at ¶ 5.
[96]*Id.* at ¶¶ 53, 73.
[97]*Id.* at ¶¶ 65 (citing prior National Assembly resolutions unrelated to the 2020 Notes Transaction).
[98]Before the new legislature could convene its first session, the outgoing legislature stacked the Supreme Tribunal with Maduro loyalists who then refused to refuse to swear in certain opposition legislators in violation of the Venezuelan Constitution.  *Jimenez*, 2019 WL 3526479, at *2.

decisions are what led the U.S. Government to declare the Supreme Tribunal illegitimate on account of its collusion with the Maduro regime in "usurp[ing] the authority of Venezuela's democratically-elected legislature, the National Assembly."[99]  Accordingly, the courts in the *Jimenez* and *Impact Fluid Sols.* cases gave no weight to the Supreme Tribunal's post-2015 decisions purportedly blocking opposition lawmakers from taking office, declaring null and void all actions of the National Assembly, arrogating to itself the National Assembly's legislative powers, and declaring the 2019 Transition Statute unconstitutional.  *Jimenez*, 2019 WL 3526479 at *2, 7; *see generally Impact Fluid Solutions*, Civ No. 4:19-cv-00654, Dkt. No. 55 (nowhere mentioning opinions of the Supreme Tribunal).  Likewise, this Court need not concern itself with the complexities of the Supreme Tribunal's 2016 decision in the *Brigitte Acosta Isasis* case, which is one of the main decisions on which ▮▮▮▮▮▮▮▮ relies.

  ***Third***, the centerpiece of Defendants' argument—the Supreme Tribunal's 2002 decision in the *Andrés Velásquez* case—is not contrary to the National Assembly's interpretation of the Transaction Documents as national public interest contracts requiring National Assembly authorization.  In that case, the Constitutional Chamber stated in *dicta* that "contracts concluded by the Republic through the competent organs of the National Executive to do so and whose purpose is determinant or essential to accomplishing the purposes and objectives of the Venezuelan State would be included within the species of national public interest contracts . . . ."  As Professor Brewer points out, nowhere did the Constitutional Chamber state that the concept of national public interest contracts includes *only* contracts entered into by the National Executive or that contracts entered into by public corporations or state-owned enterprises within the National Public Administration (which were not at issue in the case) cannot be national public interest contracts.  Indeed, the National Assembly has referred to the *Andrés Velásquez*

---

[99] *See supra* at note 61.

decision in declaring contracts entered into by PDVSA to be national public interest contracts.[100] The National Assembly has also passed post-*Andrés Velásquez* resolutions authorizing joint venture agreements entered into by PDVSA or certain of its subsidiaries as national public interest contracts under Article 150.[101]

Furthermore, ▮▮▮▮▮ assertions are belied by post-*Andrés Velásquez* decisions in which the Constitutional Chamber and other chambers of the Supreme Tribunal accepted (without even a question being raised) that contracts entered into by public corporations and state-owned enterprises within the National Public Administration were national public interest contracts.  Just a few months after *Andrés Velásquez*, in decision No. 953 of April 29, 2003, the Constitutional Chamber expressly recognized as a national public interest contract an electricity supply agreement entered into by a state-owned enterprise known as "EDELCA" with Brazilian counterparties.[102] ▮▮▮▮▮ discreetly acknowledges this decision in a footnote to his initial report, admitting that "*a state corporation [EDELCA] entered into an agreement that the Court characterized as one of national interest.*"[103]  In another footnote, ▮▮▮▮▮

---

[100]*Resolution rejecting the increase to forty percent in the equity stake of the Russian state-owned company Rosneft, partner of Petróleos de Venezuela S.A., in the mixed-ownership company Petromonagas, without approval of the modifications of the conditions governing the aforementioned resolution by the National Assembly pursuant to the constitutional and legal provisions governing the matter*, dated February 9, 2017 (translated), Ex. 37.  In any event, the decision did not establish any "binding interpretation" that national public interest contracts must include the Republic itself as a party.  In Venezuela's civil law system, there is no doctrine of stare decisis or binding authority, and Supreme Tribunal decisions are not a source of law except where the Constitutional Chamber (i) annuls a legislative act of general effect, in which case the interpretation is limited to the core "thema decidendum" or (ii) interprets a constitutional rule or principle in a binding fashion pursuant to Article 335 of the Venezuelan Constitution.  Brewer Rebuttal Report at ¶ 40-43.  Except in these circumstances, Supreme Tribunal decisions carry no more weight than the interpretations of legal scholars and other branches of government.  *Id.* at ¶ 44.  "Binding interpretations" pursuant to Article 335 are demarcated by (i) the "rule of explicitness"—that the binding character of the interpretation pursuant to Article 335 is explicitly declared in the text of the decision—and (ii) the "rule of publicity"—that the decision contains an order for its publication in the Official Gazette of the Republic on account of the binding interpretation.  *Id.* at ¶¶ 50-51.  No Constitutional Chamber discussion of public interest contracts, in Andrés Velásquez or any other decision, meets these criteria.  *Id.* at ¶¶ 53-54.
[101]*See, e.g.*, Resolutions dated May 4, 2006, published in the Official Gazette No. 38.430, dated May 5, 2006 (translated), Ex. 47; Resolution dated Sept. 24, 2009, published in the Official Gazette No. 39.273, dated Sept. 28, 2009 (translated), Ex. 48.
[102]Brewer Rebuttal Report at ¶¶ 3, 9.
[103]▮▮ Report at ¶ 102 n. 139, Ex. 35.

acknowledges that "[t]he Political-Administrative Chamber [of the Supreme Tribunal] has also issued decisions related to Contracts of National Interest," including contracts entered into by *Diques y Astilleros de Nacionales S.A. (DIANCA)*, *Corporación Venezolana de Guayana (CVG)*, and *Compañía Anónima Venezolana de Televisión (VTV)*, which are all public corporations or state-owned enterprises that, like PDVSA and PDVSA Petróleo, are part of the decentralized National Public Administration of the Republic.[104]  Finally, in decision No. 1460 of July 12, 2007 (*Attorney General of the Republic II*)—another decision on which ▮▮▮▮▮▮▮ purportedly relies—the Constitutional Chamber presumed that promissory notes issued by a public corporation known as "BANDAGRO" were national public interest contracts subject to the requirements for such contacts in Article 245 of the Venezuelan Constitution.

In his rebuttal report, ▮▮▮▮▮▮▮ misleadingly portrays Professor Brewer as having suddenly contradicted a number of his prior writings, including some from recent years, by opining in this case that the *Andrés Velásquez* decision did not establish any binding interpretation of the concept of national public interest contracts.  The fact is that Professor Brewer's opinion has not changed at all.  A single footnote from a 2006 paper that was reprinted verbatim in numerous other publications inadvertently referred to the discussion in *Andrés Velásquez* of public interest contracts as a "binding interpretation."  The inadvertency of this isolated reference is conclusively demonstrated by the fact that the decision's discussion of public interest contracts does not meet the criteria for a "binding interpretation" under Article 335 of the Venezuelan Constitution *according to Professor Brewer's own prior[105] and*

---

[104]*Id*. at ¶ 104 n. 144.
[105] Allan R. Brewer-Carías, THE CONSTITUTION OF 1999 VOL. II (Editorial Jurídica Venezolana 2004) (translated), Ex. 38.

subsequent[106] writings on the concept of binding interpretation—*i.e.*, that the binding character

of the interpretation under Article 335 must be expressly declared in the text of the decision itself

(indeed, the decision does not even mention Article 335).[107]  In a book on Venezuelan

administrative law originally published in 2013,[108] as well as in a 2017 article in a Venezuelan

public law journal, Professor Brewer discussed the *Andres Valezquez* decision and did *not* state

that it established a "binding interpretation."[109]

      In short, there is virtually no support for ▮▮▮▮▮▮▮▮ opinion regarding national

public interest contracts.  Those who have interpreted the concept of national public interest

contracts to include contracts entered into by public corporations and state-owned enterprises

within the National Public Administration include:

- the National Assembly in numerous resolutions, including resolutions unrelated to the 2020 Notes Transaction;

- the Venezuelan Republic itself, as set out in the legitimate Venezuelan Government's letter to this Court;

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- the Constitutional Chamber of the Supreme Tribunal in the above-referenced *EDELCA* (2003) and *Attorney General of the Republic II* (2007) cases;

- the Political-Administrative Chamber of the Supreme Tribunal in the above-referenced *Diques y Astilleros de Nacionales S.A. (DIANCA)*, *Corporación Venezolana de Guayana (CVG)*, and *Compañía Anónima Venezolana de Televisión (VTV)* cases;

---

[106]Allan R. Brewer-Carías, *The effects of constitutional sentences in Venezuela*, *in* 22 ANUARIO INTERNATCIONAL SOBRE JUSTICIA 19, 64 (2008) (translated), Ex. 39.

[107]Allan Randolph Brewer-Carías, *La Mutación de la Noción de Contratos de Interés Público Nacional Hecha Por la Sala Constitucional, para Cercenarle a la Asamblea Nacional sus Poderes de Control Político en Relación con la Actividad Contractual de la Administración Pública y sus Consecuencias*, *in* 151–52 REVISTA DE DERECHO PÚBLICO (2017), Ex. 40.

[108]ALLAN RANDOLPH BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA (2013), Ex. 41; ALLAN RANDOLPH BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA 132–33 (2d ed. 2015), Ex. 42.

[109]*See generally* Allan Randolph Brewer-Carías, *La Mutación de la Noción de Contratos de Interés Público Nacional Hecha Por la Sala Constitucional, para Cercenarle a la Asamblea Nacional sus Poderes de Control Político en Relación con la Actividad Contractual de la Administración Pública y sus Consecuencias*, *in* 151–52 REVISTA DE DERECHO PÚBLICO (2017), Ex. 40.

- Professor Brewer, who proposed the inclusion of Article 150 in the Constitution and who is widely regarded as the foremost scholar of Venezuelan public law in the world;

- Professor Juan Cristóbal Carmona Borjas, a distinguished member of the National Academy of Political and Social Sciences, who rendered an opinion on this matter to the National Assembly at the time of the Exchange Offer;

- Professor Román J. Duque-Corredor, also a member of the National Academy and a prominent public intellectual, who recently published an academic article addressing the constitutional issues relating to the 2020 Notes; and

- seven other distinguished professors, including Rafael Badell and Jesús Caballero Ortíz (contrary to ███████ mischaracterization of their writings).[110]

Not even Defendants' own counsel agrees with their expert's erroneous opinion, having argued in the *PDVSA Litigation Trust* case (while relying on different experts) that "contracts with state-owned enterprises (like PDVSA) . . . may [] qualify as national public interest contracts that are 'null and void' without the constitutionally required National Assembly authorization."[111]

Under Venezuelan law, contracts entered into by PDVSA and PDVSA Petróleo can be national public interest contracts because those state-owned enterprises run Venezuela's nationalized oil industry to achieve the national public policy goals established in Article 303 of the Venezuelan Constitution.  Accordingly, PDVSA and PDVSA Petróleo had no authority to execute the Transaction Documents and purportedly pledge a controlling interest in CITGO without prior authorization of the National Assembly.

---

[110]Brewer Rebuttal Report, at ¶ 5.  Apart from Professor Eloy Lares Martínez, who affirmed that "national interest contracts are administrative contracts entered into by the National Public Administration" only to later express the contradictory view that the Republic must be a party, *no other Venezuelan public law scholar holds the opinion expressed by* ███████ *in this case. Id.* at ¶ 80 (quoting Eloy Lares Martínez, *Contracts of National Interest, in* 1 LIBRO HOMENAJE AL PROFESOR ANTONIO MOLES CAUBET 117, 137 (1981)) (translated), Ex. 43.  Contrary to ███████ erroneous assertions, his opinion does not find support in the writings of the late Professor José Melich Orsini.  *Id.* at ¶ 77.

[111]*See* Defendant's Motion to Dismiss, *PDVSA U.S. Litig. Tr.*, Case No. 1:18-cv-20818-DPG, Dkt. No. 517, at 26.  Defendants' counsel went on to argue that the "National Assembly's refusal to approve" the contract at issue between PDVSA and a U.S. litigation trust rendered it "null and void."  *Id.* at 26-27.

### III.   DEFENDANTS' DEFENSES FAIL AS A MATTER OF LAW[112]

Defendants' first defense ("failure to state a claim") and part of their ninth defense ("insufficiency of the evidentiary record") fail for the obvious reason that Plaintiffs have stated perfectly cognizable claims for declaratory relief on the evidence presented.  Defendants' second through fourth and sixth through eighth defenses and the remainder of their ninth defense, which are all equitable in nature, fail at the outset because "equitable defenses are unavailable when the rights being pressed by a party are based upon a void document."  *See Sardanis v. Sumitomo Corp.*, 282 A.D.2d 322, 324 (1st Dep't 2001); *see also Draper v. Georgia Prop*s., Inc., 230 A.D.2d 455, 460 (1st Dep't 1997), *aff'd*, 94 N.Y.2d 809 (1999) (where contract provisions are void and unenforceable, the "contention that [defendant's] affirmative defenses and counterclaims should be reinstated is without merit[.]").  Equally fundamental, "a party to an illegal undertaking cannot come into a court either of law or equity and ask to have his illegal contract carried out."  *Roberts v. Criss*, 266 F. 296, 301 (2d Cir. 1920); *see also Stone v. Freeman*, 298 N.Y. 268, 271 (1948) ("It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object"); *Strauss Linotyping Co. v. Schwalbe*, 159 A.D. 347, 350 (1st Dep't 1913) ("But an illegal contract of this character cannot be given validity by ratification.  The agreement is void in its inception and thereafter continues to be void.").

Furthermore, Defendants cannot establish an essential element of apparent authority—reasonable reliance—because, as set forth above, the relevant limitations on Plaintiffs' authority to enter into the Transaction Documents were a matter of public law.  Moreover, the highly

---

[112]Defendants have not explicitly raised and, as far as Plaintiffs can tell, are not intending to raise any defenses or counterclaims arising under Venezuelan law.  Without conceding that New York law applies, Plaintiffs demonstrate that Defendants' defenses and counterclaims fail under New York law and reserve the right to address any defenses or counterclaims under Venezuelan law in subsequent briefing.

sophisticated holders of the 2020 Notes knew (or certainly should have known[113]) from the

September 2016 Resolution and numerous other sources that the 2020 Notes Transaction was at

risk of invalidation.  *See, e.g., Highland Capital Mgmt. LP v. Schneider,* 607 F.3d 322, 328 (2d

Cir. 2010) ("A party cannot claim that an agent acted with apparent authority when it knew, or

should have known, that [the agent] was exceeding the scope of its authority.") (citation and

quotation marks omitted).  Nor can Defendants show that actions of the principal, in this case the

Venezuelan Government, created the appearance of authority.  On the contrary, the National

Assembly, the only legitimate branch of the Venezuelan Government, explicitly rejected the

Pledge, called for an investigation into the entire Exchange Offer, and withheld its authorization

of the Transaction Documents.  *See* September 2016 Resolution, *supra.*

Defendants likewise cannot satisfy an essential element of equitable estoppel—a

misrepresentation of fact—because no facts have been or are alleged to have been

misrepresented, and "an opinion or misrepresentation of law will not suffice."  *In re Zarro*, 268

B.R. 715, 722 (Bankr. S.D.N.Y. 2001).  Nor can Defendants establish the element of both waiver

and ratification that Plaintiffs had a right to waive requirements of the Venezuelan Constitution

or to ratify the Transaction Documents despite the National Assembly's refusal to authorize

them.  *See City of Zanesville, Ohio v. Mohawk Data Scis. Corp. ,* 97 A.D.2d 64, 67 (4th Dep't

1983); *DoubleLine Capital LP v. Odebrecht Fin., Ltd.,* 323 F. Supp.3d 393, 468 (S.D.N.Y. 2018)

("Ratification requires both 'knowledge of a defect in the act to be confirmed' and 'the right to

reject or ratify it.'") (citations omitted).  Any contrary decision would also violate act of state and

comity principles, as this Court would effectively be invalidating sovereign acts of the National

Assembly taken within Venezuela's territory.  In any event, the 2020 Notes Transaction cannot

be compared to any other PDVSA debt transaction because no prior transaction involved the

---

[113]Hinman Report ¶¶ 38-52.

purported pledged of a controlling interest in CITGO.

Defendants also cannot establish at least two essential elements of their fifth defense of laches—undue delay and prejudice.  *See Cohen v. Krantz*, 227 A.D.2d 581, 582 (2d Dep't 1996) (setting forth the elements of laches); *NML Capital, Ltd. v. Republic of Arg.*, 699 F.3d 246, 261 (2d Cir. 2012) (same).  Plaintiffs filed this action less than a year after formal recognition of Interim President Guaidó and his appointment of the PDVSA Ad Hoc Board.  No "undue delay" resulted while the newly recognized Venezuelan Government was taking shape and organizing its legal affairs.  Further, this action was filed within three years of the execution of the Transaction Documents, well within the six-year statute of limitations applicable to contract claims, which would not even apply in this case because a "a statute of limitations 'does not make an agreement that was void at its inception valid by the mere passage of time.'"  *Faison v. Lewis*, 25 N.Y.3d 220, 226 (2015) (*quoting Riverside Syndicate, Inc. v. Munroe*, 10 N.Y.3d 18, 24 (2008)).  There was no prejudice as a result of any purported delay, as Defendants were on notice of the invalidity risks prior to entering into the Transaction Documents.  *Saratoga Cty Chamber of Commerce v. Pataki*, 100 N.Y.2d 801, 818 (2003) ("[T]he prejudice caused by a loss of expected profits based on a predictably vulnerable compact is not the sort of prejudice that supports a defense of laches.").

Defendants' tenth affirmative defense (act of state and comity) fails as well.  The act of state defense fails because, among other reasons, PDVSA's actions as a state-owned enterprise under Maduro's control were not acts of a legitimate "state" but rather an illegitimate regime. *Underhill*, 168 U.S. 250; *Oetjen,* 246 U.S. 297.  Defendants' comity defense likewise fails because the only U.S.-recognized, legitimate Venezuelan Government considers the Transaction

Documents to be invalid and unenforceable.[114]

## IV.    DEFENDANTS' COUNTERCLAIMS FAIL AS A MATTER OF LAW

Defendants' first, second, third, fourth, and fifth counterclaims—which seek declarations that the Transaction Documents are valid and enforceable, that an Event of Default under the Indenture has occurred, and that the Trustee and the Collateral Agent are entitled to sell the CITGO Shares—and their sixth, seventh, ninth, tenth, and eleventh counterclaims—sounding in breach of contract and breach of warranty—fail as a matter of law because the Transaction Documents are invalid. *See, e.g., Carmine v. Murphy*, 285 N.Y. 413, 416 (1941) ("no right of action can spring out of an illegal contract"); *Estate of Leventhal ex rel. Bernstein v. Wells Fargo Bank, N.A.*, No. 14 Civ. 8751 (ER), 2015 WL 5660945 at *9 n.14 (S.D.N.Y. Sept. 25, 2015) (noting that if the agreements at issue "are invalid, Plaintiff cannot simultaneously seek to enforce them through a breach of contract claim" under New York law).

Defendants' twelfth counterclaim for a *quantum meruit* recovery also fails as a matter of law because Defendants cannot recover for services performed under illegal or invalid contracts. *See Fabrizio & Martin, Inc. v. Bd. of Educ.*, 290 F. Supp. 945, 955 (S.D.N.Y. 1968) ("plaintiff may not . . . recover in *quantum meruit* under an invalid contract ."); *Michael R. Gianatasio, PE, P.C. v. City of New York*, 53 Misc. 3d 757, 774 (N.Y. Sup. Ct. 2016), *aff'd sub nom.* 159 A.D.3d 659 (1st Dep't 2018) ("A plaintiff may not recover in *quantum meruit*. . . where, as here, there is a contract governing the work which is illegal and unenforceable.").

To succeed on their fourth counterclaim for unjust enrichment, Defendants must prove (1) that Plaintiffs were enriched, (2) at Defendants' or the noteholders' expense, and (3) that equity and good conscience militate against permitting Plaintiffs to retain what Defendants are seeking to recover. *See Briarpatch Ltd., L.P. v. Phoenix. Pictures, Inc.*, 373 F.3d 296, 306 (2d

---

[114]Letter from the Republic to the Honorable Katherine Polk Failla, *supra* at note 66.

Cir. 2004) (enumerating the elements of an unjust enrichment claim).  This counterclaim fails at the outset because Plaintiffs have not been "enriched" by the 2020 Notes Transaction.  In fact, as Plaintiffs' expert David Hinman makes clear, PDVSA and PDVSA Petróleo incurred *more debt* in exchange for only a relatively short maturity extension that benefited only the Maduro regime.[115]  While one of Defendants' economics experts, Dr. Porzecanski, purports to rebut Mr. Hinman's opinion that Plaintiffs were not enriched, he actually only disputes that the terms of the Exchange Offer were unusually favorable to the noteholders, not that PDVSA and PDVSA Petróleo ended up deeper in debt.[116]  Nor does he provide any independent analysis from which the Court could conclude that PDVSA and PDVSA Petróleo were enriched by being relieved of their 2017 Notes obligations.  Defendants' unjust enrichment counterclaim fails as to PDV Holding for the simple reason that it had nothing to do with the 2017 Notes and thus did not, and could not have, received any "specific and direct benefit" (as required for an unjust enrichment claim) from PDVSA and PDVSA Petróleo being relieved of their 2017 Notes obligations.  *See M+J Savitt, Inc. v. Savitt*, No. 08 CIV. 8535 (DLC), 2009 WL 691278, *10 (S.D.N.Y. Mar. 17, 2009) ("It is not sufficient for defendant to receive some indirect benefit—the benefit received must be 'specific and direct' to support an unjust enrichment claim.").[117]

Finally, Defendants' unjust enrichment counterclaim fails because "equity and good

---

[115]Hinman Report ¶ 77.

[116]Rebuttal Declaration of Professor Arturo C. Porzecanski in Response to Portions of the Expert Report by David C. Hinman, at  ¶¶ 2(e), 87, 88, 91, 92, Ex. 44.

[117]Even if Defendants could prove that Plaintiffs were somehow enriched by the 2020 Notes Transaction, any enrichment was not at the noteholders' expense.  As set forth above, Mr. Hinman has demonstrated that, regardless of when 2017 Notes were purchased, noteholders that accepted the Exchange Offer have lost little or no money on their investments and, in most purchase scenarios, have realized substantial positive returns.  The fact that the noteholders could have made even more money had PDVSA not stopped paying interest and principal on the 2020 Notes is irrelevant.  In any event, had the 2020 Notes Transaction not occurred, the Maduro regime would almost certainly have defaulted on the 2017 Notes, causing their market value to plummet and ending the flow of interest and principal.  *See* Hinman Report ¶ 34 ("[T]he Exchange Offer was seen as an attempt by the Maduro regime to buy time and stave off default that seemed inevitable unless oil prices recovered, or the country obtained other sources of financing.").

conscience" does not favor them.  *See Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 739-40

(S.D.N.Y.), *aff'd*, 505 F. App'x 45 (2d Cir. 2012) ("'The essential inquiry in any action for

unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant

to retain what is sought to be recovered.'") (quoting *Dragon Inv. Co. II LLC v. Shanahan*, 409

A.D.3d 403, 405 (1st Dep't 2008)).  The noteholders knew that the Transaction Documents were

potentially invalid and that the Exchange Offer served to prop up Maduro by providing his

authoritarian regime with a financial lifeline. ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████ [118]

Ashmore was also aware that, under the illegitimate Maduro regime, Venezuela was "one of the

most miserable, mismanaged, hopeless countries on the planet," but it nonetheless saw

Venezuela as an opportunity to "make money."[119]  In addition, Ashmore's correspondence

immediately following the National Assembly's September 2016 Resolution makes clear that it

understood the resolution's significance. ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

---

[118] ████████████████████ *see also* Hinman Report ¶ 36–57 (detailing the extensive market
commentary on the risk that the 2020 Notes were invalid and noting that this commentary "highlighted the fact that
the Venezuelan National Assembly had publicly rejected the purported pledge of CITGO Collateral for the 2020
Notes issued by PDVSA.").

[119] *See* Hinman Report ¶ 30; *see also* Email from Javier Kulesz to Jan Dehn, "Jefferies LatAm Sovns – Venezuela
commentary," *Jefferies*, August 1, 2016. (ASH_00000018 – 21), Ex. 46 (August 1, 2016 Jefferies report explaining:
"[w]e find it difficult to envision a scenario within which such an authoritarian and corrupt government is ousted
peacefully through a referendum.  At this point, there should be little doubt that Chavismo's ultimate objective is to
perpetuate itself in power, irrespective of the costs.  If those costs involve the outright violation of the constitution,
ignoring international pressures or even using violence, so be it.").  For these same reasons, Defendants'
counterclaims are barred by the doctrines of unclean hands and *in pari delicto*, and Plaintiffs are entitled to summary
judgment on their third and fifth affirmative defenses.



"[121]   But the risk was clear.

"[122]   This Court should not invoke equitable principles to rescue

highly sophisticated hedge fund managers and financial institutions from a risk of which they

were fully aware when they decided to extend a financial and political lifeline to a collapsing

authoritarian regime.

## **CONCLUSION**

For the forgoing reasons, Plaintiffs respectfully request that their motion for summary

judgment be granted in its entirety.

[*remainder of page left intentionally blank*]

---

[120]
[121] *Id.*
[122] *Id.*

Dated:  June 10, 2020

Respectfully submitted,

/s/ Kurt W. Hansson
Kurt W. Hansson
James R. Bliss
James B. Worthington

PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
kurthansson@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com

*Attorneys for Plaintiffs and Counterclaim
Defendants Petróleos de Venezuela, S.A. and
PDVSA Petróleo, S.A.*

/s/ Jeffrey B. Korn
Jeffrey B. Korn
Michael Gottlieb
Nicholas Reddick
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
jkorn@willkie.com
1875 K Street NW
Washington, DC  20006-1238
Telephone: (202) 303-1442
Facsimile: (202) 303 2442
mgottlieb@willkie.com
nreddick@willkie.com

*Attorneys for Plaintiff and Counterclaim Defendant
PDV Holding, Inc.*

## APPENDIX A

| PLAINTIFFS' CLAIMS | |
|---|---|
| First Cause of Action (on behalf of PDVSA and PDVSA Petróleo) | Declaratory judgment that the 2020 Notes and the Indenture are invalid, illegal, null and void *ab initio*, and unenforceable |
| Second Cause of Action (on behalf of all Plaintiffs) | Declaratory judgment that the Pledge is invalid, illegal, null and void *ab initio*, and unenforceable |
| **DEFENDANTS' AFFIRMATIVE DEFENSES** | |
| First Defense | Failure to state a claim upon which relief can be granted |
| Second Defense | Unclean hands and/or inequitable conduct |
| Third Defense | Failure to disclose known Venezuelan constitutional violations; acceptance of the benefits of the Exchange Offer; bad faith and prejudicial delay in asserting purported claims |
| Fourth Defense | Consent, acquiescence, waiver, promissory estoppel, and/or ratification |
| Fifth Defense | Laches |
| Sixth Defense | Estoppel by recitals and/or equitable estoppel |
| Seventh Defense | *In pari delicto* |
| Eighth Defense | Apparent authority |
| Ninth Defense | Inequitable conduct, lack of mutuality, and insufficiency of the evidentiary record |
| Tenth Defense | Act of state doctrine and/or comity |
| **DEFENDANTS' COUNTERCLAIMS** | |
| First Cause of Action (Defendants against all Plaintiffs) | Declaratory judgment that the 2020 Notes are valid, legal, and enforceable |
| Second Cause of Action (Defendants against PDVSA and PDVSA Petróleo) | Declaratory judgment that the Indenture is valid, legal, and enforceable |
| Third Cause of Action (Defendants against all Plaintiffs) | Declaratory judgment that the Pledge is valid, legal, and enforceable |
| Fourth Cause of Action (Defendants against PDVSA and PDVSA Petróleo) | Declaratory judgment that one or more Events of Default under the Indenture have occurred |
| Fifth Cause of Action (Defendants against all Plaintiffs) | Declaratory judgment that, subject to obtaining any necessary United States government approvals, the Trustee is entitled to direct the Collateral Agent to sell the collateral, and the Collateral Agent is entitled to sell the collateral |
| Sixth Cause of Action (Trustee against | Breach of contract / payment of amounts due |

| PDVSA) | under the Indenture pursuant to Indenture Sections 5.01(f) and 5.01(m) |
|---|---|
| Seventh Cause of Action (Trustee against PDVSA Petróleo) | Breach of contract / payment of amounts due under guarantee pursuant to Indenture Sections 5.01, 7.01, and 7.04 |
| Eighth Cause of Action (against all Plaintiffs) | Unjust enrichment |
| Ninth Cause of Action (against PDVSA Petróleo) | Breach of warranty |
| Tenth Cause of Action (against PDV Holding) | Breach of warranty |
| Eleventh Cause of Action (against PDVSA and PDVSA Petróleo) | Breach of contract and indemnification of fees, costs, and expenses |
| Twelfth Cause of Action (against PDVSA and PDVSA Petróleo) | *Quantum meruit* |
| **PLAINTIFFS' AFFIRMATIVE DEFENSES** | |
| First Defense | Failure to state a claim upon which relief can be granted |
| Second Defense | The Indenture and the Pledge are invalid, illegal, and null and void *ab initio* because they were entered into in violation of the Venezuelan Constitution |
| Third Defense | Unclean hands |
| Fourth Defense | Equitable estoppel |
| Fifth Defense | *In pari delicto* |
| Sixth Defense | Act of state doctrine |
| Seventh Defense | Comity |
| Eighth Defense | Defendants' counterclaims are barred by the U.S. sanctions regime |

# EXHIBIT 28

 **REUTERS**®

 

July 29, 2021 11:32 AM CDT Last Updated 4 months ago

**Energy**

# Citgo should be run by an independent trust, Venezuela opposition figure says

**By Mayela Armas and Luc Cohen**

4 minute read

    



1/4

A Citgo gas station is pictured in Kearny, New Jersey September 24, 2014.REUTERS/Eduardo Munoz/File Photo

CARACAS, July 29 (Reuters) - Venezuela's opposition should hand over U.S. refiner Citgo and other overseas assets that it controls to an independent trust until President Nicolas Maduro leaves power, senior opposition politician Julio Borges said in an interview this week.

Washington in 2019 recognized opposition-held National Assembly speaker Juan Guaido as Venezuela's president and allowed the Assembly to authorize boards of directors to Citgo and Colombia-based petrochemicals company Monomeros, which is also owned by Venezuela.

Borges, who is based in Bogota and serves as Guaido's chief diplomatic representative, is now proposing that the opposition put a multilateral agency in charge of choosing management and conducting oversight of the companies, arguing that the current arrangement has become a "distraction."

"Our task is not to manage companies. Our task is to get Nicolas Maduro out of power," Borges told Reuters.

The proposal marks a new rift within the opposition, which is struggling to maintain a stalled effort to oust Maduro two years after the United States launched a broad sanctions program that was meant to usher in a political transition in Venezuela.

Washington is also protecting Citgo from possible seizures by creditors seeking to collect on unpaid debts from state oil company PDVSA and Venezuela.

"We are grateful for the protection of the assets, but we cannot depend on that - we must explore new models that give that protection more stability," Borges said.

Opponents label Maduro a dictator who has overseen an economic collapse, violated human rights and rigged his 2018 re-election. Maduro blames the economic crisis on U.S.

sanctions and opposition sabotage, and has accused the opposition of "stealing" Citgo and Monomeros.

Borges said he and his party - Justice First, one of four that make up the main opposition coalition - had presented the proposal to Guaido, but had not yet received a response. He mentioned the Washington-based Inter-American Development Bank as an institution that could possibly oversee the trust.

A Guaido spokesman did not respond to a request for comment.

Guaido and his Popular Will party have described the interim government's management of Citgo and Monomeros as transparent and responsible, drawing a contrast with Maduro's governance they say was marked by graft.

Venezuela's information ministry did not respond to a request for comment.

When Guaido assumed control of the companies in 2019, many believed a change of government was imminent. But Maduro has remained in power, backed by the South American country's military, as well as allies like China, Russia and Cuba.

Putting Citgo under the control of a trust would prevent any dividends from immediately reaching its owner, an ad-hoc board of directors for PDVSA named by the opposition. But the company has not paid dividends in years, in part due to **covenants** on loans barring it from disbursing profits until it meets certain financial conditions.

Citgo also posted a $667 million loss in 2020, due to slack demand for fuel and higher costs. **read more**

Reporting by Mayela Armas in Caracas and Luc Cohen in New York Editing by Marguerita Choy

Our Standards: **The Thomson Reuters Trust Principles.**

# EXHIBIT 29



World   Business   Markets   Breakingviews   Video   More

AN HOUR AGO

AN HOUR AGO

**AMERICAS-TEST-2**

FEBRUARY 6, 2019 / 2:49 PM / UPDATED 3 YEARS AGO

# Venezuela opposition plans to get oil money from U.S. fund

By Corina Pons, Mayela Armas



CARACAS (Reuters) - Venezuela's opposition on Wednesday said it would use a U.S.-based fund to receive some of the country's oil income in a key step to bankroll its efforts to dislodge President Nicolas Maduro.



FILE PHOTO: Oil facilities are seen on Lake Maracaibo in Cabimas, Venezuela January 29, 2019. REUTERS/Isaac Urrutia/File Photo

NOW READING   **Venezuela opposition plans to get oil money from U.S. fund**

'The fight goes on': Argentina's Peronists seek positives i...      Trump adviser Bannon surrenders to face charges for stonewa...      〉

AN HOUR AGO                                    AN HOUR AGO

Guadio, head of Venezuela's National Assembly, last month declared himself to be the South American country's interim ruler.

White House national security adviser John Bolton said on Wednesday the United States would consider lifting sanctions on senior Venezuelan military officers if they recognize Guaido as interim leader. "If not, the international financial circle will be closed off completely," Bolton wrote on Twitter.

Aside from one senior general, who recognized Guaido in a video and urged others in the military to do the same, most of Venezuela's top military officers have not defected from Maduro.

Citgo, the eighth-largest U.S. refiner and Venezuela's top foreign asset, is in the middle of a tug of war as the United States has made aggressive moves to remove it from Maduro's control and imposed sanctions on OPEC-member Venezuela's oil industry.

"This is already quite advanced, I hope that next week it can be announced by our representative in the United States," Paparoni said, though he did not give details about the nature of the U.S.-based fund or the financial institution involved.

Pressure is building on Maduro, a socialist, to resign amid an economic crisis marked by widespread shortages and hyperinflation. Maduro was re-elected last year in a vote critics have called a sham.

Yon Goicoechea, a member of Guaido's policy team, told Reuters that Guaido was in contact with PDVSA's international partners and they were willing to keep operating in Venezuela. He did not identify the partners.

Guaido's team is planning for a post-Maduro government with an emergency arrangement to supply fuel domestically, given widespread shortages across Venezuela, Goicoechea said.

NOW READING  **Venezuela opposition plans to get oil money from U.S. fund**

'The fight goes on': Argentina's Peronists seek positives i...

AN HOUR AGO



Trump adviser Bannon surrenders to face charges for stonewa...

AN HOUR AGO





Venezuela opposition will name new Citgo board this week: WSJ



U.S. might lift sanctions on Venezuelan military who back Guaido: Bolton

See more stories ⌄

Maduro, who retains control over the state, denounces Guaido as a U.S. puppet who is seeking to foment a coup against him. He is supported by China and Russia, while Slovakia on Wednesday joined Italy in defying the coordinated action of European Union nations and the United States.

## GOLD SALES

The opposition has also sought to prevent the government from selling gold, believing that it is using the proceeds to try to stay solvent as the sanctions cut off other revenue streams.

But Maduro's government last year sold 73 tonnes of gold to Turkey and the United Arab Emirates without the required approval of the opposition-led National Assembly, Paparoni told a news conference. Abu Dhabi investment firm Noor Capital bought the largest amount, 27.3 tonnes of gold, and a Turkish firm bought 23.9 tonnes, Paparoni said.

"We will keep working so that not one more gram of gold can be sold," Paparoni said.

Venezuela had gold reserves of 132 tonnes between the central bank's vaults and the Bank of England at the end of November, according to central bank data.

NOW READING   **Venezuela opposition plans to get oil money from U.S. fund**

'The fight goes on': Argentina's Peronists seek positives i...



AN HOUR AGO

Trump adviser Bannon surrenders to face charges for stonewa...



AN HOUR AGO

have been ordered to unload at Venezuela's ports as fuel inventories dwindle. PDVSA issued court orders for most of the tankers to discharge, according to shipping and PDVSA sources.

Guaido asked Italy's ruling coalition leaders in a letter to meet with his representatives as he seeks their explicit backing. Italy's hard-right League has expressed strong support for Guaido, but coalition partner the 5-Star Movement has not, making Italy the only major European Union nation not to recognize him as Venezuela's interim head of state.

League leader and Deputy Prime Minister Matteo Salvini's office on Wednesday said he would meet Guaido's envoys on Feb. 11.



Slideshow ( 4 images )

NOW READING  **Venezuela opposition plans to get oil money from U.S. fund**

'The fight goes on': Argentina's Peronists seek positives i...



AN HOUR AGO

Trump adviser Bannon surrenders to face charges for stonewa...



AN HOUR AGO



"Humanitarian action needs to be independent of political, military or other objectives," U.N. spokesman Stephane Dujarric told reporters in New York.

The International Committee of the Red Cross has doubled its budget in Venezuela in recent weeks and is also helping Venezuelan migrants in neighboring Colombia and Brazil, ICRC President Peter Maurer said in Geneva.

Reporting by Corina Pons and Mayela Armas; Additional reporting by Angus Berwick in Caracas, Tatiana Jancarikova in Bratislava, Stephanie Nebehay in Geneva, Michelle Nichols in New York, Mircely Guanipa in Punto Fijo, Makini Brice in Washington, and Steve Scherer in Rome; Writing by Will Dunham; Editing by Rosalba O'Brien and Alistair Bell

*Our Standards: The Thomson Reuters Trust Principles.*

Apps     Newsletters     Advertise with Us     Advertising Guidelines     Cookies     Terms of Use     Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2021 Reuters. All Rights Reserved.

# EXHIBIT 30



July 1, 2019

OFFICE OF THE SPECIAL ATTORNEY GENERAL OF THE BOLIVARIAN REPUBLIC OF VENEZUELA

GUIDELINES FOR THE RENEGOTIATION OF THE CHÁVEZ/MADURO ERA LEGACY PUBLIC EXTERNAL DEBT.

*

This memorandum describes the policies that will guide the Interim Government and the National Assembly of the Bolivarian Republic of Venezuela led by President Jan Guaidó (the "Authorities") as they approach the imminent renegotiation of foreign currency-denominated private claims against the Republic and the Venezuelan public sector (that is, claims asserted by private sector parties, not claims of official sector entities). This memorandum has been prepared by the advisory commission designated by the Special Attorney General, José Ignacio Hernández G., integrated by Ricardo Hausmann and Alejandro Grisanti. Furthermore it benefited from the advice of Lee Buchheit, who is the Authorities' strategic adviser in public debt matters.

**

This public external debt renegotiation cannot begin until the usurpation by regime of Nicolas Maduro has not ended and the economic sanctions imposed on said regime by the United States of America and other countries have not been lifted. Consequently, once these events have occurred, it shall be the policy of the Authorities to proceed with an orderly and consensual renegotiation of legacy private claims as soon as practicable thereafter, in accordance with the Special Law to be passed by the National Assembly.

1.      **Comprehensive Private Claims Renegotiation**

The Authorities anticipate that this will be a comprehensive renegotiation of claims against the Venezuelan State, including all the foreign currency-denominated claims against the Venezuelan public sector. A significant number of the outstanding claims against the Venezuelan public sector did not arise in the context of traditional debt instruments evidencing obligations contracted. These include, for example, claims related to unpaid supplier invoices and damage claims resulting from the expropriations and nationalizations carried out by the Chavez/Maduro regimes. The Authorities intend to use this opportunity to resolve as many outstanding private claims against the Venezuelan public sector as possible.

2.      **Claim Reconciliation**

Only reconciled foreign currency-denominated claims will be eligible to participate in the renegotiation. The Authorities expect to appoint a claims reconciliation agent, whose

1



responsibilities will include, among others, compiling a comprehensive list and inventory of the outstanding legacy claims, as well as determining the amounts of each one of these claims for purposes of renegotiation. In many cases (such as bonds or loans that were not issued with significant amounts of original discount) the Authorities expect the reconciliation process will be straightforward; the reconciled amount of such claims will represent unpaid principal and interest accrued according to original contractual terms.

There may be other categories of foreign currency-denominated claims. However, that will require the claims reconciliation agent to undertake a factual investigation. Among these may be claims whose face amount was inflated at the time of issuance in expectation of a heavy market discount upon resale by the holder, debt instruments issued with significant amounts of original issue discount, claims (such as arbitration claims that have not yet resulted in a final arbitral award) whose quantification will require discussion by the Authorities and the holder of the claim, claims procured or tainted by demands of corruption allegedly committed by officials in the Chávez/Maduro regimes, and perhaps other categories of questionable claims.

The Authorities will early in the process publish a memorandum describing the policies that will guide the claims reconciliation agent in carrying out its functions.

The Authorities reserve the right to exercise all actions and potential legal defenses with respect to questionable claims until the point that such claim has been reconciled in order to participate in the renegotiation in accordance with the published guidelines and accepted by the Authorities.

## 3.    Equal Treatment

Once the amount of a claim has been reconciled and accepted to be renegotiated, the claim shall be eligible to participate in the renegotiation on equal terms with all other reconciled private claims (subject to the exceptions described in the next paragraph). Stated differently, no different treatment shall be accorded to eligible foreign currency-denominated claims as a result of their origin (for example, whether arising pursuant to a debt instrument, an unpaid invoice, an expropriation, etc.), the nature or domicile of the holder of the claim, and/or the identity of the public sector obligor (the Republic, PDVSA or another public sector entity, whether the claim has been reduced to a court judgment or otherwise.

Claims that benefit from a valid first priority security interest in property of the Venezuelan state or its public sector entities may be given separate treatment in the renegotiation.

## 4.    Financial Terms

Promptly once the transition has taken place, the Authorities expect to request the assistance of the International Monetary Fund (IMF) and other multilateral agencies in

2



addressing the dire humanitarian crisis in Venezuela and in developing a longer-term program for the country's economic recovery. The Authorities recognize that designing an economic recovery program for a country in the condition of Venezuela will be a challenging and time-consuming task. That program is expected to include a projection about the level of debt and associated debt service requirements that the country will be able to carry in future years.

As a practical matter, a detailed discussion about the financial terms of the foreign currency-denominated claims renegotiation must await the conclusion of the IMF's assessment of Venezuela's condition and economic prospects. With that assessment in hand, however, and consistent with IMF policies, the Authorities will enter into discussions with representatives of the various claimant groups regarding both the proposed financial terms for the renegotiation of their claims and the nature of the new debt instruments that will be issued.

It shall be the policy of the Authorities to ensure that settlements of both commercial and financial legacy claims, as well as bilateral claims, are consistent with the economic recovery program supported by the IMF and other official sector sponsors.

The Authorities acknowledge and appreciate the forbearance from exercising legal remedies shown by most private creditors despite the behavior and the provocations of the Maduro regime. Few, if any, claims are in danger of becoming time-barred as a result of the running of a statute of limitations. To the extent that any claims are in danger of becoming time-barred, the Authorities will entertain proposals to extend the relevant limitations period to permit the debt renegotiation to proceed. Moreover, as noted above, no preferential treatment will be accorded in the debt renegotiation to claims that have been reduced to a court judgment. The Authorities therefore request all claimants to refrain from pursuing legal remedies (and suspend, without prejudice, any actions that have already been commenced) pending the coming end of usurpation and the commencement by the Authorities of an orderly, consensual resolution of those claims.

3

# EXHIBIT 31



# PDVSA's ad hoc Board of Directors highlights the transparent management of its subsidiaries in the U.S.

5 agosto, 2020



**10**
SHARES

**249**
VIEWS

   



Based on its commitment to transparency, the Chairman of the ad hoc Board of Directors of Petróleos de Venezuela, S.A. (PDVSA), Luis A. Pacheco, presented – before the permanent committees of Energy and Petroleum, Finance and Economic Development, and Comptrollership – a detailed summary of the management of the new administration of the state oil company and its subsidiaries, highlighting the current status of the assets recovered or still in dispute for control, as is the case with Nynas and other PDVSA assets in the Caribbean. The representative of the ad hoc Administrative Board clarified that, in the case of PDV Holding, Inc., CITGO Holding, Inc. and CITGO Petroleum Corporation, these are companies registered in the state of Delaware, in the United States, and therefore PDVSA exercises its role as shareholder in accordance with the laws of that country.

Luis Pacheco pointed out that by the time the companies were received in 2019, they were in a very critical situation, the banks were refusing to renew the lines of credit, there was inadequate indebtedness. PDV Holding, Inc., CITGO Holding, Inc, and CITGO Petroleum Corporation, were under sanctions imposed by the Office of Foreign Assets Control (OFAC), there were irregularities in contracts signed by previous administrations and CITGO was practically lost as a result of the irresponsible policies of expropriation and indebtedness of the regimes of Hugo Chavez and Nicolas Maduro, which also led the companies to face international litigation, endangering their property and allowing litigation to move forward without exercising any defense.

→ **Canada in the OAS: "Venezuela is a sample of what happens when democracy is denied, the rule of law is abandoned and human rights are violated"**

→ **President Duque warns about the threats to democracy posed by the dictatorships of Daniel Ortega and Nicolás Maduro**

The president of PDVSA's ad hoc Administrative Board pointed out that once the boards of directors assumed total control and therefore, the management of the companies, progress was made – despite limited human and financial resources – in their recovery, strengthening and protection, through the successful refinancing of 70% of the debt of CITGO's subsidiaries – equivalent to 3. 090 million – improvements in credit risk ratings, implementation of measures to achieve sound corporate governance, the increase in refining capacity by 20,000 barrels per day made possible to achieve a new record for product exports in the fourth quarter of 2019, outstanding environmental and safety performance, reorientation of spending by giving priority to investment and refinery maintenance, and the hiring of external advisors to carry out internal audits. Luis Pacheco added that a relationship of constant collaboration is maintained with the very investigations being carried out by the U.S. Department of Justice. Furthermore, understanding the importance these assets represent for the Venezuelan nation and the emphasis that has been made on their defense, it was achieved the U.S. administration's protection of CITGO subsidiaries from creditors.

Regarding the goals set for 2020, the PDVSA representative referred to the efforts that continue to be made to guarantee the protection of Venezuela's assets abroad, as well as the actions in the operational and financial areas – such as the 10% reduction of investments and the refinancing of debt – that have been taken to have greater liquidity in CITGO subsidiaries in view of the uncertainty caused in the market by the COVID-19 pandemic.

In reference to the Simón Bolívar Foundation – a charitable foundation of CITGO Petroleum Corporation – the president of the ad hoc Administrative Board of PDVSA highlighted that – since the arrival of the new administration – the Foundation has rethought its role in order to maximize the impact of the aid it gives to Venezuelans inside and outside Venezuela thus benefiting, together with different and recognized NGOs, 33 hospitals, more than 10.845 health professionals, more than 257 soup kitchens or community centers assisted and approximately 15,000 meals served per month.

Luis Pacheco pointed out that, although the last year has been one of important achievements, the danger over the assets has not disappeared, since the shadow of the legacy of the litigations and the accumulation of debts still persists. He added that sustainable solutions require political and legal changes that will return Venezuela to democratic normalcy and concluded by emphasizing that "all the efforts and achievements made by the new boards of directors have allowed us to position the companies – despite the critical world context and the adverse conditions they encountered- with greater strength and competitiveness in view of the fundamental role they will play for the reconstruction of Venezuela, once the time comes".

The presentation of the accounts of the ad hoc Administrative Board of PDVSA was carried out in a public ceremony in the National Assembly, in which the deputies attending had the opportunity to ask questions and clear up doubts. In order to continue promoting transparency, which has been a maxim of the Legitimate Government, the session was transmitted live to all Venezuelans.

**Tags:**   Asamblea Nacional   Citgo   EE.UU   PDVSA   Petróleos de Venezuela



INTERNATIONAL

🕐 11 NOVIEMBRE, 2021



INTERNATIONAL

🕐 11 NOVIEMBRE, 2021



INTERNATIONAL

🕐 11 NOVIEMBRE, 2021

# EXHIBIT 32



Español   English

HOME   PRESIDENCY   PARLIAMENT   EMBASSIES   REGIONS   INTERNATIONAL

# U.S. Treasury Department Extends Protection to Citgo from PDVSA 2020 Bonds (Press Release)

15 julio, 2020



**10**
SHARES

**252**
VIEWS

Facebook    Twitter    Whatsapp    Email

The Office of the Special Prosecutor of the Republic reports that, on July 15th, 2020, the U.S. Treasury Department, through the Office of Foreign Assets Protection (OFAC), issued a 5D General License which extends until October 20th, 2020, the impossibility for holders of the PDVSA 2020 Bond to take control of Citgo.

Initially, through General License 5 issued in 2018 (under Nicolás Maduro's regime), OFAC provided an exception that allowed PDVSA Bond holders to take control of Citgo, despite the protective measures previously issued by the U.S. Government. This license validity was the main reason that led the National Assembly to authorize under protest the payment of interest on the 2020 Bond in April 2019. At that time, the failure to make that payment, and even any judicial defense or lawsuit by PDVSA based on the invalidity of the Bond, would have allowed the bondholders to take immediate control over Citgo in accordance with the burdensome and irresponsible terms on which the guarantee on that company was constituted.

→ **The First Lady highlighted the Legitimate AN's commitment to achieve a political solution in Venezuela**

→ **President Guaidó ratified that he will not abandon Venezuelans in the fight and will continue until achieving free presidential elections**

Subsequently, through various coordinated conversations carried out by the Venezuelan Embassy in the United States designated by President Guaidó, on October 24th, 2019 the Department of the Treasury issued General License 5A, which suspended the possibility of the bondholders to take the shares and control of Citgo. This decision allowed, with the support of the National Assembly, the ad-hoc management board of PDVSA and PDVSA Holding, Inc. to sue in U.S. courts for the nullity of the PDVSA 2020 Bond, since the guarantee contracts that commit 50.1% of Citgo Holding, Inc. were issued unconstitutionally by Maduro's regime (without the prior authorization of the National Assembly required by national public interest contracts). If this suspension did not exist, as previously indicated, the only demand for annulment of the 2020 Bonds would have resulted in the immediate loss of Citgo.

OFAC has extended the suspension on January 17th, 2020 (License 5B) and April 10th, 2020 (License 5C), and the suspension will remain in effect until July 22nd, 2020. Now, July 15th, 2020, a new License (5D) was issued, which again extends the suspension until October 20th, 2020. This extension maintains the protection over Citgo, as the bondholders will not be able to exercise any action to take control of that company. At the same time, the trial of the Nullity of the 2020 Bonds and the nullity of the guarantee on Citgo shares is progressing.

It is worth recalling that the National Assembly, in an agreement dated September 27, 2017, questioned the operation of issuing the referred Bonds and the guarantee that put at risk the property of Citgo

(50.1% of its shares), based on the constitutional rules that allow it to control contracts of national public interest. However, PDVSA (controlled by the Maduro regime) and the bondholders decided to ignore this warning and issue the Bond and sign the pernicious guarantee, in violation of the Constitution and to the clear detriment of the interests of the Nation.



OFICINA DEL PROCURADOR ESPECIAL
República Bolivariana de Venezuela

**EL DEPARTAMENTO DEL TESORO DEL GOBIERNO DE ESTADOS UNIDOS EXTIENDE PROTECCIÓN SOBRE CITGO FRENTE A LOS BONOS PDVSA 2020**

La Procuraduría Especial de la República informa que, en fecha 15 de julio de 2020 el Departamento del Tesoro del Gobierno de Estados Unidos, a través de la Oficina de Protección de Activos Extranjeros (OFAC), emitió Licencia General 5D, en la cual **extiende hasta el 20 de octubre de 2020, la imposibilidad para los tenedores del Bono PDVSA 2020 de tomar control sobre Citgo.**

Inicialmente, a través de la Licencia General 5 emitida en 2018 (durante el Régimen de Nicolás Maduro), la OFAC dispuso una excepción que permitía a los tenedores del Bono PDVSA tomar el control sobre Citgo, pese a las medidas de protección dictadas previamente por el Gobierno de Estados Unidos. La vigencia de esa Licencia fue la principal razón que llevó a la Asamblea Nacional a autorizar bajo protesto el pago de intereses del Bono 2020 en abril de 2019. En aquel momento, el incumplimiento de ese pago, e incluso, cualquier defensa judicial o demanda de PDVSA basada en la invalidez del Bono, hubiese permitido a los bonistas tomar el control inmediato sobre Citgo, conforme a los gravosos e irresponsables términos en que se constituyó la garantía sobre dicha empresa.

Posteriormente, a través de diversas conversaciones coordinadas con la Embajada de Venezuela en Estados Unidos designada por el Presidente Guaidó, en fecha 24 de octubre de 2019 el Departamento del Tesoro emitió la Licencia General 5A, que suspendió la posibilidad de los bonistas de tomar las acciones y control de Citgo. Esta decisión permitió que, con el respaldo de la Asamblea Nacional, la junta administradora ad-hoc de PDVSA y PDVSA Holding, Inc., demandaran ante Tribunales de EEUU, la nulidad del Bono PDVSA 2020, pues, los contratos de garantía que comprometen el 50,1% de Citgo Holding, Inc., fueron emitidos inconstitucionalmente por el régimen de Maduro (sin la autorización previa de la Asamblea Nacional que requieren los contratos de interés público nacional). De no existir esta suspensión, como se indicó previamente, la sola demanda de nulidad de los Bonos 2020, hubiera devenido en la pérdida inmediata de Citgo.

La OFAC ha extendido la suspensión en fechas, 17 de enero de 2020 (Licencia 5B) y 10 de abril de 2020 (Licencia 5C), estando vigente dicha suspensión hasta el 22 de julio de 2020. Ahora, el 15 de julio de 2020, se emitió nueva Licencia (5D), que nuevamente prorroga la suspensión hasta el 20 de octubre de 2020. Esta extensión mantiene la protección sobre Citgo, pues, los bonistas no podrán ejercer ninguna acción para tomar control de esa empresa. Paralelamente, avanza el juicio de Nulidad de los Bonos 2020 y nulidad de la garantía sobre acciones de Citgo.

Cabe recordar que, la Asamblea Nacional en Acuerdo de 27 de septiembre de 2017, cuestionó la operación de emisión de los referidos Bonos y la garantía que ponía en riesgo la propiedad de Citgo (50,1% de sus acciones), con base en las normas constitucionales que le permiten controlar los contratos de interés público nacional. No obstante, PDVSA (controlada por el régimen de Maduro) y los bonistas decidieron ignorar esa advertencia y emitir el Bono y suscribir la perniciosa garantía, en violación a la Constitución y en claro detrimento de los intereses de la Nación.

**Tags:** Ad Hoc de PDVSA   Citgo   EEUU   Estados Unidos   PDVSA



PRESIDENCY

 11 NOVIEMBRE, 2021



PRESIDENCY

 10 NOVIEMBRE, 2021



PRESIDENCY

 2 NOVIEMBRE, 2021



CENTRO DE COMUNICACIÓN
N A C I O N A L

**Descargar APP**

# EXHIBIT 33



# NY District Court responds favorably to the appeal of the Interim Government with a ruling that prevents holders of the PDVSA 2020 Bond from acting against CITGO's assets

29 diciembre, 2020



Carlos Vecchio , embajador de Venezuela ante EEUU.

**2**
SHARES

**39**
VIEWS

 Facebook  Twitter  Whatsapp  Email 

The Ambassador of the Bolivarian Republic of Venezuela to the United States, Carlos Vecchio, affirmed that "the responsible strategy that we have established for the protection of CITGO continues to bear fruit," after the New York District Court responded to the appeal filed by the Interim Government of Venezuela, through PDVSA Ad Hoc, with an ruling that prevents holders of the PDVSA 2020 Bond from acting against the Venezuelan patrimony.

Vecchio recalled that "days ago the administration of President Donald Trump, through the Treasury Department, extended a license that protects CITGO from any 2020 bondholder action until July 2021. It is clear that we have done and will continue to do EVERYTHING to protect and preserve Citgo for Venezuelans."

→ **Ambassador Viera-Blanco presented the report of his diplomatic activities and the promotion of freedom, peace and democracy in Venezuela**

→ **Eduardo Battistini applauded the granting of the first Temporary Protection permits to Venezuelan children in Colombia**

The ambassador once again highlighted the positive and pertinent actions of Interim President Juan Guaidó, in contrast to the terrible consequences that Nicolás Maduro's dictatorship of has generated for the Venezuelan people.

"Maduro generated more than $ 150 billion in irresponsible debts, putting the main asset of the Venezuelan people abroad at serious risk. The correct strategy promoted by the Interim President Guaidó has recovered and maintained CITGO. If not, today it would be in private or Russian hands."

He added that the extension of the mandate of the current and legitimate National Assembly of Venezuela, approved at the weekend, benefits the protection of CITGO and other assets.

(The) "Constitutional continuity of the legitimate National Assembly and its international recognition are especially important. With it, the mandate to protect CITGO from the criminal corruption of Maduro's dictatorship is renewed. They intend unsuccessfully to put their looting tentacles on CITGO."

He concluded by saying: "From the Venezuelan Embassy in the United States we will continue to work together with the Special Prosecutor's Office, the National Assembly and PDVSA Ad Hoc, under the guidelines of President Guaidó, for the final preservation of all assets that must be available for the next

and speedy recovery of Venezuela. We want to honor obligations and commitments legitimately contracted by the State, once the democratic transition takes place."

**CARLOS VECCHIO** ✔
@carlosvecchio

La estrategia responsable que hemos establecido para protección de @CITGOve sigue rindiendo frutos. Corte de Distrito de Nueva York responde a nuestra apelación con dictamen que evita que tenedores de Bono PDVSA 2020 accionen en contra del patrimonio venezolano.



1:04 p. m. · 29 dic. 2020

♡ 176    💬 33    ⬆ Compartir este Tweet

**Twittea tu respuesta**

**Tags:**  bonos PDVSA 2020    Carlos Vecchio    Citgo    EEUU    Nicolás Maduro
orte Federal del Distrito Sur de Nueva York    PDVSA    Venezuela


CANADA


COLOMBIA


ARGENTINA

⊘ 2 NOVIEMBRE, 2021　　⊘ 30 OCTUBRE, 2021　　　　⊘ 29 OCTUBRE, 2021



**Descargar APP**

# EXHIBIT 34



Español   English

CENTRO DE COMUNICACIÓN
N A C I O N A L

REPÚBLICA BOLIVARIANA DE VENEZUELA
ASAMBLEA NACIONAL

HOME    PRESIDENCY    PARLIAMENT    EMBASSIES    REGIONS    INTERNATIONAL

# President (e) Guaidó after court ruling on PDVSA 2020 bonds: "CITGO remains protected"

17 octubre, 2020



Juan Guaidó, presidente encargado de Venezuela,

**5** SHARES   **117** VIEWS

  Facebook     Twitter     Whatsapp     Email



The president in charge of Venezuela, Juan Guaidó, blamed Maduro's dictatorship for unconstitutionally ceding CITGO with PDVSA 2020 bonds as collateral.

"The regime unconstitutionally ceded CITGO as a guarantee for the 2020 bonds. They put the assets of the Republic at risk and intend to continue disposing of them as they please and in secret," said President (e) Guaidó in a message disclosed through his official Twitter account.

→  **The First Lady highlighted the Legitimate AN's commitment to achieve a political solution in Venezuela**

→  **President Guaidó ratified that he will not abandon Venezuelans in the fight and will continue until achieving free presidential elections**

Despite the recent court ruling in a U.S. court, the Venezuelan head of state stressed that the Legitimate Government is implementing all options to protect the heritage of all Venezuelans.

"CITGO continues to be protected. The first instance decision of a court in the United States on the so-called 2020 bonds is a consequence of the irresponsibility of the dictatorship," he said.

"We will continue to defend the country's assets," concluded President (e) Guaidó.

**Juan Guaidó** ✔ @jguaido · 17 oct. 2020 

El régimen, de manera inconstitucional, cedió CITGO en garantía de los bonos 2020. Desde el Gobierno Encargado acudimos a las instancias posibles. Queda la opción legal de la apelación y CITGO continúa bajo la protección de la OFAC.

Seguiremos defendiendo los activos del país.

**Centro de Comunicación Nacional** ✔ @Presidencia_VE

Comunicado del Gobierno Legítimo de Venezuela ante decisión de la Corte de Nueva York en el caso de los Bonos PDVSA 2020 bit.ly/2H5OCSR



**Juan Guaidó** ✔
@jguaido

CITGO sigue protegida. La decisión en primera instancia de un tribunal en EEUU sobre los llamados bonos 2020 es consecuencia de la irresponsabilidad de la dictadura.

Pusieron en riesgo los bienes de la República y pretenden continuar disponiendo de ellos a su gusto y en secreto.

11:54 a. m. · 17 oct. 2020                                    ⓘ

♡ 667          💬 63          ⬆ Compartir este Tweet

**Twittea tu respuesta**

Tags:   bonos PDVSA 2020   Citgo   Dictadura   EEUU   Juan Guaidó   OFAC   Régimen   Venezuela


PRESIDENCY
🕐 11 NOVIEMBRE, 2021


PRESIDENCY
🕐 10 NOVIEMBRE, 2021


PRESIDENCY
🕐 2 NOVIEMBRE, 2021



Descargar APP

# EXHIBIT 35

 

October 28, 2021 11:27 AM CDT Last Updated 19 days ago

**Energy**

# EXCLUSIVE U.S. oil refiner Citgo Petroleum readies new board shakeup

By **Marianna Parraga**                                                3 minute read

    



The Citgo Petroleum Corporation headquarters are pictured in Houston, Texas, U.S., February 19, 2019. REUTERS/Loren Elliott

HOUSTON, Oct 28 (Reuters) - Venezuela-owned Citgo Petroleum (PDVSAC.UL) is preparing to name two of its executives as new members to its board of directors, to help steer the company during upcoming negotiations between its parent boards and creditors, people familiar with the matter told Reuters.

Citgo's directors will work closely with the supervisory boards that are setting the table to begin talks with creditors who want to break up the company through an auction process that is backed by a U.S court. The parent boards this month **approached U.S. officials** seeking to extend Washington's protection over the company while they pursue talks to leave it intact.

Citgo Chief Executive Carlos Jorda is expected to rejoin the board after a four-month hiatus. The company's top legal and government affairs official, Jack Lynch, also will take a board seat, the people said. Lynch is a former BP executive who joined the refiner two years ago.

Even though they are not expected to directly participate in the talks with creditors, the Citgo directors would bring necessary operating and legal know-how to greenlight any negotiation decision, the people said.

Controlled since 2019 by boards appointed by Venezuelan political leader Juan Guaido, Citgo has struggled to recruit and retain board members and top executives. The company split with parent Petroleos de Venezuela (PDVSA.UL) after the U.S. sanctioned the state-run oil firm.

The company plans to announce board changes along with is quarterly results in mid-November, a Citgo spokesperson confirmed. The person did not elaborate on the executives to be added.

PDVSA did not reply to a request for comment.

Citgo's current five-member board of directors, largely composed of members of Venezuela's opposition parties, was overhauled in June. CEO Jorda, who had been on two supervisory boards, **was replaced by the politically connected sons of former PDVSA executives**.

Citgo's operating chief Edgar Rincon was also withdrawn from Citgo Holding's board as part of the June shakeup. **read more**

The company is under siege on several fronts. Venezuela President Nicolas Maduro wants to regain control of Citgo under any reconciliation while the U.S. is investigating bribery allegations against former Citgo managers. Profits have suffered after it lost access to Venezuelan crude. It earned $3 million last quarter after five consecutive quarterly losses.

"A portion of the Venezuelan opposition, along with other countries, have stolen international assets," said Venezuela's deputy Comptroller General, Jhosnel Peraza, on Twitter this week.

Citgo has revamped management over the last two years. This month, the firm named a new vice president of health, safety and environment and in August appointed a former BP executive as general counsel. Another former BP executive was named chief ethics and compliance officer in April. In October 2020, John Zuklic was named finance chief.

Along with the two directors, Citgo is expected to name a new treasurer to replace Gina Coon, who retired earlier this year, the sources said.

Reporting by Marianna Parraga and Gary McWilliams in Houston, additional reporting by Deisy Buitrago in Caracas; Editing by David Gregorio

Our Standards: **The Thomson Reuters Trust Principles.**

## More from Reuters

**Read Next**

Energy                                                                    10:30 AM CST

**Canadian indigenous group says it has ordered workers off site of disputed gas pipeline**

Energy                                                          10:23 AM CST

**Ukraine's Naftogaz CEO still hopes Nord Stream 2 will be blocked**

Disrupted                                              9:44 AM CST

**As autos go electric, Toyota chases hydrogen dream**



Energy                                                9:20 AM CST

**Exxon workers begin a vote on union's future at Texas refinery**



## Sign up for our newsletter

Subscribe for our daily curated newsletter to receive the latest exclusive Reuters coverage delivered to your inbox.

**Sign up**

# EXHIBIT 36

 

# US shields Citgo from creditors in win for Venezuela's Guaido

MAIN | By Correspondent  Oct. 25, 2019

**WASHINGTON** - Venezuela's opposition scored a last-minute victory Thursday as the Trump administration stepped in with a measure to protect the nation's most prized asset abroad from creditors before a key debt payment.

The U.S. Treasury Department updated its sanctions guidelines to temporarily put transactions pertaining to Petroleos de Venezuela's 2020 bonds, backed by 50.1% of Citgo Holding Inc.'s shares, on the same footing as other financial deals that are prohibited. Timing was of the essence: Advisers to National Assembly President Juan Guaido said they lacked the funds to make a $913 million debt payment due Monday.

Washington's decision to block holders of PDVSA's 2020 bonds from seizing their collateral for 90 days followed months of lobbying by Venezuelan opposition leaders. They warned that losing Citgo would be a political **catastr**ophe for Guaido, whom the U.S. and almost 60 other countries recognize as the nation's rightful leader. With the Trump administration's support, Guaido and his allies effectively run Houston-based Citgo, yet have little operational control over its parent PDVSA.

Citgo said in a statement that it's "gratified" by the decision, while Guaido's office said it "welcomes" the move.

"We will continue working in all legal ways to achieve the irrefutable protection of this and all the assets of the Venezuelan people," Guaido's office said. "This amendment from the U.S. Treasury Department recognizes the strategic value of Citgo for the present and future of Venezuela."

PDVSA 2020 bonds have cratered amid default concern

Guaido's team also faces a cash crunch. While the U.S. froze accounts linked to Nicolas Maduro's regime, it has refrained from handing them to the Venezuelan opposition out of fear that it would prompt litigation from creditors. Even if that money was available, Guaido would've needed approval from the National Assembly. Last week, the legislature passed an accord calling the PDVSA 2020 bonds unconstitutional because they weren't approved in the first place.

"The Treasury Department is giving a strong signal that it wants creditors and the Guaido administration to reach a refinancing agreement," said Francisco Rodriguez, director of Oil for Venezuela. "What Treasury has essentially done here is grant the Guaido team the 90-day truce they requested."

The PDVSA 2020 bonds rallied Thursday by the most since December 2017 as investors took some relief that the Trump administration left room for a deal in the coming months. The notes now trade at 34 cents on the dollar from about 90 cents in June.

London-based Ashmore Group Plc holds about half of the bonds. BlackRock Inc., T Rowe Price Group Inc. and the Royal Bank of Canada are among the other largest reported holders.

Right-wing groups, including Grover Norquist's Americans for Tax Reform, had argued that the Trump administration should refrain from intervening because that would interfere with property rights. But a bipartisan bloc of U.S. senators and representatives including Marco Rubio, Ted Cruz and Lizzie Fletcher urged the president to take action.

They argued that a PDVSA default would open the door for Russia's state oil giant Rosneft to take control of Citgo shares. PDVSA pledged a 49.9% stake in the Houston-based refiner to Rosneft as collateral on a loan in late 2016. Rosneft said earlier this month that it "has no intentions to enter into real ownership and management of the company."

U.S. Treasury Secretary Steven Mnuchin has previously said that, in the event of a PDVSA default, Citgo's loan from Russia would be reviewed by the department's Committee on Foreign Investment in the U.S., which can derail deals on national security concerns.

## Related News



**'Climate change becomes an existential crisis on the islands'**

By Koen van Tankeren, March 5, 2021

## Share

     



HOME          ADVERTISEMENT OPPORTUNITY          INFORMATION          CONTACT US

All Rights Reserved. Core Communications © 2019

Developed by VORDEV

# EXHIBIT 37

 CRIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/7/20

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

```
                                          X
ACL1 INVESTMENTS LTD., ACL2               :
INVESTMENTS LTD., and LDO (CAYMAN)        :
XVIII LTD.,                               :
                                          :    No. 19-cv-09014-LLS
               Plaintiffs,                :
                                          :
        v.                                :
                                          :
BOLIVARIAN REPUBLIC OF VENEZUELA,         :
                                          :
               Defendant.                 :
                                          :
                                          X
```

## FINAL JUDGMENT AND PERMANENT INJUNCTION

**WHEREAS,** this Court having subject matter jurisdiction over this case and personal

jurisdiction over Defendant the Bolivarian Republic of Venezuela (the "Republic"), the Republic

having appeared before the Court and not contesting the Court's jurisdiction;

**WHEREAS,** the parties having conducted informal discovery in which plaintiffs

provided evidence to the Republic of plaintiffs' standing to sue, identity, and continuing

ownership interest in the debt securities placed in issue by the Amended Complaint; and

**WHEREAS,** the parties having reached a stipulation for the entry of judgment for the

reasons and on the terms set forth therein;

### IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

Final Judgment is entered in favor of Plaintiffs ACL1 Investments Ltd., ACL2

Investments Ltd., and LDO (Cayman) XVIII Ltd. (the "Plaintiffs") against the Republic for

breach of contract; and

6

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED THAT:**

The Republic is liable to the Plaintiffs for damages in the following amounts:

1.    **To Plaintiff ACL1 Investments Ltd. on account of 2004 Issuance of the 2034s**

**(ISIN US922646BL74):**

- a.  For non-payment of principal due on December 6, 2018 as a result of the acceleration of the indebtedness: $57,215,000.

- b.  Interest on $57,215,000 of principal at the rate of 9.375% per annum computed starting July 13, 2020 through December 1, 2020, such interest being equal to $2,056,164.06.

- c.  For non-payment of six (6) due and unpaid biannual interest payments due on each of January 13, 2018, July 13, 2018, January 13, 2019, July 13, 2019, January 13, 2020, and July 13, 2020:

    - i.  For non-payment of an interest payment due on January 13, 2018, $2,681,953.13, plus interest thereon at the rate of 9% per annum simple interest starting from January 14, 2018, through December 1, 2020, such interest being equal to $696,352.60;

    - ii.  For non-payment of an interest payment due on July 13, 2018, $2,681,953.13, plus interest thereon at the rate of 9% per annum simple interest starting from July 14, 2018, through December 1, 2020, such interest being equal to $576,656.66;

    - iii.  For non-payment of an interest payment due on January 13, 2019, $2,681,953.13, plus interest thereon at the rate of 9% per annum simple

7

interest starting from January 14, 2019, through December 1, 2020, such interest being equal to $454,976.82;

    iv.  For non-payment of an interest payment due on July 13, 2019, $2,681,953.13, plus interest thereon at the rate of 9% per annum simple interest starting from July 14, 2019, through December 1, 2020, such interest being equal to $335,280.88;

    v.  For non-payment of an interest payment due on January 13, 2020, $2,681,953.13, plus interest thereon at the rate of 9% per annum simple interest starting from January 14, 2020, through December 1, 2020, such interest being equal to $213,601.03; and

    vi.  For non-payment of an interest payment due on July 13, 2020, $2,681,953.13, plus interest thereon at the rate of 9% per annum simple interest starting from July 14, 2020, through December 1, 2020, such interest being equal to $93,243.79.

  d.  For coupon and prejudgment interest following December 1, 2020, $18,867.56 per day until the date on which this judgment is entered on the docket of the Court.

2.    **To Plaintiff ACL2 Investments Ltd. on account of 2004 Issuance of the 2034s (ISIN US922646BL74):**

  a.  For non-payment of principal due on December 6, 2018 as a result of the acceleration of the indebtedness: $20,288,000.

b. Interest on $20,288,000 of principal at the rate of 9.375% per annum computed starting July 13, 2020 through December 1, 2020, such interest being equal to $729,100.00.

c. For non-payment of six (6) due and unpaid biannual interest payments due on each of January 13, 2018, July 13, 2018, January 13, 2019, July 13, 2019, January 13, 2020, and July 13, 2020:

    i. For non-payment of an interest payment due on January 13, 2018, $951,000, plus interest thereon at the rate of 9% per annum simple interest starting from January 14, 2018, through December 1, 2020, such interest being equal to $246,921.29;

    ii. For non-payment of an interest payment due on July 13, 2018, $951,000, plus interest thereon at the rate of 9% per annum simple interest starting from July 14, 2018, through December 1, 2020, such interest being equal to $204,478.03;

    iii. For non-payment of an interest payment due on January 13, 2019, $951,000, plus interest thereon at the rate of 9% per annum simple interest starting from January 14, 2019, through December 1, 2020, such interest being equal to $161,331.29;

    iv. For non-payment of an interest payment due on July 13, 2019, $951,000, plus interest thereon at the rate of 9% per annum simple interest starting from July 14, 2019, through December 1, 2020, such interest being equal to $118,888.03;

     v. For non-payment of an interest payment due on January 13, 2020,

$951,000, plus interest thereon at the rate of 9% per annum simple interest

starting from January 14, 2020, through December 1, 2020, such interest

being equal to $75,741.29; and

     vi. For non-payment of an interest payment due on July 13, 2020, $951,000,

plus interest thereon at the rate of 9% per annum simple interest starting

from July 14, 2020, through December 1, 2020, such interest being equal

to $33,063.53.

    d. For coupon and prejudgment interest following December 1, 2020, $6,690.29 per

day until the date on which this judgment is entered on the docket of the Court;

and

3. **To Plaintiff LDO (Cayman) XVIII Ltd. on account of 2004 Issuance of the 2034s**

**(ISIN US922646BL74):**

    a. For non-payment of principal due on December 6, 2018 as a result of the

acceleration of the indebtedness: $9,197,000.

    b. Interest on $9,197,000 of principal at the rate of 9.375% per annum computed

starting July 13, 2020 through December 1, 2020, such interest being equal to

$330,517.19.

    c. For non-payment of six (6) due and unpaid biannual interest payments due on

each of January 13, 2018, July 13, 2018, January 13, 2019, July 13, 2019, January

13, 2020, and July 13, 2020:

     i. For non-payment of an interest payment due on January 13, 2018,

$431,109.38, plus interest thereon at the rate of 9% per annum simple

interest starting from January 14, 2018, through December 1, 2020, such interest being equal to $111,934.89;

ii. For non-payment of an interest payment due on July 13, 2018, $431,109.38, plus interest thereon at the rate of 9% per annum simple interest starting from July 14, 2018, through December 1, 2020, such interest being equal to $92,694.42;

iii. For non-payment of an interest payment due on January 13, 2019, $431,109.38, plus interest thereon at the rate of 9% per annum simple interest starting from January 14, 2019, through December 1, 2020, such interest being equal to $73,135.05;

iv. For non-payment of an interest payment due on July 13, 2019, $431,109.38, plus interest thereon at the rate of 9% per annum simple interest starting from July 14, 2019, through December 1, 2020, such interest being equal to $53,894.58;

v. For non-payment of an interest payment due on January 13, 2020, $431,109.38, plus interest thereon at the rate of 9% per annum simple interest starting from January 14, 2020, through December 1, 2020, such interest being equal to $34,335.20; and

vi. For non-payment of an interest payment due on July 13, 2020, $431,109.38, plus interest thereon at the rate of 9% per annum simple interest starting from July 14, 2020, through December 1, 2020, such interest being equal to $14,988.43; and

11

  d. For coupon and prejudgment interest following December 1, 2020, $3,032.86 per

   day until the date on which this judgment is entered on the docket of the Court;

   and

4. **To Plaintiffs jointly on account of out-of-pocket expenses due under Section 7 of**

**the Terms and Conditions of the 2004 Issuance of the 2034s (ISIN US922646BL74) as of the**

**date of the judgment:** $220,000; and

  **IT IS FURTHER ORDERED, ADJUDGED AND DECREED THAT:**

  Each Plaintiff and any of its successors or assigns; and anyone acting on its behalf,

including its officers, agents, servants, employees, trustees, beneficial owners, and attorneys; and

all persons and organizations acting in concert with any of them are hereby **PERMANENTLY**

**ENJOINED** from selling or otherwise transferring in any manner the securities or security

entitlements on which each Plaintiff has brought suit in this case identified as **ISIN**

**US922646BL74,** unless (i) such sale or transfer also includes the Plaintiff's corresponding

interest in this judgment, and (ii) the Plaintiff provides to the Republic through counsel of record

in this action three (3) calendar days' prior written notice of the settlement of any such sale or

transfer; and

  **IT IS FURTHER ORDERED, ADJUDGED AND DECREED THAT:**

  The Plaintiffs and any of their successors or assigns; and anyone acting on their behalf,

including their officers, agents, servants, employees, trustees, beneficial owners, and attorneys;

and all persons and organizations acting in concert with any of them, shall be bound by the terms

of the parties' Stipulation for Entry of Final Judgment and Permanent Injunction dated December

4, 2020; and

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED THAT:**

This Court shall retain non-exclusive jurisdiction over matters related to the enforcement

of this judgment.

Dated: New York, New York
      Dec. 7, 2020

                                        **SO ORDERED:**

                                        _Louis L. Stanton_
                                        **LOUIS L. STANTON**
                                        **United States District Judge**

# EXHIBIT 38

# FISCAL AGENCY AGREEMENT

Among

## THE REPUBLIC OF VENEZUELA

## BANCO CENTRAL DE VENEZUELA

and

## THE CHASE MANHATTAN BANK
*Fiscal Agent*

*Dated as of August 6, 1998*

## DEBT SECURITIES

DC_LAN01: 91108.4

## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| Parties | | | 1 |
| 1. | Securities Issuable in Series | | 1 |
|  | (a) | General | 1 |
|  | (b) | Authorization | 1 |
|  | (c) | Forms of Securities | 4 |
|  | (d) | Temporary Securities | 4 |
|  | (e) (i) | Originally Issued Bearer Securities | 5 |
|  | (ii) | Temporary Bearer Global Securities | 5 |
|  | (f) (i) | U.S. Book-Entry Provisions | 7 |
|  | (ii) | Offshore Book-Entry Provisions | 8 |
|  | (g) | Legends | 8 |
| 2. | Fiscal Agent; Other Agents | | 8 |
| 3. | Authentication | | 9 |
| 4. | Payment and Cancellation | | 10 |
|  | (a) | Payment | 10 |
|  | (b) | Withholding; Payment of Additional Amounts | 11 |
|  | (c) | Cancellation | 12 |
|  | (d) | Instructions of the Republic to Banco Central | 12 |
|  | (e) | References to Include Additional Amounts | 12 |
| 5. | Exchange of Securities | | 13 |
|  | (a) | General | 13 |
|  | (b) | Bearer and Registered Securities | 13 |
|  | (c) | Definitive Registered Global Securities | 13 |
|  | (d) | Definitive Bearer Global Securities | 15 |
| 6. | Register | | 15 |
| 7. | Sinking Fund and Optional Redemption | | 16 |
| 8. | Conditions of Fiscal Agent's Obligations | | 17 |
|  | (a) | Compensation and Indemnity | 17 |
|  | (b) | Agency | 17 |
|  | (c) | Advice of Counsel | 18 |
|  | (d) | Reliance | 18 |
|  | (e) | Interest in Securities, etc. | 18 |
|  | (f) | Non-Liability for Interest | 18 |
|  | (g) | Certifications | 18 |

Page

(h)    No Implied Obligations ................................... 19

9.    Resignation and Appointment of Successor ......................... 19
      (a)    Fiscal Agent and Paying Agent ........................... 19
      (b)    Resignation and Removal .............................. 20
      (c)    Successors ....................................... 20
      (d)    Acknowledgment ................................... 20
      (e)    Merger, Consolidation, etc. ........................... 20
      (f)    Separate Fiscal Agents ............................... 21

10.   Payment of Taxes ....................................... 21

11.   Meetings and Amendments ................................. 21
      (a)    Calling of Meeting, Notice and
             Quorum ........................................ 21
      (b)    Approval ....................................... 22
      (c)    Binding Nature of Amendments, Notices,
             Notations, etc. .................................. 23
      (d)    "Outstanding" Defined ............................. 24

12.   Governing Law ......................................... 25

13.   Notices ............................................... 25

14.   Waiver of Immunity; Consent to Jurisdiction;  Consent to
      Service; Proceedings in Venezuela .......................... 26

15.   Conversion of Currency .................................. 28

16.   Headings ............................................ 28

17.   Counterparts ......................................... 28

EXHIBIT A       Form of Registered Security

EXHIBIT B       Form of Bearer Security

EXHIBIT C       Form of Temporary Bearer Global Security

EXHIBIT D       Form of Certificate of Beneficial Ownership

EXHIBIT E       Form of Certificate to be given by the EUROCLEAR Operator or
                CEDEL BANK, *société anonyme*

EXHIBIT F       Form of Banco Central Undertaking

FISCAL AGENCY AGREEMENT, dated as of August 6, 1998, among THE REPUBLIC OF VENEZUELA (the "Issuer" or "Venezuela"), BANCO CENTRAL DE VENEZUELA, as official financial agent of Venezuela, ("Banco Central") and THE CHASE MANHATTAN BANK, a banking corporation duly organized and existing under the laws of New York, as Fiscal Agent.

1.  Securities Issuable in Series.

(a) General. Venezuela may issue its notes, bonds, debentures and/or other unsecured evidences of indebtedness (the "Securities") in separate series from time to time (each such series of Securities being hereinafter referred to as a "Series" or the "Securities of a Series"). All Securities will be unsecured (subject to the provisions in the Securities providing for the securing of such obligations in the event certain other obligations of Venezuela are secured), direct, unconditional and general obligations of Venezuela for money borrowed and each Series will rank pari passu without any preference among themselves. The payment obligations under the Securities will at all times rank at least equally with all other payment obligations of Venezuela relating to External Public Debt (as defined in the Securities) of Venezuela. The full faith and credit of Venezuela will be pledged for the due and punctual payment of all Securities and for the due and timely performance of all obligations of Venezuela in respect thereof. The aggregate principal amount of the Securities of all Series which may be authenticated and delivered under this Agreement and which may be outstanding at any time is not limited by this Agreement.

(b) Authorization. The Securities of a Series delivered to the Fiscal Agent (as defined in Section 2 hereof) for authentication on original issuance pursuant to Section 3 hereof shall be authorized by Venezuela in a certificate (an "Authorization") executed by the Minister of Finance, the Director General of the Ministry of Finance, the Director General of Public Finance of the Ministry of Finance or another person duly authorized to deliver an Authorization by one of the foregoing and shall establish and, subject to Section 3 hereof, shall set forth or prescribe the manner for determining:

(i)     Designation: the designation of the Securities of such Series (which shall distinguish the Securities of such Series from all other Series);

(ii)    Aggregate Principal Amount: any limit upon the aggregate principal amount of the Securities of such Series which may be authenticated and delivered under this Agreement (except for Securities authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Securities of such Series pursuant to the provisions of this Agreement or the Securities of such Series);

(iii)   Registered/Bearer Form: whether the Securities of such Series shall be in registered form without interest coupons or in bearer form with or without interest coupons, or both, and the terms upon which Securities of such Series in one form may be exchanged for Securities of such Series in another form, if at all;

(iv)    Temporary Global Securities: whether Securities of such Series in registered form and/or bearer form shall initially be represented in whole or in part, by one or more temporary global Securities, the date, or the manner of

determination of such date, prior to which interests in any such temporary global Security may not be exchanged for definitive Securities of such Series (each an "Exchange Date") and the extent to which and the manner in which any interest on such temporary global Security may be paid;

(v) **Book Entry:** whether the definitive Securities of such Series in registered form and/or bearer form shall be represented by one or more definitive global Securities to be deposited with a depositary, and the terms upon which such definitive global Securities may be exchanged for Securities of such Series not in global form, if at all;

(vi) **Payment Dates, etc.:** the date or dates on which the principal of (and premium, if any, on) and the interest on (and Additional Amounts, if any) the Securities of such Series is payable and the record dates, if any, for the determination of holders of the Securities of such Series to whom such principal (and premium, if any) is payable;

(vii) **Interest Rates, etc.:** the rate or rates at which the Securities of such Series shall bear interest, if any, or the manner in which such rate or rates will be determined (including any provisions for the increase or decrease of such rate or rates upon the occurrence of specified events), the date or dates from which any such interest shall accrue, the interest payment dates on which such interest shall be payable and the record dates, if any, for the determination of holders of the Securities of such Series to whom any such interest is payable;

(viii) **Payment Places:** the place or places where the principal of (and premium, if any) and any interest on the Securities of such Series is payable, where any Securities of such Series in registered form may be surrendered for registration of transfer, where Securities of such Series may be surrendered for exchange and where notices and demands to or upon the Issuer in respect of the Securities of such Series may be served;

(ix) **Optional Redemption Features:** the price or prices at which, the period or periods within which and the terms and conditions upon which Securities of such Series may be redeemed, whether in whole or in part, at the option of the Issuer or otherwise;

(x) **Special Redemption Features:** the obligation (which may be fixed or contingent upon events), if any, of the Issuer to redeem, purchase or repay Securities of such Series pursuant to any sinking fund or analogous provisions or at the option of the holder thereof and the price or prices at which and the period or periods within which (or the manner in which such price or prices or period or periods will be determined) and the terms and conditions upon which Securities of such Series shall be redeemed, purchased or repaid, in whole or in part, pursuant to such obligation;

(xi) **Denomination:** the denomination or denominations in which Securities of such Series shall be issuable and transferable or exchangeable;

(xii)   <u>Covenants</u>:  if other than as set forth in the forms of Securities attached hereto as Exhibits A, B and/or C, all covenants or agreements of the Issuer and any events which give rise to the right of the holder of a Security of such Series to accelerate the maturity of such Security;

(xiii)  <u>Special Principal Repayment Features</u>:  if other than all of the principal amount thereof, the portion of the principal amount of Securities of such Series which shall be payable upon acceleration of maturity, or otherwise, or the manner in which such portion will be determined;

(xiv)   <u>Foreign Currency Features</u>:  the coin or currency or composite currency in which principal of (and premium, if any) and any interest are payable, or the manner in which such coin, currency or composite currency will be determined; and if the principal of (or premium, if any) or interest on the Securities of such Series are to be payable, at the election of the Issuer or a holder thereof, in a currency or currencies, including composite currencies, other than that or those in which the Securities are stated to be payable, the currency or currencies in which payment of the principal of (or premium, if any) or interest on Securities of such Series as to which such election is made shall be payable, and the periods within which and the terms and conditions upon which such election is to be made;

(xv)    <u>Index Features</u>:  if the amount of payments of principal of (or premium, if any) or interest on Securities of such Series is to be determined by reference to an index, the manner in which such amounts shall be determined;

(xvi)   <u>Special Payment Features</u>:  the person to whom any interest on any registered Security of such Series shall be payable if other than the person in whose name such Security (or one or more predecessor Securities) is registered at the close of business on the record date for such interest and the manner in which, or the person to whom, any interest on any bearer Security of such Series shall be payable if otherwise than upon presentation and surrender of the coupons appertaining thereto as they severally mature;

(xvii)  <u>Additional Amounts</u>:  if other than as set forth in the forms of Securities attached hereto as Exhibits A, B and/or C, the obligation, if any, of the Issuer to pay additional amounts in respect of principal of (and premium, if any) and any interest on Securities of such Series, and the circumstances under which any such obligation shall arise;

(xviii) <u>Legends</u>:  whether any legends shall be stamped or imprinted on any Securities of such Series, and the terms and conditions upon which any such legends may be removed;

(xix)   <u>Certifications</u>:  whether any certifications by purchasers or holders of the Securities of such Series should be required, and the form thereof if other than in substantially the form of Exhibits D or E hereto;

(xx)    <u>Other Terms</u>:  any other terms of the Securities of such Series; and

(xxi)   Form of Securities: the form of the Securities of such Series if other than in substantially the form of Exhibits A, B and/or C hereto.

Each Authorization shall be delivered to the Fiscal Agent and copies thereof shall be held on file and available for inspection at the corporate trust office of the Fiscal Agent in The City of New York, and in the offices of any Paying Agents (as referred to below) for the Securities of the Series to which the Authorization relates.

(c)   Forms of Securities.  The Securities of a Series to be issued in registered form without coupons ("registered Securities") will be issuable in substantially the form of Exhibit A hereto or such other form as shall be established pursuant to an Authorization and in the denominations specified in such Authorization. The Securities of a Series, if any, to be issued in bearer form, with or without interest coupons attached ("bearer Securities"), will be issuable in substantially the form of Exhibit B hereto (or, in the case of a temporary bearer global security, in substantially the form of Exhibit C hereto) or such other form as shall be established pursuant to such Authorization and in the denominations specified in such Authorization. In this Agreement, (i) Securities which are not in temporary form are referred to as "definitive Securities" and Securities which are in temporary form are referred to as "temporary Securities", (ii) registered Securities which are not in temporary form are referred to as "definitive registered Securities" (unless such Securities are in global form, in which case they are referred to as "definitive registered global Securities") and registered Securities which are in temporary form are referred to as "temporary registered Securities" (unless such Securities are in global form, in which case they are referred to as "temporary registered global Securities") and (iii) bearer Securities which are not in temporary form are referred to as "definitive bearer Securities" (unless such Securities are in global form, in which case they are referred to as "definitive bearer global Securities") and bearer Securities which are in temporary form are referred to as "temporary bearer Securities" (unless such Securities are in global form, in which case they are referred to as "temporary bearer global Securities").

All Securities shall be executed manually or in facsimile on behalf of Venezuela by such official or officials of Venezuela as shall have been authorized by an Authorization (each, an "Authorized Official").  In case any person who shall have executed any Security shall thereafter cease to hold the office by virtue of which such person so executed such Security prior to the authentication and delivery thereof, such Securities may nevertheless be authenticated and delivered as though such person had not ceased to be an Authorized Official. The Securities of a Series (i) may have such additional provisions, omissions, variations or substitutions as are not inconsistent with the provisions of this Agreement or of an Authorization, and (ii) may have such letters, numbers or other marks of identification and such legends or endorsements not referred to in an Authorization placed thereon as may be required to comply with this Agreement, any law or with any rules made pursuant thereto or with the rules of any securities exchange or governmental agency or as may, consistently herewith, be determined necessary or advisable by the Authorized Officials executing such Securities, in each case (i) and (ii) as conclusively evidenced by their execution of such Securities. All Securities of a particular Series shall be otherwise substantially identical except as to denomination and as provided herein or in an Authorization.

(d)   Temporary Securities.  Until definitive Securities of a Series are prepared, the Issuer may (and, if an Authorization so requires, the Issuer shall) execute, and there shall be authenticated and delivered in accordance with the provisions of Section 3 hereof (in lieu of

definitive printed Securities of such Series), temporary Securities of such Series. Such temporary Securities may be in global form; provided, however, that any temporary Security in global form shall be in registered form unless delivered in compliance with the conditions set forth in Section 1(e) hereof. Such temporary Securities of a Series shall be subject to the same limitations and conditions and entitled to the same rights and benefits as definitive Securities of such Series, except as provided herein or therein. Unless otherwise provided herein or therein, temporary Securities of a Series shall be exchangeable for definitive Securities of such Series when such definitive Securities are available for delivery; and upon the surrender for exchange of temporary Securities of a Series which are so exchangeable, the Issuer shall execute and there shall be authenticated and delivered, in accordance with the provisions of Sections 5 and 6 hereof, in exchange for such temporary Securities of a Series, a like aggregate principal amount of definitive Securities (*provided that* such Securities have not been previously redeemed) of such Series of like tenor. The Issuer shall pay all charges, including (without limitation) stamp and other taxes and governmental charges, incident to any exchange of temporary Securities for definitive Securities. All temporary Securities shall be identified as such and shall describe the right of the holder thereof to effect an exchange for definitive Securities and the manner in which such an exchange may be effected.

(e)  (i)  Originally Issued Bearer Securities. This Section 1(e)(i) shall apply only to definitive bearer Securities, temporary bearer Securities and definitive bearer global Securities which are originally issued at the time of sale thereof.

The Issuer shall not deliver for original issuance at the time of sale thereof any definitive bearer Security, temporary bearer Security or definitive bearer global Security of any Series to the person entitled to physical delivery thereof (other than EUROCLEAR or CEDEL (each as defined below)) except upon delivery by such person to the Issuer of a certificate in substantially the form set forth in Exhibit D hereto and where the person entitled to physical delivery of such Securities is EUROCLEAR or CEDEL, only upon delivery to the Issuer of a certificate substantially in the Form set forth in Exhibit E hereto. Notwithstanding any other provision hereof or the Securities of a Series, no bearer Security of such Series may be mailed to or otherwise delivered to any location within the United States in connection with their sale during the restricted period (as defined in United States Treasury Regulations Section 1.163-5(c)(2)(i)(D)(7)).

(ii)  Temporary Bearer Global Securities.  This Section 1(e)(ii) shall apply only to temporary bearer global Securities delivered to a common depositary or its nominee (the "Common Depositary") for the benefit of Morgan Guaranty Trust Company of New York, Brussels office, as operator of the EUROCLEAR system ("EUROCLEAR"), or CEDEL BANK, *société anonyme* ("CEDEL"), except as otherwise may be provided in the Authorization.

If the Authorization relating to the Securities of a Series so provides, bearer Securities of such Series shall be issued initially in the form of a temporary bearer global Security in substantially the form of Exhibit C hereto or such other form as shall be established pursuant to such Authorization. The temporary bearer global Security of a Series will be exchangeable, as provided below, for definitive bearer or definitive registered Securities of such Series or, if such Authorization so provides, in the form of one or more definitive bearer global Securities or definitive registered global Securities, or any combination thereof specified or contemplated by such Authorization. The term "Securities of a Series" as used herein includes any temporary bearer global Security of such Series.

Any such temporary bearer global Security of a Series shall be executed by the Issuer and delivered to the Fiscal Agent, and the Fiscal Agent shall, upon the order of the Issuer, authenticate such temporary bearer global Security and shall deliver such temporary bearer global Security to the Common Depositary for the benefit of EUROCLEAR and CEDEL for credit to the respective accounts of the beneficial owners of Securities of such Series on the records of EUROCLEAR and CEDEL (or to such other accounts as they may direct).

Unless otherwise specified in an Authorization, the interest of a beneficial owner of Securities of a Series in the temporary bearer global Security of such Series shall be exchanged for an interest in one or more definitive bearer global Securities of such Series, when the account holder instructs EUROCLEAR or CEDEL, as the case may be, to request such exchange on his behalf and delivers to EUROCLEAR or CEDEL, as the case may be, a certificate in substantially the form set forth in Exhibit D hereto, copies of which certificates shall be available at the offices of EUROCLEAR, CEDEL and the Fiscal Agent. If an Exchange Date is specified in an Authorization relating to the Securities of a Series to be applicable to the Securities of such Series, no definitive Securities of such Series shall be exchanged pursuant to this Section 1(e)(ii) prior to such Exchange Date. Any exchange pursuant to this Section 1(e)(ii) shall be made free of charge to the beneficial owners of the temporary bearer global Security, except that a person receiving definitive Securities must bear the cost payable in advance to the Fiscal Agent of insurance, postage, transportation and the like in the event that such person does not take delivery of such definitive Securities in person at the offices of EUROCLEAR or CEDEL. Notwithstanding any other provision hereof or of the Securities of a Series, no bearer Security of such Series may be mailed to or otherwise delivered in connection with their sale during the restricted period (as defined in United States Treasury Regulations Section 1.163-5(c)(2)(i)(D)(7)) to a location within the United States.

On or after the applicable Exchange Date, or if no Exchange Date is specified in the Authorization relating to the Securities of a Series to be applicable to Securities of such Series, on or after the fortieth day following the date of original issuance of the Securities of such Series, the temporary bearer global Security of such Series shall be surrendered by the Common Depositary to the Fiscal Agent outside the United States, as the Issuer's agent, for purposes of the exchange of Securities described below. In the event the temporary bearer global Security of such Series is to be exchanged for one or more definitive bearer global Securities and/or definitive registered global Securities, following such surrender the Fiscal Agent shall authenticate and deliver such definitive Securities to the Common Depositary for the benefit of EUROCLEAR and CEDEL for credit to the respective accounts of the beneficial owners of Securities of such Series on the records of EUROCLEAR and CEDEL (or to such other accounts as they may direct), but only upon delivery by EUROCLEAR and CEDEL, as the case may be, to the Fiscal Agent of a certificate or certificates substantially in the form set forth in Exhibit E hereto. In the event the temporary bearer global Security of a Series is to be exchanged for one or more definitive bearer Securities and/or definitive registered Securities, following such surrender, upon the request of EUROCLEAR or CEDEL, acting on behalf of beneficial owners of Securities, the Fiscal Agent shall authenticate and deliver to EUROCLEAR or CEDEL, as the case may be, for the account of such owners, definitive bearer Securities or definitive registered Securities, or any combination thereof, as shall be specified by such owners, in exchange for the aggregate principal amount of the temporary bearer global Security of such Series beneficially owned by such owners, but only upon delivery by EUROCLEAR and CEDEL, as

the case may be, to the Fiscal Agent of a certificate or certificates substantially in the form set forth in Exhibit E hereto.

Upon any exchange of a portion of the temporary bearer global Security of a Series for definitive Securities of such Series, the temporary bearer global Security of such Series shall be endorsed to reflect the reduction of the principal amount evidenced thereby, whereupon its remaining principal amount shall be reduced for all purposes by the amount so exchanged. Until so exchanged in full, the temporary bearer global Security of a Series shall in all respects be entitled to the same benefits under this Agreement as definitive Securities of such Series authenticated and delivered hereunder, except that neither EUROCLEAR nor CEDEL nor the beneficial owners of the temporary bearer global Security of such Series shall be entitled to receive payment of interest thereon; provided that beneficial owners of the temporary bearer global Security of such Series, and EUROCLEAR or CEDEL on their behalf, shall be entitled to receive payment of interest in respect of the definitive global or bearer securities, as the case may be, in accordance with the terms of such Securities following delivery by the beneficial owners to EUROCLEAR or CEDEL, as the case may be, of a certificate substantially in the form set forth in Exhibit D hereto and delivery by EUROCLEAR or CEDEL to the Fiscal Agent of a certificate substantially in the form set forth in Exhibit E thereto.

(f)(i)  U.S. Book-Entry Provisions.  This Section 1(f)(i) shall apply only to definitive registered global Securities of a Series deposited with or on behalf of a depositary located in the United States (a "U.S. Depositary"), except as may otherwise be provided in an Authorization.

If the Issuer shall establish in an Authorization that the registered Securities of a Series are to be issued in whole or in part in the form of one or more definitive registered global Securities deposited with or on behalf of a U.S. Depositary, then the Issuer shall execute and the Fiscal Agent shall, in accordance with this Section 1(f)(i) and the Authorization with respect to such Series, authenticate and deliver one or more definitive registered global Securities that (i) shall be registered in the name of the U.S. Depositary for such global Security or Securities or the nominee of such U.S. Depositary, (ii) shall be delivered by the Fiscal Agent to such U.S. Depositary or pursuant to such U.S. Depositary's instruction and (iii) except as otherwise provided in such Authorization, shall bear a legend substantially to the following effect: "Unless this certificate is presented by an authorized representative of [insert name and address of the U.S. Depositary] to the Republic of Venezuela or its agent for registration of transfer, exchange or payment, and any certificate issued is registered in the name of [insert name of nominee of the U.S. Depositary] or such other name as requested by an authorized representative of [insert name of the U.S. Depositary] [and any payment is made to [insert name of nominee of the U.S. Depositary] or to such other entity as is requested by an authorized representative of [insert name of U.S. Depositary]], ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch the registered owner hereof, [insert name of nominee of the U.S. Depositary], has an interest herein".

Members of, or participants in, a U.S. Depositary ("Agent Members") shall have no rights under this Agreement with respect to any definitive registered global Security held on their behalf by a U.S. Depositary or under the global Security, and such U.S. Depositary may be treated by the Issuer, the Fiscal Agent, and any agent of the Issuer or the Fiscal Agent as the sole owner of such definitive registered global Security for all purposes

whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Fiscal Agent, or any agent of the Issuer or the Fiscal Agent, from giving effect to any written certification, proxy or other authorization furnished by a U.S. Depositary or impair, as between a U.S. Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any Security.

(ii)   Offshore Book-Entry Provisions. This Section 1(f)(ii) shall apply only to definitive bearer global Securities of a Series delivered to the Common Depositary for the benefit of EUROCLEAR and CEDEL, except as otherwise may be provided in an Authorization.

The provisions of the "Operating Procedures of the EUROCLEAR System" and the "Terms and Conditions Governing Use of EUROCLEAR" and the "Management Regulations" and "Instructions to Participants" of CEDEL, respectively, shall be applicable to definitive bearer global Securities of a Series delivered to the Common Depositary for the benefit of EUROCLEAR and CEDEL. Account holders or participants in EUROCLEAR and CEDEL shall have no rights under this Agreement with respect to any such definitive bearer global Securities delivered to the Common Depositary for the benefit of EUROCLEAR and CEDEL for credit to the respective accounts of such account holders or participants, and such Common Depositary may be treated by the Issuer, the Fiscal Agent, and any agent of the Issuer or the Fiscal Agent as the owner of any such definitive bearer global Securities for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Fiscal Agent, or any agent of the Issuer or the Fiscal Agent, from giving effect to any written certification, proxy or other authorization furnished by the Common Depositary or impair, as between the Common Depositary and its account holders or participants, the operation of customary practices governing the exercise of the rights of a holder of any Security.

(g)   Legends. Securities of a Series shall be stamped or otherwise be imprinted with such legends, if any, as are provided in an Authorization or pursuant to Section 1(c) hereof. Any legends so provided may be removed as provided in an Authorization or pursuant to Section 1(c) hereof.

2.   Fiscal Agent: Other Agents.

The Issuer hereby appoints The Chase Manhattan Bank, having a corporate trust office at 450 West 33rd Street, 15th Floor and a payment office at 450 West 33rd Street, 15th Floor (for payments, exchanges and transfers), each in The City of New York (together, the "Corporate Trust Office"), as fiscal agent of the Issuer in respect of the Securities upon the terms and subject to the conditions herein set forth, and The Chase Manhattan Bank hereby accepts such appointment. The Chase Manhattan Bank and any successor or successors as such fiscal agent qualified and appointed in accordance with Section 9 hereof, are herein called the "Fiscal Agent". The Fiscal Agent shall have the powers and authority granted to and conferred upon it in the Securities and hereby and such further powers and authority to act on behalf of the Issuer as may be mutually agreed upon by the Issuer and the Fiscal Agent. All of the terms and provisions with respect to such powers and authority contained in the Securities are subject to and governed by the terms and provisions hereof. The Fiscal Agent shall keep a copy of this Agreement available for inspection during normal business hours at its Corporate Trust Office.

The Issuer may, in its discretion, appoint one or more agents (a "Paying Agent" or "Paying Agents") for the payment (subject to applicable laws and regulations) of the principal of (and premium, if any) and any interest on the Securities of a Series, and one or more agents (a "Transfer Agent" or "Transfer Agents") for the transfer and exchange of Securities of a Series, at such place or places as the Issuer may determine; provided, however, that for so long as any Securities of such Series are listed on the Luxembourg Stock Exchange or the stock exchange of Hong Kong Limited, and such Exchange shall so require, the Issuer shall maintain a Paying Agent in Luxembourg or Hong Kong, as the case may be; and provided, further, that, in the event Securities are issued in registered form, the Issuer shall at all times maintain a Paying Agent, Registrar and Transfer Agent in The City of New York (which Paying Agent and Transfer Agent may be, and initially shall be, the Fiscal Agent). The Issuer shall promptly notify the Fiscal Agent of the name and address of each Paying Agent and Transfer Agent appointed by it and of the country or countries in which a Paying Agent or Transfer Agent may act in that capacity, and will notify the Fiscal Agent of the resignation or termination of any Paying Agent or Transfer Agent. Subject to the provisions of Section 9(c) hereof, the Issuer may vary or terminate the appointment of any such Paying Agent or Transfer Agent at any time and from time to time upon giving not less than ninety days' notice to such Paying Agent or Transfer Agent, as the case may be, and to the Fiscal Agent. Notwithstanding the foregoing, if the Issuer issues bearer Securities of a Series, to the extent provided in the Securities of such Series, the Issuer shall maintain under appointment a Paying Agent or Paying Agents with respect to such Series outside the United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction (the "United States") for the payment of principal of (and premium, if any) and any interest on bearer Securities of such Series.

In respect of the Securities of a Series, the Issuer shall cause notice of any resignation, termination or appointment of any Paying Agent or Transfer Agent or of the Fiscal Agent and of any change in the office through which any such Agent will act to be given as provided in the text of the Securities of such Series.

3.   Authentication.

The Fiscal Agent is authorized, upon receipt of Securities of a Series duly executed on behalf of the Issuer for the purposes of the original issuance of Securities of such Series, (i) to authenticate the said Securities in an aggregate principal amount not in excess of the aggregate principal amount specified in the text of the Securities of such Series in accordance with an Authorization and to deliver the said Securities in accordance with the written order or orders of the Issuer signed on its behalf by any person authorized by or pursuant to an Authorization and (ii) thereafter to authenticate and deliver Securities of such Series in accordance with the provisions therein or hereinafter set forth. Each registered Security shall be dated the date of its authentication.

Notwithstanding the provisions of Section 1(b) and of the preceding paragraph, if all Securities of a Series are not to be originally issued at one time, it shall not be necessary to deliver an Authorization otherwise required pursuant to Section 1(b) or the order or orders otherwise required pursuant to such preceding paragraph at or prior to the time of authentication of each Security of such Series if such documents are delivered at or prior to the time of authentication upon original issuance of the first Security of such Series to be issued.

No Security shall be entitled to any benefit under this Agreement or be valid or obligatory for any purpose unless there appears on such Security a certificate of authentication executed by the Fiscal Agent or any authenticating agent by manual signature, and such certificate upon any Security shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder and is entitled to the benefit of this Agreement.

The Fiscal Agent may, with the written consent of the Issuer, appoint by an instrument or instruments in writing one or more agents (which may include itself) for the authentication of Securities of a Series and, with such consent, vary or terminate any such appointment upon written notice and approve any change in the office through which any authenticating agent acts. The Issuer (by written notice to the Fiscal Agent and the authenticating agent whose appointment is to be terminated) may also terminate any such appointment at any time. The Fiscal Agent hereby agrees to solicit written acceptances from the entities concerned (in form and substance satisfactory to the Issuer) of such appointments. In its acceptance of such appointment, each such authenticating agent shall agree to act as an authenticating agent pursuant to the terms and conditions of this Agreement.

4.   Payment and Cancellation.

(a) Payment. Unless otherwise agreed, subject to the following provisions, the Issuer shall provide to the Fiscal Agent, no later than 10:00 a.m. (New York City time), in immediately available funds on the business day in New York prior to each date on which a payment of principal of (or premium, if any) or any interest on the Securities of a Series shall become due, as set forth in the text of the Securities of such Series, such amount, in such coin or currency, as is necessary to make such payment, and the Issuer hereby authorizes and directs the Fiscal Agent from funds so provided to it to make or cause to be made payment of the principal of (and premium, if any) and any interest on, as the case may be, the Securities of such Series as set forth herein and in the text of such Securities. The Fiscal Agent shall arrange directly with any Paying Agent who may have been appointed by the Issuer pursuant to the provisions of Section 2 hereof for the payment from funds so paid by the Issuer of the principal of (and premium, if any) and any interest on the Securities of such Series as set forth herein and in the text of such Securities. Notwithstanding the foregoing, where an Authorization expressly so provides, the Issuer may provide directly to a Paying Agent funds for the payment of the principal thereof and premium and interest, if any, payable thereon under an agreement with respect to such funds containing substantially the same terms and conditions set forth in this Section 4(a) and in Section 8(b) hereof and shall so advise the Fiscal Agent in writing; and the Fiscal Agent shall have no responsibility with respect to any funds so provided by the Issuer to any such Paying Agent.

The Issuer will deliver to the Fiscal Agent by 10:00 a.m. (New York City time), two business days prior to each payment date an irrevocable confirmation (by tested telex or authenticated SWIFT MT 100 Message) of its intention to make such payment.

Any interest on registered Securities of a Series shall be paid, unless otherwise provided in the text of the Securities of such Series, to the persons (the "registered holders") in whose names such Securities are registered on the register maintained pursuant to Section 6 hereof at the close of business on the record dates designated in the text of

the Securities of such Series. Principal of (and premium, if any, on) registered Securities of a Series shall be payable against surrender thereof at the corporate trust office of the Fiscal Agent and at the offices of such other Paying Agents as the Issuer shall have appointed pursuant to Section 2 hereof, and payments of any interest on registered Securities of a Series shall be made, in accordance with the foregoing and subject to applicable laws and regulations, by check mailed on or before the due date for such payment to the person entitled thereto at such person's address appearing on the register of the Securities of such Series maintained pursuant to Section 6 hereof, or, in the case of payments of principal (and premium, if any), to such other address as the registered holder shall provide in writing at the time of such surrender; provided, however, that, if provided in the Authorization relating to the Securities of such Series, such payments may be made, in the case of a registered holder of greater than the aggregate principal amount of Securities of such Series specified in such Authorization, by transfer to an account denominated in the currency in which such payments are to be made maintained by the payee with a bank as specified in such Authorization if such registered holder so elects by giving written notice to the Fiscal Agent, not less than 15 days (or such fewer days as the Fiscal Agent may accept at its discretion) prior to the date of the payments to be obtained, of such election and of the account to which payment is to be made.

Any interest on bearer Securities of a Series shall be payable by check or wire transfer upon surrender of any applicable coupon, and principal of (and premium, if any, on) bearer Securities of such Series shall be payable by check or wire transfer upon surrender of such Securities, at such offices or agencies of the Fiscal Agent or any Paying Agent outside the United States as the Issuer may from time to time designate, unless the Issuer shall have otherwise instructed the Fiscal Agent in writing, or additionally or alternatively, in such other manner as may be set forth or provided for in the Securities of such Series. No such check which is mailed shall be mailed to an address in the United States, nor shall any transfer made in lieu of payment by check be made to an account maintained by the payee with a bank in the United States. Neither the Fiscal Agent nor any Paying Agent shall, and the Issuer shall not instruct the Fiscal Agent or any Paying Agent to, make such payments on bearer Securities of a Series at an office or agency located in the United States unless such payments are to be made in U.S. dollars and payment of the full amount so payable at each office of the Fiscal Agent and of each Paying Agent outside the United States appointed and maintained by the Issuer in accordance with Section 2 hereof is illegal or effectively precluded by reason of the imposition of exchange controls or other similar restrictions on the full payment or receipt of such amount in U.S. dollars.

If the Fiscal Agent pays out any amount due under the terms of the Securities on or after the due date thereof on the assumption that the corresponding payment for such amount has been or will be made by the Issuer and such payment has in fact not been so made by the Issuer prior to the time the Fiscal Agent makes such payment, then the Issuer shall on demand reimburse the Fiscal Agent for the relevant amount, and pay interest to the Fiscal Agent on such amount from the date on which such amount is paid out to the date of reimbursement at a rate per annum equal to the cost (to the Fiscal Agent) of funding the amount paid out, as certified by the Fiscal Agent and expressed as a rate per annum.

Interest on Securities of a Series in which the rate of interest is a fixed rate will be computed on a basis of a 360-day year of twelve 30-day months unless otherwise provided in the Authorization relating to Securities of such Series.

(b)  Withholding; Payment of Additional Amounts.  In respect of the Securities of each Series issued hereunder, at least 10 days prior to the first date of payment of interest (which, for purposes of this subsection (b), shall include accrued original issue discount) on the Securities of such Series and at least 10 days prior to each date, if any, of payment of principal (and premium, if any) or interest or other amount thereafter if there has been any change with respect to the matters set forth in the below-mentioned certificate, the Issuer will furnish the Fiscal Agent and each other Paying Agent with a certificate of an Authorized Official instructing the Fiscal Agent and each other Paying Agent whether such payment of principal of (and premium, if any) or any interest on such Securities shall be made without deduction or withholding for or on account of any tax, duty, assessment or other governmental charge. If any such deduction or withholding shall be required, then such certificate shall specify, by country, the amount, if any, required to be withheld or deducted on such payment to holders of such Securities or any coupon appertaining thereto, and the Issuer will pay to the Fiscal Agent (or, if applicable, directly to a Paying Agent or Agents) additional amounts, if any, required by the terms of such Securities to be paid. The Issuer agrees to indemnify the Fiscal Agent and each other Paying Agent for, and to hold them harmless against, any loss, liability or expense reasonably incurred without negligence or bad faith on their part arising out of or in connection with actions taken or omitted by them in reliance on any certificate furnished pursuant hereto.

(c)  Cancellation.  All Securities, together with all coupons appertaining thereto, delivered to the Fiscal Agent (or any other Agent appointed by the Issuer pursuant to Section 2 hereof) for payment, redemption, registration of transfer or exchange or for credit against any sinking fund payment as provided herein or in the Securities and all coupons paid through the application of interest installments (other than Securities and coupons delivered to the Fiscal Agent), shall be marked "cancelled" and, in the case of any other such Agent, forwarded to the Fiscal Agent by the Paying or Transfer Agent to which they are delivered. If any Security shall have been authenticated and delivered hereunder but never issued or sold by the Issuer thereof, the Issuer may deliver such Security to the Fiscal Agent for cancellation together with a written statement stating that such Security has never been issued and sold by the Issuer. All such Securities and coupons shall be cancelled and destroyed by the Fiscal Agent or such other person as may be jointly designated by the Issuer and the Fiscal Agent, and the Fiscal Agent or such other person shall thereupon furnish certificates of such destruction to the Issuer.

(d)  Instructions of the Republic to Banco Central.    The Issuer hereby irrevocably and unconditionally agrees that each payment to be made by the Issuer under this Agreement and the Securities shall be effected through Banco Central, and to that effect in connection with the issuance of each Series of Securities it shall instruct Banco Central to remit (as and to the extent provided in Section 2(a) of the form Banco Central Undertaking to be delivered in connection with each issuance of Securities, the form of which is attached hereto as Exhibit F) an amount equal to each payment of principal, interest (including Additional Amounts), or other amounts required to be paid by the Issuer for the benefit of the holders and the Paying Agents to the person, at the time and place, and in the manner provided in this Agreement and the Securities.  In this regard, the Issuer irrevocably and unconditionally agrees to deposit, from time to time, at Banco Central, in the accounts specially established for this purpose, the Bolivars required for each payment prior to the date such payment is required to be made and to deliver, in a timely manner, to Banco Central the authorizations (the "Orders") necessary for it to effect the required conversion of Bolivars into the currency in which the Securities are denominated.  The

Issuer agrees that no such deposit of funds with Banco Central shall be deemed to constitute payment to any holder or any Paying Agent of any amount payable to such holder or Paying Agent and further agrees that nothing in this Section or in the Banco Central Undertaking shall excuse any failure by the Issuer to pay any amount on the date such payment is required to be made by the Issuer by the terms of this Agreement and the Securities or otherwise affect an any way any of the rights of any holders or any Paying Agent. The Issuer agrees that, in the event that any payment required to be made by the Issuer hereunder or under any Security is not effected through Banco Central at or prior to the time such payment is required to be made by the terms of this Agreement and the Securities, it will effect such payment in accordance with the terms of this Section or the relevant provisions of such Security.

(e) _References to Include Additional Amounts._  All references in this Agreement to principal, premium and interest and other amounts payable in respect of Securities of a Series shall, unless the context otherwise requires, be deemed to mean and include all additional amounts, if any, payable in respect thereof as set forth herein or in the text of the Securities of such Series.

5. _Exchange of Securities._

(a) _General._  The Fiscal Agent, or its duly authorized agent, is hereby authorized from time to time in accordance with and subject to the provisions of the Securities and of this Agreement (including Section 3 hereof and this Section 5) to authenticate and deliver:

(i)  Securities of a Series in exchange for or in lieu of Securities of such Series of like tenor and form which become mutilated, defaced, destroyed, stolen or lost;

(ii)  registered Securities of a Series of authorized denominations in exchange for a like aggregate principal amount of registered Securities of such Series of like tenor and form;

(iii)  if bearer Securities of a Series are authorized to be issued, registered Securities of such Series in exchange for a like aggregate principal amount of bearer Securities of such Series of like tenor and form;

(iv)  if Securities of a Series are subject to partial redemption, Securities of a Series of authorized denominations in exchange for the unredeemed portion of any Securities of such Series redeemed in part only; and

(v)  if specifically so provided by the provisions of the Securities of a Series, Securities of such Series in exchange for Securities of another Series;

provided, however, that any definitive registered global Security shall be exchangeable only as provided in Sections 5(a)(i), 5(a)(iv) and 5(c) and any definitive bearer global Securities delivered to a Common Depositary shall be exchangeable only as provided in Sections 5(a)(i), 5(a)(iv) and 5(d).

(b) _Bearer and Registered Securities._  Bearer Securities may not be issued in exchange for registered Securities. All bearer Securities of a Series surrendered for exchange for other

Securities of such Series shall have attached thereto all unmatured coupons appertaining thereto. Unless otherwise provided in the applicable Authorization, bearer Securities shall be dated the date from which any interest on the Securities of such Series first begins to accrue. Registered Securities shall be dated the date of their authentication by the Fiscal Agent. Notwithstanding anything to the contrary herein contained, such Security authenticated and delivered upon any transfer or exchange for or in lieu of the whole or any part of any Security shall carry all the rights if any, to interest accrued and unpaid and to accrue which were carried by the whole or such part of such Security. Each new Security, if a registered Security, shall be so dated, and, if a bearer Security, shall have attached thereto such coupons, that neither gain nor loss in interest shall result from such transfer or exchange.

(c)   Definitive Registered Global Securities.  This Section 5(c) shall apply only to definitive registered global Securities deposited with a U.S. Depositary pursuant to Section 1(f)(i), unless otherwise provided in the Authorization.

A definitive registered global Security shall be exchangeable for definitive registered Securities of such Series if (x) the U.S. Depositary with respect to such definitive registered global Security notifies the Issuer that it is unwilling or unable to continue as U.S. Depositary for all global Securities or if at any time such U.S. Depositary ceases to be a clearing agency registered under the U.S. Securities Exchange Act of 1934, as amended, and a successor U.S. Depositary is not appointed by the Issuer within ninety days, (y) the Issuer delivers to the Fiscal Agent a written notice executed by Authorized Officials that all definitive registered global Securities shall be exchangeable or (z) an Event of Default (as defined in the terms and conditions of such Securities) has occurred and is continuing with respect to such Securities.

Unless the definitive registered global Security is presented by an authorized representative of the U.S. Depositary to the Issuer or its agent for registration of transfer, exchange or payment, and any certificate issued is registered in the name of a nominee of the U.S. Depositary and any payment is made to such nominee, any transfer, pledge or other use of the definitive registered global Security for value or otherwise shall be wrongful since the registered owner of the definitive registered global Security, the nominee of the U.S. Depositary, has an interest in the definitive registered global Security.

If the beneficial owners of interests in a definitive registered global Security are entitled to exchange interests for definitive registered Securities of such Series of another authorized form, as provided in the second preceding paragraph, then without unnecessary delay but in any event not later than the earliest date on which such interests may be so exchanged the Issuer shall deliver to the Fiscal Agent definitive registered Securities in aggregate principal or face amount equal to the principal or face amount of such definitive registered global Security executed by the Issuer. On or after the earliest date on which such interests may be so exchanged, such definitive registered global Security shall be surrendered by the U.S. Depositary to the Fiscal Agent, as the Issuer's agent for such purpose, to be exchanged, in whole or from time to time in part, for definitive registered Securities without charge and the Fiscal Agent shall authenticate and deliver, in exchange for each portion of such definitive registered global Security, an equal aggregate principal amount of definitive registered Securities of the same Series of authorized denominations and of like tenor as the portion of such definitive registered global Security to be exchanged; provided, however, that no such exchanges may occur during a period

beginning at the opening of business 15 days before any selection of Securities of such Series and like tenor to be redeemed and ending on the relevant date of redemption. Any definitive registered global Security that is exchangeable pursuant to this Section 5(c) shall be exchangeable for definitive registered Securities issuable in the denominations specified in the applicable Authorization and registered in such names as the U.S. Depositary that is the holder of such definitive registered global Security shall direct. If a definitive registered Security is issued in exchange for any portion of a definitive registered global Security after the close of business at the office or agency where such exchange occurs on any record date and before the opening of business at such office or agency on the relevant interest payment date, interest will not be payable on such interest payment date in respect of such definitive registered Security, but will be payable on such interest payment date only to the person to whom interest in respect of such portion of such definitive registered global Security is payable.

The U.S. Depositary may grant proxies and otherwise authorize any person, including Agent Members and persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Fiscal Agency Agreement or the Securities.

(d)  Definitive Bearer Global Securities.  This Section 5(c) shall apply only to definitive bearer global Securities delivered to a Common Depositary for EUROCLEAR or CEDEL pursuant to Section 1(f)(ii), unless otherwise provided in an Authorization.

If the beneficial owners of interests in a definitive bearer global Security are entitled to exchange such interests for definitive bearer Securities or definitive registered Securities of such Series, as provided in the Authorization, then without unnecessary delay but in any event not later than the fifteenth day prior to the earliest date on which such interests may be so exchanged the Issuer shall deliver to the Fiscal Agent definitive bearer Securities and/or definitive registered Securities in aggregate principal amount equal to the principal amount of such definitive bearer global Security. On or after the earliest date (if any) on which such interests may be so exchanged, such definitive bearer global Security shall be surrendered by the Common Depositary to the Fiscal Agent outside the United States, as the Issuer's agent for such purpose, to be exchanged, in whole or from time to time in part, for definitive bearer Securities and/or definitive registered Securities without charge and the Fiscal Agent shall authenticate and deliver, in exchange for each portion of such definitive bearer global Security, an equal aggregate principal amount of definitive bearer Securities and/or definitive registered Securities of the same Series of authorized denominations and of like tenor as the portion of such definitive bearer global Security in such combination thereof as shall be specified by the beneficial owner thereof and communicated to the Fiscal Agent through EUROCLEAR or CEDEL, and, if in registered form, registered in such name as may be specified by the beneficial owner thereof and so communicated to the Fiscal Agent; provided, however, that no such exchanges may occur during a period beginning at the opening of business 15 days before any selection of Securities of that Series and like tenor to be redeemed and ending on the relevant date of redemption; and provided, further, that no definitive bearer Security delivered in exchange for a portion of a definitive bearer global Security shall be mailed or otherwise delivered to any location in the United States. If a definitive registered Security is issued in exchange for any portion of a definitive bearer global Security after the close of business at the office or agency where such exchange occurs on any record date and before the opening of business at such office or agency on the relevant interest payment date, interest will not be payable on such interest payment

date in respect of such registered Security, but will be payable on such interest payment date only to the person to whom interest in respect of such portion of such definitive bearer global Security is payable.

So long as the Common Depositary is the registered owner of a definitive bearer global Security, such Common Depositary, as the case may be, will be considered the sole owner or holder of the Securities represented by such definitive bearer global Security for the purposes of receiving payment on the Securities, receiving notices and for all other purposes under this Agreement and the definitive bearer global Security. The Common Depositary may grant proxies and otherwise authorize any person, including EUROCLEAR and CEDEL and beneficial owners of the Securities, to take any action which a holder is entitled to take under this Fiscal Agency Agreement or the Securities. Beneficial interests in a definitive bearer global Security will be evidenced only by, and transfers thereof will be effected only through, records maintained by EUROCLEAR and CEDEL.

6.   Register.

The Fiscal Agent, as agent of the Issuer for this purpose, shall maintain at its corporate trust office in The City of New York, a register for each Series of Securities issued in whole or in part in registered form for the registration of Securities of such Series and the registration of transfers and exchanges thereof. Upon presentation for the purpose of registration or transfer or exchange at the said office of the Fiscal Agent of any registered Security of such Series, accompanied by a written instrument of transfer or exchange in the form approved by the Issuer and the Fiscal Agent (it being understood that, until notice to the contrary is given to holders of Securities of a Series, the Issuer and the Fiscal Agent shall each be deemed to have approved the form of instrument of transfer, if any, printed on any definitive registered Security of such Series), executed by the registered holder, in person or by such holder's attorney thereunto duly authorized in writing, such Security shall be transferred upon the register for the Securities of such Series, and a new registered Security of such Series and of like tenor shall be authenticated and issued in the name of the transferee; provided, however, that registered Securities may be delivered for the purpose of registration of transfer by mail at the risk and expense of the transferor. Transfers and exchanges of Securities of a Series shall be subject to such restrictions as shall be set forth in the text of the Securities of such Series and such reasonable regulations as may be prescribed by the Issuer. Successive registrations and registrations of transfers as aforesaid may be made from time to time as desired, and each such registration shall be noted on the Security register. No service charge shall be made for any registration, registration of transfer or exchange of the Securities of a Series unless otherwise provided by the provisions of the Securities of such Series, but, except as otherwise provided herein with respect to the exchange of temporary securities for definitive securities, the Fiscal Agent (and any Transfer Agent or authenticating agent appointed pursuant to Section 2 or 3 hereof, respectively) may require payment of a sum sufficient to cover any stamp or other tax or governmental charge in connection therewith and any other amounts required to be paid by the provisions of the Securities of such Series.

Any Transfer Agent appointed pursuant to Section 2 hereof shall provide to the Fiscal Agent such information as the Fiscal Agent may reasonably require in connection with the delivery by such Transfer Agent of Securities in exchange for other Securities.

Neither the Fiscal Agent nor any Transfer Agent shall be required to make registrations of transfer or exchange of Securities of a Series during any periods set forth in the text of the Securities of such Series in which such transfer or exchange is prohibited.

### 7.   Sinking Fund and Optional Redemption.

The Issuer hereby authorizes and directs the Fiscal Agent to administer the sinking fund with respect to the Securities of any Series having a mandatory sinking fund or similar provision in accordance with the provisions set forth in the text of the Securities of such Series. In the event that the provisions of the Securities of a Series permit the Issuer to redeem Securities of such Series at its option, the Issuer shall, unless otherwise provided in the text of the Securities of such Series, give written notice to the Fiscal Agent of the principal amount of Securities of such Series to be so redeemed not less than 60 days prior to the optional redemption date and, if earlier, no later than 15 days prior to the date on which notice is required to be given to holders of the Securities of such Series pursuant to the following sentence (or such shorter period as may be acceptable to the Fiscal Agent). All notices of redemption of the Securities of a Series shall be made in the name and at the expense of the Issuer and shall be given in accordance with the provisions applicable thereto set forth in the Authorization relating to or the text of the Securities of such Series. In the event that the provisions set forth in the Authorization or in the text of the Securities of a Series permit the Issuer to redeem Securities of such Series only upon the occurrence or satisfaction of a condition or conditions precedent thereto, prior to the giving of notice of redemption of the Securities of such Series, the Issuer shall deliver to the Fiscal Agent a certificate of an Authorized Official stating that the Issuer is entitled to effect such redemption and setting forth in reasonable detail a statement of facts showing that such condition or conditions precedent have occurred or been satisfied. In the event that the provisions of the Securities of a Series permit the holders thereof, at their option, to cause the Issuer to redeem such Securities, the Issuer shall, as contemplated by Section 4 hereof, arrange with the Fiscal Agent (and each Paying Agent for the purpose, if applicable) for the provision of funds sufficient to make payments to such holders in respect of such redemptions, and the Fiscal Agent shall provide to the Issuer from time to time reasonably detailed information as to such redemptions.

Whenever less than all the Securities of a Series at any time outstanding are to be redeemed at the option of the Issuer, the particular Securities of such Series to be redeemed shall be selected not more than 60 days prior to the redemption date by the Fiscal Agent from the Outstanding Securities of such Series not previously called for redemption, in the case of bearer Securities of such Series, individually by lot (unless all bearer Securities are subject to such redemption) and, in the case of registered Securities of such Series, by such usual method as the Fiscal Agent shall deem fair and appropriate, which method may provide for the selection for redemption of portions of the principal amount of registered Securities of such Series the minimum denominations of which, if any, will be specified in the text of the Securities of such Series. Upon any partial redemption of a registered Security of a Series, the Fiscal Agent shall authenticate and deliver in exchange therefor one or more registered Securities of such Series, of any authorized denomination and like tenor as requested by the holder thereof, in aggregate principal amount equal to the unredeemed portion of the principal of such Security.

8. <u>Conditions of Fiscal Agent's Obligations</u>.

The Fiscal Agent accepts its obligations set forth in this Agreement upon the terms and conditions hereof, including the following, to all of which the Issuer agrees and to all of which the rights of holders from time to time of Securities are subject:

(a) <u>Compensation and Indemnity</u>. The Fiscal Agent shall be entitled to compensation as agreed in writing with the Issuer for all services rendered by it, and the Issuer agrees promptly to pay such compensation and to reimburse the Fiscal Agent for the out-of-pocket expenses (including counsel fees) reasonably incurred by it in connection with its services hereunder after receipt of an itemized statement detailing such expenses. The Issuer also agrees to indemnify the Fiscal Agent for, and to hold it harmless against, any loss, damage, claim, liability or expense, including the reasonable and documented fees and expenses of counsel, incurred without gross negligence or bad faith, arising out of or in connection with its acting as Fiscal Agent hereunder, as well as the reasonable and documented costs and expenses of defending against any claim of liability in the premises. The obligations of the Issuer under this Section 8(a) shall survive payment of all the Securities or the resignation or removal of the Fiscal Agent.

(b) <u>Agency</u>. In acting under this Agreement and in connection with the Securities, the Fiscal Agent is acting solely as agent of the Issuer and does not assume any responsibility for the correctness of the recitals in the Securities (except for the correctness of the statement in its certificate of authentication thereon) or any obligation or relationship of agency or trust, for or with any of the owners or holders of the Securities or coupons, except that all funds held by the Fiscal Agent for the payment of principal of (and premium, if any) and any interest on the Securities shall be held in trust for such owners or holders, as the case may be, as set forth herein and in the Securities; <u>provided</u>, <u>however</u>, that monies held in respect of the Securities of a Series remaining unclaimed at the end of two years after the principal of all the Securities of such Series (and premium, if any) or such interest, as the case may be, shall have become due and payable (whether at maturity or otherwise) and monies sufficient therefor shall have been duly made available for payment shall, together with any interest made available for payment thereon, be repaid to the Issuer, as provided and in the manner set forth in the Securities of such Series. Upon such repayment, the aforesaid trust with respect to the Securities of such Series shall terminate and all liability of the Fiscal Agent and Paying Agents with respect to such funds shall thereupon cease.

(c) <u>Advice of Counsel</u>. The Fiscal Agent and any Paying Agent or Transfer Agent appointed by the Issuer pursuant to Section 2 hereof may consult with their respective counsel or other counsel satisfactory to them, and the written opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by them hereunder in good faith and without gross negligence and in accordance with such opinion.

(d) <u>Reliance</u>. The Fiscal Agent and any Paying Agent or Transfer Agent appointed by the Issuer pursuant to Section 2 hereof each shall be protected and shall incur no liability for or in respect of any action taken or thing suffered by it in reliance upon any Security or coupon, Authorization, notice, direction, consent, certificate,

affidavit, statement, or other paper or document believed by it, in good faith and without negligence, to be genuine and to have been passed or signed by the proper parties.

(e) <u>Interest in Securities, etc.</u>  The Fiscal Agent, any Paying Agent or Transfer Agent appointed by the Issuer pursuant to Section 2 hereof and their respective officers, directors and employees may become the owners of, or acquire any interest in, any Securities or coupons, with the same rights that they would have if they were not the Fiscal Agent, such Paying Agent or Transfer Agent or such other person, and may engage or be interested in any financial or other transaction with the Issuer, and may act as depositary, trustee or agent for, holders of Securities or coupons or other obligations of the Issuer, as freely as if they were not the Fiscal Agent, such Paying Agent or Transfer Agent or such other person.

(f) <u>Non-Liability for Interest.</u>  Except as expressly provided for in this Agreement, and subject to any agreement between the Issuer and the Fiscal Agent to the contrary, the Fiscal Agent shall not be under any liability for interest on monies at any time received by it pursuant to any of the provisions of this Agreement or of the Securities.

(g) <u>Certifications.</u>  Whenever in the administration of this Agreement the Fiscal Agent shall deem it necessary or desirable that a matter of fact be proved or established prior to taking, suffering or omitting any action hereunder, the Fiscal Agent (unless other evidence be herein specifically prescribed) may, in the absence of bad faith or gross negligence on its part, rely upon a certificate signed by any person authorized by or pursuant to an Authorization and delivered to the Fiscal Agent as to such matter of fact.

(h) <u>No Implied Obligations.</u>  The duties and obligations of the Fiscal Agent shall be determined solely by the express provisions of this Agreement, and the Fiscal Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Fiscal Agent. Nothing in this Agreement shall be construed to require the Fiscal Agent to advance or expend its own funds; <u>provided</u>, <u>however</u>, that the Fiscal Agent may not refuse or fail to perform any of its duties hereunder solely as a result of nonpayment by the Issuer of the Fiscal Agent's fees.

9.  <u>Resignation and Appointment of Successor.</u>

(a) <u>Fiscal Agent and Paying Agent.</u>  The Issuer agrees, for the benefit of the holders from time to time of the Securities of a Series, that there shall at all times be a Fiscal Agent hereunder which shall be a bank or trust company organized and doing business under the laws of the United States of America or the State of New York, in good standing and having an established place of business in The City of New York, and authorized under such laws to exercise corporate trust powers, and, to the extent required by the provisions of bearer Securities of such Series, if any, unless payments are permitted by the provisions of the fourth paragraph of Section 4(a) hereof to be made in the United States, a Paying Agent outside the United States for payment of principal of (and premium, if any) and any interest on such bearer Securities, until all the Securities of such Series authenticated and delivered

hereunder (i) shall have been delivered to the Fiscal Agent for cancellation or (ii) become due and payable and monies sufficient to pay the principal of (and premium, if any) and any interest on the Securities of such Series shall have been made available for payment and either paid or returned to the Issuer as provided herein and in such Securities.

(b)  Resignation and Removal.  The Fiscal Agent may at any time resign by giving written notice to the Issuer of such intention on its part, specifying the date on which its desired resignation shall become effective, provided that such date shall not be less than 60 days from the date on which such notice is given, unless the Issuer agrees to accept shorter notice. The Fiscal Agent hereunder may be removed at any time by the filing with it of an instrument in writing signed on behalf of the Issuer and specifying such removal and the date when it shall become effective. Notwithstanding the dates of effectiveness of resignation or removal, as the case may be, to be specified in accordance with the preceding sentences, such resignation or removal shall take effect only upon the appointment by the Issuer, as hereinafter provided, of a successor Fiscal Agent (which, to qualify as such, shall for all purposes hereunder be a bank or trust company organized and doing business under the laws of the United States of America or of the State of New York, in good standing and having and acting through an established place of business in The City of New York, and authorized under such laws to exercise corporate trust powers) and the acceptance of such appointment by such successor Fiscal Agent. Upon its resignation or removal, the Fiscal Agent shall be entitled to payment by the Issuer pursuant to Section 8 hereof of compensation for services rendered and reimbursement of out-of-pocket expenses incurred hereunder after receipt of an itemized statement detailing such expenses. If no successor Fiscal Agent is appointed and has accepted such appointment within 90 days of such resignation or removal, the Fiscal Agent may petition a court of proper jurisdiction to appoint a successor Fiscal Agent.

(c)  Successors.  In case at any time the Fiscal Agent or any Paying Agent in respect of the Securities of a Series (if such Paying Agent is the only Paying Agent located in a place where, by the terms of the Securities of such Series or this Agreement, the Issuer is required to maintain a Paying Agent) shall resign, or shall be removed, or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or shall file a voluntary petition in bankruptcy or make an assignment for the benefit of its creditors or consent to the appointment of a receiver of all or any substantial part of its property, or shall admit in writing its inability to pay or meet its debts as they severally mature, or if a receiver of it or of all or any substantial part of its property shall be appointed, or if an order of any court shall be entered approving any petition filed by or against it under the provisions of applicable receivership, bankruptcy, insolvency, reorganization or other similar legislation, or if a receiver of it or its property shall be appointed, or if any public officer shall take charge or control of it or of its property or affairs, for the purpose of rehabilitation, conservation or liquidation, a successor Fiscal Agent or Paying Agent, as the case may be, qualified as aforesaid, shall be appointed by the Issuer by an instrument in writing, filed with the successor Fiscal Agent or Paying Agent, as the case may be, and the predecessor Fiscal Agent or Paying Agent, as the case may be. Upon the appointment as aforesaid of a successor Fiscal Agent or Paying Agent, as the case may be, and acceptance by such successor of such appointment, the Fiscal Agent or Paying Agent, as the case may be, so succeeded shall cease to be Fiscal Agent or Paying Agent, as the case may be, hereunder. If no successor Fiscal Agent or other Paying Agent, as the case may be, shall have been so appointed by the Issuer and shall have accepted appointment as hereinafter provided, and, in the case of such other Paying Agent, if such other Paying Agent is the only Paying Agent

located in a place where, by the terms of the Securities of a Series or this Agreement, the Issuer is required to maintain a Paying Agent, then any holder of a Security who has been a bona fide holder of a Security for at least six months (which Security, in the case of such other Paying Agent, is of the Series referred to in this sentence), on behalf of himself and all others similarly situated, or the Fiscal Agent may petition any court of competent jurisdiction for the appointment of a successor agent; provided that the Issuer may, but shall not be required to, appear in any proceeding with respect to such petition; and provided, further, that (i) if the Issuer elects not to appear in such proceeding, such election shall constitute an irrevocable waiver of its right to contest in any forum by any means the determinations made in such proceeding and (ii) if the Issuer elects to appear in any such proceeding, such appearance shall not constitute a waiver of any immunity the Issuer may have or a submission to jurisdiction for purposes of any cross-claim, counterclaim, action, lawsuit or process. The Issuer shall give prompt written notice to each other Paying Agent of the appointment of a successor Fiscal Agent.

(d) Acknowledgment. Any successor Fiscal Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and to the Issuer an instrument accepting such appointment hereunder, and thereupon such successor Fiscal Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, trusts, immunities, duties and obligations of such predecessor with like effect as if originally named as Fiscal Agent hereunder, and such predecessor, upon payment of its compensation and reimbursement of its disbursements then unpaid, shall thereupon become obligated to transfer, deliver and pay over, and such successor Fiscal Agent shall be entitled to receive, all monies, securities, books, records or other property on deposit with or held by such predecessor as Fiscal Agent hereunder.

(e) Merger, Consolidation, etc. Any corporation into which the Fiscal Agent hereunder may be merged, or any corporation resulting from any merger or consolidation to which the Fiscal Agent shall be a party, or any corporation to which the Fiscal Agent shall sell or otherwise transfer all or substantially all the assets and business of the Fiscal Agent, provided that it shall be qualified as aforesaid, shall be the successor Fiscal Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f) Separate Fiscal Agents. The Issuer may appoint a separate fiscal agent for the Securities of any Series in addition to or in lieu of the Fiscal Agent or any other fiscal agent which is acting as such agent for the Securities of any other Series. Any such separate fiscal agent shall be a bank or trust company organized and doing business under the laws of the United States of America or of the State of New York, in good standing and having and acting through an established place of business in The City of New York, and authorized under such laws to exercise corporate trust powers. Any separate fiscal agent shall enter into an agreement with the Issuer under which such fiscal agent shall agree to act on substantially the terms applicable to the Fiscal Agent hereunder.

10. Payment of Taxes.

The Issuer will pay all stamp taxes and other duties, if any, which may be imposed by the Republic of Venezuela, the United States of America or any political subdivision thereof or taxing authority of or in the foregoing with respect to this Agreement or the issuance of the Securities.

11. <u>Meetings and Amendments</u>.

   (a) <u>Calling of Meeting, Notice and Quorum</u>.  A meeting of holders of Securities of a Series may be called at any time and from time to time to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Agreement or the Securities of such Series to be made, given or taken by holders of Securities of such Series or to modify, amend or supplement the terms of the Securities of such Series or this Agreement as hereinafter provided. The Issuer may at any time call a meeting of holders of Securities of any Series for any such purpose to be held at such time and at such place as the Issuer shall determine. Notice of every meeting of holders of Securities of any Series, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given as provided in the terms of the Securities of such Series, not less than 30 nor more than 60 days prior to the date fixed for the meeting (provided that, in the case of any meeting to be reconvened after adjournment for lack of a quorum, such notice shall be so given not less than 10 nor more than 60 days prior to the date fixed for such meeting). In case at any time the Issuer or the holders of at least 10% in aggregate principal amount of the Outstanding Securities (as defined in subsection (d) of this Section 11) of a Series shall, after the occurrence and during the continuance of any default under the Securities of such Series, have requested the Fiscal Agent to call a meeting of the holders of Securities of such Series for any purpose specified in the first sentence of this Section 11(a), by written request setting forth in reasonable detail the action proposed to be taken at such meeting, the Fiscal Agent shall call such meeting for such purposes by giving notice thereof.

   To be entitled to vote at any meeting of holders of Securities of any Series, a person shall be a holder of Outstanding Securities of such Series or a person duly appointed by an instrument in writing as proxy for such a holder. The persons entitled to vote a majority in principal amount of the Outstanding Securities of such Series shall constitute a quorum. In the absence of a quorum within 30 minutes of the time appointed for any such meeting, the meeting shall, if convened at the request of the holders, be dissolved. In any other case, the meeting may be adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment of such meeting. In the absence of a quorum at any such adjourned meeting, such adjourned meeting may be further adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment of such adjourned meeting. Notice of the reconvening of any adjourned meeting shall be given as provided in the preceding paragraph of this subsection (a), except that such notice need be given only once. Notice of reconvening of an adjourned meeting shall state expressly the percentage of the principal amount of the Outstanding Securities which shall constitute a quorum. Subject to the foregoing, at the reconvening of any meeting adjourned for a lack of a quorum, the persons entitled to vote 25% in principal amount of the Outstanding Securities of any Series shall constitute a quorum for the taking of any action set forth in the notice of the original meeting. Any meeting of holders of Securities of such Series at which a quorum is present may be adjourned from time to time by vote of a majority in principal amount of the Outstanding Securities represented at the meeting, and the meeting may be held as so adjourned without further notice.

   The Fiscal Agent may make such reasonable and customary regulations consistent herewith as it shall deem advisable for any meeting of holders of Securities of such Series with respect to the proof of the holding of Securities, the adjournment and chairmanship of such meeting, the appointment of proxies in respect of holders of Securities of such Series,

the record date for determining the registered holders of Securities of such Series who are entitled to vote at such meeting (which date shall be designated by the Fiscal Agent and set forth in the notice calling such meeting hereinabove referred to and which shall be not less than 15 nor more than 60 days prior to such meeting (provided that nothing in this paragraph shall be construed to render ineffective any action taken by holders of the requisite principal amount of Outstanding Securities of such Series on the date such action is taken), the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate. The Fiscal Agent shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Issuer or the holders of Securities of such Series as provided above, in which case the Issuer or the holders of Securities of such Series calling the meeting, as the case may be, shall in like manner appoint a temporary chairman. A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the persons entitled to vote a majority in principal amount of the Outstanding Securities represented and voting at the meeting. The chairman of the meeting shall have no right to vote, except as holder of Securities of such Series or proxy. A record, at least in duplicate, of the proceeding of each meeting of holders shall be prepared, and one such copy shall be delivered to the Issuer and another to the Fiscal Agent to be preserved by the Fiscal Agent.

(b) Approval. (i) At any meeting of holders of Securities of any Series duly called and held as specified above, upon the affirmative vote, in person or by proxy thereunto duly authorized in writing, of the lesser of (X) a majority in principal amount of the Outstanding Securities of such Series or (Y) the holders of not less than 66 2/3% in aggregate principal amount of the Securities of such Series then Outstanding represented at such meeting (or of such other percentage as may be set forth in the text of the Securities of such Series with respect to the action being taken), or (ii) with the written consent of the owners of not less than a majority in aggregate principal amount of the Securities of any Series then Outstanding (or of such other percentage as may be set forth in the text of the Securities of such Series with respect to the action being taken), the Issuer and the Fiscal Agent (and, in the case of the Banco Central Undertaking, with the agreement of Banco Central), upon agreement between themselves, may modify, amend or supplement the terms of the Securities of such Series or, insofar as respects the Securities of such Series, this Agreement or the Banco Central Undertaking, in any way, and the holders of Securities of such Series may make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Agreement or the Securities of such Series to be made, given or taken by holders of Securities of such Series; provided, however, that no such action may, without the consent or affirmative vote of the holder of each Security of such Series affected thereby, (A) change the due date for the payment of the principal of (or premium, if any) or any installment of interest on any Security of such Series, (B) reduce the principal amount of any Security of such Series, the portion of such principal amount which is payable upon acceleration of the maturity of such Security, the interest rate thereon or the premium payable upon redemption thereof, (C) change the coin or currency in which payment with respect to interest, premium or principal in respect of Securities of such Series is payable, (D) reduce the proportion of the principal amount of Securities of such Series the vote or consent of the holders of which is necessary to modify, amend or supplement this Agreement, the Banco Central Undertaking or the terms and conditions of the Securities of such Series or to make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided hereby or thereby to be made, taken or given, or (E) change the obligation of the Issuer to pay Additional Amounts, if any,

pursuant to the Securities of such Series. Any such modification, amendment or supplement shall be binding on the holders of Securities of such Series. The Issuer and the Fiscal Agent (and, in the case of the Banco Central Undertaking, with the agreement of Banco Central), upon agreement between themselves, without the vote or consent of any holder of Securities, may modify, amend or supplement this Agreement or the Securities of a Series for the purpose of (A) adding to the covenants of the Issuer for the benefit of the holders of the Securities of such Series, (B) surrendering any right or power conferred upon the Issuer, (C) securing the Securities of such Series pursuant to the requirements of such Securities or otherwise, (D) curing any ambiguity, or curing, correcting or supplementing any defective provision thereof or (E) amending this Agreement, the Banco Central Undertaking or the Securities of such Series in any manner which the Issuer and the Fiscal Agent may determine and shall not adversely affect the interest of any holder of Securities of such Series in any material respect.

It shall not be necessary for the vote or consent of the holders of Securities of a Series to approve the particular form of any proposed modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action, but it shall be sufficient if such vote or consent shall approve the substance thereof.

(c)  Binding Nature of Amendments, Notices, Notations, etc.  Any instrument given by or on behalf of any holder of a Security of a Series in connection with any consent to or vote for any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action will be irrevocable once given and will be conclusive and binding on all subsequent holders of such Security or any Security issued directly or indirectly in exchange or substitution therefor or in lieu thereof. Any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action will be conclusive and binding on all holders of Securities of such Series, whether or not they have given such consent or cast such vote or were present at any meeting, and whether or not notation of such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action is made upon the Securities of such Series. Notice of any modification or amendment of, supplement to, or request, demand, authorization, direction, notice, consent, waiver or other action with respect to the Securities of a Series or this Agreement (other than for purposes of curing any ambiguity or of curing, correcting or supplementing any defective provision hereof or thereof) shall be given to each holder of Securities affected thereby and then Outstanding, in all cases as provided in Securities of such Series.

Securities of a Series authenticated and delivered after the effectiveness of any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action may bear a notation in the form approved by the Fiscal Agent and the Issuer as to any matter provided for in such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action taken, made or given in accordance with Section 11(b) hereof. New Securities of such Series modified to conform, in the opinion of the Fiscal Agent and the Issuer, to any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action may be prepared by the Issuer, authenticated by the Fiscal Agent (or any authenticating agent appointed pursuant to Section 3 hereof) and delivered in exchange for Outstanding Securities of such Series.

(d) "Outstanding" Defined. For purposes of this Agreement and the Securities, any Security authenticated and delivered pursuant to this Agreement shall, as of any date of determination, be deemed to be "Outstanding", except:

(i)     Securities theretofore cancelled by the Fiscal Agent or delivered to the Fiscal Agent for cancellation and not reissued by the Fiscal Agent;

(ii)     Securities which have been called for redemption in accordance with their terms or which have become due and payable at maturity or otherwise and with respect to which monies sufficient to pay the principal thereof (and premium, if any) and any interest thereon shall have been paid or duly provided for; or

(iii)     Securities of a Series in lieu of or in substitution for which other Securities of such Series shall have been authenticated and delivered pursuant to this Agreement;

provided, however, that in determining whether the holders of the requisite principal amount of Outstanding Securities of a Series are present at a meeting of holders of Securities of such Series for quorum purposes or have consented to or voted in favor of any request, demand, authorization, direction, notice, consent, waiver, amendment, modification or supplement hereunder, (i) the principal amount of a Security which by its terms provides for an amount other than the stated face amount to be due and payable upon a declaration of acceleration of the maturity thereof or at stated maturity (a "Variable Principal Security") that shall be deemed to be Outstanding shall be either (A) the amount of the principal thereof that would be due and payable as of the date of such determination upon acceleration of the maturity thereof or (B) such other amount not in excess of the stated face amount, as may be specified in such Security, (ii) the principal amount of a Security denominated in a foreign currency or currencies shall be the U.S. dollar equivalent, determined on the date of original issuance of such Security, of the principal amount (or, in the case of a Variable Principal Security, the U.S. dollar equivalent, determined on the date of original issuance of such Security, of the amount determined as provided in (i) above) of such Security, and (iii) Securities of such Series owned directly or indirectly by the Issuer shall be disregarded and deemed not to be Outstanding.

12. Governing Law.

THIS AGREEMENT SHALL BE GOVERNED BY, AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. AUTHORIZATION AND EXECUTION OF THIS AGREEMENT BY THE ISSUER, HOWEVER, SHALL BE GOVERNED BY THE LAWS OF THE REPUBLIC OF VENEZUELA.

13. Notices.

All notices or communications hereunder, except as herein otherwise specifically provided, shall be in writing, shall specify this Agreement by name and date and shall identify the Securities to which such notices or communications relate, and if sent to the Fiscal Agent shall be delivered, or transmitted by facsimile or registered mail, first class postage prepaid, to it at 450 West 33rd Street, 15th Floor, New York, New York 10001, Facsimile No. (212) 946-8177 or (212) 946-8178, Attention: Global Trust Services,

International, or if sent to the Issuer shall be delivered or transmitted by hand, facsimile or reputable international courier, postage prepaid to it at:

> Ministerio de Hacienda de la Republica de Venezuela
> Direccion General Sectorial de Finanzas Publicas
> Esquina de Carmelitas
> Avenida Urdaneta
> Edificio del Ministerio de Hacienda
> Caracas, Venezuela
> Attention: Director de Credito Publico
> Telecopier: (582) 802-1893
> Telephone: (582) 802-1887

with a copy to

> Banco Central de Venezuela
> Esquina de Carmelitas
> Avenida Urdaneta
> Caracas 1010
> Venezuela
> Attention: Vice President of International Operations
> Telecopier:   (582) 837-373
> Telephone:   (582) 801-5352/801-5347/801-5088

The foregoing addresses for notices or communications may be changed by written notice given by the addressee to each party hereto, and the addressee's address shall be deemed changed for all purposes from and after the giving of such notice.

If the Fiscal Agent shall receive any notice or demand addressed to the Issuer by the holder of a Security, the Fiscal Agent shall promptly forward such notice or demand to the Issuer.

Notice to holders of Securities of a Series shall be given as provided in the terms of the Securities of such Series, provided, however, if the Fiscal Agent is requested to give notice in the name and at the expense of Venezuela it shall receive notice from Venezuela at least 15 days prior to the last date for notice to the holders.

14. Waiver of Immunity; Consent to Jurisdiction; Consent to Service; Proceedings in Venezuela.

(a)   The Issuer agrees that any suit, action or proceeding against it or its properties, assets or revenues with respect to this Agreement, any Security or a coupon appertaining thereto (a "Related Proceeding") shall be brought exclusively in the Supreme Court of the State of New York, County of New York; in the United States District Court for the Southern District of New York; in the courts of England that sit in London; or in the courts of Venezuela that sit in Caracas, as the person bringing such Related Proceeding may elect in its sole discretion, provided that if none of the courts specified above located in the country in which such person has elected to bring such Related Proceeding is a court that has jurisdiction of the subject matter or is otherwise competent under applicable law to hear

and determine such proceeding, such Related Proceeding may be brought in such other court located in such country as shall have jurisdiction of the subject matter or be otherwise competent under applicable law to hear and determine such Related Proceeding, or if such Related Proceeding seeks relief or a judgment that is enforceable only against any of its properties, assets or revenues that are subject to the jurisdiction of any other court located in the countries listed above and is limited to the value of such properties, assets or revenues, such Related Proceeding may be brought in any such court (all such courts described in this sentence being called herein "Specified Courts"). The Issuer also agrees that any judgment obtained in any of the Specified Courts arising out of any Related Proceeding may be enforced or executed in any Specified Court or any other court of competent jurisdiction whatsoever, and any judgment obtained in any such other court as a result of such enforcement or execution may be enforced or executed in any such other court of competent jurisdiction (all courts other than Specified Courts being herein called "Other Courts"), by means of a suit on the judgment or in any other manner provided by law. The Issuer hereby irrevocably submits to the exclusive jurisdiction of each of the Specified Courts for the purpose of any Related Proceeding and, solely for the purpose of enforcing or executing any judgment referred to in the preceding sentence (a "Related Judgment"), of each Specified Court and each Other Court. The Agreement made by the Issuer with respect to jurisdiction is made solely with respect to Related Proceedings and the enforcement or execution of Related Judgments and under no circumstances shall it be interpreted as a general agreement by the Issuer with respect to proceedings unrelated to this Agreement, any Security or a coupon appertaining thereto.

(b)    The Issuer agrees that service of all writs, process and summonses in any Related Proceeding or any suit, action or proceeding to enforce or execute any Related Judgment brought against it in the State of New York may be made upon the Consul General of the Republic of Venezuela or, in his or her absence or incapacity, any official of the Consulate of Venezuela, presently located at 7 East 51st Street, New York, New York 10022, U.S.A. (The "New York Process Agent"), and service of all writs, process and summonses in any Related Proceeding or any suit, action or proceeding to enforce or execute any Related Judgment brought against it in England may be made upon the person in charge of consular affairs at the Embassy of the Republic of Venezuela, presently located at One Cromwell Road, London SW7 2HW, England (the "London Process Agent" and, together with the New York Process Agent, the "Process Agents"), and the Issuer irrevocably appoints each Process Agent as its agent to receive such service of any and all such writs, process and summonses, and agrees that the failure of any of the Process Agents to give any notice to it of any such service of process shall not impair or affect the validity of such service or of any judgment based thereon. The Issuer agrees to maintain at all times an agent with offices in New York to act as its New York Process Agent, and an agent with offices in London to act as its London Process Agent as aforesaid (each such agent to be appointed by an irrevocable power of attorney hereto granted before a Venezuelan notary public). Nothing herein shall in any way be deemed to limit the ability to serve any such writs, process or summonses in any other manner permitted by applicable law.

(c)    The Issuer irrevocably consents to and waives any objection which it may now or hereafter have to the laying of venue of any Related Proceeding brought in any of the Specified Courts or to the laying of venue of any suit, action or proceeding brought solely for the purpose of enforcing or executing any Related Judgment in any of the Specified Courts or Other Courts, and further irrevocably waives, to the fullest extent it may

effectively do so, the defense of an inconvenient forum to the maintenance of any Related Proceeding or any such suit, action or proceeding in any such court.

(d)   To the extent that the Issuer or any of its revenues, assets or properties shall be entitled, with respect to any Related Proceeding at any time brought against the Issuer or any of its revenues, assets or properties in any jurisdiction in which any Specified Court is located, or with respect to any suit, action or proceeding at any time brought solely for the purpose of enforcing or executing any Related Judgment in any jurisdiction in which any Specified Court or Other Court is located, to any immunity from suit, from the jurisdiction of any such court, from attachment prior to judgment, from attachment in aid of execution of judgment, from execution of a judgment or from any other legal or judicial process or remedy, and to the extent that in any such jurisdiction there shall be attributed such an immunity, the Issuer irrevocably agrees not to claim and irrevocably waives such immunity to the fullest extent permitted by the laws of such jurisdiction (including, without limitation, the Foreign Sovereign Immunities Act of 1976 of the United States) and consents generally for the purposes of the State Immunity Act of 1978 of the United Kingdom to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment, provided that such agreement and waiver, insofar as it relates to any jurisdiction other than a jurisdiction in which a Specified Court is located, is given solely for the purpose of enabling the Fiscal Agent, any Paying Agent or any holder to enforce or execute a Related Judgment.  In addition, to the extent that the Issuer or any of its revenues, assets or properties shall be entitled, in any jurisdiction, to any immunity from set-off, banker's lien or any similar right or remedy, and to the extent that there shall be attributed, in any jurisdiction, such an immunity, the Issuer hereby irrevocably agrees not to claim and irrevocably waives such immunity to the fullest extent permitted by the laws of such jurisdiction with respect to any claim, suit, action, proceeding, right or remedy arising out of or in connection with this Agreement, any Security or a coupon appertaining thereto.

15.  Conversion of Currency.

The Issuer agrees that, if a judgment or order given or made by any Specified Court or Other Court for the payment of any amount in respect of any Security is expressed in a currency (the "judgment currency") other than the currency in which such Security is denominated (the "denomination currency"), the Issuer will pay any deficiency arising or resulting from any variation in rates of exchange between the date as of which the amount in the denomination currency is notionally converted into the amount in the judgment currency for the purposes of such judgment or order and the date of actual payment thereof. This obligation will constitute a separate and independent obligation from the other obligations under the Securities, will give rise to a separate and independent cause of action, will apply irrespective of any waiver or extension granted from time to time and will continue in full force and effect notwithstanding any judgment or order for a liquidated sum or sums in respect of amounts due in respect of the relevant Security or under any such judgment or order. The term "rates of exchange" shall include any premiums and costs of exchange payable in connection with the purchase of or conversion into the denomination currency.

16.  Headings.

The section headings herein are for convenience only and shall not affect the construction hereof.

**17. Counterparts.**

This Agreement may be executed in any number of counterparts, each of which, when so executed shall be deemed to be an original but all such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Fiscal Agency Agreement as of the date first above written.

THE REPUBLIC OF VENEZUELA

By _____
    Name:
    Title:

BANCO CENTRAL DE VENEZUELA,
as Official Financial Agent of the
Republic of Venezuela

By _____
    Name:
    Title:

THE CHASE MANHATTAN BANK

By _____
    Name:
    Title:

EXHIBIT D*

[FORM OF CERTIFICATE OF BENEFICIAL OWNERSHIP]

CERTIFICATE

REPUBLIC OF VENEZUELA

[TITLE OF SECURITIES]

This is to certify that as of the date hereof, [and except as set forth below,]** the above-captioned Securities [held by you for our account]** [to be acquired from you]*** (i) are owned by person(s) that are not citizens or residents of the United States, domestic partnerships, domestic corporations or any estate or trust the income of which is subject to United States Federal income taxation regardless of its source ("United States person(s)"), (ii) are owned by United States person(s) that (a) are foreign branches of United States financial institutions (as defined in U.S. Treasury Regulations Section 1.165-12(c)(1)(v)) ("financial institutions") purchasing for their own account or for resale, or (b) acquired the Securities through foreign branches of United States financial institutions and who hold the Securities through such United States financial institutions on the date hereof (and in either case (a) or (b), each such United States financial institution hereby agrees, on its own behalf or through its agent, that you may advise the Issuer that it will comply with the requirements of Section 165(j)(3)(A), (B) or (C) of the Internal Revenue Code of 1986, as amended, and the regulations thereunder), or (iii) are owned by United States or foreign financial institutions for purposes of resale during the restricted period (as defined in U.S. Treasury Regulations Section 1.163-5(c)(2)(i)(D)(7)) and, in addition, if the owner of the Securities is a United States or foreign financial institution described in clause (iii) above (whether or not also described in clause (i) or (ii)) this is to further certify that such financial institution has not acquired the Securities for purposes of resale directly or indirectly to a United States person or to a person within the United States or its possessions.

As used herein, "United States" means the United States of America (including the States and the District of Columbia); and its "possessions" include Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, Wake Island and the Northern Mariana Islands.

[We undertake to advise you by tested telex if the above statement is not correct on the date on which you intend to submit your certificate relating to such Securities to the

---

* For use in those instances where a definitive bearer Security, a temporary bearer Security, a temporary bearer global Security or a definitive bearer global Security is delivered in an Offshore Offering to non-U.S. persons at the time of sale thereof.

** To be included if the Certificate is being provided to EUROCLEAR or CEDEL BANK, société anonyme.

*** To be included if the Certificate is being provided directly to the Issuer.

DC_LAN01 911084

Fiscal Agent, and in the absence of any such notification it may be assumed that this certificate applies as of such date.]*

This certificate excepts and does not relate to $_____ of such interest in the above Securities in respect of which we are not able to certify and as to which we understand exchange and delivery of definitive Securities cannot be made until we do so certify.

We understand that this certificate is required in connection with certain tax laws of the United States. In connection therewith, if administrative or legal proceedings are commenced or threatened in connection with which this certificate is or would be relevant, we irrevocably authorize you to produce this certificate to any interested party in such proceedings.

Dated: _____, 199_

By: _____

    As, or as agent for, the
    beneficial owner(s) of the
    Notes to which this
    certificate relates.

---

*   To be included if the Certificate is being provided to Euroclear or CEDEL BANK, *société anonyme.*

EXHIBIT E

[FORM OF CERTIFICATE TO BE GIVEN
BY THE EUROCLEAR OPERATOR OR
CEDEL BANK, *société anonyme*]

CERTIFICATE

REPUBLIC OF VENEZUELA

[TITLE OF SECURITIES]

This is to certify that, based solely on certifications we have received in writing, by tested telex or by electronic transmission from member organizations appearing in our records as persons being entitled to a portion of the principal amount set forth below (our "Member Organizations") substantially to the effect set forth in the Fiscal Agency Agreement, as of the date hereof, _____ principal amount of the above-captioned Securities (i) is owned by persons that are not citizens or residents of the United States, domestic partnerships, domestic corporations or any estate or trust the income of which is subject to United States Federal income taxation regardless of its source ("United States persons"), (ii) is owned by United States persons that (a) are foreign branches of United States financial institutions (as defined in U.S. Treasury Regulations Section 1.165-12(c)(1)(v) ("financial institutions")) purchasing for their own account or for resale, or (b) acquired the Securities through foreign branches of United States financial institutions and who hold the Securities through such United States financial institutions on the date hereof (and in either case (a) or (b), each such United States financial institution has agreed, on its own behalf or through its agent, that we may advise the Issuer that it will comply with the requirements of Section 165(j)(3)(A), (B) or (C) of the Internal Revenue Code of 1986, as amended, and the regulations thereunder), or (iii) is owned by United States or foreign financial institutions for purposes of resale during the restricted period (as defined in U.S. Treasury Regulations Section 1.163-5(c)(2)(i)(D)(7)), and to the further effect that United States or foreign financial institutions described in clause (iii) above (whether or not also described in clause (i) or (ii)) have certified that they have not acquired the Securities for purposes of resale directly or indirectly to a United States person or to a person within the United States or its possessions.

As used herein, "United States" means the United States of America (including the States and the District of Columbia); and its "possessions" include Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, Wake Island and the Northern Mariana Islands.

We further certify (i) that we are not making available herewith for exchange (or, if relevant, exercise of any rights or collection of any interest) any portion of the temporary global Security excepted in such certifications and (ii) that as of the date hereof we have not received any notification from any of our Member Organizations to the effect that the statements made by such Member Organizations with respect to any portion of the part submitted herewith for exchange (or, if relevant, exercise of any rights or collection of any interest) are no longer true and cannot be relied upon as of the date hereof.

We understand that this certification is required in connection with certain tax laws and, if applicable, certain securities laws of the United States. In connection therewith, if administrative or legal proceedings are commenced or threatened in connection with which this certification is or would be relevant, we irrevocably authorize you to produce this certification to any interested party in such proceedings.

Dated: _____, 199__

Yours faithfully,

MORGAN GUARANTY TRUST COMPANY OF NEW YORK,
Brussels office, as operator of the EUROCLEAR System

or

CEDEL BANK, société anonyme

By: _____

# EXHIBIT 39



# Certificate of Accuracy

| Original File Name(s) | Translated File Name(s) |
|---|---|
| AG [SPANISH].pdf | AG [ENGLISH].docx |
| AI [SPANISH].pdf | AI [ENGLISH].docx |
| AJ [SPANISH].pdf | AJ [ENGLISH].docx |
| AK [SPANISH].pdf | AK [ENGLISH].docx |
| AL [SPANISH].pdf | AL [ENGLISH].docx |
| Z [SPANISH].pdf | Z [ENGLISH].docx |

November 17, 2021

We, Trustpoint.One, hereby certify that to the best of our knowledge and belief the documents attached to this letter is are true and accurate translations of the original documents.

For all certified translations, Trustpoint.One follows an ISO 9001:2015 certified process. A fully vetted professional translator who is a native speaker of the target language and expert in the subject matter translates the documents. Thereafter, an equally qualified linguist edits the translations, which are then sent back to the lead translator for finalization. As a final step, the project manager and quality control specialist reviews the final translation for completeness.

*Elizabeth Wozniak*
Elizabeth Wozniak
Project Manager
Trustpoint.One

Trustpoint Translations, LLC
Three Gateway Center
401 Liberty Avenue
Pittsburgh, PA 15219
412.261.1101
translate.one

# EXHIBIT 40

## CERTIFICATE OF TRANSLATION

STATE OF TENNESSEE
SS:
COUNTY OF DAVIDSON

I, Waleska Rehbein, being first duly sworn on oath, depose and say that:

1. I am familiar with the Spanish and English Languages.
2. I have made the attached translation from the annexed document in the Spanish language and hereby certify that the same is a true and complete translation to the best of my ability, knowledge, and belief.

Waleska Rehbein
Telephone: 615-767-9221
339 Brewer Dr.  Nashville, TN 37211

ata MEMBER
American Translators Association   ID. 270762

State of: Tennessee
County of: Davidson

The foregoing instrument was acknowledged by
**Waleska Rehbein** who is known by me
or has produced TN Driver's Lisense as identification.

My Commission Expires: Jan 8, 2024

# EXHIBIT 41

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORPORATION, Plaintiff, v. BOLIVARIAN REPUBLIC OF VENEZUELA, Defendant. | C.A. No. 17-mc-00151-UNA |

## DECLARATION OF JASON MYATT

I, JASON MYATT, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am of counsel in the law firm of Gibson, Dunn & Crutcher LLP, which is counsel for Plaintiff and Judgment Creditor Crystallex International Corporation ("Crystallex") in the above-captioned action.

2.      I make this declaration in support of Plaintiff Crystallex International Corporation's Motion for an Order Authorizing the Issuance of a Writ of Attachment *Fieri Facias* Pursuant to 28 U.S.C. § 1610(c), dated August 14, 2017.

3.      I am providing notice of Plaintiff Crystallex International Corporation's Motion for an Order Authorizing the Issuance of a Writ of Attachment *Fieri Facias* Pursuant to 28 U.S.C. § 1610(c) to (a) PDV Holding, Inc. ("PDVH"), (b) Petróleos de Venezuela, S.A. ("PDVSA"), and (c) Defendant and Judgment Debtor Bolivarian Republic of Venezuela ("Venezuela"), respectively, by sending true and correct copies of the motion and all supporting documents via FedEx on August 14, 2017 to: (a) Kenneth J. Nachbar, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, DE 19899, counsel for

PDVH in *Crystallex Int'l Corp. v. Petróleos de Venezuela, S.A.*, C.A. No. 1:15-cv-01082-LPS
(D. Del. Nov. 23, 2015) ("*Crystallex I*") and *Crystallex Int'l Corp. v. PDV Holding, Inc.*, C.A.
No. 16-1007-LPS (D. Del. Oct. 28, 2016) ("*Crystallex II*"); (b) Nathan P. Eimer, Eimer Stahl
LLP, 224 S. Michigan Avenue, Suite 1100, Chicago, IL 60604, counsel for PDVH in *Crystallex
I* and *Crystallex II*; (c) PDV Holding, Inc., c/o its Registered Agent, Corporation Trust Company,
1209 Orange Street, Wilmington, DE 19801, PDVH's registered agent; (d) Samuel Taylor Hirzel
II, Heyman, Enerio, Gattuso & Hirzel LLP, 300 Delaware Avenue, Suite 200, Wilmington, DE
19801, counsel for PDVSA in *Crystallex I* and *Crystallex II*; (e) Joseph D. Pizzurro, Curtis,
Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178, counsel for
PDVSA in *Crystallex I* and *Crystallex II*; (f) Petróleos de Venezuela, S.A., Avenida. Libertador
con calle El Empalme, Complejo MinPetróleo – PDVSA, La Campiña, Caracas, Venezuela,
PDVSA's headquarters in Venezuela; (g) Peter R. Shults, Foley Hoag LLP, 155 Seaport Blvd.,
Boston, MA 02210, counsel for Venezuela in *Crystallex International Corporation v. Bolivarian
Republic of Venezuela*, No. 1:16-cv-00661-RC (D.D.C. Apr. 7, 2016) ("the D.C. Action");
(h) Lawrence H. Martin, Foley Hoag LLP, 1717 K Street, N.W., Washington, D.C. 20006,
counsel for Venezuela in the D.C. Action; (i) Dr. Ángelo Rivero Santos, Minister Counselor and
Chargé d'Affaires of the Bolivarian Republic of Venezuela, Embassy of Venezuela, 1099 30th
Street, N.W., Washington, DC 20007; and (j) Ministerio de Relaciones Exteriores, Avenida Sur
4, Caracas 1010, Distrito Capital, Venezuela.

    4.    Attached hereto as Exhibit 1 is Crystallex's Praecipe in support of its request that
the Clerk of the Court issue a writ of attachment *fieri facias* directed to PDVH.

    5.    Attached hereto as Exhibit 2 is Crystallex's proposed Writ of Attachment *Fieri
Facias* directed to PDVH.

6. Attached hereto as Exhibit 3 is a true and correct copy of 127 separate "tweets"— and, in some cases, responsive comments thereto from Twitter users—posted to the official Twitter account of PDVSA as retrieved from https://twitter.com/pdvsa, all dated July 17, 2017, each containing the phrase "#PDVSAesVenezuela."

7. Attached hereto as Exhibit 4 is an excerpt of a true and correct copy of the final award rendered by a Washington, D.C.-seated arbitral tribunal on April 4, 2016 in an arbitration between Crystallex and Venezuela pursuant to the Arbitration (Additional Facility) Rules of the International Centre for Settlement of Investment Disputes.

8. Attached hereto as Exhibit 5 is a true and correct copy of the Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, dated July 1, 1996.

9. Attached hereto as Exhibit 6 is a true and correct copy of the order issued by the District Court for the District of Columbia, dated March 25, 2017, granting Crystallex's petition to confirm its arbitral award.

10. Attached hereto as Exhibit 7 is a true and correct copy of the judgment that was entered against Venezuela in favor of Crystallex by the District Court for the District of Columbia, dated April 7, 2017 ("the Judgment").

11. Attached hereto as Exhibit 8 is a true and correct copy of the order issued by the District Court for the District of Columbia, dated June 9, 2017, granting Crystallex's motion for relief pursuant to 28 U.S.C. § 1610(c) and 28 U.S.C. § 1963.

12. Attached hereto as Exhibit 9 is a true and correct copy of the order issued by the District Court for the District of Columbia, dated August 8, 2017, denying Venezuela's motion to stay execution of the Judgment pending appeal.

13.     Attached hereto as Exhibit 10 is a true and correct copy of the registration of the Judgment in the Southern District of New York, dated June 15, 2017.

14.     Since registering the Judgment in the Southern District of New York on June 15, 2017, *see Crystallex International Corporation v. Bolivarian Republic of Venezuela*, No. 17-mc-00205-Pl (S.D.N.Y.), Crystallex has filed three *ex parte* applications before that Court pursuant to 28 U.S.C. § 1610(c) seeking authorization to restrain or execute on Venezuelan commercial property in the possession of banking insitutions in the United States. All three of these applications have been granted. First, Crystallex filed an *Ex Parte* Application for an Order Authorizing the Issuance of Restraining Notices Pursuant to 28 U.S.C. § 1610(c), directed to Nomura Securities International, Inc. and Nomura Bank International plc, which was granted on June 30, 2017. Crystallex next filed a second *Ex Parte* Application for an Order Authorizing the Issuance of Restraining Notices Pursuant to 28 U.S.C. § 1610(c), this time directed to Haitong International Securities (USA) Inc. and Haitong Securities USA LLC, which was granted on July 5, 2017. Crystallex then filed an *Ex Parte* Application for a Writ of Execution Pursuant to 28 U.S.C. § 1610(c), directed at assets held at the Bank of New York Mellon, which was granted on July 25, 2017.

15.     Attached hereto as Exhibit 11 is a true and correct copy of Official Gazette No. 1.769 issued by the Venezuelan Government, dated August 29, 1975, which created PDVSA pursuant to the Organic Law that Reserves the Hydrocarbons Industry and Commerce ("Nationalization Law"), along with a certified English translation of the relevant portion of the same.

16.     Attached hereto as Exhibit 12 is a true and correct copy of Official Gazette No. 1.770 issued by the Venezuelan Government on August 30, 1975, which mandated the creation of PDVSA, along with a certified English translation of the relevant portion of the same.

17.     Attached hereto as Exhibit 13 is a true and correct copy of Official Gazette No. 38.081 issued by the Venezuelan Government, dated December 7, 2004, which adopts PDVSA's Articles of Incorporation, directs PDVSA to "comply with and implement the policy on hydrocarbons enacted by the National Executive Branch," and calls for PDVSA's Board of Directors, President, Vice Presidents, and Shareholder Council to be appointed by Executive Order of the President, along with a certified English translation of the relevant portion of the same.

18.     Attached hereto as Exhibit 14 is a true and correct copy of Official Gazette No. 6.147 issued by the Venezuelan Government, dated November 17, 2014, enacting the Public Administration Organic Law ("LOAP"), along with a certified English translation of the relevant portion of the same.

19.     Attached hereto as Exhibit 15 is a true and correct copy of Official Gazette No. 5.908 issued by the Venezuelan Government, dated February 19, 2009, which contains Venezuela's Constitution mandating Venezuela to retain all shares of PDVSA "[f]or reasons of economic and political sovereignty and national strategy," along with a certified English translation of the relevant portion of the same.

20.     Attached hereto as Exhibit 16 is a true and correct copy of a decision of the Supreme Tribunal of Justice – Constitutional Chamber of Venezuela, dated October 25, 2016, along with a certified English translation of an excerpt of the relevant portion of the same.  The

decision recognizes the "importance of PDVSA from the economic, social and constitutional viewpoint."

21.    Attached hereto as Exhibit 17 is a true and correct copy of Decision No. 464 of the Supreme Tribunal of Justice – Constitutional Chamber of Venezuela, dated March 18, 2002, along with a certified English translation of an excerpt of the relevant portion of the same. The decision recognizes that "there is no doubt" that PDVSA "falls within the framework of the general structure of [the] National Public Administration."

22.    Attached hereto as Exhibit 18 is a true and correct copy of Decision No. 281 of the Supreme Tribunal of Justice – Constitutional Chamber of Venezuela, dated February 26, 2007, along with a certified English translation of an excerpt of the relevant portion of the same. The decision recognizes that PDVSA enjoys the "privileges" of the Venezuelan State.

23.    Attached hereto as Exhibit 19 is a true and correct copy of Official Gazette No. 6.284 issued by the Venezuelan Government, dated January 29, 2017, which announces Venezuelan President Nicolás Maduro's appointments of new directors at PDVSA, along with a certified English translation of the relevant portion of the same.

24.    Attached hereto as Exhibit 20 is a true and correct copy of Official Gazette No. 40.727 and Decree No. 1945 issued by the Venezuelan Government, dated August 19, 2015, designating Eulogio Antonio Del Pino Diaz as the Minister of People's Power for Oil and Mining ("Oil Minister"), along with a certified English translation of the relevant portion of the same.

25.    Attached hereto as Exhibit 21 is a true and correct copy of an excerpt of PDVSA's Annual Management Report (2015), along with a certified English translation of the same. The report states that PDVSA is the "key driver of [the] Venezuelan economy" and also

details the various affiliations of PDVSA's board members who also hold positions in the Venezuelan Government.

26.     Attached hereto as Exhibit 22 is a true and correct copy of the Form 6-K filed by PDVSA with the United States Securities and Exchange Commission for the month of July 2005, dated July 19, 2005.

27.     Attached hereto as Exhibit 23 is a true and correct copy of a press release titled "Juramentación en el Cuartel de la Montaña Presidente Maduro renovó gabinete ministerial," issued by the Venezuelan Ministry of Popular Power for Oil and Mining ("Oil Ministry") and dated May 1, 2017, which notes that, in January 2017, Nelson Martinez left his post as President of PDVSA's indirect subsidiary, CITGO Petroleum Corporation, and took over as Oil Minister, along with a certified English translation of the same.

28.     Attached hereto as Exhibit 24 is a true and correct copy of a news report titled "Venezuela's oil minister offered PDVSA presidency," published by Reuters and dated June 6, 2017, which states that the Venezuelan Government offered the presidency of PDVSA to Oil Minister Nelson Martinez.

29.     Attached hereto as Exhibit 25 is a true and correct copy of PDVSA's webpage dedicated to "PDVSA in the World," which lists PDVSA's address as Avenida Libertador con calle El Empalme Complejo MinPetróleo - PDVSA, La Campiña, Caracas - Venezuela.  This webpage is available at http://www.pdvsa.com/index.php?option=com_content&view=article&id=6581&Itemid=898&lang=en (last visited on August 12, 2017).

30.     Attached hereto as Exhibit 26 is a true and correct copy of a news report titled "Venezuela opens disputed new constituent assembly," published by BBC and dated August 5, 2017, which states that the new constituent assembly opened despite opposition in Venezuela.

31.     Attached hereto as Exhibit 27 is a true and correct copy of a news report titled "Venezuela's 'tiger' foreign minister Rodriguez quits," published by Reuters and dated June 21, 2017, which states that Delcy Rodriguez, a current Director of PDVSA and PDVSA's Vice President of Foreign Affairs, who also was Venezuela's Foreign Affairs Minister, resigned from the Ministry on June 21, 2017 to run for a position in Venezuela's Constituent Assembly.

32.     Attached hereto as Exhibit 28 is a true and correct copy of a news report titled "Conozca a los poderosos nuevos directivos de Pdvsa: Simón Zerpa y Maribel Parra," published by Cuentas Claras Digital and dated January 29, 2017, which states that President Maduro named new PDVSA executives, created a new post for Executive Vice-President of PDVSA, and appointed Rear Admiral Maribel del Carmen Parra de Mestre to that new position, along with a certified English translation of the relevant portion of the same.

33.     Attached hereto as Exhibit 29 is a true and correct copy of a press release titled "Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela," published by the U.S. Department of the Treasury and dated July 26, 2017, which states that Simón Alejandro Zerpa Delgado is PDVSA's Vice President of Finance as well as the President of Fondo Nacional para el Desarrollo Nacional ("FONDEN").

34.     Attached hereto as Exhibit 30 is a true and correct copy of Official Gazette No. 40.529 and Decree No. 1.359 issued by the Venezuelan Government, dated October 29, 2014, which states that Simón Alejandro Zerpa Delgado is the commissioner of the Venezuelan Chinese Fund, along with a certified English translation of the same.

35.     Attached hereto as Exhibit 31 is a true and correct copy of PDVSA's webpage dedicated to PDVSA's "Strategic Plan," which describes two of PDVSA's "Main Historic Objectives" as (i) to "[c]ontribute to the development of a new international geopolitics that allows for a multicentric [*sic*] and multipolar world and ensure world peace," and (ii) to "guarantee state control over PDVSA." This webpage is available at http://www.pdvsa.com/index.php?option=com_content&view=article&id=6810&Itemid=1181&l ang=en (last visited on August 12, 2017).

36.     Attached hereto as Exhibit 32 is a true and correct copy of PDVSA's webpage dedicated to PDVSA's "History," which indicates that PDVSA is a corporation owned by Venezuela and "subordinated to the Venezuelan state." This webpage is available at http://www.pdvsa.com/index.php?option=com_content&view=article&id=6541&Itemid=88&lan g=en (last visited on August 12, 2017).

37.     Attached hereto as Exhibit 33 is a true and correct copy of a video of former Venezuelan President Hugo Chávez firing two executives of PDVSA during a televised address that was published to YouTube (https://www.youtube.com/watch?v=4VCf2aPMJd8) on September 21, 2016 and was downloaded on July 17, 2017, along with a certified Spanish transcription of an excerpt of the same and a certified English translation of that excerpt.

38.     Attached hereto as Exhibit 34 is a true and correct copy of a news report titled "Venezuela's Chavez fires 7 PDVSA exec rebel leaders," published by ICIS News and dated April 8, 2002, which reports that Hugo Chávez—then-President of Venezuela—fired seven PDVSA executives and forced the retirement of twelve additional employees.

39.     Attached hereto as Exhibit 35 is a true and correct copy of a news report titled "In political storm, Venezuela state-run oil company PDVSA drifts further," published by Reuters

and dated August 8, 2017, which states that PDVSA employees have been and continue to be expressly threatened with being fired if they do not support the current regime.

40.     Attached hereto as Exhibit 36 is a true and correct copy of Official Gazette No. 38.493 issued by the Venezuelan Government, dated August 4, 2006, which enacts the Hydrocarbons Organic Law, which, in turn, provides that the Venezuelan Oil Ministry is responsible for formulating, regulating, and controlling the "policies and planning" related to hydrocarbons activity, along with a certified English translation of the relevant portion of the same.

41.     Attached hereto as Exhibit 37 is a true and correct copy of Official Gazette No. 6.238 and Decree No. 2.378 issued by the Venezuelan Government, dated July 13, 2016, which requires PDVSA to operate under the direct supervision of the Vice-Presidency of the Economic Sector and the Oil Ministry, along with a certified English translation of the relevant portion of the same.

42.     Attached hereto as Exhibit 38 is a true and correct copy of the English translation from PDVSA's website of a "Speech by the Vice President for the Economic Area Minister of Popular Power for Oil and Mining President of Petróleos de Venezuela Rafael Ramírez Carreño" to a special session of the National Assembly of the Bolivarian Republic of Venezuela, dated August 5, 2014, as retrieved from a prior-existing version of PDVSA's website.  Among other things, Mr. Ramirez noted that the National Government "exercises control of [PDVSA's] production and export of oil" and "grants the rights and mining areas as established" under Venezuela's Hydrocarbons Law.  Mr. Ramirez also confirmed that PDVSA is "subject to the Venezuelan state and [an] instrument of liberation of our beloved Venezuelan people."

43.     Attached hereto as Exhibit 39 is a true and correct copy of Official Gazette No. 41.063 issued by the Venezuelan Government, dated December 29, 2016, which designates PDVSA's oil production levels by official decree, along with a certified English translation of the relevant portion of the same.

44.     Attached hereto as Exhibit 40 is a true and correct copy of an excerpt from an Offering Circular, dated November 11, 2011, through which PDVSA offered $2,394,239,600 in debt instruments to the public markets and detailed the control that Venezuela exerts over PDVSA under "Risk Factors."

45.     Attached hereto as Exhibit 41 is a true and correct copy of a news report titled "Up in smoke," published by The Economist and dated August 27, 2012, which details PDVSA's financial difficulties and notes that, "in an unprecedented combination of roles, the petroleum and mining minister is none other than [PDVSA President] Mr. Ramirez himself" and that Mr. Ramirez "has also allowed Mr. Chávez to use [PDVSA] as a piggy bank for his 'socialist revolution': last year, PDVSA spent twice as much on off-budget government programmes [*sic*] as it did on taxes, royalties, and dividends."

46.     Attached hereto as Exhibit 42 is a true and correct copy of a decision of the Supreme Tribunal of Justice – Constitutional Chamber of Venezuela, dated October 2, 2008, along with a certified English translation of an excerpt of the relevant portion of the same.  The decision recognized that PDVSA "play[s] a main role in [the] national economy."

47.     Attached hereto as Exhibit 43 is a true and correct copy of a report titled "Ministro Del Pino: 'PDVSA es codiciada porque es la columna financiera de la Nación,'" published by PDVSA and dated July/August 2016, along with a certified English translation of the same.

48. Attached hereto as Exhibit 44 is a true and correct copy of an excerpt from an Offering Circular, dated September 16, 2016, through which PDVSA offered $7,100,000,000 in debt instruments to the public markets and detailed the control Venezuela exerts over PDVSA under "Risk Factors."

49. Attached hereto as Exhibit 45 is a true and correct copy of Official Gazette No. 38.232 and the Venezuelan Central Bank Law issued by the Venezuelan Government, dated July 20, 2005, along with a certified English translation of the relevant portion of the same.

50. Attached hereto as Exhibit 46 is a true and correct copy of Official Gazette No. 40.114 and the Partial Reform Law of Special Contribution Law over Extraordinary Prices in the International Hydrocarbons Market issued by the Venezuelan Government, dated February 20, 2013, which requires PDVSA to sell currencies to the Central Bank of Venezuela in the event that FONDEN requires contributions to be made in Bolivars, along with a certified English translation of the relevant portion of the same.

51. Attached hereto as Exhibit 47 is a true and correct copy of Official Gazette No. 38.261 issued by the Venezuelan Government, dated August 30, 2005, which mandates that "the remainder of foreign currency obtained by means of export of hydrocarbons, gases and others will be transferred to" FONDEN, along with a certified English translation of the relevant portion of the same.

52. Attached hereto as Exhibit 48 is a true and correct copy of Official Gazette No. 40.865 issued by the Venezuelan Government, dated March 9, 2016, which sets official exchange rates from Venezuelan Bolivars to United States Dollars, along with a certified English translation of the relevant portion of the same.

53.     Attached hereto as Exhibit 49 is a true and correct copy of an unsigned Four Party Agreement, dated March 18, 2011, between Venezuela, PDVSA, China, and China National United Oil Corporation, as retrieved from scribd.com on June 27, 2017, which notes that PDVSA will act "on behalf of the Bolivarian Republic of Venezuela."

54.     Attached hereto as Exhibit 50 is a true and correct copy of Official Gazette No. 39.019 and the law approving the "Agreement Between the Government of the Bolivarian Republic of Venezuela and the Government of the Chinese People's Republic on the Joint Financing Fund," dated September 18, 2008, along with a certified English translation of the relevant portion of the same.

55.     Attached hereto as Exhibit 51 is a true and correct copy of Official Gazette No. 39.927 and the law approving the "Amendment to the Agreement between the Government of the Bolivarian Republic of Venezuela and the Government of the People's Republic of China on the Chinese-Venezuelan Joint Financing Fund," dated May 22, 2012, along with a certified English translation of the relevant portion of the same.

56.     Attached hereto as Exhibit 52 is a true and correct copy of an unsigned Petroleum Sales and Purchase contract, dated March 18, 2011, between China National United Oil Corporation and PDVSA, as retrieved from scribd.com on June 27, 2017.

57.     Attached hereto as Exhibit 53 is a true and correct copy of a summary of the first round of negotiations for long-term financing between China and Venezuela between Asdrúbal Chávez, Vice-President of PDVSA, and Tian Yunhai, Director General of International Corporation of the Development Bank of China, that occurred in Beijing from February 2, 2010 to February 4, 2010, as retrieved from scribd.com on June 27, 2017, along with a certified English translation of the same.

58.     Attached hereto as Exhibit 54 is a true and correct copy of a news report titled "La revolución vive, las colitas de Pdvsa siguen (fotos)," published by LaPatilla and dated March 6, 2015, which details the use of PDVSA airplanes for travel by Venezuelan officials, along with a certified English translation of the same.

59.     Attached hereto as Exhibit 55 is a true and correct copy of a news report titled "Maduro confirma que 'Timochenko' viajó a La Habana en avión de PDVSA," published by the BBC and dated September 28, 2015, which states that Colombian guerrilla leader Rodrigo Londoño Echeverri traveled to Havana, Cuba in an official Venezuelan airplane, along with a certified English translation of the same.

60.     Attached hereto as Exhibit 56 is a true and correct copy of a news report titled "Chávez confirma que Zelaya viaja a Honduras en un avión venezolano (+Video)," published by Noticias24 and dated July 5, 2009, which states that PDVSA airplanes have been used to transport former Honduran president Manuel Zelaya to Washington, D.C., along with a certified English translation of the same.

61.     Attached hereto as Exhibit 57 is a true and correct copy of a news report titled "Pdvsa adjudica 3 aviones de lujo para uso del régimen en Cuba," published by Reportero24 and dated April 7, 2014, which states that Venezuela lent three airplanes belonging to PDVSA to the Cuban Government, where they were used to transport President Raul Castro and Vice President Miguel Diaz-Canel on government business, along with a certified English translation of the same.

62.     Attached hereto as Exhibit 58 is a true and correct copy of a news report titled "Dos gandolas de Pdvsa obstaculizan el paso en vía Guacara-Valencia este #19Abr," published by LaPatilla and dated April 19, 2017, which states that Venezuela used PDVSA trucks to

prevent anti-government demonstrators from entering Valencia, along with a certified English translation of the same.

63. Attached hereto as Exhibit 59 is a true and correct copy of La Nueva PDVSA: Produciendo Bienestar Para El Pueblo, a publication of the Venezuelan Ministry of Information and Communication, dated November 2004, detailing the formation of the "new PDVSA," along with a certified English translation of the same.

64. Attached hereto as Exhibit 60 is a true and correct copy of Official Gazette No. 6.118 issued by the Venezuelan Government, dated December 4, 2013, listing the "Strategic and General Objectives," which calls for the Government to "[m]aintain and guarantee control by the State over [PDVSA]," along with a certified English translation of the relevant portion of the same.

65. Attached hereto as Exhibit 61 is a true and correct copy of an excerpt from PDVSA's Strategic Socialist Plan 2016–2026, which notes that PDVSA should be transformed into a "Socialist and Revolutionary PDVSA," along with a certified English translation of the relevant portion of the same.

66. Attached hereto as Exhibit 62 is a true and correct copy of Ministerio del Poder Popular de Petróleo's webpage, "Petróleos de Venezuela S.A. (PDVSA) y sus empresa filiales y empresas mixtas," dated April 8, 2017, which describes PDVSA as a "national company, subordinated to the Venezuelan State," along with a certified English translation of the relevant portion of the same. This webpage is available at http://www.mpetromin.gob.ve/portalmenpet/secciones.php?option=view&idS=36 (last visited on August 12, 2017).

15

67.     Attached hereto as Exhibit 63 is a true and correct copy of PDVSA's 2004 Management Report, which states that PDVSA is "an essential tool in the service of the Venezuelan State," along with a certified English translation of the same.

68.     Attached hereto as Exhibit 64 is a true and correct copy of a press release issued by PDVSA on August 14, 2015, which was available on a prior-existing version of PDVSA's website and which details work performed by PDVSA Agricola in the Orinoco Oil Belt.

69.     Attached hereto as Exhibit 65 is a true and correct copy of a news report titled "Venezuelan government demands USD 3 billion from PDVSA to build houses," published by El Universal and dated January 11, 2011, which details Venezuela's use of funds received from PDVSA bond offerings in October 2010 to fund a national housing program.

70.     Attached hereto as Exhibit 66 is a true and correct copy of a news report titled "Venezuela's Maduro orders state workers to vote for assembly," published by Reuters and dated July 7, 2017, which states that Venezuelan President Maduro directed PDVSA employees to vote in favor of the Government in upcoming assembly elections, or else risk losing their jobs.

71.     Attached hereto as Exhibit 67 is a true and correct copy of an item posted to PDVSA's official Twitter account (https://twitter.com/pdvsa) on July 17, 2017 at 2:33 A.M., which included a video relating to Venezuela's upcoming constituent assembly and purporting to portray PDVSA employees.

72.     Attached hereto as Exhibit 68 is a true and correct copy of a video that PDVSA posted to its official Twitter account (https://twitter.com/pdvsa), dated July 17, 2017 at 2:33 A.M., which relates to Venezuela's upcoming constituent assembly and purports to portray PDVSA employees, along with a certified Spanish transcription of an excerpt of the same and a certified English translation of that excerpt.

73.     Attached hereto as Exhibit 69 is a true and correct copy of PDVSA's official Twitter feed (https://twitter.com/pdvsa) on August 8, 2017, which includes a photo of Hugo Chávez surrounded by PDVSA employees, holding a beaker of oil, in the banner heading.

74.     Attached hereto as Exhibit 70 is a true and correct copy of an excerpt from a report titled, "A Decade Under Chávez, Political Intolerance and Lost Opportunities for Advancing Human Rights in Venezuela," published by Human Rights Watch and dated September 18, 2008.

75.     Attached hereto as Exhibit 71 is a true and correct copy of PDVSA's webpage dedicated to PDVSA's "Strategic Objectives," which include "[s]upport[ing] the geopolitical positioning of Venezuela internationally."  This webpage is available at: http://www.pdvsa.com/index.php?option=com_content&view=article&id=6551&Itemid=890&lang=en (last visited on August 12, 2017).

76.     Attached hereto as Exhibit 72 is a true and correct copy of Official Gazette No. 38.344 and the Energetic Cooperation Agreement "Petrocaribe" of 2005 issued by the Venezuelan Government, dated December 27, 2005, which indicates that PDVSA, through Petrocaribe, must sell oil to select Caribbean and Latin American nations at substantial discounts, along with a certified English translation of the relevant portion of the same.

77.     Attached hereto as Exhibit 73 is a true and correct copy of Official Gazette No. 39.183 and the Agreement of Food Security and Sovereignty of the Member States of Petrocaribe and the Alba (2009) issued by the Venezuelan Government, dated May 21, 2009, which creates a food security fund initially financed by contributions for each barrel of oil exported outside of Venezuela whose price exceeds $100, along with a certified English translation of the relevant portion of the same.

78. Attached hereto as Exhibit 74 is a true and correct copy of a news report titled "¿Petróleo cubano?," published by Guia and dated February 29, 2016, along with a certified English translation of the same. The report notes that Venezuela's supply of oil to Cuba "generate[s] practically no profits or foreign currency for [Venezuela]."

79. Attached hereto as Exhibit 75 is a true and correct copy of a news report titled "Explainer: What Is Petrocaribe?," published by Americas Society, Council of the Americas, and dated May 10, 2013, explaining how, through Petrocaribe, Venezuela commits PDVSA to selling oil to select Caribbean and Latin American nations on favorable, non-market terms.

80. Attached hereto as Exhibit 76 is a true and correct copy of a news report titled "Caribbean countries should be ashamed of supporting Venezuela at OAS meeting," published by the Miami Herald and dated June 21, 2017, stating that certain Petrocaribe member states helped to defeat a resolution against Venezuela that was backed by the United States, Canada, Mexico, Brazil, Argentina, and 15 other major countries in the region.

81. Attached hereto as Exhibit 77 is a true and correct copy of a news report titled "Venezuela Gets $1.9 Billion as Dominican Republic Pays Debt," published by Bloomberg and dated January 30, 2015, which discusses Venezuela's and PDVSA's Petrocaribe program. The report notes that PDVSA sells oil to Caribbean nations that "pay for only a portion of the bill upfront and finance the remainder at 1 percent or 2 percent over 25 years."

82. Attached hereto as Exhibit 78 is a true and correct copy of Official Gazette No. 60.094 and Resolution No. 177 issued by the Venezuelan Government, dated December 28, 2012, which delineates the area of the New Mining Blocks through a set of geographical coordinates, along with a certified English translation of the relevant portion of the same.

83.     Attached hereto as Exhibit 79 is a true and correct copy of Official Gazette No. 40.109 and Decree 9.368 issued by the Venezuelan Government, dated February 13, 2013, which transferred the mining rights over the New Mining Blocks to PDVSA through a Presidential Decree, along with a certified English translation of the relevant portion of the same.

84.     Attached hereto as Exhibit 80 is a true and correct copy of Official Gazette No. 37.437 and Decree 1.757 issued by the Venezuelan Government, dated May 7, 2002, which shows the coordinates of the Las Cristinas Mine blocks, along with a certified English translation of the same.

85.     Attached hereto as Exhibit 81 is a true and correct copy of an excerpt from PDVSA's 2013 Annual Report, dated May 6, 2014, which details the sale by PDVSA of 40% of its interests in Empresa Nacional Aurífera, S.A. (ENA).

86.     Attached hereto as Exhibit 82 is a true and correct copy of an excerpt of a news report titled "Asistencia del BCV a Pdvsa sube 13% en una semana," published by El Universal and dated April 11, 2014, which states that PDVSA had, at the end of 2013, sold to the Venezuelan Central Bank (the BCV) a 40% shareholding in a national gold mining company, Empresa Nacional Aurífera, S.A. (ENA), along with a certified English translation of the relevant portion of the same.

87.     Attached hereto as Exhibit 83 is a true and correct copy of an excerpt of Official Gazette No. 39.173 and the Organic Law issued by the Venezuelan Government, dated May 7, 2009, which reserves to the State the primary activities of the hydrocarbons industry, along with an excerpt of a certified English translation of the same.

88.     Attached hereto as Exhibit 84 is a true and correct copy of a press release titled "Venezuela will assume sovereign control of 11 drilling rigs," issued by PDVSA and dated June

19

23, 2010, which was available on a prior-existing version of its website and which notes that Venezuela, through PDVSA, expropriated 11 drilling rigs, which would "boost Oil domestic production and strengthen the Full Petroleum Sovereignty policy."

89.     Attached hereto as Exhibit 85 is a true and correct copy of a news report titled "Labor tension up at Venezuelan oil company PDVSA," published by Reuters and dated July 23, 2009, which discusses the expropriation of formerly private companies.

90.     Attached hereto as Exhibit 86 is a true and correct copy of Official Gazette No. 39.896 and Decree No. 8.886 issued by the Venezuelan Government, dated April 2, 2012, which orders the expropriation of land for the development of nationally sponsored housing programs, along with a certified English translation of the relevant portion of the same.

91.     Attached hereto as Exhibit 87 is a true and correct copy of Official Gazette No. 39.528 and Decree 7.712 issued by the Venezuelan Government, dated October 11, 2010, which designates PDVSA as the expropriating entity with respect to Venoco and other lubricants companies, along with a certified English translation of the same.

92.     Attached hereto as Exhibit 88 is a true and correct copy of Official Gazette No. 39.644 and Decree No. 8.133 issued by the Venezuelan Government, dated March 29, 2011, which orders the expropriation of Norpro Venezuela, C.A., along with a certified English translation of the relevant portion of the same.

93.     Attached hereto as Exhibit 89 is a true and correct copy of a news report titled "Venezuela, Oil and Chavez: a Tangled Tale," published by CNBC and dated January 11, 2013, reporting that when PDVSA workers went on strike to put political pressure on then-President Chávez, PDVSA fired 18,000 workers.

94.     Attached hereto as Exhibit 90 is a true and correct copy of Official Gazette No. 41.086 and Decree 2.712 issued by the Venezuelan Government, dated January 31, 2017, which requires PDVSA Agricola to transfer certain assets to another State company, "Corporacion de Desarrollo Agricola, S.A.," along with a certified English translation of the relevant portion of the same.

95.     Attached hereto as Exhibit 91 is a true and correct copy of a UCC-1 financing statement, dated December 21, 2016, showing that PDVH is incorporated in Delaware.

96.     Attached hereto as Exhibit 92 is a true and correct copy of PDVH's Third Circuit Corporate Disclosure Statement and Statement of Financial Interest, dated March 10, 2017.

97.     Attached hereto as Exhibit 93 is a true and correct copy of a writ of garnishment dated October 4, 2005, a praecipe dated October 3, 2005, and a related order, issued in accordance with 28 U.S.C. § 1610(c) by the Delaware Superior Court, dated September 30, 2005, in *Connecticut Bank of Commerce v. The Republic of Congo*, No. 05-cv-00762 (Del. Sup. Ct.).

98.     Attached hereto as Exhibit 94 is a true and correct copy of a letter, dated April 12, 2017, that PDVH submitted in *Crystallex I*.

99.     Attached hereto as Exhibit 95 is a true and correct copy of an omnibus motion filed by EM, Ltd. and NML Capital, Ltd. in *EM Ltd. v. The Republic of Argentina*, No. 06-cv-07792-LAP (S.D.N.Y.), dated January 11, 2010, seeking Orders of Attachment and Restraint, and Writs of Execution.

100.     Attached hereto as Exhibit 96 is a true and correct copy of the order issued by the District Court for the Southern District of New York, dated January 11, 2010, in *EM Ltd. v. The*

*Republic of Argentina*, No. 06-cv-07792-LAP (S.D.N.Y.), granting EM, Ltd.'s and NML Capital, Ltd.'s Motion for Orders of Attachment and Restraint, and Writs of Execution.

101.     Attached hereto as Exhibit 97 is a true and correct copy of a news report titled "UPDATE 2-Venezuela's PDVSA revenue slips on domestic fuel sales," published by Reuters and dated March 22, 2013, quoting Rafael Ramírez, who was Oil Minister and President of PDVSA at the time, as indicating that PDVSA "is not a company designed to generate profits. This is a national oil company."

102.     Attached hereto as Exhibit 98 is a true and correct copy of an excerpt from PDVSA's 2016 Financial Statement, dated August 11, 2017, along with a certified English translation of the relevant portion of the same.

103.     Attached hereto as Exhibit 99 is a true and correct copy of an excerpt of the "Decision on Liability and the Principles of Quantum" in *Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela*, rendered in International Centre for Settlement of Investment Disputes Case No. ARB/12/13 on December 30, 2016, wherein the Tribunal found, *inter alia*, that "all of PDVSA's actions" with respect to an expropriated plant "can and have to be attributed to [Venezuela]."

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on August 14, 2017, in New York, New York.

Jason Myatt