## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACL1 INVESTMENTS LTD., ACL2 INVESTMENTS LTD., and LDO (CAYMAN) XVIII LTD. | : : : : : | C.A. No. 1:21-mc-0046-LPS |
| *Plaintiffs*, | : : | |
| v. | : : | |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : : | |
| *Defendant*. | : : | |

## MEMORANDUM OF LAW OF PETRÓLEOS DE VENEZUELA, S.A. IN SUPPORT OF ITS CROSS-MOTION TO DISMISS FOR LACK OF JURISDICTION AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER CONDITIONALLY AUTHORIZING ISSUANCE AND SERVICE OF A WRIT OF ATTACHMENT *FIERI FACIAS*

HEYMAN ENERIO GATTUSO & HIRZEL LLP
Samuel T. Hirzel, II (#4415)
Aaron M. Nelson (#5941)
Jamie L. Brown (#5551)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law
anelson@hegh.law
jbrown@hegh.law

OF COUNSEL:

Joseph D. Pizzurro
Julia B. Mosse
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

*Attorneys for Intervenor*
*Petróleos de Venezuela, S.A.*

January 21, 2022

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................. iii

NATURE AND STAGE OF PROCEEDINGS .......................................................................1

SUMMARY OF ARGUMENT ........................................................................................1

STATEMENT OF FACTS .............................................................................................5

      A.     Procedural History ............................................................................5

      B.     The Republic's Relationship with PDVSA Has Changed
            Materially Since This Court's Decision in *Crystallex I* ..............................6

      C.     The Venezuela Sanctions Program Has Evolved Significantly
            Since This Court's Decision in *Crystallex I* ...................................8

      D.     Plaintiffs' Attachment Motion Mirrors Those Filed by OIEG and
            Huntington Ingalls .........................................................................9

ARGUMENT ..........................................................................................................10

  I.    This Court Lacks Jurisdiction Because Plaintiffs Cannot Meet Their
       Burden of Proving That PDVSA Is Currently the Alter Ego of the
       Republic under *Bancec* ................................................................10

      A.     Actions of the Unrecognized Maduro Regime Are Irrelevant Under
            *Bancec* ...................................................................................11

      B.     Plaintiffs' Allegations Concerning the Interim Governing Are
            Insufficient to Rebut the *Bancec* Presumption of Separateness ...............17

           1.     *The Republic does not manage PDVSA's daily affairs* ................21

           2.     *The Republic does not exert excessive economic control
                 over PDVSA.* ...................................................................24

           3.     *The Republic does not impose extraordinary fiscal
                 obligations on PDVSA.* .......................................................27

           4.     *The ad hoc board acts in PDVSA's economic interest.* ...............28

            5.     *Adherence to separate identities would not entitle
                 Venezuela to benefits in United States courts while
                 avoiding its obligations* ......................................................29

      C.     The "Pertinent Time" for the Alter Ego Analysis is the Present,
            Not 2018.....................................................................................30

II.     The Attachment Motion Must Be Denied Because Plaintiffs' Requested
        Relief is Barred by OFAC Sanctions and is Not Ripe for Adjudication ..............30

III.    The Attachment Motion Must Be Denied Under Delaware Law .........................33

IV.     A Reasonable Period Time Has Not Elapsed Under Section 1610(c) of the
        FSIA .................................................................................................................35

CONCLUSION .................................................................................................................35

# TABLE OF AUTHORITIES

**Pg.**

## CASES

*Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*,
   963 A.2d 746 (Del. Ch. 2009) ................................................... 34

*Arch Trading Corp. v. Republic of Ecuador*,
   839 F.3d 193 (2d Cir. 2016) ..................................................... 17

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) ................................................................. 10

*Arriba Ltd. v. Petroleos Mexicanos*,
   962 F.2d 528 (5th Cir. 1992) ................................................... 14

*Arrington v. ColorTyme, Inc.*,
   972 F. Supp. 2d 733 (W.D. Pa. 2013) ...................................... 33

*Autocephalous Greek-Orthodox Church v. Goldberg & Feldman Fine Arts, Inc.*,
   917 F.2d 278 (7th Cir. 1990) ................................................... 16

*Baglab Ltd. v. Johnson Matthey Bankers Ltd.*,
   665 F. Supp. 289 (S.D.N.Y. 1987) ........................................... 27

*Barnhill v. Johnson*,
   503 U.S. 393 (1992) ................................................................. 34

*Behring Int'l, Inc. v. Imperial Iranian Air Force*,
   699 F.2d 657 (3d Cir. 1983) .................................................... 32

*Casa Express Corp. v. Bolivarian Republic of Venez.*,
   Nos. 18 Civ. 11940 (AT), 19 Civ. 3123 (AT),
   2020 U.S. Dist. LEXIS 181032 (S.D.N.Y. Sep. 30, 2020) ....... 13

*Crosse v. BCBSD, Inc.*,
   836 A.2d 492 (Del. 2003) ........................................................ 34

*Crystallex Int'l Co. v. Bolivarian Republic of Venez.*,
   C.A. No. 17-mc-151-LPS, 2021 U.S. Dist. LEXIS 7793
   (D. Del. Jan. 14, 2021) ................................................... 3, 10, 30

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
   333 F. Supp. 3d 380 (D. Del. 2018) ................................. passim

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
   932 F.3d 126 (3d Cir. 2019) ........................................................................ passim

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
   Nos. 21-1276, 21-1277, 21-1289, Slip Op. (3d Cir. Jan. 18, 2022)...................................... 9, 34

*Crystallex Int'l Corp. v. PDV Holding, Inc.*,
   C.A. No. 15-cv-1082-LPS, 2019 U.S. Dist. LEXIS 214167 (D. Del. Dec. 12, 2019) ......... 2, 11

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981)....................................................................................... 32

*Delaware v. New York*,
   507 U.S. 490 (1993)....................................................................................... 34

*EM Ltd. v. Banco Central de la República Argentina*,
   800 F.3d 78 (2d Cir. 2015) .............................................................. 10, 20, 21, 22

*EM Ltd. v. Republic of Argentina*,
   473 F.3d 463 (2d Cir. 2007) ........................................................................ 35

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
   462 U.S. 611 (1983)................................................................................... passim

*Flatow v. Islamic Republic of Iran*,
   308 F.3d 1065 (9th Cir. 2002) ..................................................................... 19

*Gater Assets Ltd. v. Moldovagaz*,
   2 F.4th 42 (2d Cir. 2021) ........................................................................... passim

*GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*,
   822 F.3d 598 (D.C. Cir. 2016) ............................................................... 18, 29

*Guaranty Tr. Co. v. United States*,
   304 U.S. 126 (1938)................................................................................... 13

*In re Lazy Days' RV Ctr. Inc.*,
   724 F.3d 418 (3d Cir. 2013) ....................................................................... 33

*Jiménez v. Palacios*,
   No. 2019-0490-KSJM, 2019 Del. Ch. LEXIS 288 (Del. Ch. Aug. 2, 2019),
   *aff'd* 237 A.3d 68 (Del. 2020)................................................................. passim

*Latvian State Cargo & Passenger S.S. Line v. McGrath*,
   188 F.2d 1000 (D.C. Cir. 1951)............................................................... 13, 16

*Lnc Invs. v. Democratic Republic of Congo*,
   69 F. Supp. 2d 607 (D. Del. 1999)............................................................. 34

iv

*M. Salimoff & Co. v. Standard Oil Co. of N.Y.*,
    186 N.E.679 (N.Y. 1933) ................................................................. 15, 16

*Nat'l Union Fire Ins. Co. v. Republic of China*,
    254 F.2d 177 (4th Cir. 1958) ......................................................... 14, 15

*Ned Chartering & Trading, Inc. v. Republic of Pakistan*,
    130 F. Supp. 2d 64 (D.D.C. 2001) ...................................................... 35

*OBB Personenverkehr AG v. Sachs*,
    577 U.S. 27 (2015) ....................................................................... 10

*Oetjen v. Cent. Leather Co.*,
    246 U.S. 297 (1918) ...................................................................... 13

*Pescatore v. Pan Am. World Airways, Inc.*,
    97 F.3d 1 (2d Cir. 1996) ................................................................. 35

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ......................................................... 35

*Pfizer v. Government of India*,
    434 U.S. 308 (1978) ...................................................................... 13

*Republic of Argentina v. NML Capital, Ltd.*,
    573 U.S. 134 (2014) ...................................................................... 35

*Republic of Panama v. Air Panama Internacional, S.A.*,
    745 F. Supp. 669 (S.D. Fla. 1988) ..................................................... 14

*Republic of Panama v. Lexdale, Inc.*,
    804 F. Supp. 1521 (S.D. Fla. 1992) ................................................... 33

*Republic of Panama v. Republic Nat. Bank of New York*,
    681 F. Supp. 1066 (S.D.N.Y. 1988) ................................................... 14

*Rubin v. Islamic Republic of Iran*,
    138 S. Ct. 816 (2018) .................................................................... 20

*Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*,
    No. 18-7044, 2019 U.S. App. LEXIS 17543 (D.C. Cir. May 1, 2019) .................. 13

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ...................................................................... 10

*Schreiber v. Kellogg*,
    849 F. Supp. 382 (E.D. Pa. 1994) ..................................................... 34

*Sherwin-Williams Co. v. Cty. of Del.*,
  968 F.3d 264 (3d Cir. 2020) ............................................................. 33

*Simon v. Southern Ry. Co.*,
  236 U.S. 115 (1915) ......................................................................... 33

*Suburban Trails, Inc. v. N.J. Transit Corp.*,
  800 F.2d 361 (3d Cir. 1986) ............................................................. 33

*The Denny*,
  127 F.2d 404 (3d Cir. 1942) ......................................................... 15, 16

*The Maret*,
  145 F.2d 431 (3d Cir. 1944) ................................................. 13, 14, 15, 16

*TransAmerica Leasing, Inc. v. La Republica de Venezuela*,
  200 F.3d 843 (D.C. Cir. 2000) ................................................. 19, 20, 21, 27

*UAB Skyroad Leasing v. OJSC Tajik Air*,
  No. 20-cv-00763 (APM), 2021 U.S. Dist. LEXIS 13872 (D.D.C. Jan. 26, 2021) ........... passim

*Underhill v. Hernandez*,
  168 U.S. 250 (1897) ......................................................................... 13

*United States v. Belmont*,
  301 U.S. 324 (1937) ......................................................................... 13

*United States v. Pink*,
  315 U.S. 203 (1942) ................................................................. 13, 14, 15, 16

*Wallace v. Wood*,
  752 A.2d 1175 (Del. Ch. 1999) ........................................................... 4

*Wyatt, V.I., Inc. v. Gov't of V.I.*,
  385 F.3d 801 (3d Cir. 2004) ............................................................. 33

*Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ......................................................................... 12, 13

## STATUTES

28 U.S.C. § 1330(b) ......................................................................... 1, 10

28 U.S.C. § 1605(a)(1) ......................................................................... 11

28 U.S.C. § 1610(a)(1) ......................................................................... 11

28 U.S.C. § 1610(c) ......................................................................... 4, 35

8 Del. C. § 324(a) .................................................................................................... 34

**RULES**

Federal Rule of Civil Procedure 69(a) ........................................................ 4, 10, 33, 34

**REGULATIONS AND EXECUTIVE ORDERS**

31 C.F.R. § 591.201 ...................................................................................................... 8

31 C.F.R. § 591.202(a) ................................................................................................ 32

31 C.F.R. § 591.202(e) ................................................................................................ 32

31 C.F.R. § 591.309 ................................................................................................ 31, 32

31 C.F.R. § 591.310 .......................................................................................... 30, 31, 32

31 C.F.R. § 591.407 ...................................................................................... 9, 30, 31, 32

31 C.F.R. § 591.506 .................................................................................................... 31

31 C.F.R. § 591.506(c) .............................................................................................. 9, 30

Amended Venezuelan Sanction Regulations,
   84 Fed. Reg. 64415, 64416 (Nov. 22, 2019) .......................................................... 9

Exec. Order No. 13692, 80 Fed. Reg. 12747 (Mar. 8, 2015) ......................................... 8

Exec. Order No. 13850, 83 Fed. Reg. 55, 243 (Nov. 1, 2018) ...................................... 8

Exec. Order No. 13884, 84 Fed. Reg. 38843 (Aug. 5, 2019) ........................................ 8

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 94-1487 (1976) .................................................................................... 35

**OTHER AUTHORITIES**

Press Statement, U.S. Department of State, "U.S. Recognition of Venezuela's
   2015 National Assembly and Interim President Guaidó," (Jan. 4, 2022) ................................. 7

Restatement (Third) of Foreign Relations Law of the United States ...................... 15, 16

U.S. Dep't of Treasury, Other Sanctions Programs,
   Venezuela Sanctions, FAQ No. 808 (Dec. 9, 2019) ...................................... 31, 32

U.S. EMBASSY & CONSULATE IN ECUADOR,
   *Statement from President Donald J. Trump*
   *Recognizing Venezuelan National Assembly President Juan Guaido*
   *as the Interim President of Venezuela* (Jan. 23, 2019) ............................................................. 6

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs ACL1 Investments Ltd. ("ACL1"), ACL2 Investments Ltd. ("ACL2"), and LDO (Cayman) XVIII Ltd. ("LDO" and together with ACL1 and ACL2, "Plaintiffs"), all Cayman Islands entities, are judgment creditors of the Bolivarian Republic of Venezuela (the "Republic" or "Venezuela").  Plaintiffs sued the Republic in the United States District Court for the Southern District of New York ("N.Y. District Court") for breach of contract after the Republic defaulted on its payment obligations under certain bonds.  Plaintiffs and the Republic stipulated to a consent judgment, which was entered by the N.Y. District Court in December 2020 (the "Judgment").  Plaintiffs registered the Judgment in this Court, and, on November 22, 2021, filed their Motion for an Order Conditionally Authorizing the Issuance and Service of a Writ of Attachment *Fieri Facias* [D.I. 2] (the "Attachment Motion").  Plaintiffs' Attachment Motion seeks an order conditionally authorizing issuance and service of a writ of attachment against the shares of PDV Holding, Inc. ("PDVH"), which are wholly owned by Petróleos de Venezuela, S.A. ("PDVSA"), on the theory that PDVSA is the alter ego of the Republic. PDVSA was granted leave to intervene and now submits this memorandum of law in support of its cross-motion to dismiss for lack of subject matter and personal jurisdiction under the Foreign Sovereign Immunities Act (the "FSIA") and in opposition to the Attachment Motion.[1]

## SUMMARY OF ARGUMENT

**I.**     The Attachment Motion presents a threshold question that goes both to this Court's subject matter jurisdiction under the FSIA and to Plaintiffs' right to attempt to reach PDVSA's assets to satisfy a judgment rendered solely against the Republic:  Is PDVSA the alter ego of the Republic under *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,

---

[1] Because the Court lacks subject matter jurisdiction and because PDVSA was never properly served, this Court also lacks personal jurisdiction over PDVSA.  28 U.S.C. § 1330(b).

462 U.S. 611 (1983) ("*Bancec*")?  If the answer is no, then two conclusions automatically follow: the Attachment Motion must be dismissed for lack of subject matter jurisdiction and PDVSA's assets cannot be deemed assets of the Republic.

The FSIA provides the exclusive source of subject matter jurisdiction over actions against a foreign state or its agencies or instrumentalities, such as PDVSA, but only when an exception to sovereign immunity applies.  No such exception applies to PDVSA here.  Plaintiffs argue that the Court's jurisdiction over the Republic under the FSIA's waiver exception extends to PDVSA because PDVSA is the alter ego of the Republic under *Bancec*.  Plaintiffs offer three arguments as to why PDVSA should be considered Venezuela's alter ego.  Each is meritless.

**I.A.**     Plaintiffs contend that – despite the indisputable reality that from January 2019 to the present, U.S. courts must recognize Interim President Juan Guaidó and the National Assembly (the "Interim Government") – PDVSA has been Venezuela's alter ego since 2019, because the outlaw regime of Nicolás Maduro – unrecognized by the United States and its courts – exercises control over PDVSA *in Venezuela*.  The actions of the illegitimate Maduro regime are legally irrelevant to the *Bancec* analysis.  First, as this Court previously recognized, "[t]he relevant portion of PDVSA, which is property in the U.S., is under different control under a new legal regime . . . recognized by the U.S."  *Crystallex Int'l Corp. v. PDV Holding, Inc.*, C.A. No. 15-cv-1082-LPS, 2019 U.S. Dist. LEXIS 214167, at *7 (D. Del. Dec. 12, 2019).  There is no dispute that the Maduro regime has no access to or control over the PDVH shares.  Thus, Plaintiffs cannot rely upon the Maduro regime's conduct as a basis for attaching those shares. Second, Plaintiffs' reliance upon the acts of the Maduro regime is foreclosed by the political question doctrine.  The U.S. Constitution vests the Executive Branch with the exclusive power to recognize foreign governments, and since January 2019, the Executive has recognized the

Interim Government as the only legitimate government of Venezuela and has declared its nonrecognition of the Maduro regime.  The U.S. Supreme Court has consistently held that all U.S. courts are unequivocally bound by such determinations by the Executive.  The Executive's recognition of the Interim Government forecloses a finding of an alter ego relationship between PDVSA and the Republic based upon actions by the unrecognized Maduro regime.

**I.B.**     Plaintiffs argue that even if the Court considers only the acts of the Interim Government, the Interim Government still extensively controls PDVSA.  Plaintiffs are wrong and their sparse and conclusory assertions are wholly insufficient to rebut the strong *Bancec* presumption.  Since this Court's August 2018 ruling in *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 333 F. Supp. 3d 380 (D. Del. 2018) ("*Crystallex I*"), the relationship between PDVSA and the Republic has changed materially.  The Interim Government has enacted new institutional safeguards to ensure the independence of PDVSA, its subsidiaries, and their assets in the United States, including the PDVH shares.  PDVSA's *ad hoc* board has observed corporate formalities and maintained strict independence from Venezuela.  As a result, Plaintiffs cannot meet their burden of proving that PDVSA, as managed by the *ad hoc* board, can currently be considered to be the alter ego of Venezuela.

**I.C.**     Plaintiffs argue that the relevant time for making the alter ego determination is not now but 2018, when Plaintiffs were injured by the Republic's default on the bonds.  However, Plaintiffs acknowledge that this argument is expressly precluded by this Court's ruling that the "pertinent time" for the alter ego analysis is "the period between the filing of the motion seeking a writ of attachment [here, November 22, 2021] and the subsequent issuance and service of that writ."  *Crystallex Int'l Co. v. Bolivarian Republic of Venez.*, C.A. No. 17-mc-151-LPS, 2021 U.S. Dist. LEXIS 7793, at *18 (D. Del. Jan. 14, 2021) ("*Crystallex III*").

II.      Plaintiffs cannot obtain the relief they seek – an order authorizing issuance and service of a writ of attachment conditioned on approval from the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") – without *first* obtaining a specific license from OFAC.  OFAC regulations prohibit the creation of *any* right or interest, including contingent interests, in the PDVH shares or *any* judicial process that purports to alter or affect PDVSA's interest in the PDVH shares, absent a specific license.  Plaintiffs do not have such a license. That is sufficient to require dismissal of the Attachment Motion.  Moreover, to the extent Plaintiffs seek a determination that they would be entitled to an attachment in the future should they obtain an OFAC license, the Court is barred from doing so both by applicable regulations and by Article III of the U.S. Constitution.  Because Plaintiffs do not have the requisite OFAC license, any order purporting to create a contingent or other right or interest in the PDVH shares would be a nullity under OFAC regulations.  And because Plaintiffs' requested relief depends entirely upon OFAC's discretion, the Attachment Motion is not ripe for adjudication and any decision by this Court before a license is granted would amount to nothing more than an advisory opinion prohibited by Article III.

III.      Even assuming the Court has jurisdiction under the FSIA, the Attachment Motion still must be denied because Plaintiffs cannot prove their entitlement to a writ of attachment under Delaware law, applicable by virtue of Federal Rule of Civil Procedure 69(a).  Delaware law permits attachment of shares registered in the name of a judgment debtor's alter ego *only if* the judgment debtor used the putative alter ego to perpetrate "fraud or similar injustice," *see Wallace v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999), which is not the case here.

IV.      Under the FSIA, 28 U.S.C. § 1610(c), enforcement efforts may not begin until the Court determines that a reasonable period of time has elapsed since the entry of the Judgment.

That requirement cannot be satisfied here because OFAC has not authorized the Republic to make, or Plaintiffs to accept, any payment on the Judgment.

## STATEMENT OF FACTS

### A.    Procedural History

Plaintiffs are the beneficial owners of certain bonds issued by the Republic pursuant to a Fiscal Agency Agreement dated as of August 6, 1998, as amended (the "FAA").  *ACL1 Investments Ltd., et al. v. Bolivarian Republic of Venez.*, 19-cv-09014-LLS, D.I. 47, ¶ 1 (S.D.N.Y. Oct. 14, 2020).  In the FAA, the Republic waived its immunity from suit in actions arising out of the FAA and the immunity of its assets from attachment and execution in connection with such actions.  *See* D.I. 4-1, Ex. 38 § 14(d).  PDVSA was not a party to the FAA and there is no contention that it had any obligations or waived its own sovereign immunity thereunder.

In 2018, the Republic defaulted on its payment obligations under the bonds.  PDVSA is not alleged to have had any involvement in or to have benefitted in any way from the Republic's default.  On September 27, 2019, ACL1 and ACL2 sued the Republic in the N.Y. District Court for breach of contract.  *See ACL1*, 19-cv-09014-LLS, D.I. 1 (S.D.N.Y. Sept. 27, 2019).  The complaint was then amended to include LDO.  *See id.*, D.I. 47.  On December 7, 2020, the N.Y. District Court entered the Judgment against the Republic in the form stipulated by Plaintiffs and the Republic.  *See* D.I. 4-1, Ex. 37.  The Republic and Plaintiffs also stipulated that Plaintiffs could not seek to enforce the Judgment until October 23, 2021.  D.I. 3 at 2.  PDVSA was not a party to the New York action.  Plaintiffs have no judgment against PDVSA.

On February 5, 2021, Plaintiffs registered the Judgment in this Court.  D.I. 1.  On November 22, 2021, Plaintiffs filed the Attachment Motion.  D.I. 2-3.  On December 14, 2021,

the Court granted PDVSA's motion to intervene in this action.  D.I. 15.  The Court later set

January 21, 2022 as PDVSA's date to respond to the Attachment Motion.  D.I. 19.

> **B.**     **The Republic's Relationship with PDVSA Has Changed Materially Since This Court's Decision in *Crystallex I***

On August 9, 2018 in *Crystallex I*, this Court found that PDVSA was Venezuela's alter

ego at that time based on evidence that, under the Maduro regime and the Chávez regime that

preceded it, Venezuela exercised "extensive control" over PDVSA.  333 F. Supp. 3d at 396, 401.

On that basis, the Court ruled that PDVSA was not entitled to sovereign immunity and

jurisdiction over PDVSA was proper under the FSIA.  The Court also ruled that PDVSA's shares

in PDVH, which at that time could be considered the property of Venezuela for FSIA purposes,

were not immune from attachment under the FSIA.  *Id.* at 425-26.

In January 2019, Venezuela's National Assembly declared Maduro's presidency

illegitimate and National Assembly President Juan Guaidó became the Interim President of

Venezuela pursuant to Article 233 of the Venezuelan Constitution.  *Jiménez v. Palacios*, No.

2019-0490-KSJM, 2019 Del. Ch. LEXIS 288, at *1-2 (Del. Ch. Aug. 2, 2019), *aff'd* 237 A.3d 68

(Del. 2020).  On January 23, 2019, the U.S. officially recognized Mr. Guaidó as Interim

President of Venezuela and rejected the legitimacy of the Maduro regime.  *See* Declaration of

Julia B. Mosse dated Jan. 21, 2022 ("Mosse Decl.") Ex. 1, Expert Declaration of Allan R.

Brewer-Carías dated April 2, 2021 ("Brewer-Carías Decl.") ¶ 27.[2]  The administration of

---

[2] U.S. EMBASSY & CONSULATE IN ECUADOR, *Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela* (Jan. 23, 2019), *available online at* https://ec.usembassy.gov/statement-from-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-as-the-interim-president-of-venezuela/.

President Biden continues to recognize the Interim Government as the only legitimate government of Venezuela.[3]

On February 5, 2019, the Venezuelan National Assembly enacted the "Statute to Govern a Transition to Democracy to Reestablish the Full Force and Effect of the Constitution of the Bolivarian Republic of Venezuela" (the "Transition Statute").  Brewer-Carías Decl. ¶ 28.  Article 15 of the Transition Statute empowers Interim President Guaidó to "[a]ppoint *ad hoc* Administrative Boards" of state-owned corporations and other entities "for the purpose of . . . adopting the measures necessary to control and protect State company assets."  *Id.* ¶ 31.  Interim President Guaidó exercised his authority under that statute and the Venezuelan Constitution to appoint an *ad hoc* administrative board of PDVSA.  Five days later, the National Assembly passed a special resolution ratifying those appointments.  *Id.* ¶ 36.

On April 10, 2019, Interim President Guaidó issued Presidential Decree No. 3, granting "new responsibilities and duties" to PDVSA's *ad hoc* board for the purpose of "protect[ing] the assets of the Venezuelan Government abroad, controlled directly or indirectly by PDVSA."  *Id.* ¶ 40; *see also* Mosse Decl. Ex. 2, Declaration of Horacio Francisco Medina Herrera dated April 1, 2021 ("Medina Decl."), Ex. A, Decl. of Luis A. Pacheco, Ex. B, at 12.  Presidential Decree No. 3 mandates strict political independence, directing that the PDVSA *ad hoc* board shall not "follow[] political or partisan guidelines," and ordering the board to "exercise the powers conferred herein autonomously and independently, following only technical criteria aimed at the efficient management of PDVSA's direct and indirect subsidiaries organized abroad."  Brewer-Carías Decl. ¶¶ 40-41.

---

[3] On January 3, 2022, the National Assembly voted to extend its authority, as well as the authority of Interim President Guaidó, for an additional year.  On January 4, 2022, the U.S. Department of State reaffirmed its recognition of the Interim Government.  *See* Press Statement, U.S. Department of State, "U.S. Recognition of Venezuela's 2015 National Assembly and Interim President Guaidó," (Jan. 4, 2022), *available online at* https://www.state.gov/u-s-recognition-of-venezuelas-2015-national-assembly-and-interim-president-guaido/.

In accordance with those legal enactments, PDVSA's *ad hoc* board has maintained strict independence from the Republic.  Although PDVSA submits periodic reports to the National Assembly, the board does not take orders or directives from any government official, but instead facilitates PDVSA's role as a shareholder with respect to its U.S. subsidiaries.  Medina Decl. ¶¶ 6-7, 11.

### C.    The Venezuela Sanctions Program Has Evolved Significantly Since This Court's Decision in *Crystallex I*

On November 1, 2018, after this Court decided *Crystallex I*, President Trump issued Executive Order 13850, which blocked the assets of any individual or entity designated by the U.S. Treasury Secretary as a Specially Designated National ("SDN") under the Venezuelan Sanctions Regulations.  Exec. Order No. 13850, 83 Fed. Reg. 55243 (Nov. 1, 2018) ("E.O. 13850").  On January 28, 2019, the Treasury Secretary designated PDVSA as an SDN under E.O. 13850.  As a result, all of PDVSA's "property and interests in property that are in the United States," including the PDVH shares, are "blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in" without a specific license from OFAC.  E.O. 13850, § 1(a).

On August 5, 2019, President Trump issued Executive Order 13884, which blocks property of the Venezuelan Government (defined to include PDVSA) from being "transferred, paid, exported, withdrawn, or otherwise dealt in" without a specific license.  Exec. Order No. 13884, 84 Fed. Reg. 38843 (Aug. 5, 2019) ("E.O. 13884").  Because E.O. 13850 and E.O. 13884 (together, the "Blocking Orders") were issued pursuant to the emergency declared in Executive Order 13692, 80 Fed. Reg. 12747 (Mar. 8, 2015), any transactions prohibited by the Blocking Orders are also prohibited pursuant to Part 591 of OFAC's Venezuela sanctions regulations.  31 C.F.R. § 591.201.

On November 22, 2019, OFAC significantly amended and expanded the regulations implementing the Venezuela sanctions program. *See* Amended Venezuelan Sanction Regulations, 84 Fed. Reg. 64415, 64416 (Nov. 22, 2019). The amendments included a new rule, which "looms large in this case." *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, Nos. 21-1276, 21-1277, 21-1289, Slip Op. at 7 (3d Cir. Jan. 18, 2022) ("*Crystallex IV*"). It provides:

> [T]he entry into a settlement agreement or *the enforcement of any* lien, *judgment*, arbitral award, decree, or other order *through* execution, garnishment, or other *judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked* pursuant to § 591.201, as referenced in § 591.506(c), *is prohibited* unless authorized pursuant to a specific license issued by OFAC.

31 C.F.R. § 591.407 (emphasis added); *see also* 31 C.F.R. 591.506(c).

### D. Plaintiffs' Attachment Motion Mirrors Those Filed by OIEG and Huntington Ingalls

On February 19, 2021, OI European Group B.V. ("OIEG") and Northrop Grumman Ship Systems, Inc. ("Huntington Ingalls"), creditors of the Republic, each filed a motion in this Court to attach PDVSA's shares in PDVH on the theory that PDVSA is the Republic's alter ego. *See OI Eur. Grp. BV v. Bolivarian Republic of Venez.*, 19-mc-290-LPS ("*OIEG*"), D.I. 48-49; *Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venez.*, 20-mc-257-LPS ("*Northrop*"), D.I. 25-26. As in the instant case, PDVSA intervened in those actions and filed cross-motions to dismiss, and oppositions to, the attachment motions. *See OIEG*, D.I. 64-65; *Northrop*, D.I. 31-32. On April 30, 2021, the Court held an evidentiary hearing on OIEG's and Huntington Ingalls' attachment motions after which the parties and PDVSA submitted two rounds of post-hearing briefs. *See* Transcript of Apr. 30, 2021 Hr'g; *OIEG*, D.I. 95, 101 (PDVSA post-hearing briefs), D.I. 98, 103 (Republic's post-hearing briefs), D.I. 96, 102 (OIEG post-hearing briefs); *Northrop*, D.I. 51, 53 (PDVSA's post-hearing briefs), D.I. 52, 54

(Huntington Ingalls' post-hearing briefs). OIEG's and Huntington Ingalls' attachment motions remain *sub judice*.

Virtually all of Plaintiffs' arguments in support of its Attachment Motion – including those regarding (i) the effect of the Executive's recognition of the Interim Government, (ii) the relationship between the Interim Government and PDVSA, (iii) OFAC sanctions, and (iv) the application of Delaware law by virtue of Rule 69 – overlap substantially with, or are identical to, arguments made by OIEG and/or Huntington Ingalls. Therefore, PDVSA hereby incorporates by reference its submissions and arguments in those cases.[4]

## ARGUMENT

### I. This Court Lacks Jurisdiction Because Plaintiffs Cannot Meet Their Burden of Proving That PDVSA Is Currently the Alter Ego of the Republic under *Bancec*

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state," including any "agency or instrumentality of a foreign state," in U.S. courts. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 30 (2015) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). PDVSA is undisputedly an "agency or instrumentality of a foreign state" as defined in the FSIA, 28 U.S.C. § 1603(b), and is entitled to "invoke its own sovereign immunity" as a defense to an alter ego claim whether it is brought in a complaint or an attachment motion. *Crystallex I*, 333 F. Supp. 3d at 426; *see also EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 98 (2d Cir. 2015). Thus, unless Plaintiffs can meet their burden of establishing that one of the "FSIA's express exceptions to sovereign immunity applies" to PDVSA, this Court lacks subject matter jurisdiction. *OBB*, 577 U.S. at 31 (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)).

---

[4] PDVSA also incorporates by reference its recent arguments in *Crystallex* as to the meaning and effect of OFAC's sanctions regulations. *See Crystallex*, 17-mc-151-LPS, D.I. 408, 419.

In *Crystallex I*, this Court held that PDVSA's sovereign immunity could be abrogated by showing that PDVSA is Venezuela's alter ego under *Bancec*, such that the basis for jurisdiction over the Republic could be imputed to PDVSA.  333 F. Supp. 3d at 394.  Plaintiffs argue that the FSIA's waiver exceptions, 28 U.S.C. §§ 1605(a)(1), 1610(a)(1) – applicable by virtue of the Republic's waiver of its jurisdictional and attachment immunity in the FAA – can be imputed to PDVSA because:  (1) the Maduro regime continues to exercise extensive control over PDVSA in Venezuela; (2) the Interim Government extensively controls PDVSA within the United States; and (3) the pertinent time for analyzing the alter ego relationship between PDVSA and the Republic is 2018.  D.I. 3 at 2.  As set forth below, each of these arguments fails.  Because Plaintiffs cannot rebut the *Bancec* presumption, the Attachment Motion must be dismissed for lack of subject matter jurisdiction under the FSIA.

## A.     Actions of the Unrecognized Maduro Regime Are Irrelevant Under *Bancec*

Plaintiffs incorrectly rely upon allegations concerning the Maduro regime's conduct related to PDVSA and its assets in Venezuela and argue that "[i]n Venezuelan territory, PDVSA is Venezuela's alter ego."  D.I. 3 at 5-7, 11-12.  Plaintiffs' argument is untenable under this Court's precedents and black letter law governing Executive Branch recognition and non-recognition of sovereigns.  Those authorities make clear that the only relationship that is relevant to the Attachment Motion is that between the Interim Government and the PDVSA *ad hoc* board, the entity that owns the specific property that Plaintiffs seek to attach.

Indeed, this Court previously recognized that "'things are not at all the same' as they were when the Court made its findings in the *Crystallex Asset Proceeding . . . 'The relevant portion of PDVSA*, which is *the property in the U.S.*, is under different control under a new legal regime . . . recognized by the U.S."  *Crystallex*, 2019 U.S. Dist. LEXIS 214167, at *7 (emphasis added).  Here, there is no dispute that:  (i) the PDVH shares – the "specific property at issue" in

11

this proceeding, *Crystallex I*, 333 F. Supp. 3d at 394 – are located in the U.S.; (ii) only the

PDVSA *ad hoc* board has any rights or interests in the PDVH shares, *see Jiménez*, 2019 Del. Ch.

LEXIS 288, at \*22; and (iii) the Maduro regime has no control over the PDVSA *ad hoc* board

and has no rights or interests in the PDVH shares.  Thus, in this garnishment proceeding, where

the alter ego analysis turns on ownership and control of the entity that owns the specific property

sought to be garnished, the actions of the Maduro regime in Venezuela are irrelevant.  *See*

*Crystallex I*, 333 F. Supp. at 394.

Plaintiffs assert, erroneously, that the location of the PDVH shares in the U.S. does not

"aid" PDVSA because certain cases from other jurisdictions "concern assets located here" but

"consider facts arising in the foreign state's territory" when applying *Bancec*.  D.I. 3 at 12.  Not

only does Plaintiffs' argument ignore this Court's prior rulings, but the cases on which Plaintiffs

rely also are inapposite because the "facts arising in the foreign state's territory" that the courts

considered were not the actions of an unrecognized regime.  Conversely, in this case, Plaintiffs

ask the Court to attribute to the Republic the Maduro regime's alleged misconduct with respect

to PDVSA and its assets in Venezuela, notwithstanding the Executive's express recognition of

the Interim Government and nonrecognition of the Maduro regime.  Plaintiffs' request must be

denied.

The U.S. Constitution vests the Executive Branch with the exclusive power to recognize

foreign states.  *See Zivotofsky v. Kerry*, 576 U.S. 1, 18 (2015).  Here, the Executive Branch

exercised that power to recognize the Interim Government as the only legitimate government of

Venezuela.  The Executive also has declared its nonrecognition of the Maduro regime and that

the Maduro regime has no authority to act on behalf of the Republic.  The Supreme Court has

repeatedly held that the Judicial Branch is bound by and cannot interfere with such

determinations.  *See Zivotofsky*, 576 U.S. at 18-19; *Pfizer v. Government of India*, 434 U.S. 308, 319-20 (1978); *United States v. Pink,* 315 U.S. 203, 229 (1942); *Guaranty Tr. Co. v. United States*, 304 U.S. 126, 137-38 (1938).  Thus, courts have consistently deferred to the Executive Branch's recognition of the Interim Government and its nonrecognition of the Maduro regime.  *See, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 932 F.3d 126, 135 n.2 (3d Cir. 2019) ("*Crystallex II*"); *Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*, No. 18-7044, 2019 U.S. App. LEXIS 17543, at *1-2 (D.C. Cir. May 1, 2019); *Casa Express Corp. v. Bolivarian Republic of Venez.*, Nos. 18 Civ. 11940 (AT), 19 Civ. 3123 (AT), 2020 U.S. Dist. LEXIS 181032, at *6-7 (S.D.N.Y. Sep. 30, 2020); *Jiménez*, 2019 Del. Ch. LEXIS 288 at *21-22, *33.

The Executive's recognition of the Interim Government has sweeping consequences.  As the recognized government of Venezuela, the Interim Government's acts, including the appointment of PDVSA's *ad hoc* board, are subject to the act of state doctrine and the validity of those acts cannot be questioned by this Court.  *See Jiménez*, 2019 Del. Ch. LEXIS 288, at *22; *Pink,* 315 U.S. at 232-33; *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303 (1918); *Underhill v. Hernandez*, 168 U.S. 250, 253-54 (1897).

Moreover, only a recognized government is deemed to have any rights in state assets.  *See Pink,* 315 U.S. at 231-32; *United States v. Belmont*, 301 U.S. 324, 328-30 (1937).  Where a foreign regime is not recognized by the Executive, courts cannot recognize that regime's assertion of rights in state assets.  *The Maret*, 145 F.2d 431, 442 (3d Cir. 1944); *see also Latvian State Cargo & Passenger S.S. Line v. McGrath*, 188 F.2d 1000, 1003-04 (D.C. Cir. 1951).  As the Supreme Court explained in *Pink,* a court's failure to observe a recognized government's rights in state property "amounts to official disapproval or non-recognition" of such rights and would fly "in the face of the underlying policy adopted by the United States when it recognized

13

the [foreign] Government."  315 U.S. at 232.  Applying *Pink*, the Third Circuit held in *The Maret*

that the Executive's nonrecognition of a foreign regime is "binding on the courts of this country

adjudicating interests in property . . . claimed by an agency of the unrecognized government."

145 F.2d at 440.  In such cases, "courts of this country may not examine the effect of decrees of

the unrecognized foreign sovereign and determine rights in property . . . upon the basis of these

decrees."  *Id.* at 442.  To do otherwise "would nullify the effect of nonrecognition by our

Executive."  *Id.*  Thus, where "two competing regimes claim to be the legitimate government

which owns [state] property, recognition by the Executive Branch of one regime as the lawful

foreign government conclusively establishes that government's title to the property."  *Republic*

*of Panama v. Air Panama Internacional, S.A.*, 745 F. Supp. 669, 672 (S.D. Fla. 1988); *see also*

*Nat'l Union Fire Ins. Co. v. Republic of China*, 254 F.2d 177, 186 (4th Cir. 1958); *Republic of*

*Panama v. Republic Nat. Bank of New York,* 681 F. Supp. 1066, 1071 (S.D.N.Y. 1988).

     Applying these principles, this Court cannot recognize the Maduro regime as having any

interest in PDVSA or its assets, or as having any authority to act on behalf of PDVSA or the

Republic.  Accordingly, the actions of the Maduro regime with respect to PDVSA cannot be

credited by this Court as official actions of Venezuela and cannot be the basis for finding an alter

ego relationship between PDVSA and the Republic.  Such allegations are irrelevant to the

*Bancec* analysis.  It would be like piercing a "non-existent corporate veil" between two entities

that do not share "common ownership" or "any similar legal relationship" – which of course

cannot be done.  *See Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528, 535 (5th Cir. 1992).  The

only relationship this Court can consider is the one between the Interim Government and

PDVSA, as managed by the *ad hoc* board.

Plaintiffs argue that § 205(3) of the Restatement (Third) of Foreign Relations Law, *The Denny*, 127 F.2d 404 (3d Cir. 1942), and *M. Salimoff & Co. v. Standard Oil Co. of N.Y.*, 186 N.E.679 (N.Y. 1933) can be read as creating an exception to the political question doctrine for acts of an unrecognized regime taken within its own territory.  *See* D.I. 3 at 12.  That argument misses the mark.  As an initial matter, the notion that acts of an unrecognized government should be considered insofar as they "deal[] solely with private, local and domestic matters," D.I. 3 at 12, is of no moment in this case where Plaintiffs ask a U.S. court to give extraterritorial effect to the acts of the Maduro regime for purposes of determining rights in property located in the United States.

Moreover, as PDVSA explained in response to OIEG's identical argument, *see OIEG*, D.I. 101 at 15-20, Transcript of Apr. 30, 2021 Hr'g at 204-16, Plaintiffs' proposed exception is foreclosed by the Third Circuit's binding decision in *The Maret*, which involved adjudication of rights in U.S. property (a maritime lien created under U.S. law) and an act of the unrecognized Soviet Estonian government within its own territory (the issuance of an expropriation decree) relating to Estonian flagged vessels.  145 F.2d at 433.  In *The Maret*, the locus of the Soviet government's act and the nationality of the vessel were irrelevant to the Third Circuit's analysis. Rather, the court held that the political question doctrine bars U.S. courts from considering the acts and decrees of a non-recognized government to "determine rights in property subject to the jurisdiction of the examining court," because "to do so would nullify the effect of nonrecognition by our Executive."  *Id.* at 441-42; *see also Nat'l Union Fire Ins. Co. v. Republic of China*, 254 F.2d 177, 186 (4th Cir. 1958) (holding that *Pink* and *The Maret* required deferring to the Executive's recognition in determining rights in property abroad for purposes of resolving a private insurance dispute); *Jiménez*, 2019 Del. Ch. LEXIS 288 at *30-31 (rejecting argument that

acts of the Maduro regime within Venezuela should be given effect and stating that the political question doctrine "does not permit domestic courts to ignore the Executive Branch's *de jure* recognition based on its own assessment of a foreign sovereign's *de facto* control").

Plaintiffs claim that *The Maret* is "inapposite" because the Third Circuit itself recognized that the situation in that case was "different" from *The Denny*.  D.I. 3 at 12.  But it is *The Denny* that is inapposite.  Indeed, in *The Maret*, the Third Circuit declined to apply *The Denny* and narrowly construed that decision as merely holding that the notarization by an official of an unrecognized government was admissible to authenticate a power of attorney.  145 F.2d at 439 n.38.  Plaintiffs' reliance upon *Salimoff* fares no better.  That case was addressed and overruled by the Supreme Court in *Pink* to the extent the New York state court failed to give effect to the U.S. recognition of the Soviet government in Russia.  *See* 315 U.S. at 229, 233; *OIEG*, D.I. 101 at 18-20.  Thereafter, in *The Maret*, the Third Circuit considered *Salimoff* and rejected it as overruled by the Supreme Court in *Pink*.  *The Maret*, 145 F.2d at 439-42, 441-42; *see also Autocephalous Greek-Orthodox Church v. Goldberg & Feldman Fine Arts, Inc.*, 917 F.2d 278, 292-93 (7th Cir. 1990) (rejecting *Salimoff* in favor of *The Maret*); *Latvian State Cargo*, 188 F.2d at 1002-03 (similar).

Plaintiffs' reliance upon the Restatement is similarly misplaced.  The Restatement does not and cannot displace the binding precedent of *The Maret*, nor does it even suggest that a U.S. court can give effect to acts of an unrecognized government where, as here, the United States has recognized another government as the foreign state's sole legitimate government.  *See OIEG*, D.I. 101 at 17-18.  To the contrary, the Restatement makes clear that the Executive's recognition of a foreign government is binding and amounts to the nonrecognition of any rival government.  *See* Restatement § 203 cmt. f and § 204.

Accordingly, Plaintiffs offer no basis, and there is none, for attributing the acts of the illegitimate Maduro regime to the Republic.

### B.    Plaintiffs' Allegations Concerning the Interim Governing Are Insufficient to Rebut the *Bancec* Presumption of Separateness

Plaintiffs argue in the alternative that, "[e]ven if the Court does not consider the actions of the Maduro government and looks solely to the actions of the Guaidó government, PDVSA is still Venezuela's alter ego." D.I. 12 at 13.  Plaintiffs offer no actual evidence in support of this argument and their sparse and conclusory assertions concerning the Interim Government are woefully insufficient to rebut the presumption of separateness under *Bancec*.  To the contrary, the Interim Government does not exert day-to-day control over the PDVSA *ad hoc* board and the actions the Interim Government has taken with respect to PDVSA are fully consistent with the responsibilities that come with being a sole shareholder and a regulator.

The Supreme Court held in *Bancec* that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."  *Crystallex II*, 932 F.3d at 140 (quoting *Bancec*, 462 U.S. at 626-27).  This "presumption of independent status" flows from corporate principles of limited liability and the judicial imperative that "[d]ue respect" be shown "for the actions taken by foreign sovereigns and for principles of comity between nations."  *Bancec*, 462 U.S. at 626-27; *see also Crystallex II*, 932 F.3d 140.  Thus, the "strong presumption" of separateness between a foreign state and its instrumentality is "not to be taken lightly."  *Crystallex II*, 932 F.3d at 140; *see also Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 201 (2d Cir. 2016).  Plaintiffs bear the burden of rebutting the *Bancec* presumption.  *Crystallex II*, 932 F.3d at 145-46.

In *Bancec*, the Supreme Court stated that this presumption may be overcome when "a corporate entity is so extensively controlled by its owner that a relationship of principal and

agent is created," and, "[i]n addition," respecting its corporate separateness "would work fraud or injustice."  462 U.S. at 629.  The Third Circuit interpreted that passage to mean that "*Bancec* establishes a disjunctive test for*" piercing the corporate veil of a government instrumentality for FSIA purposes.  *Crystallex II*, 932 F.3d at 140.  Plaintiffs rely only on the so-called "extensive-control prong."  *Id*. at 141.

It is an inherent feature of government ownership that the state will exercise some degree of control over a state-owned company, both as shareholder and regulator.  *See Bancec*, 462 U.S. at 613-14.  As the Court explained in *Bancec*, a "typical government instrumentality" has the following characteristics:

> [It] is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law.  The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued.  Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances.  The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

*Id*. at 624.  "These same features frequently prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large-scale national investments."  *Id*. at 625.

Under this paradigm, typical shareholder and regulatory control cannot form the basis for overcoming the *Bancec* presumption.  *See Gater Assets Ltd. v. Moldovagaz*, 2 F.4th 42, 55-56 (2d Cir. 2021) ("To qualify as sufficiently extensive under *Bancec*, the sovereign's control over an entity must rise above the level that corporations would normally tolerate from significant shareholders or expect from government regulators."); *GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598, 606 (D.C. Cir. 2016) (holding that, because a state may "wield power not

only 'as shareholder' but also as 'regulator,'" legitimate regulatory oversight cannot be the basis for disregarding a government instrumentality's corporate separateness (quoting *TransAmerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 851 (D.C. Cir. 2000))); *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1072-74 (9th Cir. 2002).

The U.S. District Court for the District of Columbia recently concluded that Tajikistan's wholly owned national airline, Tajik Air, was a typical government instrumentality, notwithstanding the substantial degree of shareholder control and regulatory oversight exercised by the Tajik government. *UAB Skyroad Leasing v. OJSC Tajik Air*, No. 20-cv-00763 (APM), 2021 U.S. Dist. LEXIS 13872, at *35-37 (D.D.C. Jan. 26, 2021). Tajik Air was created by a legislative decree in 2009 transferring a state enterprise to a private joint-stock company. *Id.* at *14-15. After its restructuring, the government owned 100% of Tajik Air's voting shares. *Id.* at *18. The government exercised its right as sole shareholder in many ways, including by appointing and having the power to dismiss Tajik Air's Director General, indirectly funding Tajik Air through tax offsets for creditors, and maintaining sole responsibility for the purchase, lease, and funding of aircraft. *Id.* at *18-19. The board of directors of Tajik Air was made up of high-level government officials, including the Prime Minister, First Deputy Prime Minister, Deputy Prime Minister, and the Ministers of Finance, Transport, and Justice. *Id.* at *25. The government also controlled the disbursement of the company's profits. *Id.* at *18. Tajik Air was represented by a government lawyer in the underlying arbitration. *Id.* at *5. None of these facts, however, showed anything more than an ordinary relationship between a sole government shareholder and its instrumentality and thus were insufficient to overcome the presumption of separateness. *Id.* at *35.

19

In short, to overcome the *Bancec* presumption based on control alone, the degree of government control must "significantly exceed[] the normal supervisory control exercised by any corporate parent over its subsidiary." *Crystallex II*, 932 F.3d at 143 (quoting *TransAmerica*, 200 F.3d at 848). A plaintiff must show that the government exercises "complete domination," so that the state and its instrumentality are "not meaningfully distinct entities." *TransAmerica*, 200 F.3d at 848.

In assessing whether an instrumentality is so extensively controlled that an alter ego relationship exists, the Third Circuit looks to five factors: (1) "the degree to which government officials manage the entity or otherwise have a hand in its daily affairs"; (2) "the level of economic control by the government"; (3) "whether the entity's profits go to the government"; (4) "whether the government is the real beneficiary of the entity's conduct"; and (5) "whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." *Crystallex II*, 932 F.3d at 141 (quoting *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018)). These factors are not meant to "establish a 'mechanical formula,'" but should serve as a guide for a "case-by-case analysis." *Id.* (quoting *Bancec*, 462 U.S. at 633). Still, the "touchstone inquiry" remains "'whether the sovereign state exercise[s] significant and repeated control over the instrumentality's day-to-day operations.'" *Gater Assets*, 2 F.4th at 55 (quoting *EM Ltd.*, 800 F.3d at 91).

Looking at the facts as they exist today, Plaintiffs have failed to meet their burden of showing that the Interim Government exercises the extensive day-to-day control over PDVSA necessary to satisfy *Bancec*. Since February 2019, when Interim President Guaidó appointed PDVSA's *ad hoc* board, the *ad hoc* board's actions have made clear that PDVSA operates as an independent economic entity, subject only to the ordinary control and oversight exercised over a

typical government instrumentality.  Plaintiffs' conclusory and unsupported allegations come nowhere close to showing even the high degree of government involvement that the D.C. district court rejected in *UAB Skyroad* as insufficient to show complete domination under *Bancec*. Indeed, many of the salient facts the Third Circuit and this Court relied upon to pierce PDVSA's corporate veil in *Crystallex* no longer hold true.  Those changed circumstances compel a finding that PDVSA is a legally separate instrumentality whose sovereign immunity cannot be abrogated.

             1.     *The Republic does not manage PDVSA's daily affairs*.

As to the first factor – "the degree to which *government officials* manage the entity or otherwise have a hand in its *daily affairs*" – the Third Circuit concluded that Venezuela wielded extensive control over PDVSA's day-to-day operations not only because Venezuela's president appointed PDVSA's officers and directors (as is the right of any sole shareholder), *but also because*: (i) Venezuela's oil minister often served as the president of PDVSA, allowing the government to "control the daily operations of PDVSA"; (ii) military officials served as officers of PDVSA; (iii) the Ministry of Petroleum and Mining shared physical office space with PDVSA for their headquarters; and (iv) the government wielded influence over PDVSA's employees through politically motivated firings and threats of termination for those who did not support the Socialist Party.  *Crystallex II*, 932 F.3d at 148.  Other than the unexceptional fact that Interim President Guaidó appointed the members of PDVSA's *ad hoc* board, Plaintiffs have presented no evidence showing that any of the other circumstances remain true today.  *See Bancec*, 462 U.S. at 624 (noting that a typical government instrumentality is "managed by a board *selected by the government*" (emphasis added)); *EM Ltd.*, 800 F.3d at 92-93 ("Missing from plaintiffs' allegations are any claims that Argentina's appointment of board members then caused it to interfere in and dictate BCRA's daily business decisions"); *TransAmerica*, 200 F.3d at 851.

To the contrary, the *ad hoc* board, which does not include any government officials or military personnel, has acted in accordance with the laws, regulations and decrees enacted by the Interim Government and taken steps to insulate PDVSA's daily affairs from extraordinary government interference:

- The National Assembly's April 2, 2019 "Accord to Expand the Powers Vested and the Number of Ad-Hoc Board Members of PDSA" distances PDVSA from the control of the Minister of Petroleum and Mining by "suspending any functions given to the Minister of Hydrocarbons and any other government official, branch, or agency related to PDVSA." Brewer-Carías Decl. ¶ 39.[5]

- Pursuant to Article 7 of Presidential Decree No. 3, the *ad hoc* board acts "autonomously and independently" and "refrain[s] from following political or partisan guidelines." Brewer-Carías Decl. ¶ 40; Medina Decl. ¶ 4.

- No officer of the Interim Government has influenced or interfered with the *ad hoc* board's management of PDVSA's direct and indirect U.S. subsidiaries. Medina Decl. ¶ 11(b).

- No officer of the Interim Government has intervened in the commercial affairs of PDVSA, PDVH or its subsidiaries by, for example managing production levels, setting prices, selecting customers, or dictating terms of customer relationships. *Id.* ¶ 11(c).[6]

- No officer of the Interim Government has imposed any material commitments on PDVSA's *ad hoc* board or on PDVH or its subsidiaries. *Id.* ¶ 11(d).

- No officer of the Interim Government nor any military official holds any seat on the board or any board seat or

---

[5] Plaintiffs cite to this Accord as purported evidence of the Interim Government's economic control over PDVSA, but do not even attempt to explain how it supports Plaintiffs' position. D.I. 3 at 8, 13.

[6] Plaintiffs' assert that the "Guaidó government 'installed' politically connected allies to run" PDVSA's subsidiaries. D.I. 3 at 13. That is not true. After the Interim President appointed the PDVSA *ad hoc* board, the *ad hoc* board then exercised its right as shareholder to appoint the PDVH board, which in turn appointed the board of CITGO Holding, which in turn appointed the board of CITGO Petroleum. *See Jiménez*, 2019 Del. Ch. LEXIS 288 at *13; *see also Gater Assets*, 2 F.4th at 59 ("Appointing loyal board members is a due 'exercise of power incidental to ownership.'") (quoting *EM Ltd.*, 800 F.3d at 92-93).

senior management position at PDVSA or its U.S. subsidiaries.  *Id.* ¶ 11(e)-(f).

- Although Interim President Guaidó has the power to appoint and remove the members of the PDVSA *ad hoc* board, no board member has been removed for any reason. *Id.* ¶ 11(g).

- No officer of the Interim Government has hired or fired any employees of PDVH or its subsidiaries, and no officer of the Interim Government has threatened to terminate any employees of PDVH or its subsidiaries for any reason.  *Id.* ¶ 11(h)-(i).

Following these substantial changes, it cannot be seriously sustained that the Interim Government plays an active role in PDVSA's daily affairs, let alone exerts complete domination over PDVSA.

Because they have no evidence that the Interim Government controls PDVSA's day-to-day operations, Plaintiffs resort to mischaracterizing news reports.  For example, Plaintiffs cite to a news article from August 2020 reflecting a single report that the then-chairman of the PDVSA *ad hoc* board made to the National Assembly as part of PDVSA's "commitment to transparency," D.I. 4-1, Ex. 31, and assert in conclusory fashion that the *ad hoc* board "reports directly to the Guaidó-led legislature."  D.I. 3 at 9, 13.  As Mr. Medina, the current chairman of the PDVSA *ad hoc* board explained, although PDVSA submits periodic reports to the National Assembly, the board does not take orders or directives from any government official, and instead facilitates PDVSA's role as a shareholder with respect to its U.S. subsidiaries.  Medina Decl. ¶¶ 6-7, 11; *see also Gater Assets*, 2 F.4th at 59 (finding that a law requiring board members to report to the government on the company's affairs was not evidence of day-to-day control).  Nor do the handful of articles in which representatives of the Interim Government refer to the protection of PDVSA's assets demonstrate in any way that the Interim Government controls

PDVSA's daily operations.  *See* D.I. 3 at 9 (citing D.I. 4-1, Exs. 32-34).  If anything, they demonstrate the significant steps that have been taken to undo the damage caused by Maduro and insulate PDVSA and its assets from government interference.

> 2. *The Republic does not exert excessive economic control over PDVSA.*

With respect to the second factor – "the level of economic control by the government" – the Third Circuit in *Crystallex* relied on certain financial disclosures in which PDVSA asserted not only that it was "controlled by the Venezuelan government," but also that the government could "intervene in [PDVSA's] commercial affairs" and that the government, in fact, required PDVSA to make contributions to social programs at the expense of its future operations and to acquire assets that had "nothing to do with its business."  *Crystallex II*, 932 F.3d at 146.  The court also pointed to the government's power to dictate to whom and at what price oil was sold, as well as the fact that the government required PDVSA to use an artificially low U.S. Dollar-to-Bolivar exchange rate.  *Id.* at 147.  While Plaintiffs assert in conclusory fashion that the level of economic control remains the same today, those circumstances are not present under the Interim Government.

To the contrary, the Interim Government has taken significant steps to insulate PDVSA's commercial affairs from government interference.  Under the Transition Statute and Presidential Decree No. 3, PDVSA's *ad hoc* board and the boards of its U.S. subsidiaries must make business decisions independent from any political considerations, and the *ad hoc* board is expressly forbidden from using the assets of PDVSA's subsidiaries for the political benefit of Venezuela. *See* Brewer-Carías Decl. ¶¶ 16, 41; Medina Decl. ¶ 14.  Presidential Decree No. 3 mandates strict political independence, ordering the *ad hoc* board to "exercise the powers conferred herein autonomously and independently, following only technical criteria aimed at the efficient

management of PDVSA's direct and indirect subsidiaries organized abroad."  Brewer-Carías Decl. ¶ 40.

Although the legal structure and obligations of PDVSA "stem in part from the Venezuelan constitution, which endows the State with . . . control over PDVSA and the oil industry in the country," *Crystallex II*, 932 F.3d at 147, Plaintiffs do not contend that the Interim Government uses that power to force PDVSA to take actions outside the scope of its business enterprise or otherwise insert itself into the company's economic planning.  In fact, no Interim Government official has issued any order to PDVSA's *ad hoc* board with respect to production levels, pricing, selection of customers, or the terms of customer relationships.  Medina Decl. ¶ 11(c).

Plaintiffs contend that the "legislature must approve any PDVSA contract with a foreign national, including even ordinary transactions such as the payment of legal fees," citing to Article 36 of the Transition Statute and PDVSA's arguments in another case as to the invalidity of its 2020 bonds due to lack of legislature approval.  D.I. 3 at 8, 13.  However, the Transition Statute reflects the Interim Government acting as regulator to repair the calamitous economic consequences of the unlawful actions of the Chávez and Maduro regimes and to restore PDVSA's commercial autonomy.  Brewer-Carías Decl. ¶ 32.  Enacting measures to put an end to decades-long corruption is not evidence of an alter ego relationship under *Bancec*.  *See GSS Grp.*, 822 F.3d at 606-07 (holding that Liberian government's termination of plaintiff's contract with state-owned port authority was a "quintessential function of a government regulator" and reflected "Liberia's broader regulatory goal of remedying past financial mismanagement."); *see also OIEG*, Transcript of Apr. 30, 2021 Hr'g at 222-26 (PDVSA's counsel addressing the same

argument).  For the same reasons, the National Assembly's refusal to recognize certain PDVSA bonds issued during the corrupt Maduro regime does not support an alter ego finding.[7]

The allegation concerning government approval of PDVSA's legal fees was addressed in *Northrop*.  *See Northrop*, D.I. 32 at 21-22.  As PDVSA explained, in October 2019, the National Assembly approved by Resolution the use of PDVSA's own funds for the legal defense of PDVSA's assets outside of Venezuela, for example, in cases involving creditors in the United States aimed at seizing PDVSA's shares in PDVH.  The October 2019 Resolution involved the authorization of expenditures outside of PDVSA's ordinary operations and served merely as a procedural safeguard to check potential abuse.  Medina Decl. ¶ 18; *see also UAB Skyroad*, 2021 U.S. Dist. LEXIS 13872, at *21-22 (holding that a sovereign decision to have "the last word in making an extraordinary expenditure" was part of "the normal supervisory control one would expect from a sole shareholder").  Moreover, the National Assembly does not order or direct the *ad hoc* board to pursue specific business policies or business transactions, such as the selection of counsel, legal strategy or the day-to-day payment of legal fees.  Medina Decl. ¶¶ 11(c), 18.

Plaintiffs also point to the Interim Government's stated plan to globally restructure Venezuela's and PDVSA's debts.  *See* D.I. 3 at 8-9, 13.  Venezuela is confronted with an extraordinary fiscal and humanitarian crisis.  The aspirational statement of a desire to resolve legacy debt in an orderly fashion, Medina Decl. ¶ 15, is not evidence of an alter ego relationship. *See Gater Assets*, 2 F.4th at 60 ("[W]e cannot conclude that a government's intercession on behalf of an important domestic utility company renders that company its alter ego—especially

---

[7] In addition, as addressed at the April 30, 2021 hearing, including through the testimony of Mr. Medina, PDVSA's position that the 2020 bonds are invalid does not demonstrate that the Interim Government must currently approve all PDVSA contracts.  *OIEG*, Transcript of Apr. 30, 2021 Hr'g at 227-29.  Instead, there is a long-standing provision of the Venezuelan Constitution providing that certain "national public interest contracts" require National Assembly approval, and the 2020 bonds, which were secured by a pledge of 50.1% of the equity in CITGO Holding, fell within that category.  *Id.*

where the government's efforts are related to promoting the company's interests vis-à-vis other entities rather than directing the company's day-today operations."); *TransAmerica*, 200 F.3d at 850-52 (government did not exercise extensive control over state-owned company by "overseeing the restructuring" of the company and "inject[ing] funds into [the company] as part of the restructuring plan."); *UAB Skyroad*, 2021 U.S. Dist. LEXIS 13872, at *31; *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289, 297 (S.D.N.Y. 1987).

> 3. *The Republic does not impose extraordinary fiscal obligations on PDVSA.*

With regard to the third factor – "whether the entity's profits go to the government" – the Third Circuit took into account more than ordinary profits that one would expect to flow to a sole shareholder as a return on investment or ordinary taxes and royalties that one would expect a government to collect from oil revenues.  In particular, the court identified "extraordinary taxes" set at "an artificial rate designed" to intercept excess revenues that PDVSA could otherwise use for its business operations.  Plaintiffs do not present any evidence to show that the Interim Government drains PDVSA of its revenues through extraordinary fiscal obligations.[8]  Rather, under the new laws enacted by the National Assembly, the *ad hoc* board is expressly prohibited from permitting the assets and resources of PDVSA's U.S. subsidiaries to be used for the sole benefit of Venezuela.  Brewer-Carías ¶¶ 16, 41; Medina Decl. ¶ 14.  Further, the Interim Government has its own source of funds and does not draw its funding from PDVSA or its U.S. subsidiaries.  Medina Decl. ¶ 19.

---

[8] Plaintiffs cite one article that they claim shows that in February 2019 the Interim Government gained "direct access to PDVSA's bank accounts inside the United States."  D.I. 3 at 8, 13 (citing D.I. 4-1, Ex. 29).  Putting aside that the article does not support Plaintiffs' characterization, Plaintiffs make no allegation that the Interim Government ever actually accessed or withdrew funds from PDVSA's bank accounts in the U.S.

4.      *The ad hoc board acts in PDVSA's economic interest.*

As to the fourth factor – "whether the government is the real beneficiary of the entity's conduct" – the Third Circuit found that Venezuela used PDVSA to advance the state's sovereign interests to the detriment of PDVSA's business interests.  The court pointed to the fact that Venezuela sold oil cheaply to certain allies without paying PDVSA.  *Crystallex II*, 932 F.3d at 148-49.  The court also noted that PDVSA paid certain expenses on behalf of Venezuela in the underlying arbitration to which PDVSA was not a party, and that the interests in the gold mines that were the subject of the expropriation claim in the underlying arbitration were transferred to PDVSA for no consideration in a "seamless transfer of value between PDVSA and Venezuela." *Id.* at 149.  None of those circumstances is present in this case.

There is not a single allegation that the Interim Government has forced PDVSA or its U.S. subsidiaries to sell oil at fire-sale prices to advance Venezuela's political alliances, that the Venezuelan government receives direct payments for sales of oil, or that the Interim Government forces PDVSA or its U.S. subsidiaries to contribute to governmental efforts unrelated to its business.  The reason is clear: the Interim Government does not use PDVSA in that way. Medina Decl. ¶¶ 11.[9]

Lacking any actual evidence, Plaintiffs cite to certain statements by the Interim Government concerning the importance to its administration of protecting CITGO and argue that "[t]he primary aim of the Guaidó government appears to be using PDVSA to prop up its own political power and legitimacy."  D.I. 3 at 9, 14.  It is unsurprising that Venezuela, PDVSA's sole shareholder, would be concerned with the protection of PDVSA's assets and the assets of its

---

[9] Plaintiffs make the conclusory assertion that "the Guaidó government uses PDVSA assets to directly benefit the people of Venezuela[,]" alleging that "the Simón Bolívar Foundation (a charitable foundation of CITGO) has supported social welfare projects for the benefit of" Venezuelans.  D.I. 3 at 9, 14 (citing D.I. 4-1, Ex. 31).  CITGO's charitable foundation is not a "PDVSA asset[]," and Plaintiffs do not allege that the Interim Government forced CITGO to support those projects or had any role in CITGO's decision as to how to use its foundation.

U.S. subsidiaries.  This is particularly true in light of the Maduro regime's prior treatment of PDVSA's assets.  Plaintiffs improperly ignore this context entirely.  *See GSS*, 822 F.3d at 606-07 (recognizing the importance of the "context" in which Liberia's actions were taken in light of "Liberia's broader regulatory goal of remedying past financial mismanagement.").

     5.    *Adherence to separate identities would not entitle Venezuela to benefits in United States courts while avoiding its obligations.*

As to the fifth factor – "whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations," *Crystallex II*, 932 F.3d at 141 – the Third Circuit in *Crystallex* held that this factor required some showing of "unfairness," which was satisfied in that case because "PDVSA profited . . . from Crystallex's injury [as] Venezuela transferred the rights to the expropriated mines to PDVSA for no consideration." *Crystallex II*, 932 F.3d at 149.  No such inequity exists here.  Plaintiffs argue that because the bonds issued by the Republic are governed by U.S. law and the jurisdiction of U.S. courts, "[a]ny outcome where Plaintiffs are not paid means that Venezuela has avoided its obligations."  D.I. 3 at 14.  However, Plaintiffs do not and cannot allege that PDVSA has benefitted in any way from the underlying bond transaction or the Republic's default.

*** 

In sum, Plaintiffs have failed to show that the Interim Government treats PDVSA as anything other than a "typical government instrumentality."  *Bancec*, 462 U.S. at 624; *see UAB Skyroad*, 2021 U.S. Dist. LEXIS 13872, at *35-37.  Thus, Plaintiffs have failed to demonstrate that an exception to PDVSA's own sovereign immunity applies and the Attachment Motion must be dismissed for lack of subject matter jurisdiction.

### C.     The "Pertinent Time" for the Alter Ego Analysis is the Present, Not 2018

Plaintiffs' halfhearted, final argument as to why PDVSA should be considered the alter ego of the Republic is that "Venezuela injured Plaintiffs in 2018, before the Guaidó government's recognition, and the time of injury governs the alter-ego analysis." D.I. 3 at 14. However, in the very same paragraph, Plaintiffs acknowledge, as they must, that "this Court has held otherwise." *Id.* Indeed, in *Crystallex III*, this Court expressly held that the "pertinent time" for the alter ego analysis is "the period between the filing of the motion seeking a writ of attachment and the subsequent issuance and service of that writ." 2021 U.S. Dist. LEXIS 7793, at *18. Plaintiffs filed their Attachment Motion on November 22, 2021. Thus, facts that may have existed in 2018 are irrelevant. The only relevant inquiry is whether, since November 22, 2021, the Interim Government has exercised extensive control over PDVSA, as managed by the *ad hoc* Board. As to that inquiry, Plaintiffs have failed to meet their burden.

## II.     The Attachment Motion Must Be Denied Because Plaintiffs' Requested Relief is Barred by OFAC Sanctions and is Not Ripe for Adjudication

Absent a specific license, the Venezuela sanctions program prohibits any "judicial process purporting to transfer or otherwise alter or affect property or interests in" blocked property. 31 C.F.R. § 591.407; *see also* 31 C.F.R. 591.506(c). OFAC regulations broadly define the term "transfer" to mean "*any actual or purported act or transaction, . . . the purpose, intent, or effect of which is to create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property*[,]" including, among other things, "the creation or transfer of any lien; the issuance, docketing, or filing of, or levy of or under, any judgment, decree, attachment, injunction, execution, or other judicial or administrative process or order, or the service of any garnishment." 31 C.F.R. § 591.310 (emphasis added). OFAC's definition of "property" and "property interest" are similarly broad

and include "*any* [] property . . . or interests therein, present, *future, or contingent*."  31 C.F.R. § 591.309 (emphasis added).

Plaintiffs concede that OFAC sanctions prohibit the issuance and service of a writ of attachment with respect to PDVSA's shares of PDVH without a specific license and that Plaintiffs have no such license.  D.I. 3 at 17.  Plaintiffs also concede that OFAC regulations bar the creation of contingent interests in the PDVH shares absent a specific license.  *Id.* at 18. Indeed, OFAC has issued guidance interpreting the amended regulations – 31 C.F.R. §§ 591.309, 591.310, 591.407 and 591.506 – to mean that "a specific license from OFAC *is required* for . . . the purported creation or perfection of any legal or equitable interests (*including contingent or inchoate interests*) in blocked property."  OFAC FAQ 808 (Dec. 9, 2019).[10]  Thus, Plaintiffs' concessions alone require the Court to deny the Attachment Motion without prejudice to refiling if Plaintiffs do receive the license required to obtain an attachment under federal law.

Nevertheless, Plaintiffs assert that the regulations do not bar their requested relief, because Plaintiffs seek entry of an order authorizing issuance and service of the writ "*conditioned on*" OFAC authorization.  D.I. 3 at 18 (emphasis in original).  According to Plaintiffs, this requested relief "depends entirely on the exercise of governmental discretion," and therefore creates only an "expectancy" and not a prohibited "property interest" in the PDVH shares.  *Id.*  Plaintiffs' invented "expectancy" exception to the Venezuelan Sanctions Regulations finds no support in the regulations themselves, which require a specific license *before* granting Plaintiffs' requested relief – which in reality is simply a contingent right or interest by another name.

---

[10] *Available at*: https://home.treasury.gov/policy-issues/financial-sanctions/faqs/808.

Indeed, OFAC makes no exception for the creation of interests made "conditioned on" OFAC approval.  Again, OFAC's regulations state unequivocally that blocked property interests include *any* interest in the PDVH shares whether "present, future, or contingent."  31 C.F.R. § 591.309.  OFAC regulations expressly contemplate that some restricted "transfers" may be acts that are only effective later, given that the definition of an illegal transfer includes "any actual or purported act or transaction" with even the "purpose [or] intent" to "alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to" blocked property interests.  *Id.* § 591.310.  Thus, Section 591.407 requires a specific license *before* any such contingent "transfer" occurs "through . . . judicial process," even if the ultimate transfer will occur only after OFAC grants a license.  *Id.* § 591.407.  This is confirmed by OFAC's authoritative guidance that a specific license "is required" for "the purported creation . . . of any . . . contingent or inchoate interests[] in blocked property."  OFAC FAQ 808.

OFAC regulations also make clear that any unlicensed "transfer" of any interest in the PDVH shares, even where such transfer is executed via "judicial process," "is *null and void* and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power, or privilege with respect to such property or property interest."  31 C.F.R. § 591.202(a) (emphasis added); *see also* 31 C.F.R. § 591.202(e).  Thus, if the Court were to issue an order having the effect of creating a contingent interest in the PDVH shares, such an interest would be null and void.  *See Dames & Moore v. Regan*, 453 U.S. 654, 672-75 (1981); *Behring Int'l, Inc. v. Imperial Iranian Air Force*, 699 F.2d 657, 660, 664 (3d Cir. 1983).

Moreover, Plaintiffs' argument that their requested relief "depends entirely" on OFAC authorization, which may never occur, demonstrates that the Attachment Motion is not ripe for adjudication.  The Third Circuit has held that "[a] dispute is not ripe for judicial determination if

it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Sherwin-Williams Co. v. Cty. of Del.*, 968 F.3d 264, 272 (3d Cir. 2020) (quoting *Wyatt, V.I., Inc. v. Gov't of V.I.*, 385 F.3d 801, 806 (3d Cir. 2004)); *see also Suburban Trails, Inc. v. N.J. Transit Corp.*, 800 F.2d 361, 369 (3d Cir. 1986) (vacating and remanding a case on ripeness grounds because resolution of the case hinged on discretionary agency action that had not yet occurred). Here, by Plaintiffs' own admission, the Attachment Motion seeks relief that is necessarily contingent upon future conduct by third parties, namely, the issuance of a license by OFAC or the lifting of sanctions, and therefore is not ripe for adjudication. *See Republic of Panama v. Lexdale, Inc.*, 804 F. Supp. 1521, 1524 (S.D. Fla. 1992) (dismissing an action on ripeness grounds because plaintiff sought relief with respect to the potential enforcement of a judgment against blocked property that "will only come to pass if third party OFAC issues a license to [the judgment creditor] or if third party President of the United States lifts the blocking order"). Any order granting the Attachment Motion would thus be an advisory opinion and a nullity. *See Simon v. Southern Ry. Co.*, 236 U.S. 115, 132 (1915); *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 421 (3d Cir. 2013); *Arrington v. ColorTyme, Inc.*, 972 F. Supp. 2d 733, 739 (W.D. Pa. 2013).

## III. The Attachment Motion Must Be Denied Under Delaware Law

Even if the Court determines that Plaintiffs have satisfied the *Bancec* test, the Attachment Motion still must be denied because Delaware law, applicable by virtue of Federal Rule 69(a), precludes the attachment of PDVSA's shares in PDVH to satisfy Plaintiffs' Judgment against the Republic. Because PDVSA, which is not the judgment debtor, is the record owner of 100% of the PDVH shares, as listed on the books of the corporation, and the Republic's name is not on PDVH's books, Plaintiffs can only attach the PDVH shares if they satisfy the requirements of Delaware law for piercing the corporate veil between PDVSA and the Republic. *See* 8 Del. C.

§ 324(a); *Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 769 (Del. Ch. 2009); *see also OIEG*, D.I. 65 at 31-35; *Northrop Grumman*, D.I. 32 at 29-31. Plaintiffs cannot do so because "Delaware law requires showing fraud – not just extensive control – to seize the property of a non-debtor like PDVSA[,]" and Plaintiffs do not and cannot allege that fraud exists in this case.  *Crystallex IV*, Slip Op. at 7-8 (citing *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003)).

Plaintiffs claim that Delaware alter ego law does not apply because *Bancec* "preempts contrary state law."  D.I. 3 at 17.  But the decision in *Bancec* pertains only to whether jurisdiction exists over PDVSA and whether PDVSA's property can be deemed property of the Republic for purposes of the immunity analysis under the FSIA.  *Bancec* does not purport to displace state law rules governing the attachment and execution of assets.  Nor could it, given that Federal Rule 69(a) expressly commands that state law applies to such inquiries.  *Schreiber v. Kellogg*, 849 F. Supp. 382, 387 (E.D. Pa. 1994) (holding that Rule 69 requires the application of "state law in determining whether the defendant has an interest in property which is subject to execution," such that "property which is exempt from attachment under state law is not subject to attachment in execution of a federal judgment"), *rev'd on other grounds*, 50 F.3d 264, 267 (3d Cir. 1995); *see also Delaware v. New York*, 507 U.S. 490, 502 (1993) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law." (quoting *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992))); *Lnc Invs. v. Democratic Republic of Congo*, 69 F. Supp. 2d 607, 611 (D. Del. 1999).

Courts have also consistently held that ordinary state law rules apply in determining whether a foreign state's assets are subject to attachment in aid of execution, provided those assets are not entitled to immunity under the FSIA.  *See Republic of Argentina v. NML Capital,*

*Ltd.*, 573 U.S. 134, 140 (2014); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 474 n.10 (2d Cir. 2007); *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir. 1996).

Accordingly, the Attachment Motion must be denied for the additional reason that Plaintiffs have failed to satisfy the requirements of Delaware law.

## IV.    A Reasonable Period Time Has Not Elapsed Under Section 1610(c) of the FSIA

The FSIA directs that "no attachment or execution . . . shall be permitted until the court has . . . determined that a reasonable period of time has elapsed following the entry of judgment."  28 U.S.C. § 1610(c).  "[A] court's determination of 'reasonable time' should be informed by an examination of the procedures necessary for the foreign state to pay the judgment (such as the passage of legislation), evidence that the foreign state is actively taking steps to pay the judgment, and evidence that the foreign state is attempting to evade payment of the judgment."  *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001) (citing H.R. Rep. No. 94-1487 (1976)).  The reasonableness of the period of time "will . . . vary according to the nuances of each case."  *Id.*

Venezuela and PDVSA cannot pay the Judgment due to the OFAC sanctions.  None of the cases cited by Plaintiffs addresses the extraordinary circumstances of this case, namely the existence of OFAC regulations *and* an unprecedented political situation in which the U.S. has recognized a foreign government that is still in the process of transitioning into power in the face of an intransigent illegitimate regime and a major humanitarian emergency.  In light of these circumstances, it would be unreasonable to permit Plaintiffs to commence enforcement efforts.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Attachment Motion for lack of jurisdiction under the FSIA and deny Plaintiffs' requested relief.

HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/ Samuel T. Hirzel, II*

OF COUNSEL:

Joseph D. Pizzurro
Julia B. Mosse
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

Dated: January 21, 2022

Samuel T. Hirzel, II (#4415)
Aaron M. Nelson (#5941)
Jamie L. Brown (#5551)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
shirzel@hegh.law
anelson@hegh.law
jbrown@hegh.law

*Attorneys for Intervenor Petróleos de Venezuela, S.A.*

42032238

36