## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OI EUROPEAN GROUP B.V.,<br><br>       Plaintiff,<br><br>       v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>       Defendant. | Misc. No. 19-290-LPS |
| PHILLIPS PETROLEUM COMPANY VENEZUELA LIMITED and CONOCOPHILLIPS PETROZUATA B.V.,<br><br>       Plaintiffs,<br><br>       v.<br><br>PETRÓLEOS DE VENEZUELA, S.A., CORPOGUANIPA, S.A. and PDVSA PETRÓLEO, S.A.,<br><br>       Defendants. | Misc. No. 19-342-LPS |
| NORTHROP GRUMMAN SHIP SYSTEMS, INC.,<br><br>       Plaintiff,<br><br>       v.<br><br>THE MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA,<br><br>       Defendant. | Misc. No. 20-257-LPS |
| ACL1 INVESTMENTS LTD., ACL2 INVESTMENTS LTD., and LDO (CAYMAN) XVIII LTD.,<br><br>       Plaintiff,<br><br>       v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>       Defendant. | Misc. No. 21-46-LPS |

Jody C. Barillare and Kelsey A. Bomar, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, DE

Sabin Willett, Jonathan Albano, and Christopher L. Carter, MORGAN, LEWIS & BOCKIUS LLP, Boston, MA

Edward H. Davis, Jr., Fernando J. Menendez, and Cristina Vicens Beard, SEQUOR LAW, P.A., Miami, FL

> Attorneys for OI European Group B.V.

Garrett B. Moritz, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE

Michael S. Kim, Marcus J. Green, and Josef M. Klazen, KOBRE & KIM LLP, New York, NY

Michael Sherwin, KOBRE & KIM LLP, Washington, DC

> Attorneys for Phillips Petroleum Co. Venezuela Ltd. and ConocoPhillips Petrozuata B.V.

Laura Davis Jones and Peter J. Keane, PACHULSKI STANG ZIEHL & JONES LLP, Wilmington, DE

Alexander A. Yanos, Rajat Rana, and Robert Poole, ALSTON & BIRD, LLP, New York, NY

> Attorneys for Northrop Grumman Ship Systems, Inc.

Marie M. Degnan, ASHBY & GEDDES, Wilmington, DE

Joshua S. Bolian and Keane A. Barger, RILEY WARNOCK & JACOBSON, PLC, Nashville, TN

> Attorneys for ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd.

A. Thompson Bayliss and Stephen C. Childs, ABRAMS & BAYLISS LLP, Wilmington, DE

Sergio J. Galvis, Joseph E. Neuhaus, James L. Bromley, SULLIVAN & CROMWELL LLP, New York, NY

Angela N. Ellis, SULLIVAN & CROMWELL LLP, Washington, DC

> Attorneys for Bolivarian Republic of Venezuela

Samuel Taylor Hirzel, II, Aaron M. Nelson, and Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE

Joseph D. Pizzurro, Julia B. Mosse, Kevin A. Meehan, and Juan O. Perla, CURTIS, MALLET-PROVOST, COLT & MOSLE LLP, New York, NY

        Attorneys for Petróleos de Venezuela, S.A.


Samuel Taylor Hirzel, II and Aaron M. Nelson, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE

Joseph D. Pizzurro, Julia B. Mosse, Kevin A. Meehan, and Juan O. Perla, CURTIS, MALLET-PROVOST, COLT & MOSLE LLP, New York, NY

        Attorneys for Corpoguanipa, S.A. and PDVSA Petróleo, S.A.

**OPINION**

March 2, 2022
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court are various motions brought by creditors who hold judgments against the Bolivarian Republic of Venezuela ("Venezuela" or the "Republic") or other entities of the Venezuelan government. Each judgment creditor seeks, through these actions, a writ of attachment *fieri facias* ("*fi. fa.*") for shares of PDV Holding, Inc. (the "PDVH Shares") held by the Republic's state-owned oil company, Petróleos de Venezuela, S.A. ("PDVSA").[1] Although the Republic and PDVSA are legally distinct entities, judgment creditors with judgments against the Republic have sought to collect on those judgments by attaching PDVSA's property in this District, under the theory that PDVSA is the Republic's alter ego.

Under certain executive orders and a sanctions regime implemented by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), the PDVH Shares are "blocked property," so transactions involving those shares are prohibited. Thus, each judgment creditor admits that any writ of attachment for the PDVH Shares should not be served until either OFAC grants it a specific license to obtain an interest in the PDVH Shares or the sanctions regime changes and the PDVH Shares are no longer blocked. One common legal question in all four of these cases is whether the OFAC sanctions should stop the Court from ordering the narrow relief requested by the judgment creditors in their pending motions. For the reasons explained below, the Court concludes that the OFAC sanctions do not prevent it from authorizing the eventual issuance of a writ attachment, conditioned on some form of approval by the Executive Branch.

---

[1] PDVSA wholly owns PDVH, which wholly owns CITGO Holding, Inc., which in turn wholly owns CITGO Petroleum Corp. ("CITGO"). In practical effect, then, the dispute over the PDVH Shares may be viewed as a dispute over ownership interests in CITGO.

1

## BACKGROUND

### I.    Parties And Cases

#### A.    OIEG

In 2011, OI European Group B.V. ("OIEG") commenced an arbitration against the Republic.  (Misc. No. 19-290 D.I. 49 at 2)   In 2015, the arbitral tribunal concluded that the Republic, under the regime of former President Hugo Chávez, had expropriated OIEG's interests in glass container factories.   (*Id.*)   The tribunal issued a decision in OIEG's favor and awarded OIEG over $370 million, plus costs, expenses, and interest.   (*Id.* at 2-3)   In 2019, the U.S. District Court for the District of Columbia confirmed the arbitral award and entered judgment for OIEG against the Republic.   (*See id.* at 3)   Later that year, OIEG registered its judgment with this Court.   (*Id.*)   By OIEG's calculation, the total amount of its award now stands at over $583 million.   (*Id.*)   OIEG seeks to collect on its judgment by attaching the PDVH Shares.   At this point in the process, OIEG specifically asks the Court to "enter an order authorizing the issuance of . . . a writ of attachment *fieri facias* . . . provided that such issuance and service of the writ shall be conditioned upon this Court's receipt of evidence that [OFAC] has (x) authorized such issuance and service, or (y) removed the prohibition and sanctions currently in place that prevent the issuance and service of such a writ."   (D.I. 48 at 1-2; D.I. 48-3; *see also* D.I. 102 at 2)[2]

---

[2] OIEG has occasionally framed its requested relief differently.   (*See* Misc. No. 19-290 D.I. 96 at 3) ("OIEG requests that this Court authorize the issuance of a writ, with service not to be made until and unless OFAC grants a license or lifts the current sanctions, or alternatively declare OIEG's right to issuance of a writ upon the grant of a license.")   Based on the language in OIEG's renewed motion for a writ of attachment (D.I. 48 at 1-2), the proposed order (D.I. 48-3), and OIEG's most recent articulation of the requested relief (D.I. 102 at 2), the Court understands that OIEG is not actually seeking issuance of the writ at this time.

### B.    Huntington Ingalls

Northrop Grumman Ship Systems, Inc., now known as Huntington Ingalls Inc.

("Huntington Ingalls"), commenced an arbitration against the Republic's Ministry of Defense

after the Republic failed to pay Huntington Ingalls for repairing two Venezuelan warships.   (*See*

Misc. No. 20-257 D.I. 26 at 1 & n.1)   In 2018, the arbitral tribunal sided with Huntington

Ingalls, awarding it over $128 million.   (*Id.* at 4)   Huntington Ingalls filed a motion in the U.S.

District Court for the Southern District of Mississippi seeking to recognize and enforce its

arbitral award, and that court granted the motion.   (*Id.*)   In July 2020, Huntington Ingalls

registered its judgment in this Court.   (*Id.* at 5)   Today, Huntington Ingalls' judgment is

apparently worth over $137 million.   (*See id.* at 4-5)   Like OIEG, Huntington Ingalls seeks to

collect on its judgment by attaching the PDVH Shares and obtaining a portion of the proceeds

from a forced judicial sale.   Given the sanctions regime, Huntington Ingalls seeks an order that

the Clerk of this Court may issue a writ of attachment for the PDVH Shares "upon evidence that

[OFAC] has either (i) authorized the issuance and service of such a writ or (ii) otherwise

removed or modified the relevant sanctions currently prohibiting the transfer of" the PDVH

Shares.   (D.I. 54-1 at 1-2) (emphasis omitted)

### C.    ACL

ACL1 Investments Ltd. ("ACL1"), ACL2 Investments Ltd. ("ACL2"), and LDO Cayman

XVIII Ltd. ("LDO") (collectively, "ACL") own bonds issued by the Republic.   (Misc. No. 21-46

D.I. 3 at 10)   Because the Republic stopped paying principal and interest on the bonds in

January 2018, the bonds' full principal became due in December 2018.   (*Id.*)   In September

2019, ACL1 and ACL2 sued the Republic in the U.S. District Court for the Southern District of

3

New York. (*Id.*) LDO eventually joined that case. (*Id.*) At the end of 2020, the Republic

stipulated to a judgment against it worth over $118 million. (*Id.*) ACL registered its judgment

in this Court but also agreed not to enforce that judgment until October 23, 2021. (*Id.*) Now

that the agreed-upon date has passed, ACL seeks to collect on its judgment by attaching the

PDVH Shares. ACL requests an order with the following language: "upon this Court's receipt

of evidence that [OFAC] has either authorized the issuance and service of such writ or removed

the prohibition and sanctions currently in place that prevent the issuance and service of such a

writ, the Clerk of this Court . . . shall issue that writ." (D.I. 31 at 1) The proposed order also

would provide that "the U.S. Marshals Service is authorized, upon receipt of the issued writ, to

serve" that writ on PDVH. (*Id.* at 2)

**D.    ConocoPhillips**

According to Phillips Petroleum Company Venezuela Limited and ConocoPhillips

Petrozuata B.V. (together, "ConocoPhillips"), the Republic and PDVSA "confiscated and

nationalized ConocoPhillips' interests in major projects in the Orinoco Oil Belt." (Misc. No.

19-342 D.I. 3 at 1) ConocoPhillips commenced an arbitration against the Republic, PDVSA,

and various subsidiaries of PDVSA. (*Id.*) The arbitral tribunal awarded ConocoPhillips nearly

$2 billion. (*Id.*) In August 2018, the arbitral award was confirmed in the U.S. District Court

for the Southern District of New York. (*Id.*) Notably, unlike the other judgment creditors,

ConocoPhillips holds a judgment directly against PDVSA, meaning that ConocoPhillips is not

required to show that PDVSA is the Republic's alter ego. (*See id.* at 2-3) The parties entered

into a settlement agreement, and PDVSA paid ConocoPhillips a portion of the judgment. (*Id.* at

1-2) PDVSA later breached its obligations under the settlement agreement, causing

4

ConocoPhillips to seek to enforce the judgment and collect the rest of its award, as the settlement agreement allows. (*Id.* at 2) Thus, ConocoPhillips seeks an order "authorizing the issuance of the *fi. fa.* writ, with subsequent delivery and service conditioned on OFAC authorization (or the lifting of sanctions)." (D.I. 37 at 5) Unlike the other judgment creditors, who suggest there should be conditions on both the issuance and service of their requested writs, ConocoPhillips seeks the immediate issuance of its writ with conditions only on service.

## II.    Sanctions Regime

### A.    Executive Orders

In March 2015, the President issued an executive order ("E.O.") declaring a national emergency under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, regarding the humanitarian crisis in Venezuela. *See generally* E.O. 13,692, 80 Fed. Reg. 12,747 (Mar. 8, 2015). For present purposes, two additional executive orders are especially relevant.[3] Under E.O. 13,850, 83 Fed. Reg. 55,243 (Nov. 1, 2018), certain Venezuelan property in the United States, and interests in that property, "are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." § 1(a). This prohibition does not apply "to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to" the executive order. *Id.* § 1(b). Similarly, under E.O. 13,884,

---

[3] The President has issued several other executive orders regarding the humanitarian crisis in Venezuela. *See generally* E.O. 13,808 § 1(b), 82 Fed. Reg. 41,155 (Aug. 24, 2017) (prohibiting "[t]he purchase, directly or indirectly, by a United States person or within the United States, of securities from the Government of Venezuela"); E.O. 13,835 § 1(a)(iii), 83 Fed. Reg. 24,001 (May 21, 2018) (prohibiting transactions related to "the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in which the Government of Venezuela has a 50 percent or greater ownership interest"); E.O. 13,857 § 1, 84 Fed. Reg. 509 (Jan. 25, 2019) (defining "Government of Venezuela" to include PDVSA).

84 Fed. Reg. 38,843 (Aug. 5, 2019), "[a]ll property and interests in the property of the
Government of Venezuela that are in the United States . . . are blocked and may not be
transferred, paid, exported, withdrawn, or otherwise dealt in." § 1(a). Like E.O. 13,850, the
restrictions in E.O. 13,884 do not apply if a statute, regulation, order, directive, or license states
otherwise. *Id.* § 1(c).[4]

### B.     OFAC Regulations

OFAC promulgated a regulation under which "[a]ll transactions prohibited pursuant to"
E.O. 13,692 or any other executive orders related to the national emergency involving Venezuela
"are prohibited." 31 C.F.R. § 591.201. A related regulation similarly prohibits "the
enforcement of any lien, judgment, arbitral award, decree, or other order through execution,
garnishment, or other judicial process purporting to transfer or otherwise alter or affect property
or interests in property blocked pursuant to § 591.201," unless OFAC has granted a specific
license for that conduct. *Id.* § 591.407; *see also id.* § 591.506(c) (similar).[5]

Additional regulations provide definitions for certain terms used in the prohibitions.
"Transfer" means "any actual or purported act or transaction" if the "purpose, intent, or effect" is

---

[4] The Court is releasing another Opinion today that contains additional discussion of the
relevant executive orders. *See generally Crystallex Int'l Corp. v. Bolivarian Republic of
Venezuela*, Misc. No. 17-151 D.I. 443 at 18-25 (D. Del. Mar. 2, 2022) (D.I. 443) ("*Crystallex
Sanctions Op.*").

[5] In Misc. No. 17-151, Crystallex was able to attach the PDVH Shares because
Venezuelan property in the United States had not yet been blocked when the Court granted relief
to Crystallex. The OFAC regulations outlined in this section of the Opinion were promulgated
after Crystallex obtained its writ of attachment and apply prospectively to any additional writs of
attachment that may issue.

to "create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property." *Id.* § 591.310. That definitional provision also states that "transfer" may include, among other things, "the issuance, docketing, or filing of, or levy of or under, any judgment, decree, attachment, injunction, execution, or other judicial or administrative process or order, or the service of any garnishment." *Id.* Moreover, "property" and "property interest" are broadly defined to include any "property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." *Id.* § 591.309.

Any transfers of blocked property that occur in violation of OFAC regulations will be deemed to have no legal effect. For example, one provision states: "[a]ny transfer . . . that is in violation of any provision of this part . . . and that involves any property or interest in property blocked pursuant to § 591.201, is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power, or privilege with respect to such property or property interest." *Id.* § 591.202(a). Another provision is specifically directed to judicial orders: "Unless licensed pursuant to this part, any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property and interests in property blocked pursuant to § 591.201." *Id.* § 591.202(e).[6]

### C.   FAQ 808

In December 2019, OFAC published guidance in the form of an answer to the following frequently asked question ("FAQ"):

---

[6] *See also generally Crystallex Sanctions Op.* at 21-38.

[Q.]   808.   Do I need a specific license from OFAC to file a suit in U.S. court against a person designated or blocked pursuant to Venezuela-related sanctions?   Does a U.S. court, or its personnel, need a specific license from OFAC to hear such a case?

[A.]   No.   A specific license from OFAC is not ordinarily required to initiate or continue U.S. legal proceedings against a person designated or blocked pursuant to OFAC's Venezuela sanctions program, or for a U.S. court, or its personnel, to hear such a case.   However, a specific license from OFAC is required for the entry into a settlement agreement or the enforcement of any lien, judgment, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interest in property blocked pursuant to the Venezuela Sanctions Regulations (31 C.F.R. Part 591).   This includes the purported creation or perfection of any legal or equitable interests (including contingent or inchoate interests) in blocked property.   While terminology may vary in different jurisdictions and proceedings, *a specific license from OFAC would be required for measures such as . . . [a]ttaching.*

(Misc. No. 19-290 D.I. 50-1 Ex. 25) (emphasis added) (citing 31 C.F.R. §§ 591.309, 591.310, 591.407, and 591.506)

## DISCUSSION

### I.    The Judgment Creditors Present Issues That Are Ripe For Adjudication

PDVSA argues that the issues in the judgment creditors' attachment motions are not ripe because those motions are contingent on possible future events, such as OFAC's issuance of a specific license.   Therefore, in PDVSA's view, the Court lacks jurisdiction.   (*See, e.g.*, Misc. No. 19-290 D.I. 65 at 30)   The Court concludes that the issues before it are ripe and that it has jurisdiction.

PDVSA does not account for all the factors affecting ripeness.   At a high level, the ripeness inquiry involves evaluating "the *fitness* of the issues for judicial decision and the

*hardship* to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S.

136, 149 (1967) (emphasis added), *abrogated on other grounds by Califano v. Sanders*, 430 U.S.

99 (1977).   More specifically, the "fitness" prong of this analysis considers multiple factors:

(1) "whether the issue is purely legal (as against factual)," (2) "the degree to which the

challenged action is final," (3) "whether the claim involves uncertain and contingent events that

may not occur as anticipated or at all," (4) "the extent to which further factual development

would aid decision," and (5) "whether the parties to the action are sufficiently adverse." *NE*

*Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 341 n.8 (3d Cir. 2001).   The

"hardship" prong "focuses on whether a plaintiff faces a direct and immediate dilemma, such that

lack of review will put it to costly choices." *Id.*[7]

In the instant cases addressed in this Opinion, the applicable factors demonstrate that the

issues before the Court are ripe for adjudication.   With respect to the "hardship" prong, the

judgment creditors are faced with a dilemma: if they wait for OFAC to provide additional

guidance on how far the attachment process can or should go under the current sanctions, OFAC

may decide not to provide any guidance at all, leaving the judgment creditors in legal limbo.

That position would be costly for the judgment creditors, who all hold substantial judgments

---

[7] In the context of declaratory judgments, the Third Circuit generally employs a "threefold rubric" to analyze ripeness.   *NE Hub Partners*, 239 F.3d at 342.   The considerations in that rubric are (1) "the adversity of the parties' interests," (2) "the probable conclusiveness of a judgment," and (3) "the practical utility to the parties of rendering a judgment." *Id.*; *see also Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990).   That rubric is just another way to organize the relevant factors.   *See NE Hub Partners*, 239 F.3d at 342 n.9. Regardless of how the factors are grouped, the ripeness inquiry is a flexible one.   *See id.*

9

against the Republic and/or PDVSA and would likely have to wait even longer (than they otherwise would have to wait) to collect the money owed to them.

The "fitness" prong also favors ripeness. The Court is focused on the application of the OFAC sanctions to a largely undisputed set of facts, leaving the Court to decide purely legal issues. (*See, e.g.*, Misc. No. 19-342 D.I. 37 at 1) ("[N]one of the facts are contested.") Further factual development would not aid the Court's decision on the OFAC issues. Moreover, PDVSA ignores that both sides are indisputably adverse to each other. To be sure, PDVSA is right that the judgment creditors ultimately seek relief that is contingent upon future conduct by a third party (i.e., the Executive Branch). (*See* Misc. No. 21-46 D.I. 22 at 33) But the adversity of the parties and their desired outcomes in this litigation are not contingent on anyone or anything else. The judgment creditors are asking this Court to provide relief *now* in the form of orders that will leave them better prepared to perfect interests in the PDVH Shares at the appropriate time. PDVSA opposes this relief and, more broadly, the Republic does not want to pay the judgments (unless, perhaps, there is a global resolution of all the Republic's debt).[8]

The cases cited by PDVSA are inapposite. PDVSA starts with the proposition that "'[a] dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (Misc. No. 21-46 D.I. 22 at 33) (quoting

---

[8] *See, e.g.*, Misc. No. 19-290 D.I. 65 at 25 (PDVSA referring to Guaidó administration's "plan to globally restructure Venezuela's and PDVSA's debts"); D.I. 50-1 Ex. 8 (describing Guaidó administration's policies regarding "the imminent renegotiation of foreign currency-denominated private claims against the Republic and the Venezuelan public sector"); *see also Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 147-48 (3d Cir. 2019) (noting that, in 2017, former President Maduro "decreed that Venezuela would restructure the external debt of both Venezuela and PDVSA").

*Sherwin-Williams Co. v. Cnty. of Del.*, 968 F.3d 264, 272 (3d Cir. 2020))  PDVSA's argument conflates whether a ***dispute*** is contingent with whether the requested ***relief*** involves some kind of contingency.   The disputes between the judgment creditors and the Republic and/or PDVSA exist regardless of what the Executive Branch does or does not do.   OFAC's grant of a specific license would not obviate the core disputes among these parties; a license would only allow the parties to proceed to the next step of resolving that dispute.

In another case on which PDVSA relies, *Republic of Panama v. Lexdale, Inc.*, 804 F. Supp. 1521, 1522 (S.D. Fla. 1992), Lexdale sued Air Panama for damaging an aircraft that Lexdale had leased to the airline, and Lexdale eventually obtained a default judgment.   In the meantime, and before Lexdale could attempt to enforce its judgment against Air Panama, the Executive Branch blocked Panamanian property in the United States.   *See id.*   The Republic of Panama brought suit against Lexdale, seeking a declaration that it was not responsible to pay the default judgment against Air Panama.   *See id.* at 1522-23.   The district court dismissed the Republic of Panama's action as unripe because it was unclear whether Lexdale would ever be able to seek to enforce the default judgment; it had not yet even threatened or commenced such an action.   *See id.* at 1523-24.   Here, by contrast, the judgment creditors do not merely hold judgments against Venezuela and/or PDVSA.   They have already commenced judgment enforcement actions in this Court.   (*See* Misc. No. 19-290 D.I. 102 at 6-7 ("OIEG is seeking to satisfy its judgment against specific property of Venezuela's alter ego – there is nothing speculative about its extant claims."); Misc. No. 21-46 D.I. 29 at 22 n.11)   Thus, the circumstances presented here are not as speculative as those in *Lexdale*.

Hence, the Court concludes that the judgment creditors' motions present issues that are

ripe for this Court's review, and this Court has jurisdiction.[9]

## II.    Nothing Prevents The Court From Authorizing The Eventual Issuance Of A Writ Of Attachment

Under the applicable executive orders, the PDVH Shares "are blocked and may not be

transferred, paid, exported, withdrawn, or otherwise dealt in."   E.O. 13,850 § 1(a); E.O. 13,884

§ 1(a).   By the executive orders' own terms, however, they do not apply "to the extent provided

by statutes, or in regulations, orders, directives, or *licenses* that may be issued."   E.O. 13,850

§ 1(b); E.O. 13,884 § 1(c) (emphasis added).   Here, all but one of the judgment creditors are

asking for an order authorizing the eventual issuance of a writ of attachment, conditioned on

either OFAC's grant of a specific license or material changes to the sanctions regime (the

"requested relief").[10]   The requested relief, therefore, has no impact on the PDVH Shares unless

and until the Executive Branch takes action.   If the sanctions regime remains in its current form

---

[9] PDVSA suggests that the Court may not have jurisdiction under Article III of the U.S. Constitution to reach the issue of OFAC sanctions.   (Misc. No. 19-290 D.I. 95 at 2 n.1; Misc. No. 20-257 D.I. 51 at 2 n.1)   PDVSA's Article III arguments are vague, but, for the reasons explained above, the Court concludes that the judgment creditors present live cases or controversies within the meaning of Article III.   It may also be that in the instant post-judgment posture, a live case or controversy is not required.   *See generally Peacock v. Thomas*, 516 U.S. 349, 356-57 (1996) (approving "exercise of ancillary jurisdiction" in some circumstances "to assist in the protection and enforcement of federal judgments").   The Court need not decide that issue.   Because the Court has jurisdiction under Article III, PDVSA agrees that the Court may consider the OFAC issues before turning to the alter ego analysis under the Foreign Sovereign Immunities Act.   (*See* Misc. No. 19-290 D.I. 95 at 2 n.1; Misc. No. 20-257 D.I. 51 at 2 n.1)

[10] To be precise, OIEG, Huntington Ingalls, and ACL are seeking the requested relief described here.   ConocoPhillips asks for slightly more relief: the immediate issuance of a writ of attachment.   In this section of the Opinion, the Court focuses on the relief requested by OIEG, Huntington Ingalls, and ACL.   The Court specifically addresses ConocoPhillips' request in the next section.

12

and OFAC denies the judgment creditors' license requests, PDVSA will retain full ownership of the PDVH Shares (subject to any preexisting liens), leaving the status quo in place. Accordingly, the judgment creditors' requested relief does not contravene the plain text of E.O. 13,850 and E.O. 13,884, which contain an exception for actions taken in accordance with OFAC licenses.

Turning to the OFAC regulations, PDVSA's argument against the requested relief starts with the premise that 31 C.F.R. § 591.407 broadly prohibits any "judicial process purporting to transfer or otherwise alter or affect property or interests in [blocked] property." (*See, e.g.*, Misc. No. 21-46 D.I. 22 at 30) In PDVSA's view, when that prohibition is combined with the broad definitions of "transfer" and "property" in §§ 591.309-10, the regulations effectively prohibit any proceedings involving the PDVH Shares from moving forward. (*See, e.g.*, Misc. No. 19-342 D.I. 33 at 12) ("OFAC regulations broadly prohibit any conceivable steps toward enforcing a judgment against blocked property . . . .") The Court disagrees with PDVSA's overly expansive interpretation of the regulations.

"Transfer" is defined as any "act or transaction" having the "purpose, intent, or effect" to "create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest" with respect to blocked property. 31 C.F.R. § 591.310. Under this definition, authorizing the ***eventual*** issuance of a writ of attachment does not involve any "transfer." Rather, only the actual, eventual encumbering of the PDVH Shares with a lien would "create, surrender, release, convey, transfer, or alter" any right or interest in those shares. (*See, e.g.*, Misc. No. 19-342 D.I. 35 at 3) (citing *Nat'l Oil Corp. v. Libyan Sun Oil Co.*, 733 F. Supp. 800, 809-12 (D. Del. 1990)) This interpretation is consistent with the statutory provisions

13

regarding what the President may control.   *See* 50 U.S.C. § 1702(a)(1)(B) (granting President

certain powers with respect to "property in which any foreign country or a national thereof has

any interest"); *see also Nat'l Oil*, 733 F. Supp. at 812 ("[T]he Court concludes that in this case

the President does not have the power to prohibit the mere entry of judgment by this Court.").   If

the Court grants the requested relief, no attachment will become effective and no lien will be

created ***unless and until*** OFAC grants a specific license or the sanctions regime materially

changes.   Thus, the requested relief does not come within the definition of "transfer," as it does

not have the prohibited "purpose, intent, or effect."   It would not affect rights in blocked

property until that property is no longer blocked.

    The regulations need not, and should not, be read to sweep as broadly as PDVSA

contends.   Instead, in the Court's view, the sanctions regime bars "the creation . . . of any lien"

and the other acts called out in § 591.310 that have the imminent or actual "purpose, intent, or

effect" of altering blocked property rights without an OFAC license.   The requested relief does

not do so.   Notably, the judgment creditors admit that the requested relief will not establish

priority in the PDVH Shares.   (*E.g.*, Misc. No. 19-290 D.I. 92 (Apr. 30, 2021 Tr.) at 170; D.I.

102 at 4 n.6; *see also* Misc. No. 19-342 D.I. 41 (June 9, 2021 Tr.) at 52, 54-55 (ConocoPhillips

conceding that even issuance of writ of attachment does not establish priority))   The lack of any

priority benefit underscores that the requested relief does not amount to a prohibited transfer or

otherwise alter rights in the PDVH Shares.[11]

––––––––––––––––––––––

[11] Nonetheless, as ConocoPhillips explains, the relief sought by the judgment creditors "has genuine utility because with it, [each judgment creditor] will be in a position to perfect a judgment lien against the shares of PDVH once authorized by OFAC or when sanctions are

Another regulation defines "interests" to include interests "of any nature whatsoever, direct or indirect." 31 C.F.R. § 591.305. Relatedly, 31 C.F.R. § 591.309 defines "property" to include "future[] or contingent" property interests. Based on these provisions, PDVSA contends that authorizing the eventual issuance of a writ of attachment would establish a prohibited contingent interest in blocked property. (*See, e.g.*, Misc. No. 21-46 D.I. 22 at 31-32) The Court disagrees. In the Court's view, the definitions of "interests" and "property" are intended to encompass rights that could mature into present property interests ***without*** a specific license from OFAC. One example of such an interest is a contingent reversionary interest in funds that would go to a foreign government unless a contracting party demonstrates tender of goods. *See, e.g.*, *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 702 (D.C. Cir. 1994) (applying Iraqi sanctions to letters of credit). Contrary to PDVSA's argument, therefore, the Court's interpretation of the sanctions regime does not render superfluous the portions of the definitions emphasized by PDVSA. Rather, those portions of the definitions encompass certain transactions that might otherwise evade OFAC's scrutiny. Authorizing the eventual issuance of a writ of attachment contingent on an OFAC license or material modification of the sanctions does not establish a "contingent" property interest prohibited by the regulations.[12]

---

lifted, without the need for further proceedings before the Court." (Misc. No. 19-342 D.I. 37 at 2) (emphasis omitted)

[12] Framed differently, the Court agrees with ACL that the judgment creditors are seeking "'merely an expectancy and not a property right.'" (Misc. No. 21-46 D.I. 3 at 18) (quoting *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d 457, 468 (1st Cir. 2020)) The judgment creditors have no control over whether the Executive Branch will permit them to obtain any stake in the PDVH Shares. *See, e.g.*, *In re Majestic Star Casino, LLC*, 716 F.3d 736, 756-57 (3d Cir. 2013) (explaining that company's status as "S" corporation is not property interest because that status may be revoked "at will").

15

Under the sanctions regime, an action that is conditioned on OFAC's approval does not amount to a "contingent" property interest.   In the *Crystallex* case, PDVSA points to an enforcement action in which OFAC arguably took the opposite view.   (*See* Misc. No. 17-151 D.I. 419 at 4)   In that enforcement action, OFAC concluded that Aero Sky violated the Iranian sanctions regime when it entered into a memorandum of understanding with Mahan Air, an Iranian commercial airline company, even though the agreement was "contingent, in part, upon Mahan Air being removed" from OFAC's list of specially designated nationals and blocked persons.   (D.I. 420-1)   Based on the Court's reading of the Venezuelan sanctions, as explained above, the Court will not defer to OFAC's interpretation of different sanctions in an unrelated case, particularly when the accused violator in that case never had a chance to defend itself before the agency.   *See generally Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (holding that "a court should not afford . . . deference unless the regulation is genuinely ambiguous").

Following PDVSA's arguments to their full extent would lead to illogical consequences. For example, if PDVSA's interpretation of the sanctions were correct, then the Court's issuance of the instant Opinion could arguably be considered an action that alters rights in the PDVH Shares (because it is a necessary step toward the judgment creditors collecting on their judgments), even without the Court entering any corresponding order.   Yet OFAC has never expressed a belief that its regulations prevent this Court from proceeding in these cases as it deems fit.   Indeed, the United States has told this Court that it "can do whatever it wants." (Misc. No. 17-151 D.I. 226 at 105)   And for good reason: the Executive Branch's attempted restriction of this Court's ability to enforce its judgments would raise serious separation-of-powers concerns.   *See generally Peacock*, 516 U.S. at 356 (noting courts' "inherent power to

enforce [their] judgments"); *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 360 n.16

(11th Cir. 1984) ("Simply because Congress empowers the Executive to forbid certain transfers

of property and he [or she] acts thereon does not imply that the jurisdiction of the federal courts

is dependent upon the issuance of a license by the Treasury Department.").[13]

Even if authorizing the eventual issuance of a writ of attachment might somehow be

considered to violate the sanctions regime, OFAC may still validate that action by later granting

a specific license. *See* 31 C.F.R. § 591.202(c). This potentiality makes the Court far less

concerned than PDVSA that whatever the Court accomplishes now might later be considered

"null and void." (*E.g.*, Misc. No. 19-342 D.I. 33 at 14; Misc. No. 21-46 D.I. 22 at 32; *see also*

31 C.F.R. § 591.202(a), (e)) The PDVH Shares will not be transferred without a judgment

creditor obtaining a specific OFAC license or the sanctions regime changing. While the Court is

not eager to encourage further litigation about the validity of steps taken during this litigation,

the Court will not be deterred from fulfilling its judicial function at this time.

Finally, PDVSA relies on FAQ 808 as further support for its broad interpretation of the

OFAC regulations. That informal guidance document states that "a specific license from OFAC

is required for . . . the enforcement of any lien, judgment, or other order through execution,

garnishment, or other judicial process purporting to transfer or otherwise alter or affect property

---

[13] For similar reasons, the Court concludes that no OFAC license is required before it
may issue findings of fact regarding whether PDVSA is the Republic's alter ego. (*See, e.g.*,
Misc. No. 19-290 D.I. 102 at 2 n.3 ("An alter ego finding does not change ownership of the
property; it simply recognizes the true state of affairs.") (emphasis omitted); *see also* Misc. No.
20-257 D.I. 54 at 6-7) As explained below, the Court will not be making any alter ego findings
at this time in the *OIEG*, *Huntington Ingalls*, and *ACL* cases, but this is based on the Court's
exercise of its discretion – not due to any lack of jurisdiction or authority.

or interest in property blocked pursuant to the Venezuela Sanctions Regulations." (Misc. No.
19-290 D.I. 50-1 Ex. 25)   That language in FAQ 808 tracks the language of the regulations, so
the Court's analysis of the regulations applies with equal force to FAQ 808.   The FAQ goes on
to state that prohibited transfers may include the "purported creation or perfection of any legal or
equitable interests (including contingent or inchoate interests) in blocked property." (*Id.*)
Again, as already explained, authorizing the eventual issuance of a writ of attachment does not
create or perfect any interest in the PDVH Shares, which remain PDVSA's property unless and
until OFAC permits otherwise.   And while FAQ 808 indicates that a specific license would be
required to attach any blocked property, the requested relief stops short of any attachment. *See,*
*e.g.*, *Casa Express Corp. v. Bolivarian Republic of Venezuela*, 492 F. Supp. 3d 222, 228
(S.D.N.Y. 2020) (explaining that parties are not prohibited from taking "legal actions that stop
short of transferring control of property").   Accordingly, the Court concludes that FAQ 808 does
not meaningfully bolster PDVSA's interpretation of the OFAC sanctions or preclude this Court
from granting the proposed relief.[14]

In sum, the OFAC sanctions regime does not require a specific license before the Court
may enter an order authorizing the eventual issuance of a writ of attachment.[15]

---

[14] Given the Court's reading of FAQ 808, the Court need not conclusively determine
whether any deference is due to OFAC's statements in FAQ 808.   But if FAQ 808 were read to
be in tension with the Court's decision, the Court would likely conclude that no deference is due
to such informal guidance. *See Kisor*, 139 S. Ct. at 2415-17; *see also Crystallex Sanctions Op.*
at 25-28 (holding that OFAC's FAQ 809 does not warrant deference).

[15] PDVSA has moved to strike (Misc. No. 19-290 D.I. 99) the Declaration of John E.
Smith (D.I. 97), a former Director of OFAC, which OIEG attached to its opening post-hearing
brief (D.I. 96; *see also* D.I. 100, 102, 104, 105).   The Court will deny PDVSA's motion as moot,

### III.    The Court Will Not Immediately Issue A Writ Of Attachment

Unlike the other judgment creditors, ConocoPhillips asks not that the Court indicate it will eventually issue a writ of attachment, but, instead, to immediately issue a writ of attachment while delaying delivery and service of the writ until after OFAC grants a specific license or the sanctions regime materially changes.    (Misc. No. 19-342 D.I. 37 at 5)    The Court will not go as far as ConocoPhillips requests.

As a preliminary matter, PDVSA argues that ConocoPhillips was required to obtain an OFAC license before it could even register its judgment in this Court.    (*See* D.I. 11 at 13-14; D.I. 33 at 12-13)    The Court rejects that argument and will not vacate ConocoPhillips' registered judgment.    Separate and apart from any motion for a writ of attachment, ConocoPhillips' registration of its judgment in this Court is not connected to any specific blocked property, such as the PDVH Shares.    Because registering a judgment in this Court has no effect on any blocked property, the OFAC regulations are not implicated.    (*See* D.I. 13 at 5) ("[T]he entry of a money judgment is merely evidence of a debt and it does not alone have any property-law consequences.")    Indeed, FAQ 808 explicitly states that "[a] specific license from OFAC is not ordinarily required to initiate or continue U.S. legal proceedings against a person designated or blocked pursuant to OFAC's Venezuela sanctions program, or for a U.S. court, or its personnel, to hear such a case."    (Misc. No. 19-290 D.I. 50-1 Ex. 25)    Although this case is a judgment enforcement action, not an action to determine liability, the Court discerns no persuasive reason why the procedural posture would warrant a different outcome.    *See, e.g.*, *Koch Minerals Sàrl v.*

_____

as the Court has disregarded the declaration and not relied on it or any reference to it in OIEG's post-hearing briefs.

*Bolivarian Republic of Venezuela*, 514 F. Supp. 3d 20, 44 (D.D.C. 2020) (explaining that no OFAC license is required until judgment creditor "reach[es] into PdVSA's pockets").[16]

The Court now turns to ConocoPhillips' request that a writ of attachment should issue immediately. Its argument is based on the point at which a lien on attached property is created under Delaware law. The relevant statute provides: "An execution shall not bind goods and chattels until it is delivered to the sheriff or other proper officer to be executed. An execution shall, from the time it is so delivered, bind all the goods and chattels of the defendant within the bailiwick . . . ." 10 Del. C. § 5081. In some cases, Delaware courts have explained that a lien on attached property is not actually perfected upon delivery (as the statute might suggest) but upon levy by the sheriff. *See, e.g.*, *In re Stanley's Asphalt Paving, Inc.*, 353 B.R. 63, 65 (Del. Bankr. 2006). According to ConocoPhillips, because delivery is the earliest possible time that a lien could be perfected, "there can be no dispute that the mere issuance of a *fi. fa.* writ is incapable of affecting any interest in any property." (Misc. No. 19-342 D.I. 35 at 6) (emphasis omitted) Thus, the Court need not determine at precisely which point a lien is perfected under Delaware law.

No matter when a lien is created, the Court concludes that now is not the appropriate time to issue a writ of attachment. Notably, the other judgment creditors besides ConocoPhillips all believe that any writ of attachment should not issue unless and until the Executive Branch

---

[16] PDVSA's reliance (*see, e.g.*, Misc. No. 19-342 D.I. 33 at 12; D.I. 36 at 3-4) on *Dean Witter* is not persuasive. In that case, the Eleventh Circuit recognized that Cuban sanctions forbade "only those judicial acts that transfer a property interest." *Dean Witter*, 741 F.2d at 361-62. As this Court has explained, here no property interests have yet been transferred. To the extent *Dean Witter* might be read to suggest that sanctions are implicated as soon as liability has been established in a case involving a foreign entity, *Dean Witter* is not binding on this Court.

permits them to move forward.   (Misc. No. 21-46 D.I. 3 at 17 (ACL conceding that "OFAC

regulations presently bar the issuance and service of a writ of attachment"); Misc. No. 19-290

D.I. 102 at 2 (OIEG explaining that it "has carefully crafted its requested relief to expressly stop

short" of implicating sanctions regime, given that "issuance and service of the requested writ

would be conditioned on OFAC's approval") (emphasis omitted); Misc. No. 20-257 D.I. 54-1 at

1-2 (Huntington Ingalls proposing relief in form of order that places conditions on issuance and

service of writ); *see also Crystallex*, 2021 WL 129803, at *8 ("[T]he current sanctions regime

does appear to block issuance of new writs of attachment on Venezuelan assets in the United

States without an OFAC license . . . ."), *appeal dismissed*, 24 F.4th 242 (3d Cir. 2022))   For the

reasons explained above, in the Court's view, issuing a writ of attachment does not necessarily

have the actual or imminent "purpose, intent, or effect" of altering rights in blocked property,

because no lien would be created until the writ is at least delivered (and perhaps not until it is

served).   So the Court does not lack the authority to grant ConocoPhillips' proposed relief.

Nevertheless, given the small difference between (i) authorizing the eventual issuance of a writ

dependent on OFAC approval and (ii) issuing the writ now with delivery and service dependent

on OFAC approval, the Court concludes that the more prudent approach is to delay issuance of

any writ of attachment until OFAC grants a specific license or the sanctions regime materially

changes.

      From the perspective of judicial administration, it makes sense that ConocoPhillips and

the other judgment creditors will all have access to the same form of relief at the same point in

their judgment enforcement efforts.   The Court recognizes that because ConocoPhillips holds a

judgment directly against PDVSA, if OFAC grants a specific license or the sanctions regime

materially changes, ConocoPhillips will almost certainly be in a better position than the other

judgment creditors to establish its priority in the PDVH Shares by perfecting a lien.   Unlike the

other judgment creditors, ConocoPhillips will not need to demonstrate that PDVSA is the

Republic's alter ego.   Thus, the Court's approach regarding the relief to be awarded at this time

will not prejudice ConocoPhillips, which remains at an advantage over the other judgment

creditors.[17]

Accordingly, the Court will not issue a writ of attachment in ConocoPhillips' case at this

time.   But because no other obstacles prevent the Court from granting ConocoPhillips some

relief (as explained further below), the Court will enter an order authorizing the eventual

issuance of a writ of attachment in ConocoPhillips' case, conditioned on receipt of evidence that

ConocoPhillips has obtained a specific license from OFAC or that the sanctions regime has

materially changed.

**IV.    A Reasonable Amount Of Time Has Passed Since The Judgments Were Entered**

Each of Huntington Ingalls, ACL, and ConocoPhillips seeks an order that a reasonable

period of time has elapsed following entry of judgment in its favor.   (*See generally* Misc. No.

19-342 D.I. 3 at 7-9; Misc. No. 20-257 D.I. 4 at 9-11; Misc. No. 21-46 D.I. 3 at 18-19)[18]

---

[17] To the extent ConocoPhillips is further requesting that "the Court . . . formally add
ConocoPhillips' judgment to the sale process in *Crystallex*" (Misc. No. 19-342 D.I. 35 at 7), that
request is denied.   The Court has not been persuaded that ConocoPhillips' judgment should be
added to the sale process in *Crystallex* unless ConocoPhillips establishes a concrete interest in
the PDVH Shares, which cannot occur until ConocoPhillips obtains a specific license from
OFAC or the sanctions regime materially changes.

[18] The U.S. District Court for the District of Columbia already determined that a
reasonable period of time has elapsed since entry of OIEG's judgment.   (*See* Misc. No. 19-290

Because a reasonable period of time has elapsed since the entry of each judgment, the Court will enter an order to that effect.

Under the Foreign Sovereign Immunities Act, attachment of foreign property in the United States cannot occur until a court has "determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required." 28 U.S.C. § 1610(c). There is no precise definition or formula for determining whether a period of time is "reasonable." To make this determination, other courts have looked at several factors, including "the procedures necessary for the foreign state to pay the judgment (such as the passage of legislation), evidence that the foreign state is actively taking steps to pay the judgment, and evidence that the foreign state is attempting to evade payment of the judgment." *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001).

In this case, at least 14 months have passed since entry of each judgment. Huntington Ingalls' judgment was entered over a year and a half ago, in June 2020. (Misc. No. 20-257 D.I. 1) ACL and the Republic stipulated to entry of ACL's judgment 14 months ago, in December 2020. (Misc. No. 21-46 D.I. 4-1 Ex. 37) ConocoPhillips' judgment was entered three and a half years ago, in August 2018. (*See* Misc. No. 19-342 D.I. 4-3) The Republic and PDVSA have had ample time since the entry of these judgments to pay them, but they have not done so. Rather, they have staunchly opposed the judgment creditors' collection efforts at every turn.

---

D.I. 49 at 22; *see also* D.I. 4-4) In OIEG's case, more than five months passed between entry of judgment and the D.C. District Court's finding that a reasonable period had elapsed. (D.I. 50-1 Ex. 3 at 4) Because this Court need not make another such determination with respect to OIEG's judgment, OIEG has not asked for one.

Under the circumstances presented here, the Court concludes that the periods of time that have elapsed are more than reasonable.[19]

The Court's conclusion is further supported by similar decisions from other district courts, which have held that even shorter periods of time are reasonable.  *See, e.g.*, *Pharo Gaia Fund Ltd. v. Bolivarian Republic of Venezuela*, 2021 WL 2168916, at *1 (S.D.N.Y. May 27, 2021) (seven months); *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 419 F. Supp. 3d 51, 54 (D.D.C. 2019) (five months); *Saint Gobain Performance Plastics Eur. v. Bolivarian Republic of Venezuela*, 2021 WL 6644369, at *2 (D.D.C. July 13, 2021) (four months); *see also Ned Chartering*, 130 F. Supp. 2d at 67 (D.D.C. 2001) (six weeks); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 2002 WL 32107929, at *2 (S.D. Tex. Jan. 25, 2002) (fifty days).

PDVSA argues that a reasonable amount of time has not elapsed because the Republic has been unable to pay the judgment creditors due to the OFAC sanctions.  (Misc. No. 19-342 D.I. 11 at 15; Misc. No. 20-257 D.I. 32 at 34; Misc. No. 21-46 D.I. 22 at 35)   That position is unpersuasive.   OFAC granted ConocoPhillips a license to collect payments from the Republic pursuant to a settlement agreement.  (Misc. No. 19-342 D.I. 13 at 2)   If the Republic were serious about immediately paying off its outstanding debts, it could and would have paid ConocoPhillips pursuant to its agreement.   It did not do so, and it has made no discernable efforts to pay any of the other judgment creditors whose judgments are the subject of this

---

[19] For ACL, whose judgment was entered most recently, "[t]he period of time is particularly reasonable . . . because it was agreed upon by Venezuela itself" when ACL and the Republic stipulated that ACL would not seek to enforce the judgment until October 2021. (Misc. No. 21-46 D.I. 3 at 19)

24

Opinion, which persuades the Court that Venezuela does not intend (at least at this time) to pay the judgments.

Regardless, the statute requires only that a reasonable amount of time has elapsed – which it has. The impact of the regulations, whatever it may have been, does not alter the plain language of the statute. *See Saint Gobain*, 2021 WL 6644369, at *3 ("[Plaintiff's] failure to obtain a proper OFAC license is . . . irrelevant to this Court's decision under § 1610(c)."); *see also id.* at *2 ("[T]he political reality in Venezuela is a factor generally outside the considerations a court should analyze when determining whether a reasonable time has elapsed since entry of judgment under § 1610(c)."); *see also Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, 2020 WL 209290, at *3 (S.D.N.Y. Jan. 14, 2020) (denying stay request).

In sum, the Court concludes that reasonable periods of time have passed since Huntington Ingalls', ACL's, and ConocoPhillips' judgments were entered.

## V.    The Court Is Inclined To Certify Interlocutory Appeals

As noted above, today the Court is also releasing the *Crystallex Sanctions Op.*, which involves similar, yet distinct issues about the OFAC sanctions regime. In that case, Crystallex successfully attached the PDVH Shares before they became blocked. The parties in *Crystallex* dispute how far the Court may proceed toward a judicial sale of the PDVH Shares while the current OFAC sanctions remain in place. As the Court reads the OFAC sanctions, the Court may take prefatory steps toward a sale of the PDVH Shares, including: (i) entering a Sale Procedures Order, (ii) working with a Special Master to implement that order, and (iii) selecting a winning bidder. The Court will not, however, permit the sale to close, which would result in

transferring legal title to the PDVH Shares.   The Court's approach in *Crystallex* is consistent

with its approach here of taking steps that fall short of issuing a writ of attachment.

The OFAC sanctions have played a prominent role in *Crystallex* and all the other cases

involving judgments against the Republic and/or PDVSA.   The Court has spent a great deal of

time over the past year analyzing the sanctions regime, which is complicated and presents many

challenging issues for these related litigations.   The Court is confident it has reached the best

decisions it possibly can, but also recognizes there is substantial ground for difference of opinion

on how the sanctions apply to these cases.   If a reviewing court were to adopt an interpretation

of the OFAC sanctions that differs from the Court's interpretation, that controlling legal

development might effectively halt all proceedings before this Court in *Crystallex* and/or these

other judgment enforcement actions.   Given that possibility, immediate appeals from the Court's

orders may materially and efficiently advance this litigation by conclusively resolving how far

this Court may proceed under the current OFAC sanctions regime.   Therefore, it may be

appropriate for the Court to certify interlocutory appeals in these cases (and in *Crystallex*) so that

the Third Circuit may consider all the cross-cutting OFAC issues at the same time, before the

Court undertakes the implementation of sale procedures.   *See generally* 28 U.S.C. § 1292(b).

Thus, the Court will direct the parties in *Crystallex* and the cases that are the subject of this

Opinion to provide their positions on potential interlocutory appeals.

## VI.    The Court Is Not Making Any Alter Ego Factual Findings At This Point

In April 2021, the Court presided over an extensive (remote) evidentiary proceeding in

the *OIEG* and *Huntington Ingalls* cases.   At these hearings, those judgment creditors attempted

to prove, by a preponderance of the evidence, that PDVSA was the Republic's alter ego as of that

time. (*See* Misc. No. 19-290 D.I. 49 at 23-33; Misc. No. 20-257 D.I. 26 at 9-19; *see also* Misc.

No. 21-46 D.I. 3 at 10-15)[20]  The Court previously held that the relevant time at issue in

connection with the alter ego determination is "the period between the filing of the motion

seeking a writ of attachment and the subsequent issuance and service of that writ." *Crystallex*,

2021 WL 129803, at \*6.  If the Court certifies interlocutory appeals in *Crystallex* and these

cases, a significant additional amount of time will likely pass before proceedings will continue in

the instant actions in this Court.  Even though OIEG and Huntington Ingalls already had a

chance in April 2021 to offer evidence regarding PDVSA's status as the Republic's alter ego at

that time, another evidentiary hearing may be necessary for the Court to consider any further

developments before the end of the relevant time period.  Hence, the Court is inclined to deny

OIEG's, Huntington Ingalls', and ACL's pending attachment motions, PDVSA's pending motions

to dismiss, and any other pending motions without prejudice, allowing any motions to be refiled

once the Court has the benefit of any decisions issued as a result of the interlocutory appeals (if

they occur).  In the forthcoming status report, the parties should provide their views on this

approach.

---

[20] The Court is declining to make findings of fact, notwithstanding certain of the
judgment creditors' efforts to make a record on which such findings could be based, because it
has concluded that it should first issue its legal conclusions about the impact of the sanctions and
determine whether to certify an interlocutory appeal of those conclusions.  The Court's decision
to refrain, at this time, from making findings of fact is *not* due to its agreement with PDVSA that
OFAC sanctions prohibit the Court from issuing findings of fact that may support issuance and
service of a writ or that such findings would violate Article III doctrines.  (*See* Misc. No. 20-257
D.I. 51 at 7-13)  The Court does *not* agree with PDVSA on these points.

## CONCLUSION

For the foregoing reasons, the Court has jurisdiction over the judgment creditors'

motions.   Further, the Court has concluded that no executive order, regulation, or guidance

document that has been cited prevents the Court from authorizing the eventual issuance of a writ

of attachment contingent on grant of an OFAC license or material modification of the sanctions

regime.   The Court has also determined that reasonable amounts of time have passed since

Huntington Ingalls', ACL's, and ConocoPhillips' judgments were entered.   Accordingly, the

Court will grant in part ConocoPhillips' motion for a writ of attachment.   An appropriate order

follows.